UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| CATCH 26, LLC, an Illinois Limited Liability Company, GAS CAP FUELS, LLC, an Illinois Limited Liability Company, and GRAYSLAKE STOP & SHOP, LLC, an Illinois Limited Liability Company, <br><br> Plaintiffs, <br><br> v. <br><br> LGP REALTY HOLDINGS, LP, a Delaware Limited Partnership, as successor by assignment from PT, LLC, BAPA, LLC and STATE OIL COMPANY and LEHIGH GAS WHOLESALE, LLC, a Delaware Limited Liability Company, <br><br> Defendants. | Case No. 17-cv-6135 <br><br> Judge Sharon Johnson Coleman |

**MEMORANDUM OPINION AND ORDER**

The plaintiffs' motion for a preliminary injunction and expedited discovery [2] is granted in part and denied in part. A preliminary injunction is issued with respect to the Ingleside location, but denied with respect to the Grayslake and Woodstock locations. The terms of the injunction are set forth in a separate order.

**Background**

The following are the general facts of this case, as established by the evidence and testimony presently before this Court. Plaintiff Grayslake Stop & Shop LLC has operated a gas station and convenience store in Grayslake, Illinois since 2003 ("the Grayslake location"). Plaintiff Gas Cap Fuels, LLC has operated a gas station and convenience store in Ingleside, Illinois since 2013 ("the Ingleside location"). Plaintiff Catch 26, LLC has operated a gas station and convenience store in Woodstock, Illinois since 2014 ("the Woodstock location"). Defendant LGP Realty Holdings, LP leases the Woodstock and Grayslake locations to the plaintiffs and is the title holder to the Ingleside

1

location, which is being purchased through an installment agreement. At the times relevant to this suit, the Woodstock and Grayslake locations sold unbranded fuel and the Ingleside location sold Marathon branded fuel, all of which was exclusively supplied by Lehigh Gas Wholesale, LP pursuant to supply agreements executed with each location.

On July 5, 2017, the Woodstock location had an open balance of $6,564.80 for rent, real estate taxes, and repair charges. It is disputed whether the repair charges were properly included in that balance. On July 5, 2017, the Woodstock location's pre-authorized account was debited for that balance, but there were insufficient funds to satisfy the draft and it was returned. As a result, Lehigh Gas Wholesale, LP placed the Woodstock location on a delivery hold. While the hold was in effect, the Woodstock location purchased fuel from another supplier. At the time of the default, LGP owed a credit of approximately $16,405.29 to the plaintiffs for excess escrow payments.

On August 4, 2017, the Grayslake location had an open balance for motor fuel receivables totaling $40,562.44. The location's pre-authorized account was debited for the amount of $33,736.24, but there were insufficient funds and the draft bounced. Accordingly, the Grayslake location was placed on a delivery hold on August 8, 2017. While the hold was in effect, the Grayslake location purchased fuel from another supplier. At the time of the default, LGP owed a credit of approximately $11,384.72 to the plaintiffs for excess escrow payments.

On August 5, 2017, the Ingleside location had an open balance of $17,208.90, which included real estate taxes, a monthly installment payment, and a new POS system required by Marathon. The Ingleside location's pre-authorized account was debited for the then-outstanding balance, but the transaction was rejected due to a dispute over the cost of the POS system (which the parties seem to agree was a valid dispute). On August 10, 2017, the Ingleside location was placed on a delivery hold. While that hold was in effect, the Ingleside location purchased fuel from

another supplier. At the time of the default, LGP owed a credit of approximately $12,441.58 to the plaintiffs for excess escrow payments.

Although the plaintiff gas stations were placed on hold, the defendants continued to make EFT transfers out of their bank accounts. The plaintiffs accordingly directed their banks to no longer permit such transfers. On August 14, 2017, the plaintiffs were provided with a written notice that the defendants were terminating the Ingleside, Woodstock, and Grayslake Supply Agreements, the Woodstock and Grayslake Leases, and the Ingleside Installment Agreement, effective August 25, 2017. The plaintiffs subsequently filed this action, and moved this Court for injunctive relief under the Petroleum Marketing Practices Act (PMPA). The Court ordered that the parties maintain the status quo while the pending motion was briefed, argued, and taken under advisement.

Just prior to the preliminary injunction hearing, the defendants filed a motion to dismiss. Because that motion questions the applicability of the PMPA in this action, this Court provided the parties with the opportunity to file supplemental briefing on that issue prior to ruling on the plaintiffs' motion for a preliminary injunction under the PMPA.

**Legal Standard**

The PMPA provides that a court must grant a preliminary injunction upon a showing that the franchise has been terminated or not renewed, there is a sufficiently serious question going to the merits as to make the question a fair ground for litigation, and the balance of hardships favors granted the injunction. 15 U.S.C. § 2805(b)(2). Accordingly, a franchisee need only establish a reasonable chance of success on the merits, not a "strong or reasonable likelihood" of success. *Moody v. Amoco Oil Co.,* 734 F.2d 1200, 1216 (7th Cir. 1984).

**Discussion**

The defendants contend, in their motion to dismiss, that the PMPA does not apply to the Grayslake and Woodstock locations. Because the plaintiffs are seeking statutory relief under the

PMPA, this Court must address the threshold issue of whether the PMPA applies before it can proceed to consider the relevant factors under section 2805.

Broadly speaking, the PMPA protects the interests of franchisees by regulating when and how gas station franchises can be terminated. Under section 2801(1)(A) of the PMPA, the term franchise is defined as:

> any contract—
> (1) between a refiner and a distributor,
> (ii) between a refiner and a retailer,
> (iii) between a distributor and another distributor, or
> (iv) between a distributor and a retailer,
> under which a refiner or distributor (as the case may be) *authorizes or permits a retailer or distributor to use*, in connection with the sale, consignment, or distribution of motor fuel, *a trademark which is owned or controlled by such refiner or by a refiner which supplies motor fuel to the distributor which authorizes or permits such use.*

15 U.S.C. § 2801(1)(A) (emphasis added). That definition further states that the term "franchise" includes:

> (i) any contract under which a retailer or distributor (as the case may be) is authorized or permitted to occupy leased marketing premises, which premises are to be employed in connection with the sale, consignment, or distribution of motor fuel *under a trademark* which is owned or controlled by such refiner or by a refiner which supplies motor fuel to the distributor which authorizes or permits such occupancy;
>
> (ii) any contract pertaining to the supply of motor fuel which is to be sold, consigned or distributed—
>   (I) *under a trademark owned or controlled by a refiner*; or
>   (II) under a contract which has existed continuously since May 15, 1973, and pursuant to which, on May 15, 1973, motor fuel was sold, consigned or distributed under a trademark owned or controlled on such date by a refiner; and
>
> (iii) the unexpired portion of any franchise, as defined by the preceding provisions of this paragraph, which is transferred or assigned as authorized by the provisions of such franchise or by any applicable provision of State law which permits such transfer or assignment without regard to any provision of the franchise.

15 U.S.C. § 2801(1)( B) (emphasis added).

4

Here, it is undisputed that the Ingleside location sold fuel under the Marathon trademark and therefore constituted a franchise pursuant to the PMPA. It is similarly undisputed that the Grayslake and Woodstock locations are unbranded gas stations that do not sell fuel under a refiner's trademark. Accordingly, those locations do not constitute franchises within the meaning of the PMPA. *PDV Midwest Refining, L.L.C. v. Armada Oil and Gas Co.*, 305 F.3d 498, 505 (6th Cir. 2002) (observing that a letter concerning unbranded gasoline did not reference the PMPA because "unbranded contracts are not subject to the requirements of the PMPA."); *Unified Dealer Grp. v. Tosco Corp.*, 16 F. Supp. 2d 1137, 1140 (N.D. Cal. 1998) (noting that a contract to sell unbranded motor fuel is not subject to the PMPA because a trademark is an essential element of a PMPA franchise."), *aff'd* 216 F.3d 1085 (9th Cir. 2000).

This conclusion is supported by the lease agreements for the Grayslake and Woodside properties, both of which expressly provide that:

> This lease is not a Franchise within the meaning of federal or state legislation. Landlord is not selling a way of doing business, and is not selling the right to use a trademark. Nothing contained in this Lease shall be deemed or construed by the parties hereto or by a third party to create the relationship of principal and agent or of partnership or of joint venture or of any association whatsoever between Landlord and Tenant, it being expressly understood and agreed that neither the method of computation of rent nor any other provisions contained in this Lease nor any act or acts of the parties hereto, shall be deemed to create any relationship between Landlord and Tenant other than the relationship of Landlord and Tenant.

The Supply Agreements at the Woodstock and Grayslake locations, similarly, confer no right to use a trademark on the plaintiffs; although they do contain provisions contemplating the possibility that branded fuel might later be sold. Those provisions, however, do not confer any actual trademark rights and therefore are incapable of satisfying the PMPA's definition of "franchise." *See* 15 U.S.C. § 2801(1).

The plaintiffs alternatively contend that the defendants are bound by their past admission that the PMPA applies to the Grayslake and Woodstock locations. Indeed, the defendants' actions before and during this case, up until the newly filed motion to dismiss, have reflected their understanding that the PMPA applies to all three locations. The Woodstock and Grayslake gas stations' supply agreements state that "[t]he parties specifically acknowledge and agree that the franchise relationship (as defined in the Petroleum Marketing Practices Act, 15 USC §2801 et seq.) created by this Agreement between the Retailer and the Supplier is necessarily contingent upon the Retailer's ability to maintain possession of the Premises." It is apparent that the parties intended for their agreement to be subject to the PMPA. The question of what the parties intended to contract for, however, is distinct from the question of whether a given law applies to that contract. This Court is not aware of, and the plaintiffs have not offered, any legal authority which would permit this Court to apply the PMPA based solely on the parties' belief that it applies. To the contrary, this Court must find that the parties' relationship satisfies the expressly codified requirements of the PMPA before it can contemplate granting any relief under that statute.

Finally, the plaintiffs contend that the cross-default provision renders all three gas stations subject to the PMPA because the Ingleside location is subject to the PMPA. The cross-default provision at issue provides that any default under any agreement between the supplier and retailer related to other locations owned or otherwise controlled by the retailer would constitute a default under the supply agreement. The sole case that the plaintiffs offer to support their theory that the cross-default provision renders all three gas stations subject to the PMPA, however, does not actually involve a cross-default provision. Instead, it involves an explicit contractual term providing that the termination of a premises lease and motor fuel franchise agreement would automatically terminate a separate mini-market franchise agreement. *See Atlantic Richfield Co. v. Brown*, 85 C. 5131, 1985 U.S. Dist. Lexis 14720 at *20 (N.D. Ill. Oct. 21, 1985) (Kocoras, J.) (holding that "where

6

termination of the premises lease automatically triggers termination of [a] mini-market agreement, the lease, motor fuel franchise agreement, and mini-market are so inextricably linked that the PMPA will govern termination of the mini-market agreement as well"). This Court, moreover, notes that the cross-default provision does not appear to apply to the Grayslake location because the contracting "retailer" in the Grayslake Supply Agreement was Grayslake Stop & Shop LLC and not, as in the other two supply agreements, Catch 26, LLC.

This Court accordingly holds that the PMPA does not apply to the Grayslake and Woodstock locations and that the plaintiffs therefore are not entitled to the issuance of a preliminary injunction under the PMPA at those locations.[1]

This Court next addresses the question of whether a preliminary injunction should issue with respect to the Ingleside location. In pertinent part, the PMPA requires the issuance of a preliminary injunction upon a showing that (1) the franchise has been terminated, (2) there exist sufficiently serious questions going to the merits to make such questions a fair ground for litigation, and (3) that the balance of the hardships favors granted relief. 15 U.S.C. § 2805(b)(2). Accordingly, a franchisee need only establish a reasonable chance of success on the merits, not a "strong or reasonable likelihood" of success as is ordinarily required for injunctive relief. *Moody v. Amoco Oil Co.,* 734 F.2d 1200, 1216 (7th Cir. 1984).

In support of termination, the defendants' August 14th notice of termination asserts that plaintiffs (1) failed to pay sums due in a timely manner at the Grayslake and Ingleside locations, (2) willfully adulterated, mislabeled, or misbranded fuel at the Grayslake and Woodstock locations, and (3) unilaterally changed the EFT information at the Grayslake and Woodstock locations.

---

[1] Although this Court holds that the PMPA does not confer it with power to issue injunctive relief under that statute, its ruling does not address the possibility that the parties' relationship was governed by the joint belief or understanding that the PMPA applied.

Thus, the only reason offered for termination as to the Ingleside location was the failure to timely pay sums due.[2] The evidence presented, however, calls into question whether the plaintiffs failed to timely pay sums due. It is undisputed that on August 5, 2017, Catch 26 was debited for its open balance of $17,208.90. The plaintiffs' evidence, however, establishes that $11,051.70 of that amount was disputed. The disputed amount stemmed from a POS system which the plaintiff was not expecting to have charged at that time, which had not yet been installed, which was charged at a cost well-in-excess of the previously-agreed-to price, and which was not identified on the notice of the EFT. Plaintiffs' evidence establishes that the EFT was denied due to that disputed charge, and that the plaintiff was unaware of any mechanism to pay only the undisputed charges. Additionally, at the time of the denied EFT plaintiff was owed a credit of approximately $12,000 in excess escrow payments with respect to the Ingleside location, which the plaintiffs contend should have been credited to the undisputed portion of the denied EFT.

A substantive dispute also exists as to whether the defendants were required to give the Ingleside location notice and an opportunity to cure. The Ingleside supply agreement expressly provides that "[i]n the event of a breach by Retailer of any of its material covenants or obligations contained herein, not cured within five (5) days after notice, or default by Purchaser under the terms of the Installment Contract, the parties agree that the Supplier, in addition to any other remedy available to it at law or equity, shall be entitled to terminate the Agreement." Here, however, the plaintiffs contend that they never received notice or an opportunity to cure prior to the defendants' termination of their franchise.

The defendants have similarly failed to establish that they provided adequate notice of the termination. Although the PMPA generally requires that notice of termination be delivered at least

---

[2] Defendants now contend that termination is justified based on the plaintiffs misbranding of fuel at the Ingleside location. The notice of termination, however, does not set this forth as a basis for termination. The question of whether or not misbranding occurred is therefore not presently before this Court and is immaterial to the outcome of this motion.

90 days prior to its effective date, notice of less than 90 days is permissible where it would not be reasonable to furnish 90 days' notice. 15 U.S.C. § 2804. Courts and Congress have both recognized that misbranding is a serious default of the franchise agreement warranting termination without lengthy notice. *See Wisser Co., Inc. v. Mobil Oil Corp.*, 730 F.2d 54, 60 (2d Cir. 1984) (discussing the legislative history as it relates to misbranding). It has been similarly recognized, however, that non-payment is not a permissible basis for providing less than ninety days of notice before termination absent aggravating circumstances. *Id.* (*citing Escobar v. Mobil Oil Corp.*, 522 F. Supp. 593 (D. Conn. 1981); *cf State Oil Co. v. Khan*, 839 F. Supp. 543, 546 (N.D. Ill. 1993) (collecting cases in which less than ninety days' notice was found reasonable in light of the size of the default, lengthy duration of the default, or rapid growth of the default ). Here, the Ingleside location defaulted on a fund transfer of $17,208.90 which was initiated on 8/5/2017. A mere nine days later, defendants sent a notice of termination providing eleven days' notice. Defendants do not argue that this was "reasonable" notice based on the Ingleside location's default, and, based on the authorities referenced above, this Court therefore holds that a reasonable dispute as to the adequacy of the notice therefore exists.[3]

This Court accordingly concludes that there is a question as to the merits sufficient to be the subject of litigation. Accordingly, this Court turns its attention to the balance of harms. The defendants' primary argument is that the strength of their position on the merits renders the balancing of harms irrelevant. This argument, for those reasons previously set forth, is unavailing. Based on those reasons for termination properly before this Court at the present time, the balance of hardships weighs in favor of granting the injunction requested in this case. *Greco v. Mobil Oil Corp.*, 597 F. Supp. 468, 473 (N.D. Ill. 1984) (Leighton, J.). The harm to plaintiffs, the loss of the

---

[3] As previously noted, the defendants allegations of misbranding are irrelevant to this Court's review of the notice of termination now at issue. This Court acknowledges that it appears a subsequent notice of termination was sent in October, in apparent violation of this Court's August 25, 2017 order. That notice of termination is not presently before this Court, and this Court will not consider arguments regarding its propriety absent a properly noticed motion.

Ingleside franchise, far outweighs any harm to the defendants if the franchise relationship is continued until the merits of the parties' claims can be reached.

**Conclusion**

For the foregoing reasons, the plaintiffs' motion for a preliminary injunction is granted with respect to the Ingleside location, but denied with respect to the Grayslake and Woodstock locations.

IT IS SO ORDERED.

Date: October 27, 2017

Entered: _____
SHARON JOHNSON COLEMAN
United States District Court Judge