# EXHIBIT A

## INSTALLMENT AGREEMENT FOR WARRANTY DEED AND PERSONAL PROPERTY

**THIS AGREEMENT** is made this **12TH** day of **APRIL, 2013**, by and between **BAPA, LLC and PT, LLC, each of which are an Illinois Limited Liability Companies** (hereinafter collectively referred to as "Seller"), **STATE OIL COMPANY, an Illinois Corporation** (hereinafter referred to as "Supplier"), **GAS CAP FUELS, LLC and LOUAY ALANI,** (hereinafter referred to as "Purchaser") and CATCH 26 LLC, an Illinois Limited Liability Company (hereinafter referred to as "Retailer").

**WITNESSETH,** that if Purchaser shall first make the payments and perform Purchaser covenants hereunder, Seller hereby covenants and agrees to convey to Purchaser in fee simple by Seller stamped recordable Warranty Deed, with waiver of homestead, subject to the matters hereinafter specified, the premises situated in the County of Lake and State of Illinois described as follows:

## SEE LEGAL DESCRIPTION ATTACHED HERETO AND MADE A PART HEREOF.

Address of Premises:        **26025 WEST GRAND AVENUE, INGLESIDE, IL 60041**

Permanent Index Number: **05-11-403-018**

Seller shall sell to Purchaser and Purchaser shall purchase from Seller under the terms and conditions set forth in this Agreement, all of the following:

(a)    all of Seller's interest in the building and all fixed improvements in place, lighting, canopies, dispensing equipment, underground storage tanks, pumps, pump computers, all freezers, coolers, air conditioning, counters, shelving and all other equipment necessary for Purchaser to operate the gas station and convenience mart that are located on the premises but expressly excluding any leased equipment and any equipment or property that is owned by the current dealer.  List of furniture, fixtures and equipment attached hereto as Schedule (a).

(b)    all of the gasoline inventory located on the Property.

Seller further agrees to furnish to Purchaser, at Seller's expense, a Contract Purchaser's Title Insurance Policy in the amount of the purchase price that is to be attributable to the land and real estate improvements, issued by Chicago Title Insurance Company, showing merchantable title in Seller, subject only to the matters specified below in Paragraph 1.

Purchaser hereby covenants and agrees to pay to Seller, at such place as Seller may from time to time designate in writing, and until such designation at 31366 N. Highway 45, Libertyville, Illinois 60048, the price of $445,000.00 plus the cost of the gasoline inventory located on the

1

property at the time of the Initial Closing, in the manner following, to-wit:

At the time of the initial closing, Purchaser shall pay to Seller the sum of the $44,500.00 plus the cost of the gasoline inventory located on the property at the time of the Initial Closing.

The balance of the purchase price, to-wit, $400,500.00 is to be paid as follows:

The remaining sum of $400,500.00 will be evidenced by a Promissory Note, which shall be paid in installments of principal and interest, amortized over a Fifteen (15) year period, commencing on May 1, 2013 and continuing on the first day of each month thereafter through April 1, 2020.

Interest on the unpaid balance shall accrue at an interest rate of 5.00% per annum (the "Interest Rate").

The final balloon payment of the principal and all accrued, but unpaid interest and other charges, as hereinafter provided, if not sooner paid will be due on April 1, 2020.

All payments received hereunder, shall be applied in the following order of priority:

First, to pay before delinquent, all taxes and assessments that are subsequent to the date of this Agreement which may become a lien on the premises; Second, to pay insurance premiums falling due after the date of this Agreement; Third, the interest accrued and owing on the unpaid principal balance of the purchase price; Fourth, to pay late charges that accrue under the terms of this Agreement; and Fifth, to reduce the unpaid principal balance of the purchase price.

Rents, water taxes, insurance premiums and other similar items are to be adjusted prorata as of the date provided herein for delivery of possession of the premises. General taxes for the year 2012 are to be prorated from January 1 to such date for delivery of possession, and if the amount of such taxes is not then ascertainable, the prorating shall be done on the basis of 110% of the amount of the most recent ascertainable taxes.

It is further expressly understood and agreed between the parties hereto that (collectively the "Permitted Exceptions"):

1. The Conveyance to be made by Seller shall be expressly subject to the following:

   A. General taxes for the year 2012 and subsequent years and all taxes, special assessments and special taxes levied after the date hereof;

   B. All installments of special assessments heretofore levied falling due after date of Initial Closing;

   C. The rights of all persons claiming by, through or under Purchaser;

2

D. Easements of record and party-walls and party-wall Agreements, if any;

E. Building, building line and use or occupancy restrictions, conditions and covenants of record, and building and zoning laws and ordinances; and

F. Roads, highways, streets and alleys, if any.

G. Testing and Remediation License Agreement dated September 30, 2012 a Memorandum of which was recorded on November 9, 2012, in the Office of the Recorder of Deeds of Lake County, Illinois as Document Number 6920651.

2. The "Initial Closing" shall occur on April 12, 2013 (or on a date, if any, to which such date is extended by Agreement of the parties). The Initial Closing shall take place at the offices of Churchill, Quinn, Richtman & Hamilton, Ltd., 2 South Whitney Street, Grayslake, Illinois 60030 or as may be mutually agreed by the parties. The "Final Closing" shall occur if and when all covenants and conditions herein to be performed by Purchaser have been so performed.

3. Possession shall be granted to Purchaser at the time of the Initial Closing, provided that the full down payment has been paid to Seller by cashier's or certified check on the Initial Closing date, and further provided that Purchaser on such Initial Closing date is otherwise not in default hereunder.

4. As security for the payment of the Promissory Note required to be executed by Purchaser pursuant to this Agreement, Purchaser shall also execute and deliver to Seller any additional documents required by Seller.

5. Prior to the Initial Closing Purchaser shall be permitted reasonable inspection of the premises prior to closing.

6. Buyer acknowledges receipt of a title commitment covering the property from Seller and accepts all the exceptions set forth in the title commitment except for the following:

(Unpermitted Exceptions: Seller shall have 21 days from the date of execution of this Agreement to have the Unpermitted Exceptions removed from the commitment or to have the title insurer commit to insure against loss or damage that may be occasioned by such Unpermitted Exceptions, and, in such event, the time of Initial Closing shall be *21* days after delivery of the commitment or the time expressly specified herein, whichever is later. If Seller fails to have the Unpermitted Exceptions removed or, in the alternative, to obtain the commitment for title insurance specified as to such Unpermitted Exceptions within the specified time, Purchaser may elect, upon notice to Seller within 10 days after the expiration of the *21* day period, to take title as it then is. If Purchaser does not so elect, this Agreement shall become null and void without further actions of the parties, with all earnest monies to be returned to Purchaser.

Upon the occurrence of the Initial Closing, Purchaser shall purchase the Property subject to any Unpermitted Exception not objected to in writing as above indicated and all Permitted Exceptions (as hereinafter defined).

3

7.      Purchaser acknowledges receipt of a survey for the Property from Seller. The parties hereto agree that Seller shall not provide Purchaser with any additional survey for the Property pursuant to this Agreement.

8.      Pursuant to the terms and conditions of this Agreement, at the Final Closing (as hereinafter defined) Seller agrees to convey title by a recordable warranty deed in and to the Property to Purchaser subject to the Permitted Exceptions.

9.      All inventory, stock in trade, merchandise, furniture and fixtures owned or leased by Seller are and will be adequately insured against fire and casualty through the date of the Initial Closing.  Purchaser shall procure its own insurance coverage, and Seller may cancel or assign its insurance coverage on the date of closing.

10.     Seller makes the following representations and warranties to the Purchaser:

(a)     The Seller is the owner of and has good and marketable title to the real estate that is to be transferred in accordance with this Agreement, and at the time of Final Closing the real estate will be free of all debts, liens, security interests and encumbrances.

(b)     Seller has not entered into any contract relating to the real estate that is to be transferred in accordance with this Agreement.

(c)     There are no suits, governmental proceedings, or litigation pending or, to the knowledge of Seller, threatened against Seller that might materially affect the financial condition, business or property of Seller or its property.

(d)     That all of the underground storage tanks are registered as required by the Illinois Environmental Protection Agency and the Illinois Office of the State Fire Marshall.

(e)     Seller has full power and authority to enter into this Agreement, bind Seller and the Property to the commitments made hereunder, and convey or cause the conveyance of the Property to Purchaser.

(f)     The execution, delivery and performance by Seller of this Agreement shall not constitute or cause a default or breach of any agreement or undertaking of Seller or concerning the Property.

(g)     Seller has no knowledge of and has received no notice concerning any existing or proposed special assessments or similar taxes, charges or assessments against the Property or any utility service moratoriums or other moratoriums affecting the Property.

(h)     Other than the circumstances referenced in the Testing and Remediation License Agreement dated September 30, 2012, to the best of Seller's

4

knowledge, no toxic or hazardous waste or hazardous substance or other pollutant or contaminant or any other substance which is in violation of any state, federal or local law, regulation or ordinance is contained within or located at or under the Property.

(i)    No portion of the Property is located in an area that has been designated a wetlands or other environmental protection area.

(j)    No portion of the Property has been condemned or otherwise taken by any public authority, and Seller has no knowledge that any such condemnation or taking is threatened or contemplated.

(k)    Other than the circumstances referenced in the Testing and Remediation License Agreement dated September 30, 2012, Seller has not received any written notices from any city, village or other governmental authority of zoning, building, health, fire or environmental code violations with respect to the Property, nor is the Property in violation of any law, ordinance, code or regulation and there are no latent or patent defects concerning the Property.

(l)    Other than the circumstances referenced in the Testing and Remediation License Agreement dated September 30, 2012, the Property is not in violation or breach of any of the covenants, conditions, restrictions or other agreements affecting the Property.

(m)    Other than the circumstances referenced in the Testing and Remediation License Agreement dated September 30, 2012, there are no leases, licenses or other occupancy agreements affecting the Property or security or other deposits made by any tenants, except as delivered to Purchaser prior to Initial Closing.

(n)    Other than the circumstances referenced in the Testing and Remediation License Agreement dated September 30, 2012, to Seller's knowledge, there is no pending or threatened litigation, governmental investigation or like proceeding before any court, tribunal or other governmental agency with respect to the Property nor is there any basis known to Seller for any such action.

(o)    Except for this Agreement, Seller is not a party to any contract, agreement or commitment to sell, convey, assign, transfer, provide rights of first refusal, option rights or any other similar rights relating to the disposition of the Property or any portion thereof.

(p)    Other than the circumstances referenced in the Testing and Remediation License Agreement dated September 30, 2012, there are no service contracts, equipment leases, development agreements, operating or reciprocal easement agreements, declarations or other agreements affecting the Property.

11.    The obligation of Seller to perform under this Agreement shall be subject to each and every one of the following conditions precedent:

(a)    The representations and warranties of Purchaser set forth in this Agreement shall be true and correct in all material respects.

(b)    The execution and delivery and performance of this Agreement by Purchaser will not conflict with or result in a breach of or constitute a default under the terms, conditions or provisions of any agreement or instrument to which the Purchaser is a party.

(c)    The Purchaser has not breached any of its representations or warranties hereunder or any obligation to be performed by them hereunder and prior to the closing.

(d)    That Retailer agrees to enter into a Supply Agreement for gasoline and petroleum products with State Oil Company and thus Purchaser will agree to a deed restriction in the Deed that will transfer the property to Purchaser at the Final Closing, which will confirm the fact that all petroleum related products must be purchased from State Oil Company for a period of eight (8) years from the date of the Final Closing.

(e)    The aforesaid Supply Agreement, the Promissory Note and the performance of this Agreement shall be fully guaranteed by **LOUAY ALANI**.

12.    Purchaser represents and warrants to Seller as follows:

(a)    Purchaser certifies that the limited liability company is duly organized, validly existing and in good standing under the laws of the State of Illinois.

(b)    The execution and delivery of this Agreement to Seller has been duly authorized by Purchaser's Manager.

(c)    No representation or warranty by Purchaser in this Agreement contains or will contain any untrue statement of a material fact, or omits or will omit to state a material fact necessary to make the statements contained herein not misleading, in light of the circumstances in which they are made.

(d)    Purchaser represents and warrants to Seller that the performance of this Agreement by it is not in violation of any laws, statutes, local ordinances, state or federal regulations, court order or administrative order or ruling.

(e)    The representations and warranties of Purchaser shall survive the Final Closing and shall not be deemed to be merged into this Agreement or the Deed of conveyance.

13. As long as Purchaser owes any sums under this Agreement or under the Promissory Note to Seller, Purchaser shall keep the buildings and improvements on the premises in good repair and shall neither suffer nor commit any waste on or to the premises, and if Purchaser fails to make any such repairs or suffers or commits waste, and fails to cure the foregoing with 10 business days after written notice of Seller, Seller may elect to make such repairs or eliminate such waste and the cost thereof shall become an addition to the purchase price immediately due and payable to Seller, with interest at ten percent (10%) annum until paid.

14. Purchaser shall pay before accrual of any penalty, all insurance premiums and any and all taxes and installments of special assessments pertaining to the premises that become payable on or after the date for delivery of possession to Purchaser, and Purchaser shall deliver to Seller duplicate receipts showing timely payment thereof prior to the due date of each installment.

15. Purchaser shall not transfer or assign this Agreement or any interest therein, without the previous written consent of Seller, and any such assignment or transfer, without such previous written consent, shall not vest in the transferee or assignee any right, title or interest herein or hereunder or in the premises, but shall render this Contract null and void, at the election of Seller; and Purchaser will not lease the premises, or any part thereof, for any purpose, without Seller's written consent. It is expressly understood that Purchaser and any Guarantors will remain liable under this Agreement in the event that Seller transfers its interest under the Agreement to a third party in accordance with the provisions of this Paragraph 12.

16. If Purchaser fails to pay taxes, assessments, insurance premiums or any other item, which Purchaser is obligated to pay hereunder, Seller may elect to pay such items and any amount so paid shall become an addition to the purchase price immediately due and payable to Seller, with interest at ten percent (10%) per annum until paid.

17. Purchaser shall not suffer or permit any mechanic's lien or other lien to attach to or be against the premises, which shall or may be superior to the rights of Seller.

18. Every Contract for repairs and improvements on the premises, or any part thereof, shall contain an express, full and complete waiver and release of any and all lien or claim or right of lien against the premises and no Contract or Agreement, oral or written, shall be made by Purchaser for repairs or improvements upon the premises, unless it shall contain such express waiver or release of lien upon the part of the party contracting, and a signed copy of every such Contract and of the plans and specifications for such repairs and improvements shall be promptly delivered to and may be retained by Seller.

19. No right, title or interest, legal or equitable, in the premises, or any part thereof, shall vest in Purchaser until the delivery of the deed and bill of sale aforesaid by Seller, or until the full payment of the purchase price at the times and in the manner herein provided.

20. No extension, change, modification or amendment to or of this Agreement of any kind whatsoever shall be made or claimed by Purchaser, and no notice of any extension, change, modification or amendment, made or claimed by Purchaser, shall have any force or effect whatsoever unless it shall be endorsed in writing on this Agreement and be signed by the parties hereto.

21.     Each of the following events shall constitute a Default: (i) if Purchaser vacates or abandons the Premises or permits the same to remain vacant or unoccupied for a period of ten (10) days, (ii) if the payments reserved on Page 2 of this Agreement and in the Promissory Note, or any part thereof are not paid when due and remain unpaid for ten (10) days after written notice thereof to Purchaser, (iii) if default is made in the prompt and full performance of any covenant or condition of this Agreement to be kept or performed by Purchaser and such default continues for more than a reasonable time (in no event to exceed thirty (30) days) after written notice to Purchaser, specifying such default, (iv) if any proceedings are commenced to declare Purchaser bankrupt or insolvent or to obtain relief under any bankruptcy or debtor relief law, (v) if any assignment of Purchaser's property is made for benefit of creditors, (vi) if a receiver or trustee is appointed for Purchaser's property, or (vii) if Purchaser transfers any interest in the property to a third party in contravention of Paragraph 12 of this Agreement, or (viii) the failure to timely pay any installment of real estate taxes on or before the due date and remain unpaid for ten (10) days after written notice thereof to Purchaser. If a Default shall occur, Seller, without further notice or demand of any kind to Purchaser or any other person may have the right to pursue any remedy available to Seller at law or in equity.

22.     In case of the failure of Purchaser to make any of the payments, or any part thereof, or perform any of Purchaser's covenants hereunder, this Agreement shall, at the option of Seller, be forfeited and determined, and Purchaser shall forfeit all payments made on this Agreement, and such payments shall be retained by Seller in full satisfaction and as liquidated damages by Seller sustained.

23.     All rights and remedies of Seller herein created or otherwise existing at law or equity are cumulative and the exercise of one or more rights or remedies shall not be taken to exclude or waive the right to the exercise of any other right or remedy except as otherwise provided herein. All such rights and remedies may be exercised concurrently and whenever and as often as Seller shall deem desirable.

The failure of Seller to insist upon strict performance by Purchaser of any of the covenants and conditions of this Agreement shall not be deemed a waiver of any of Seller's rights or remedies concerning any subsequent or continuing breach or default by Purchaser of any of the covenants and conditions of this Agreement. No surrender of the Premises shall be affected by Seller's acceptance of installment payments or by any other means whatsoever unless the same is evidenced by Seller's written acceptance of such a surrender.

In the event this Agreement is terminated, the Seller may purchase from the Purchaser all store merchandise and gasoline inventory at the Purchaser's actual cost. The purchase price shall be payable five (5) business days after that the Purchaser vacates the Premises, subject to any uniform commercial code requirements, any obligations owed by Purchaser to the Illinois Department of Revenue or Illinois Department of Employment Security and any outstanding indebtedness due to Seller from Purchaser. Any and all equipment installed on the Premises shall become the property of the Seller if the Agreement is terminated prior to the time that Purchaser has made all payments to Seller required by the Agreement.

24.     Intentionally omitted.

25.     In the event of the termination of this Agreement by lapse of time, forfeiture or otherwise, all improvements, whether finished or unfinished, which may be put upon the premises by Purchaser shall belong to and be the property of Seller without liability or obligation on Seller's part to account to Purchaser therefor or for any part thereof.

26.     Purchaser shall pay to Seller all costs and expenses, including attorney's fees, incurred by Seller in any action or proceeding to which Seller may be made a party by reason of being a party to this Agreement, and Purchaser will pay to Seller all costs and expenses, including attorney's fees, incurred by Seller in enforcing any of the covenants and provisions of this Agreement and incurred in any action brought by Seller against Purchaser on account of the provisions hereof, and all such costs, expenses and attorney's fees may be included in an from a part of any judgment entered in any proceeding brought by Seller against Purchaser on or under this Agreement.

27.     The remedy of forfeiture herein given to Seller shall not be exclusive of any other remedy, but Seller shall, in case of default or breach, or for any other reason herein contained, have every other remedy given by this Agreement or by law or in equity, and shall have the right to maintain and prosecute any and every such remedy, contemporaneously or otherwise, with the exercise of the right of forfeiture, or any other right herein given. In the event of default by Seller, Purchaser shall be entitled to pursue any remedy available at law or in equity.

28.     Upon default by Purchaser whether by acceleration or otherwise, Seller shall have the right to foreclose its interest herein as allowed by the Illinois Mortgage Foreclosure Law. In any suit to foreclose the indebtedness evidenced by this Agreement, there shall be allowed and included as additional indebtedness in the Judgment of Foreclosure, all expenditures and expenses which may be paid or incurred by or on behalf of Seller for reasonable attorneys' fees, appraiser's fees, outlays for documentary and expert evidence, stenographers' charges, publication costs and costs of procuring all abstracts of title, title searches and examinations, title insurance policies, and similar data and assurances with respect to title as Seller may deem to be reasonably necessary either to prosecute the foreclosure suit or to evidence to bidders at any foreclosure sale. All of the foregoing items, which may be expended after entry of the foreclosure judgment, may be estimated by Seller. All expenditures and expenses mentioned in this paragraph shall become additional liabilities and shall be immediately due and payable, with interest thereon at a rate equivalent to the post-maturity or post-default (whichever is higher) rate set forth herein, when paid or incurred by Seller. This paragraph shall also apply to any expenditures or expenses incurred or paid by Seller or on behalf of Seller in connection with (a) any proceeding, including without limitation, probate and bankruptcy proceedings, to which Seller shall be a party, as plaintiff, claimant, defendant or otherwise, by reason of this Agreement; or (b) preparations for the commencement of any suit for the foreclosure of this indebtedness after accrual of the right to foreclose whether or not actually commenced or preparation for the commencement of any suit to collect upon or enforce the provisions of this Agreement, whether or not actually commenced; or (c) preparations for the defense of any threatened suit or proceeding which might affect the Premises or the security hereof, whether or not actually commenced. In the event that the property is sold at a Foreclosure Sale, and in the event that the Foreclosure Sale does not realize the total indebtedness, plus attorney fees and costs and other charges that have been incurred by Seller, Seller shall have the right to pursue a Deficiency Judgment against any parties who have

guaranteed the obligation hereunder.

29.     Upon, or at any time after the filing of a Complaint to Foreclose the indebtedness, as otherwise permitted by the Illinois Mortgage Foreclosure Law, the Court in which such suit is filed may appoint a receiver of the Premises, or may appoint the Seller as a Mortgagee in Possession of the Premises.  Such receiver, or Seller as mortgagee-in-possession, shall have power to collect the rents, issues and profits of the Premises and shall also have all other powers which may be necessary or are usual for the protection, possession, control, management and operation of the Premises.

30.     Purchaser hereby waives any and all rights of redemption from any Judgment of Foreclosure of this indebtedness, on its own behalf and on behalf of each and every person claiming through Purchaser as a successor, on its own behalf and on behalf of any person claiming a right of reinstatement as a successor to Purchaser.

31.     A.     It is expressly understood by the parties that a default under the Petroleum Products Supply Agreement that Purchaser has entered into on this date with State Oil Company will be deemed to be a default under this Agreement and that a default under this Agreement shall be deemed to be a default under the Petroleum Product Supply Agreement.

B.     It is expressly understood by the parties that a default under the Installment Agreement entered into between Purchaser and BCP Realty, LLC and JCC Realty, LLC ,as Sellers for the property commonly known as 26037 West Grand Avenue, Ingleside, Illinois 60041, shall be deemed to be a default under this Agreement.

32.     Purchaser has inspected the premises and agrees to accept the same "as is" without any agreements, representations, undertakings or obligations on the part of Seller to perform any alterations, repairs or improvements except as expressly provided herein or in any separate written agreement that may be signed by the parties.

33.     Purchaser shall be entitled to delivery of the Deed of Conveyance and a Bill of Sale to the personal property to be transferred to Purchaser under this Agreement at any time upon payment of all amounts due hereunder in the form of a cashier's or certified check made payable to Seller, which amount shall be without premium or penalty.  At the time of delivery of the Deed, Seller and Purchaser shall execute and furnish such real estate transfer declarations as may be required to comply with state, county and local laws.  Seller shall pay the amount of any stamp tax that is imposed by state or county law on the transfer of title to Purchaser and Purchaser shall pay any stamp tax or meet other requirements as then may be established by any local ordinance with regard to transfer of title to the Purchaser.  The parties agree that legal title to the Real Estate and personal property that are the subject of this Agreement will not be transferred to Purchaser until Purchaser makes all payments required by this Agreement

34.     In the event that at least one of the Purchasers is a corporation or limited liability company, at or prior to the time of the Initial Closing, Purchaser shall provide Seller with a Certificate of Good Standing, evidencing the fact that Purchaser is in good standing as a corporation or limited liability company with the Secretary of State of Illinois. Such Purchaser will also provide Seller with evidence that the party executing this Agreement on behalf of the

10

Purchaser is duly authorized to do so.

35. If there be more than one person designated herein as "Seller" or as "Purchaser", such word or words wherever used herein and the verbs and pronouns associated therewith, although expressed in the singular, shall be read and construed as plural.

36. All notices and demands required or permitted to be given hereunder shall be deemed to be properly given if given in writing, by registered or certified United States mail with postage prepaid and return receipt requested, and addressed to the party to be notified at the address set forth below (or to such other address as any party hereto may from time to time designate by notice in writing to the other party hereto):

| If to Seller: | BAPA, LLC | and | PT, LLC |
|---|---|---|---|
| | c/o Bill Anest | | c/o Peter Anest |
| | 31366 North Highway 45 | | 31366 North Highway 45 |
| | Libertyville, IL  60048 | | Libertyville, IL 60048 |

If to Supplier:  STATE OIL COMPANY
c/o Bill Anest or Peter Anest
31366 North Highway 45
Libertyville, IL 60048

If to Retailer:  CATCH 26 LLC
c/o Ali Alani
779 South Winchester Drive
Round Lake, IL 60073

With a copy to:  William S. Bazianos, Esq.
135 South LaSalle Street, Suite 2100
Chicago, Illinois 60603

If to Purchaser:  GAS CAP FUELS, LLC
c/o Louay Alani
26025 W. Grand Ave.
Ingleside, IL 60041

With a copy to:  William S. Bazianos, Esq.
135 South LaSalle Street, Suite 2100
Chicago, Illinois 60603

37. The time of payment and performance shall be of the essence of this Agreement, and the covenants and Agreements herein contained shall extend to and be obligatory upon the heirs, executors, administrators and assigns of the respective parties.

38. Seller warrants to Purchaser that Seller has received no notice from any city, village or other governmental authority of a code violation which existed in the structure before the execution of this Contract has been received by the Seller prior to the date of execution of this

11

Contract.

39.     If any provision of this Agreement shall be prohibited by or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating or affecting the remainder of such provision or the remaining provisions of this Agreement.

40.     In the event payments are not received by Seller by the first day of the month of which they are due, a late charge of ten percent (10%) of the monthly payment shall be assessed against Purchaser.

41.     In addition to making monthly payments thereon, all as heretofore set forth, at the option of Seller, Purchaser agrees to pay monthly to Seller a sum or sums equal to one-twelfth (1/12th) of 110% of the most recent ascertainable real estate tax bill affecting the premises and one-twelfth (1/12th) of the estimated annual property insurance premium for the premises. Such payments shall be adjusted annually based upon the actual tax and insurance costs.

42.     It is hereby agreed between said parties that the sum of Seven Hundred Ninety Six and 04/100 Dollars ($796.04) shall be established as the initial monthly reserve payment for the first twelve (12) months of this Agreement, and that such payments shall thereafter be adjusted dependent upon the actual tax and insurance costs.

43.     Reserve payments shall be retained by Seller in a reserve account for the annual payments of taxes on said premises as such costs shall accrue.  In the event said annual tax cost shall exceed the sum or sums paid by Purchaser hereunder, then and in such case, Purchaser shall pay such deficiency as shall annually arise.

44.     Purchaser shall keep the premises insured in an amount equal to or greater than the amount of indebtedness owed to Seller, as per this Installment Agreement.  Purchaser shall provide Seller with the insurance policy on said premises, which shall evidence the Seller as a named insured.  Purchaser shall provide to Seller evidence of a one (1) year paid premium with such evidence being provided annually.

45.     Should any litigation be commenced between the parties to this Agreement concerning said business or the Premises, this Agreement or the rights and duties of either in relation thereto, the party prevailing in such litigation shall be entitled, in addition to such other relief as may be granted, to a reasonable sum as and for their attorneys' fees in such litigation.

46.     The Seller and Purchaser hereby represent that they have not employed a Broker in connection with this transaction.

47.     Seller shall have the absolute right to assign their interest in this Agreement at any time but such assignment is subject to the rights of the Purchaser under this Agreement.

48.     This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors, heirs and assigns.

49.     This Agreement and the agreement and other writings referred to in this Agreement, contain the entire understanding of the parties with respect to the subject matter of this Agreement.    There are no restrictions, agreements, promises, warranties, covenants or undertakings other than those expressly set forth herein or therein.  This Agreement supersedes all prior Agreements and understandings between the parties with respect to its subject matter. This Agreement may be amended only by a written instrument duly executed by all of the parties, or their successors, heirs or assigns.

50.     No waiver of any breach or default hereunder shall be considered valid unless in writing and signed by the party giving such waiver, and no such waiver shall be deemed a waiver of any subsequent breach or default of the same or similar nature.

51.     The time of payment and performance shall be of the essence of this Agreement, and the covenants and agreements herein contained shall extend to and be obligatory upon the heirs, executors, administrators and assigns of the respective parties.

52.     This Agreement and all amendments thereof shall be governed by and construed in accordance with the laws of the State of Illinois.

53.     Seller and Purchaser agree to execute a Memorandum of this Agreement which Seller shall record.

54.     If any term, condition or provision of this Agreement shall be declared invalid or unenforceable, the remainder of the Agreement, other than such term, condition or provision, shall not be affected thereby and shall remain in full force and effect and shall be valid and enforceable to the fullest extent permitted by law.

55.     Purchaser acknowledges receipt of a copy of a Testing and Remediation License Agreement by and between **Bill Anest, Peter Anest** and **S & S Petroleum Products** as Licensor and **Premcor Refining Group, Inc.**, as Licensee dated September 30, 2012 and a Memorandum of which was recorded on November 9, 2012 as Document Number 6920651, in the Office of the Recorder of Deeds of Lake County, Illinois.  Purchaser especially agrees to abide by the terms and conditions of the License Agreement and will not undertake any activity on the property that will interfere with the rights and obligations of Licensor and Licensee under the License Agreement.

56.     Purchaser may prepay the whole or any part of the indebtedness hereunder at any time, without penalty, during the Term provided it gives Seller prior written notice of its intent to prepay the indebtedness ("Payoff Notice").  The Payoff Notice shall include the date on which the Purchaser shall payoff the balance of monies due to Seller under this Agreement, which date shall be no less than 14 days from the date of the Payoff Notice.  Upon notice of prepayment from Purchaser, Seller shall provide to Purchaser in writing a statement indicated the principal balance of the Loan Amount and all accrued interest thereon, both as of that day which is 14 days from date of the Payoff Notice ("Payoff Date") and shall include all other monies known by Seller to be due to Seller as of the date the Payoff Notice is received by Seller (the "Payoff Letter"). The Payoff Letter shall also include a per diem interest accrual amount effective after the Payoff Date. The Payoff Letter shall be valid for no more than fourteen days after the Payoff Date.

**IN WITNESS WHEREOF**, the parties to this Agreement have hereunto set their hands and seals in duplicate, the day and year first above written.

**SELLER:**

**BAPA, LLC**

By:  Bill Anest
Its:  Manager

**PT, LLC**

By:  Peter Anest
Its:  Manager

**PURCHASER:**

**GAS CAP FUELS, LLC**

By:  Louay Alani
Its:  _Mgr_

Louay Alani, Individually

**SUPPLIER:**

**STATE OIL COMPANY**

By:  _Peter Anest_
Its:  _President_

**RETAILER:**

**CATCH 26 LLC**

By:    ALI ALANI
Its:    Manager

00050-120671 G:\Anest\Sale of Ingleside Property\Sale 26025 W Grand Ave, Ingleside\Documents\CLOSING DOCS rec'd from Chris 040313\Docs Revised 040913\Installment Agreement for WD - Station 2013_03_29.doc

14

STATE OF ILLINOIS )
                    ) SS
COUNTY OF LAKE )

       I, the undersigned, a Notary Public in and for said County, in the State aforesaid, DO HEREBY CERTIFY that **BILL ANEST** is the Manager of **BAPA, LLC** and **PETER ANEST** is the Manager of **PT, LLC** thereof, and are personally known to me to be the same persons whose names are subscribed to the foregoing instrument as Managers, appeared before me this day in person and acknowledged that they signed and delivered the said instrument as their own free and voluntary act, and as a free and voluntary act of said Company for the uses and purposes therein set forth.

       Given under my hand and notarial seal this _11th_ day of _April_ , 2013.

                                _Kenneth J. Chalifoux_
                                Notary Public

> "OFFICIAL SEAL"
> KENNETH J. CHALIFOUX
> Notary Public, State of Illinois
> My Commission Expires 12/06/14

STATE OF ILLINOIS )
                    ) SS
COUNTY OF LAKE )

       I, the undersigned, a Notary Public in and for said County, in the State aforesaid, DO HEREBY CERTIFY that _Peter Anest_ is the _President_ of **STATE OIL COMPANY** thereof, and is personally known to me to be the same person whose name is subscribed to the foregoing instrument as _Same_ , appeared before me this day in person and acknowledged that he signed and delivered the said instrument as his own free and voluntary act, and as a free and voluntary act of said Company for the uses and purposes therein set forth.

       Given under my hand and notarial seal this _11th_ day of _April_ , 2013.

                                  _Kenneth J. Chalifoux_
                                Notary Public

> "OFFICIAL SEAL"
> KENNETH J. CHALIFOUX
> Notary Public, State of Illinois
> My Commission Expires 12/06/14

STATE OF ILLINOIS )
) SS
COUNTY OF *Lake* )

I, the undersigned, a Notary Public in and for said County, in the State aforesaid, DO HEREBY CERTIFY that **ALI ALANI**, is the Manager of **CATCH 26 LLC,** and is personally known to me to be the same person whose name is subscribed to the foregoing instrument as Manager, appeared before me this day in person and acknowledged that he signed and delivered the said instrument as his own free and voluntary act, and as a free and voluntary act of said Company for the uses and purposes therein set forth.

Given under my hand and notarial seal this *12th* day of *April*, 2013.

_____
Notary Public

```
"OFFICIAL SEAL"
KENNETH J. CHALIFOUX
Notary Public, State of Illinois
My Commission Expires  12/06/14
```

STATE OF ILLINOIS )
) SS
COUNTY OF *Lake* )

I, the undersigned, a Notary Public in and for said County, in the State aforesaid, DO HEREBY CERTIFY that **LOUAY ALANI**, is the *Manager* of **GAS CAP FUELS, LLC,** and is personally known to me to be the same person whose name is subscribed to the foregoing instrument as *same*, appeared before me this day in person and acknowledged that he signed and delivered the said instrument as his own free and voluntary act, and as a free and voluntary act of said Company for the uses and purposes therein set forth.

Given under my hand and notarial seal this *12th* day of *April*, 2013.

_____
Notary Public

```
"OFFICIAL SEAL"
KENNETH J. CHALIFOUX
Notary Public, State of Illinois
My Commission Expires  12/06/14
```

16

STATE OF ILLINOIS      )
                           ) SS
COUNTY OF _Lake___  )

      I, the undersigned, a Notary Public in and for said County, in the State aforesaid, DO HEREBY CERTIFY that **LOUAY ALANI,** personally known to me to be the same person whose name is subscribed to the foregoing instrument, appeared before me this day in person and acknowledged that he signed and delivered the said instrument as his own free and voluntary act for the uses and purposes therein set forth.

      Given under my hand and notarial seal this _12th_ day of _April_ , 2013.

_Kenneth J. Chalifoux_
Notary Public

"OFFICIAL SEAL"
KENNETH J. CHALIFOUX
Notary Public, State of Illinois
My Commission Expires 12/06/14

17

**SCHEDULE A**

LIST OF FURNITURE, FIXTURES AND EQUIPMENT

3 – Underground Storage Tanks (8,000 gallons, 6,000 gallons, 6,000 gallons)
2 – Fuel Dispensers
1 – Canopy 22' x 35'
1 – ID Price Sign
3 – Entrance Lights and Poles
1 – Perimeter Fence
1 – Dumpster Enclosure
1 – Checkout Counter
4 – Cigarette Display Racks
1 – Ruby Sapphire System
1 – Safe
5 – Store Shelvings
8 – Store Shelving End Racks
1 – Stand Alone Freezer
1 – Walk-in Freezer Door
9 – Door Walk-in Cooler with Shelving
2 – Coffee Counters
1 – Coke Cooler
1 – Office Chair
1 – Desk
1 – 3 Compartment Sink
1 – Water Heater
1 – HVAC System
1 – Veeder Root Electrical Tank Testing System
1 – Impressed Currant Corrosion Protection Unit

## LEGAL DESCRIPTION

PARCEL 1: THAT PART OF LOT 1 DESCRIBED AS FOLLOWS: COMMENCING AT A POINT ON THE EAST LINE OF SAID LOT 1, A DISTANCE OF 83.21 FEET NORTH OF THE SOUTHEAST CORNER THEREOF; THENCE WEST PARALLEL WITH THE SOUTH LINE OF SAID LOT 1, A DISTANCE OF 144.57 FEET; THENCE NORTH PARALLEL WITH THE EAST LINE OF SAID LOT 1, A DISTANCE OF 99.0 FEET; THENCE NORTHWESTERLY A DISTANCE OF 30.76 FEET TO A POINT ON THE NORTH LINE OF SAID LOT 1, A DISTANCE OF 52.76 FEET EAST OF THE NORTHWEST CORNER THEREOF; THENCE EAST ALONG THE NORTH LINE OF SAID LOT 1, A DISTANCE OF 159.53 FEET TO THE NORTHEAST CORNER THEREOF; THENCE SOUTH ALONG THE EAST LINE OF SAID LOT 1, A DISTANCE OF 126.30 FEET TO THE POINT OF BEGINNING (EXCEPT THAT PART THEREOF DESCRIBED AS FOLLOWS: COMMENCING AT THE NORTHEAST CORNER OF THE SOUTHEAST 1/4 OF SECTION 11, TOWNSHIP 45 NORTH, RANGE 9 EAST OF THE THIRD PRINCIPAL MERIDIAN; THENCE WESTERLY ON AN ASSUMED BEARING OF NORTH 89 DEGREES 57 MINUTES 37 SECONDS WEST 54.81 FEET ALONG THE NORTH LINE OF SAID QUARTER SECTION; THENCE SOUTH 00 DEGREES 02 MINUTES 23 SECONDS WEST 30.00 FEET TO THE POINT OF BEGINNING; THENCE SOUTH 45 DEGREES 08 MINUTES 27 SECONDS EAST 35.47 FEET TO A POINT ON THE WEST RIGHT-OF-WAY LINE OF WILSON ROAD; THENCE NORTH 00 DEGREES 19 MINUTES 17 SECONDS WEST ALONG SAID WEST RIGHT-OF-WAY LINE OF WILSON ROAD A DISTANCE OF 25.00 FEET TO THE INTERSECTION WITH THE SOUTH RIGHT-OF-WAY LINE OF ILLINOIS ROUTE 59; THENCE NORTH 89 DEGREES 57 MINUTES 37 SECONDS WEST ALONG SAID LINE 25.00 FEET TO THE POINT OF BEGINNING) IN STANTON TERRACE SUBDIVISION IN THE NORTHEAST 1/4 OF THE SOUTHEAST 1/4 OF SECTION 11, TOWNSHIP 45 NORTH, RANGE 9, EAST OF THE THIRD PRINCIPAL MERIDIAN, ACCORDING TO THE PLAT THEREOF RECORDED JUNE 16, 1925 AS DOCUMENT NUMBER 259434 IN BOOK "M" OF PLATS, PAGE 105, IN LAKE COUNTY, ILLINOIS.

c/k/a       26025 WEST GRAND AVENUE, INGLESIDE, IL 60041

PIN:       05-11-403-018

# EXHIBIT B

# PROMISSORY NOTE

**$400,500.00**                                                                      **APRIL 12, 2013**

This **Promissory Note** (hereinafter the "Note") is made as of the date stated hereinabove by **GAS CAP FUELS, LLC.,** and **LOUAY ALANI** with a mailing address of 26025 West Grand Avenue, Ingleside, Illinois 60041 (referred to as "Debtor"), to the order of **BAPA, LLC and PT, LLC** (collectively referred to as "Lender"), with a mailing address of 31366 North Highway 45, Libertyville, Illinois 60048.

For value received, Debtor hereby promises to pay to the order of Lender, at the address stated hereinabove or such other place as Lender may from time to time designate in writing to Debtor, the principal amount of $400,500.00 (the "Indebtedness"), or so much thereof as ay now or hereafter be disbursed by Lender to or for the benefit of Debtor, together with interest as provided hereinbelow, all in lawful money of the United States of America, as follows:

Interest on the unpaid principal balance of the loan shall accrue at an interest rate of 5.00% per annum (the "Interest Rate") and amortized over a fifteen (15) year period. Payments of principal and interest shall be due and payable in monthly installments commencing on May 1, 2013 ("the Commencement Date") and continuing on the first day of each month thereafter through April 1, 2020 in accordance with the attached Amortization Schedule.

The entire principal balance and unpaid interest of the loan shall be due and payable on April 1, 2020 (the "Maturity Date").

Prior to an event of default by Debtor and Lender's invocation of his remedies, all monies paid by Debtor to Lender shall be applied in the following order of priority: (a) first, toward payment of all late charges; (b) next, toward payment of other fees and sums due to Lender pursuant to this Note, the Installment Agreement for Warranty Deed and Personal Property or then due and payable pursuant to the provisions of any other document securing repayment of the Indebtedness; (c) next, toward payment of interest which has accrued on the outstanding principal balance of the Loan and which is due and payable; and (d) last, toward payment of the outstanding principal balance of the Indebtedness.

This Note may be prepaid in whole at any time or in part from time to time, without premium or penalty. Any prepayment in whole or in part of this Note shall be applied first to any late charges and then to interest accrued hereon to the date of such payment with the balance being applied to the principal.

This Note is secured by an Installment Agreement for Warranty Deed and Personal Property entered into by Debtor and Lender, **STATE OIL COMPANY** and **CATCH 26 LLC** dated April 12, 2013. All of the covenants, conditions and agreements contained in the Installment Agreement for Warranty Deed and Personal Property are incorporated by reference herein and made a part hereof. Any amounts required to be paid by Debtor under the terms of the Installment Agreement for Warranty Deed and Personal Property or any other document shall become additional principal indebtedness hereunder to the extent such amounts are not paid in accordance with the Installment Agreement for Warranty Deed and Personal Property and shall be payable on demand and shall bear interest hereunder.

Failure of Debtor to pay any sum on the date such sum becomes due and payable under this Note, including without limitation interest or principal or both and either as an installment or on the Maturity Date, or the occurrence of any other default (as that term is defined in the Installment Agreement for Warranty Deed and Personal Property), shall constitute an event of default (a "Default") hereunder.

At any time during the existence of any Default and after the expiration of any applicable cure period, if any, and at the option of Lender, the entire unpaid principal balance under this Note, together with interest accrued thereon and all other sums due from the Debtor hereunder or under the Installment Agreement for Warranty Deed and Personal Property, shall become immediately due and payable without notice.

If any installment of interest or the unpaid principal balance due under this Note is not paid to Lender on the date such installment or payment is due, Debtor shall pay to Lender in addition to all other payments, whether or not as a result of default, a late charge of ten cents (10¢) for each dollar so overdue to defray part of the increased cost of collecting the late payments and the opportunity cost incurred by Lender because of the unavailability of the funds.

In the event that Debtor is in default of any of the terms of this Note, the Debtor shall be responsible for (a) all costs and expenses of collection, including without limitation, reasonable attorney's fees, in the event this Note or any portion of this Note is placed in the hands of attorneys for collection and such collection is effective without suit; (b) reasonable attorney fees, and all other costs, expenses and fees incurred by Lender in the event suit is instituted to collect this Note or any portion of this Note; (c) all costs and expenses provided for in any other instrument given as security for this Note and/or incurred by or on behalf of Lender in connection with collecting or otherwise enforcing any right of Lender under this Note, or any other instrument given as security for this Note; and (d) all costs and expenses, including, without limitation, attorney's fees incurred by Lender in connection with any bankruptcy, insolvency or reorganization proceeding, or receivership in which the Debtor is involved, including, without limitation, attorney's fees incurred in making any appearances in any such proceeding or in seeking relief from any stay or injunction issued in or arising out of any such proceeding.

Lender's remedies under this Note shall be cumulative and concurrent and may be pursued singly, successively, or together against Debtor and any other security provided by Debtor, and Lender may resort to every other right or remedy available at law or in equity without first exhausting the rights and remedies contained herein, all in Lender's sole discretion. Lender shall not by any other omission or act be deemed to waive any of its rights or remedies hereunder unless such waiver is in writing and signed by Lender, and then only to the extent specifically set forth therein. A waiver in connection with one event shall not be construed as continuing or as a bar to or as a waiver of any right or remedy in connection with a subsequent event.

Except as otherwise hereinabove provided, any notice that Lender or Debtor may desire or be required to give to the other intended recipient thereof at its address hereinabove set forth or at such other address as such intended recipient may, from time to time, by notice in writing, designated to the sender pursuant hereto. Any such notice shall be deemed to have been delivered to and received by the other party two (2) business days after mailing by United States

2

registered or certified mail, return receipt requested, or when delivered in person. Unless specifically required herein, notice of the exercise of any option granted to Lender by this Note is not required to be given.

This Note shall be construed in accordance with and governed by the laws of the State of Illinois.

Debtor hereby represents that the proceeds of the loan will be used for business purposes and that the indebtedness evidenced herein hereby constitutes a business loan.

It being the intention of Lender and Debtor to comply with the laws of the State of Illinois, it is agreed that notwithstanding any provision to the contrary in this Note, no such provision shall require the payment or permit the collection of any amount ("Excess Interest") in excess of the maximum amount of interest permitted by law to be charged for the use or detention, or the forbearance in the collection, of all of any portion of the indebtedness evidenced by this Note. If any Excess Interest is provided for, or is adjudicated to be provided for, in this Note or the Installment Agreement for Warranty Deed and Personal Property, then in such event (a) the provisions of this paragraph shall govern and control; (b) Debtor shall not be obligated to pay any Excess Interest; (c) any Excess Interest that Lender may have received hereunder shall, at the option of Lender, be (i) applied as a credit against the then outstanding principal balance of the Loan, accrued and unpaid interest thereon not to exceed the maximum amount permitted by law, or both, (ii) refunded to the payer thereof, or (iii) any combination of the foregoing; (d) the applicable interest rate or rates hereunder shall be automatically subject to reduction to the maximum lawful contract rate allowed under the applicable usury laws of the aforesaid State, and this Note, shall be deemed to have been, and shall be, reformed and modified to reflect such reduction in such applicable interest rate or rates; and I Debtor shall not have any action against Lender for any damages whatsoever arising out of the payment or collection of any Excess Interest.

Upon any endorsement, assignment, or other transfer of this Note by Lender or by operation of law, the term "Lender", as used herein, shall mean the endorsee, assignee, or other transferee or successor to Lender then becoming the holder of this Note.

This Note and all provisions hereof shall be binding on all persons claiming under or through Debtor. The term "Debtor", as used herein, shall include the respective successors, assigns, legal and personal representative, executors, administrators, devisees, legatees, and heirs of Debtor.

**IN WITNESS WHEREOF**, Debtor has caused this Note to be executed as of the date first written hereinabove.

**GAS CAP FUELS, LLC**

_____
**LOUAY ALANI,** Individually

_____
By: **LOUAY ALANI**

Its: _____

3

STATE OF ILLINOIS )
                )    SS
COUNTY OF _Lake_ )

I, the undersigned, a Notary Public in and for said County, in the State aforesaid, DO HEREBY CERTIFY that **LOUAY ALANI** is the ___Manager___ of **GAS CAP FUELS, LLC,** and is personally known to me to be the same person whose name is subscribed to the foregoing instrument as ___same___, appeared before me this day in person and acknowledged that he signed and delivered the said instrument as his own free and voluntary act, and as a free and voluntary act of said Company for the uses and purposes therein set forth.

Given under my hand and notarial seal this _12th_ day of _April_, 2013.

_Kenneth J. Chalifoux_
Notary Public

> "OFFICIAL SEAL"
> KENNETH J. CHALIFOUX
> Notary Public, State of Illinois
> My Commission Expires 12/06/14

STATE OF ILLINOIS )
                )    SS
COUNTY OF _Lake_ )

I, the undersigned, a Notary Public in and for said County, in the State aforesaid, DO HEREBY CERTIFY that **LOUAY ALANI** is personally known to me to be the same person whose name is subscribed to the foregoing instrument appeared before me this day in person and acknowledged that he signed and delivered the said instrument as his own free and voluntary act for the uses and purposes therein set forth.

Given under my hand and notarial seal this _12th_ day of _April_, 2013.

_Kenneth J. Chalifoux_
Notary Public

> "OFFICIAL SEAL"
> KENNETH J. CHALIFOUX
> Notary Public, State of Illinois
> My Commission Expires 12/06/14

00050-120671  G:\Anest\Sale of Ingleside Property\Sale 26025 W Grand Ave. Ingleside\Documents\CLOSING DOCS rec'd from Chris 040313\Docs Revised 040913\Promissory Note - BAP\APT Purchaser Rev 2013_03_29.doc

## AMORTIZATION SCHEDULE

**Gas Cap Fuels - Ingleside**       4/1/2013
**180 Month Amortization**
**84 Month (7 Year) Balloon**

| | | |
|---|---|---:|
| **Finance Amount** | | 400,500 |
| **Months** | | 180.00 |
| **Payment** | | 3,167.13 |
| **Rate** | | 5.00% |

| PMT NO. | Payment | Principal | Interest | Balance |
|---:|---|---|---|---|
| 1 | $3,167.13 | 1,498.38 | 1,668.75 | 399,001.62 |
| 2 | $3,167.13 | 1,504.62 | 1,662.51 | 397,497.00 |
| 3 | $3,167.13 | 1,510.89 | 1,656.24 | 395,986.11 |
| 4 | $3,167.13 | 1,517.19 | 1,649.94 | 394,468.92 |
| 5 | $3,167.13 | 1,523.51 | 1,643.62 | 392,945.41 |
| 6 | $3,167.13 | 1,529.86 | 1,637.27 | 391,415.56 |
| 7 | $3,167.13 | 1,536.23 | 1,630.90 | 389,879.33 |
| 8 | $3,167.13 | 1,542.63 | 1,624.50 | 388,336.70 |
| 9 | $3,167.13 | 1,549.06 | 1,618.07 | 386,787.64 |
| 10 | $3,167.13 | 1,555.51 | 1,611.62 | 385,232.12 |
| 11 | $3,167.13 | 1,561.99 | 1,605.13 | 383,670.13 |
| 12 | $3,167.13 | 1,568.50 | 1,598.63 | 382,101.63 |
| 13 | $3,167.13 | 1,575.04 | 1,592.09 | 380,526.59 |
| 14 | $3,167.13 | 1,581.60 | 1,585.53 | 378,944.99 |
| 15 | $3,167.13 | 1,588.19 | 1,578.94 | 377,356.80 |
| 16 | $3,167.13 | 1,594.81 | 1,572.32 | 375,761.99 |
| 17 | $3,167.13 | 1,601.45 | 1,565.67 | 374,160.53 |
| 18 | $3,167.13 | 1,608.13 | 1,559.00 | 372,552.41 |
| 19 | $3,167.13 | 1,614.83 | 1,552.30 | 370,937.58 |
| 20 | $3,167.13 | 1,621.56 | 1,545.57 | 369,316.03 |
| 21 | $3,167.13 | 1,628.31 | 1,538.82 | 367,687.71 |
| 22 | $3,167.13 | 1,635.10 | 1,532.03 | 366,052.62 |
| 23 | $3,167.13 | 1,641.91 | 1,525.22 | 364,410.71 |
| 24 | $3,167.13 | 1,648.75 | 1,518.38 | 362,761.96 |
| 25 | $3,167.13 | 1,655.62 | 1,511.51 | 361,106.34 |
| 26 | $3,167.13 | 1,662.52 | 1,504.61 | 359,443.82 |
| 27 | $3,167.13 | 1,669.45 | 1,497.68 | 357,774.37 |
| 28 | $3,167.13 | 1,676.40 | 1,490.73 | 356,097.97 |
| 29 | $3,167.13 | 1,683.39 | 1,483.74 | 354,414.59 |
| 30 | $3,167.13 | 1,690.40 | 1,476.73 | 352,724.18 |
| 31 | $3,167.13 | 1,697.44 | 1,469.68 | 351,026.74 |
| 32 | $3,167.13 | 1,704.52 | 1,462.61 | 349,322.22 |
| 33 | $3,167.13 | 1,711.62 | 1,455.51 | 347,610.60 |
| 34 | $3,167.13 | 1,718.75 | 1,448.38 | 345,891.85 |
| 35 | $3,167.13 | 1,725.91 | 1,441.22 | 344,165.94 |
| 36 | $3,167.13 | 1,733.10 | 1,434.02 | 342,432.84 |
| 37 | $3,167.13 | 1,740.32 | 1,426.80 | 340,692.51 |
| 38 | $3,167.13 | 1,747.58 | 1,419.55 | 338,944.93 |
| 39 | $3,167.13 | 1,754.86 | 1,412.27 | 337,190.08 |
| 40 | $3,167.13 | 1,762.17 | 1,404.96 | 335,427.91 |

5

| | | | |
|---|---|---|---|
| 41 | $3,167.13 | 1,769.51 | 1,397.62 | 333,658.39 |
| 42 | $3,167.13 | 1,776.89 | 1,390.24 | 331,881.51 |
| 43 | $3,167.13 | 1,784.29 | 1,382.84 | 330,097.22 |
| 44 | $3,167.13 | 1,791.72 | 1,375.41 | 328,305.50 |
| 45 | $3,167.13 | 1,799.19 | 1,367.94 | 326,506.31 |
| 46 | $3,167.13 | 1,806.69 | 1,360.44 | 324,699.62 |
| 47 | $3,167.13 | 1,814.21 | 1,352.92 | 322,885.41 |
| 48 | $3,167.13 | 1,821.77 | 1,345.36 | 321,063.64 |
| 49 | $3,167.13 | 1,829.36 | 1,337.77 | 319,234.27 |
| 50 | $3,167.13 | 1,836.99 | 1,330.14 | 317,397.29 |
| 51 | $3,167.13 | 1,844.64 | 1,322.49 | 315,552.65 |
| 52 | $3,167.13 | 1,852.33 | 1,314.80 | 313,700.32 |
| 53 | $3,167.13 | 1,860.04 | 1,307.08 | 311,840.28 |
| 54 | $3,167.13 | 1,867.79 | 1,299.33 | 309,972.48 |
| 55 | $3,167.13 | 1,875.58 | 1,291.55 | 308,096.91 |
| 56 | $3,167.13 | 1,883.39 | 1,283.74 | 306,213.52 |
| 57 | $3,167.13 | 1,891.24 | 1,275.89 | 304,322.28 |
| 58 | $3,167.13 | 1,899.12 | 1,268.01 | 302,423.16 |
| 59 | $3,167.13 | 1,907.03 | 1,260.10 | 300,516.13 |
| 60 | $3,167.13 | 1,914.98 | 1,252.15 | 298,601.15 |
| 61 | $3,167.13 | 1,922.96 | 1,244.17 | 296,678.19 |
| 62 | $3,167.13 | 1,930.97 | 1,236.16 | 294,747.22 |
| 63 | $3,167.13 | 1,939.02 | 1,228.11 | 292,808.21 |
| 64 | $3,167.13 | 1,947.09 | 1,220.03 | 290,861.11 |
| 65 | $3,167.13 | 1,955.21 | 1,211.92 | 288,905.91 |
| 66 | $3,167.13 | 1,963.35 | 1,203.77 | 286,942.55 |
| 67 | $3,167.13 | 1,971.53 | 1,195.59 | 284,971.02 |
| 68 | $3,167.13 | 1,979.75 | 1,187.38 | 282,991.27 |
| 69 | $3,167.13 | 1,988.00 | 1,179.13 | 281,003.27 |
| 70 | $3,167.13 | 1,996.28 | 1,170.85 | 279,006.99 |
| 71 | $3,167.13 | 2,004.60 | 1,162.53 | 277,002.39 |
| 72 | $3,167.13 | 2,012.95 | 1,154.18 | 274,989.44 |
| 73 | $3,167.13 | 2,021.34 | 1,145.79 | 272,968.10 |
| 74 | $3,167.13 | 2,029.76 | 1,137.37 | 270,938.34 |
| 75 | $3,167.13 | 2,038.22 | 1,128.91 | 268,900.12 |
| 76 | $3,167.13 | 2,046.71 | 1,120.42 | 266,853.41 |
| 77 | $3,167.13 | 2,055.24 | 1,111.89 | 264,798.17 |
| 78 | $3,167.13 | 2,063.80 | 1,103.33 | 262,734.37 |
| 79 | $3,167.13 | 2,072.40 | 1,094.73 | 260,661.96 |
| 80 | $3,167.13 | 2,081.04 | 1,086.09 | 258,580.93 |
| 81 | $3,167.13 | 2,089.71 | 1,077.42 | 256,491.22 |
| 82 | $3,167.13 | 2,098.42 | 1,068.71 | 254,392.80 |
| 83 | $3,167.13 | 2,107.16 | 1,059.97 | 252,285.64 |
| 84 | $3,167.13 | 2,115.94 | 1,051.19 | 250,169.71 |
| Balloon | | | 1,042.37 | 250,169.71 |
| | $266,038.79 | $150,330.29 | $116,750.87 | |

| Year | Payment | Principal | Interest |
|------|---------|-----------|----------|
| 1 | 38,005.54 | 18,398.37 | 19,607.17 |
| 2 | 38,005.54 | 19,339.67 | 18,665.87 |
| 3 | 38,005.54 | 20,329.12 | 17,676.42 |
| 4 | 38,005.54 | 21,369.20 | 16,636.34 |
| 5 | 38,005.54 | 22,462.49 | 15,543.05 |
| 6 | 38,005.54 | 23,611.71 | 14,393.83 |
| 7 | 38,005.54 | 24,819.73 | 14,228.18 |
| | | | |
| | $266,038.79 | $150,330.29 | $116,750.87 |

# EXHIBIT C

# PETROLEUM PRODUCTS SUPPLY AGREEMENT

This Agreement is made and entered into this 12TH day of APRIL, 2013, by and between **STATE OIL COMPANY** with an address of 31366 North Highway

**For Recorder's Use Only**

45, Libertyville, Illinois 60048 ("Supplier") and **CATCH 26, LLC,** with an address of 779 S. Winchester Drive, Round Lake, IL 60073 ("Retailer").

# R E C I T A L S

**WHEREAS,** the **Gas Cap Fuels, LLC** ("Purchaser") has entered into an Installment Contract for Deed (Installment Contract") for the Premises commonly known as 26025 West Grand Avenue, Ingleside, IL 60041 (the "Premises") and legally described in **Exhibit "B"** attached hereto, with **BAPA, LLC AND PT, LLC** ("BAPA-PT") to purchase and use the Premises for the retail sales of gasoline and allied petroleum products;

**WHEREAS,** the **Gas Cap Fuels, LLC** ("Purchaser") has entered into an Installment Contract for Deed (Installment Contract #2") for the Premises commonly known as 26037 West Grand Avenue, Ingleside, IL 60041 (the "Premises #2") and legally described in **Exhibit "C"** attached hereto, with **JCC Realty, LLC AND BCP Realty, LLC** ("JCC-BCP") to purchase and use the Premises #2 as a residential property;

**WHEREAS,** the Retailer desires to purchase all its needs of gasoline and allied petroleum products to be sold on the Premises from Supplier and Supplier desires to furnish the Retailer with all of its needs of gasoline and allied petroleum products for the Premises;

Initial ___ ___ ___

Ingleside #70
26025 W. Grand Ave.
Ingleside, IL 60041

**NOW, THEREFORE,** in consideration of the covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

1. <u>Supply of Petroleum Products.</u>  The Supplier shall furnish to Retailer a supply of gasoline reasonable for its sales need, to the degree possible and the Retailer shall purchase its gasoline supply exclusively from the Supplier.  The Supplier shall make reasonable efforts to provide an adequate supply.  If the Supplier is unable to supply the Retailer's reasonable needs of gasoline, and if the Retailer shall be able to acquire a supply of gasoline from any other source, Retailer agrees to enable the Supplier to purchase that gasoline for resale to Retailer at the cost and terms available to Retailer.  The Supplier shall charge the Retailer for each transport load of gasoline at Supplier's posted price, plus $.0200 per gallon, plus federal excise tax, Federal Oil Spill Recovery Fee, state motor fuel tax, underground storage tank tax, environmental impact fee, advertising fees from the oil company, freight, prepaid state sales tax, and any county or city imposed taxes that are required to be collected by Supplier.  State sales tax, county imposed motor fuel tax, and any other city or locally imposed tax on sales shall be the sole responsibility of the Retailer.  Retailer shall furnish Seller with satisfactory tax exemption certificates where an exemption is claimed.  To secure the present and future obligations of Retailer to Supplier, Retailer shall provide Supplier with a Security Agreement on the inventory and equipment of Retailer.

(A)  **Delivery.**  Deliveries of said gasolines shall be made by Supplier on Retailer's order in single deliveries of not less than 8,500 gallons.  However, if Retailer orders a single delivery of less than 8,500 gallons, Retailer remains responsible for all costs of delivery, including freight rate, for a delivery of 8,500 gallons.  Supplier shall make deliveries within 48 hours following receipt of Retailer's order but need not make such deliveries outside of normal business hours or on Sunday or holidays.  Retailer agrees to purchase a minimum of 75,000 gallons per month from Supplier and the failure to do so shall constitute a default of the terms and conditions of this Supply Agreement.

(B)  **Liabilities.**  The obligation of the parties to deliver and receive gasoline hereunder shall be suspended and excused (a) if Supplier is prevented from or delayed in producing, manufacturing, transporting or delivering in its normal manner any gasoline hereunder or the materials from which such gasoline is manufactured because of acts of God, earthquake, fire, flood or the elements, malicious mischief, riots, strikes, lockouts, boycotts, picketing, labor disputes or disturbance, compliance with any directive, order or regulation of any governmental authority or representative thereof acting under claim or color of authority; or (b) loss or shortage of any gasoline due to reasons beyond Supplier's reasonable control or (c) loss or shortage of any part of Supplier's own or customary transportation or delivery facilities due to reasons beyond Supplier's reasonable control; or (d) for any reason beyond Supplier's or Retailer's reasonable control.  Whenever such causes, in Supplier's judgment, require restriction of deliveries, Supplier reserves the right, in its discretion, to restrict deliveries to Retailer, whether or not delivering to others.

Initial _____ ____ ____

Ingleside #70
26025 W. Grand Ave.
Ingleside, IL 60041

(C)     **Payments.**     All sums paid to Supplier shall be paid in lawful money of the United States of America without discount at time of delivery or upon such other terms as Supplier may from time to time require.   All sums paid shall be applied first to the payments of any outstanding obligation for product purchases, credit card chargebacks, and/or repairs including all bills due to Supplier.   Supplier may assess a reasonable administrative fee upon retailer for payments that are returned or rejected for lack of sufficient funds or for any other reason within Retailer's control.   All overdue sums owed to Supplier will bear interest at the rate of 18% per annum or the highest rate permitted by law, whichever is lower, from the date due until paid.   Supplier expressly reserves the right to initiate an Electronic Funds Transfer (EFT) payment system to satisfy all payment obligations under this Paragraph 1 (Supply of Petroleum Products) and Paragraph 2 (Credit Cards).

(D)     **Resale Provisions.**     Retailer agrees not to mix, substitute or adulterate said gasolines with any other gasolines or materials.  The primary business activity of Supplier is the sale and distribution of petroleum products and it is the understanding of the Supplier and Retailer that the Retailer will continue during the term of this Agreement to purchase all petroleum products at this location from the Supplier.  In the event the Retailer mixes, substitutes, or adulterates said petroleum products, at Supplier's option, this Agreement may be terminated upon five (5) days written notice to Retailer.  The Retailer understands this paragraph in its entirety and upon signing of the Agreement is in complete agreement with all of the above.

(E)     **Notice.**     Any requests or notice required or permitted to be given hereunder to Retailer shall be deemed properly given and served when deposited, postage prepaid, Registered or Certified, in the United States mail addressed to Retailer at his place of business specified above or, in lieu of such demands, requests or notices may be personally served upon Retailer.  Any notices hereunder required or permitted to be given to Supplier shall be deemed properly given and served when deposited, postage prepaid, Registered or Certified, in the United States mail addressed to Supplier at 31366 North Highway 45, Libertyville, Illinois 60048.

(F)     **Modification.**     This agreement may be modified or superseded by any and all governmental laws and regulations enacted subsequent hereto pertaining to Energy Allocation and Conservation, however hardships and forfeitures shall not be enforced between the parties as a result.

(G)     **Retailer's Assignment.**     This Supply Agreement shall not be assigned by Retailer or by operation of law without Supplier's prior written consent, but otherwise shall be binding upon and shall inure to the benefit of the parties, their heirs, their representatives, successors and assigns, and it is the intention of the parties that the Agreement shall further be deemed to be a covenant running with the land, which shall not be extinguished by a transfer of the Property or by the transfer of the business that is operating on the Property.  The parties further agree that a copy or counterpart of this Supply Agreement shall be recorded in the office of the Recorder of Deeds of the County where the property is located.

Initial

(H) **Term of Agreement.** Retailer and Supplier expressly agree that the Initial Term of the Supply Agreement shall be for a period which commences on the date in which Retailer takes possession of the Premises, pursuant to the Installment Contract and terminates eight (8) years after the termination of the Installment Contract in conjunction with the termination of the deed restriction referred to in the Installment Contract.

(I) **Automatic Renewal.** This agreement shall automatically renew upon expiration of the Initial Term for successive one-year terms (individually a "Renewal Term") unless no later than ninety (90) days prior to expiration of the Initial Term or any Renewal Term, either party provides written notice of nonrenewal to the other.

(J) **Right of First Refusal to Supply.** The Supplier shall have the right of first refusal to match any Supply Agreement which Retailer enters into with a third party upon expiration of the Initial Term or any Renewal Term of this Supply Agreement. The right of first refusal to supply shall also apply to any subsequent operator who obtains possession by way of purchase or transfer of the property.

(K) **Right of First Refusal to Purchase Property.** At any time during the Initial Term of the Supply Agreement or any Renewal Term, the Supplier shall have the right of first refusal to match any Purchase Offer which Purchaser enters into with a third party.

(L) **Right to Assign.** Supplier shall have the right at any time to assign the Supply Agreement to a new Supplier at its sole discretion.

(M) **Shortfalls.** Retailer agrees to reimburse Supplier for the cost of any shortfall that Supplier incurs with respect to any oil company minimum gallonage requirements with respect to the subject property or any shortfalls from rebates due to early delivery.

2.    <u>Credit Cards.</u> The Retailer shall have the option of accepting credit cards for retail gasoline sales. If a nationally branded gasoline product is being advertised and sold from the premises, and if the major oil company whose brand is being used requires that its credit cards be accepted, then the Retailer shall accept such credit cards and shall comply with all credit card regulations of the oil company. All fees, discounts or charges including charge-backs associated with the use of the credit card will be at the sole expense of the Retailer. Retailer shall have the right to utilize their own credit card processor as long as it continues to accept the credit cards of the oil company whose brand is being used.

3.    <u>Meter Readings and Inventory Control.</u> Supplier reserves the right, at their option, to have a representative audit the meter readings at the beginning of any given month to verify purchases against sales. Inventory control is required on all underground storage tanks. Retailer agrees to take stick readings and pump readings on every day of each month and mail the inventory control forms and tank data sheets to State Oil Company, 31366 North Highway 45, Libertyville, Illinois 60048, on or before the 5th day of the following month.

4.    <u>Sales Tax Affidavit.</u> Retailer agrees to sign the Sales Tax Affidavit attached hereto and made a part hereof.

Initial

5. <u>Use of Premises.</u>   The Retailer shall continuously and uninterruptedly during the term of this Agreement conduct its customary business activity therein during all normal business days and during the Retailer's customary hours, unless prevented from doing so by strike, fire, casualty or other causes beyond the Retailer's control and except during reasonable periods for repairing, cleaning and decorating the Premises.

6. <u>Identification of Business.</u>   The Supplier shall be responsible for supplying and Retailer shall maintain all signs and advertising relating to the gasoline brand being dispensed from the Premises.  In the event, the Retailer desires to use another name to identify the convenience grocery store operation upon the Premises, the name will be mutually agreed upon by both the Supplier and Retailer.  The Supplier reserves the right to change the brands of gasoline at anytime.

7. <u>Indemnity.</u>   Retailer agrees that it will save, hold harmless and indemnify Supplier and the Oil Company, whose logo or signage is being used in connection with the sale of petroleum products, from and against all liability or loss, including any cost of litigation or attorneys fees, which either the Supplier or the Refiner may sustain as a result of claims, demands, costs or judgments arising from the operation of the Business on the Premises, or from any action or inaction taken by any person at the Business or Premises, or from any condition or claim of condition of the Premises during the term of the Agreement.

8. <u>Term and Termination of Agreement.</u>   The Initial Term of this Agreement shall be for a period which commences on the date in which Retailer takes possession of the Premises pursuant to the Installment Contract and terminates eight (8) years after the termination of the Installment Contract, in conjunction with the termination of the deed restriction referred to in the Installment Contract. The parties specifically acknowledge and agree that the franchise relationship (as defined in the Petroleum Marketing Practices Act, 15 USC §2801 <u>et seq</u>.) created by this Agreement between the Retailer and the Supplier is necessarily contingent upon the Retailer's ability to maintain possession of the Premises.  In the event that the Retailer's possession of the Premises is terminated, for any reason the parties agree that the purpose for which this Agreement is being entered into (the supply and purchase of gasoline and allied petroleum products to be sold on the Premises) will be frustrated.  The parties further agree that the failure of the Retailer to maintain possession will constitute a default and an event, which is relevant to the franchise relationship as a result of which termination of the franchise by Supplier is reasonable within the meaning of Section 2802 (b)(2)(C) of the Petroleum Marketing Practices Act. Notwithstanding anything to the contrary contained in this Section 8, the mere fact that Retailer has vacated the premises or otherwise has violated the terms of this Agreement does not limit the remedies of Supplier under the Petroleum Marketing Practices Act or pursuant to state law or under this Agreement.  Failure on the part of Retailer, its successors and assigns to comply fully with the branding requirements of the Oil Company shall be grounds for termination of this Agreement.

9. <u>Default.</u>

(A) **Relationship to Installment Contracts.** As stated on Page 1, BAPA-PT and JCC-BCP, which have the same principal parties as Supplier, entered into Installment Contract and Installment Contract #2 with Purchaser, which has the same principal party as Retailer. The Supply Agreement is material to both Installment Contract and Installment Contract #2.  A default under the Supply Agreement constitutes a default under both Installment

Initial _____  _____  _____

Contract and Installment Contract #2. In turn, a default under either Installment Contract or Installment Contract #2 constitutes a default under the Supply Agreement.

(B) **Other Agreements.** Supplier and Retailer may have agreements related to other locations that are owned or otherwise controlled by Retailer. Any default under any such other agreement shall be considered a default under this Supply Agreement.

10. <u>Supplier's Remedies.</u> In the event of a breach by Retailer of any of its material covenants or obligations contained herein, not cured within five (5) days after notice, or default by Purchaser under the terms of the Installment Contract, the parties agree that the Supplier, in addition to any other remedy available to it at law or equity, shall be entitled to terminate the Agreement and receive damages in a sum to be calculated by multiplying $0.0300 by the monthly gallon minimum stated in section 1(A) by the number of months remaining on the then current term (Initial Term or Renewal Term) of the Supply Agreement. Supplier will be entitled to recover from Retailer reasonable attorneys' fees and other legal costs Supplier incurs in order to secure or protect the rights inuring to Supplier under this Agreement, or to enforce the terms of this Agreement.

11. <u>Time of Performance.</u> The time of performance of all of the covenants and conditions of this Agreement is of the essence.

12. <u>Not a Joint Venture.</u> Nothing herein shall be construed so as to constitute a joint venture or partnership between Supplier and Retailer.

13. <u>Law of Illinois to Govern.</u> The laws of the State of Illinois shall govern the validity, performance and enforcement of this Agreement.

14. <u>Captions for Convenience Only.</u> The captions of the several articles and sections contained herein are for convenience only and do not define, limit, describe or construe the contents of such articles or sections.

15. <u>Amendments to be in Writing.</u> No amendment, modification or supplement to this Agreement shall be effective unless in writing, executed and delivered by Supplier and Retailer.

16. <u>Severability.</u> If any provision of this Agreement is held to be invalid, such invalid provision shall be deemed to be severable from and shall not affect the validity of the remainder of this Agreement.

17. <u>Successors and Assigns.</u> The terms and provisions of this Agreement shall be binding upon, and shall inure to the benefit of the parties hereto and their successors and permitted assigns.

18. <u>Joint Obligation.</u> The obligations hereunder imposed shall be joint and several.

19. <u>Inability to Perform.</u> This Agreement and the obligations of the Retailer hereunder shall not be affected or impaired because the Supplier is unable to fulfill any of its obligations hereunder or is delayed in doing so, if such inability or delay is caused by reason of strike, labor troubles, acts of God, or any other cause beyond the reasonable control of the Supplier.

Initial _____ ____ ____

20.    <u>Cumulative Remedies.</u>        No remedy or election hereunder shall be deemed exclusive but shall, wherever possible, be cumulative and all other remedies at law or in equity.

21.    <u>Receipt of Notice.</u>      Retailer acknowledges receipt of a copy of SUMMARY OF THE PETROLEUM MARKETING PRACTICES ACT, #3128-01-Federal Register-Vol. 43, No. 169, attached hereto as **<u>Exhibit "A"</u>**, which is made part of Retailer's Agreement with **STATE OIL COMPANY.**

*(Remainder of page intentionally left blank.)*

Initial

Ingleside #70
26025 W. Grand Ave.
Ingleside, IL 60041

**IN WITNESS WHEREOF,** the parties hereunto have caused this Petroleum Products Supply Agreement to be executed, in Libertyville, Illinois, this 5TH day of MARCH, 2013.

## RETAILER: Catch 26, LLC

Ali Alani, Manager

## GUARANTORS:

Ali Alani, as an individual
SSN:

Louay Alani, as an individual
SSN:

## PURCHASER: Gas Cap Fuels, LLC

By: Louay Alani
Its: _Mgr_

## SUPPLIER: STATE OIL COMPANY

Peter Anest, President

00050-120671   G:\Anest\Sale of Ingleside Property\Sale 26025 W Grand Ave. Ingleside\Documents\CLOSING DOCS rec'd from Chris 040313\Docs Revised 040913\Supply Agreement - Catch 26 LLC 2013_03_29.doc

Initial ____ ____

Ingleside #70
26025 W. Grand Ave.
Ingleside, IL 60041

STATE OF ILLINOIS    )
                      )    ss.
County of Lake       )

I, the undersigned, a Notary Public in and for said County, in the State aforesaid, DO HEREBY CERTIFY that **Ali Alani** is the Manager of **Catch 26, LLC** who is personally known to me to be the same person whose names is subscribed to the foregoing instrument as President and appeared before me this day in person and acknowledged that he signed, sealed and delivered the said instrument as his free and voluntary act, for the uses and purposes therein set forth.

Given under my hand and notarial seal this _12th_ day of _April_ 2013.

_Kenneth J. Chel_____
Notary Public

"OFFICIAL SEAL"
KENNETH J. CHALIFOUX
Notary Public, State of Illinois
My Commission Expires 12/06/14

STATE OF ILLINOIS    )
                      )    ss.
County of Lake       )

I, the undersigned, a Notary Public in and for said County, in the State aforesaid, DO HEREBY CERTIFY that **Ali Alani** is personally known to me to be the same person whose names is subscribed to the foregoing instrument as **Guarantor** and appeared before me this day in person and acknowledged that he signed, sealed and delivered the said instrument as his free and voluntary act, for the uses and purposes therein set forth.

Given under my hand and notarial seal this _12th_ day of _April_ 2013.

_Kenneth J. Chel_____
Notary Public

"OFFICIAL SEAL"
KENNETH J. CHALIFOUX
Notary Public, State of Illinois
My Commission Expires 12/06/14

STATE OF ILLINOIS    )
                      )    ss.
County of Lake       )

I, the undersigned, a Notary Public in and for said County, in the State aforesaid, DO HEREBY CERTIFY that **Louay Alani** is personally known to me to be the same person whose names is subscribed to the foregoing instrument as **Guarantor** and appeared before me this day in person and acknowledged that he signed, sealed and delivered the said instrument as his free and voluntary act, for the uses and purposes therein set forth.

Given under my hand and notarial seal this _12th_ day of _April_ 2013.

"OFFICIAL SEAL"
KENNETH J. CHALIFOUX
Notary Public, State of Illinois
My Commission Expires 12/06/14

_Kenneth J. Chel_____
Notary Public

Initial ____ ____ ____

Ingleside #70
26025 W. Grand Ave.
Ingleside, IL 60041

**STATE OF ILLINOIS** )
)  **ss.**
**County of Lake** )

I, the undersigned, a Notary Public in and for said County, in the State aforesaid, DO HEREBY CERTIFY that **Louay Alani** is the _Manager_ of **Gas Cap Fuels, LLC** who is personally known to me to be the same person whose names is subscribed to the foregoing instrument as President and appeared before me this day in person and acknowledged that he signed, sealed and delivered the said instrument as his free and voluntary act, for the uses and purposes therein set forth.

Given under my hand and notarial seal this _12th_ day of _April_ 2013.

_Kenneth J. Chelt_
Notary Public

"OFFICIAL SEAL"
KENNETH J. CHALIFOUX
Notary Public, State of Illinois
My Commission Expires 12/06/14

**STATE OF ILLINOIS** )
)  **ss.**
**County of Lake** )

I, the undersigned, a Notary Public in and for said County, in the State aforesaid, DO HEREBY CERTIFY that **Peter Anest** is the President of **STATE OIL COMPANY**, who is personally known to me to be the same person whose name is subscribed to the foregoing instrument and appeared before me this day in person and acknowledged that he signed, sealed and delivered the said instrument as his free and voluntary act, for the uses and purposes therein set forth.

Given under my hand and notarial seal this _11th_ day of _April_ 2013.

_Kenneth J. Chelt_
Notary Public

"OFFICIAL SEAL"
KENNETH J. CHALIFOUX
Notary Public, State of Illinois
My Commission Expires 12/06/14

Page **10** of **12**

Initial _____  _____  _____

# Revised Summary of Title I of the Petroleum Marketing Practices Act

AGENCY: Department of Energy

ACTION: Notice

SUMMARY: This notice contains a summary of Title I of the Petroleum Marketing Practices Act, as amended (the Act). The Petroleum Marketing Practices Act was originally enacted on June 19, 1978, and was amended by the Petroleum Marketing Practices Act Amendments of 1994, enacted on October 19, 1994. On August 30, 1978, the Department of Energy published in the **Federal Register** a summary of the provisions of Title I of the 1978 law, as required by the Act. The Department is publishing this revised summary to reflect key changes made by the 1994 amendments.

The Act is intended to protect franchised distributors and retailers of gasoline and diesel motor fuel against arbitrary or discriminatory termination or nonrenewal of franchises. This summary describes the reasons for which a franchise may be terminated or not renewed under the law, the responsibilities of franchisors, and the remedies and relief available to franchisees. The Act requires franchisors to give franchisees copies of the summary contained in this notice whenever notification of termination or non renewal of a franchise is given.

SUPPLEMENTARY INFORMATION:
Title I of the Petroleum Marketing Practices Act, as amended, 15 U.S.C. §§2801-2806, provides for the protection of franchised distributors and retailers of motor fuel by establishing minimum Federal standards governing the termination of franchises and the nonrenewal of franchise relationships by the franchisor or distributor of such fuel.

Section 104(d)(1) of the Act required the Secretary of Energy to publish in the **Federal Register** a simple and concise summary of the provisions of Title I, including a statement of the respective responsibilities of, and the remedies and relief available to, franchisors and franchisees under the title. The Department published this summary in the **Federal Register** on August 30, 1978. 43 F.R. 38743 (1978).

In 1994 the Congress enacted the Petroleum Marketing Practices Act Amendments to affirm and clarify certain key provisions of the 1978 statute. Among the key issues addressed in the 1994 amendments are: (1) termination or nonrenewal of franchised dealers by their franchisors for purposes of conversion to "company" operation; (2) application of state law; (3) the rights and obligations of franchisors and franchisees in third-party lease situations; and (4) waiver of rights limitations. See H.R. REP. NO. 737, 103rd Cong., 2nd Sess. 2 (1994), *reprinted in* 1994 U.S.C.C.A.N. 2780. Congress intended to: (1) make explicit that upon renewal a franchisor may not insist on changes to a franchise agreement where the purpose of such changes is to prevent renewal in order to convert a franchisee-operated service station into a company-operated service station; (2) make clear that where the franchisor has an option to continue the lease or to purchase the premises but does not wish to do so, the franchisor must offer to assign the option to the franchisee; (3) make clear that no franchisor may require, as a condition of entering or renewing a franchise agreement, that a franchisee waive any rights under the Petroleum Marketing Practices Act, any other Federal law, or any state law; and (4) reconfirm the limited scope of Federal preemption under the Act. *Id.*

The summary which follows reflects key changes to the statute resulting from the 1994 amendments. The Act requires franchisors to give copies of this summary statement to their franchisees when entering into an agreement to terminate the franchise or not to renew the franchise relationship, and when giving notification of termination or nonrenewal. This summary does not purport to interpret the Act, as amended, or to create new legal rights.

In addition to the summary of the provisions of Title I, a more detailed description of the definitions contained in the Act and of the legal remedies available to franchisees is also included in this notice, following the summary statement.

## Summary of Legal Rights of Motor Fuel Franchisees

This is a summary of the franchise protection provisions of the Federal Petroleum Marketing Practices Act, as amended in 1994 (the Act), 15 U.S.C §§2801-2806. This summary must be given to you, as a person holding a franchise for the sale, consignment or distribution of gasoline or diesel motor fuel, in connection with any termination, or nonrenewal of your franchise by your franchising company (referred to in this summary as your supplier).

You should read this summary carefully, and refer to the Act if necessary, to determine whether a proposed termination or nonrenewal of your franchise is lawful, and what legal remedies are available to you if you think the proposed termination or failure to renew is not lawful. In addition, if you think your supplier has failed to comply with the Act, you may wish to consult an attorney in order to enforce your legal rights.

The franchise protection provisions of the Act apply to a variety of franchise agreements. The term "franchise" is broadly defined as a license to use a motor fuel trademark, which is owned or controlled by a refiner and it includes secondary agreements such as leases of real property and motor fuel supply agreements which have existed continuously since May 15, 1973, regardless of a subsequent withdrawal of a trademark. Thus, if you have lost the use of a trademark previously granted by your supplier but have continued to receive motor fuel supplies through a continuation of a supply agreement with your supplier, you are protected under the Act.

Any issue arising under your franchise which is not governed by this Act will be governed by the law of the State in which the principal place of business of your franchise is located.

Although a State may specify the terms and conditions under which your franchise may be transferred upon the death of the franchisee, it may not require a payment to you (the franchisee) for the goodwill of a franchise upon termination or nonrenewal.

The Act is intended to protect you, whether you are a distributor or a retailer, from arbitrary or discriminatory termination or nonrenewal of your franchise agreement. To accomplish this, the Act first lists the reasons for which termination or nonrenewal is permitted. Any notice of termination or nonrenewal must state the precise reason, as listed in the Act, for which the particular termination or nonrenewal is being made. These reasons are described below under the headings "Reasons for Termination" and "Reasons for Nonrenewal."

The Act also requires your supplier to give you a written notice of termination or intention not to renew the franchise within certain time periods. These requirements are summarized below under the heading "Notice Requirements for Termination or Nonrenewal."

The Act also provides certain special requirements with regard to trial and interim franchise agreements, which are described below under the heading "Trial and Interim Franchises."

The Act gives you certain legal rights if your supplier terminates or does not renew your franchise in a way that is not permitted by the Act. These legal rights are described below under the heading "Your Legal Rights."

The Act contains provisions pertaining to waiver of franchisee rights and applicable State law. These provisions are described under the heading "Waiver of Rights and Applicable State Law."

This summary is intended as a simple and concise description of the general nature of your rights under the Act. For a more detailed description of these rights, you should read the text of the Petroleum Marketing Practices Act, as amended in 1994 (15 U.S.C. §§2801-2806). This summary does not purport to interpret the Act, as amended, or to create new legal rights.



### I. Reasons for Termination

If your franchise was entered into on or after June 19, 1978, the Act bars termination of your franchise for any reasons other than those reasons discussed below. If your franchise was entered into before June 19, 1978, there is no statutory restriction on the reasons for which it may be terminated. If a franchise entered into before June 19, 1978, is terminated, however, the Act requires the supplier to reinstate the franchise relationship unless one of the reasons listed under this heading or one the additional reasons for nonrenewal described below under the heading "Reasons for Nonrenewal" exists.

#### A. Non-Compliance with Franchise Agreement

Your supplier may terminate your franchise if you do not comply with a reasonable and important requirement of the franchise relationship. However, termination may not be based on a failure to comply with a provision of the franchise that is illegal or unenforceable under applicable Federal, State, or local law. In order to terminate for non-compliance with the franchise agreement, your supplier must have learned of this non-compliance recently. The Act limits the time period within which your supplier must have learned of your non-compliance to various periods, the longest of which is 120 days, before you receive notification of the termination.

#### B. Lack of Good Faith Efforts

Your supplier may terminate your franchise if you have not made good faith efforts to carry out the requirements of the franchise, provided you are first notified in writing that you are not meeting a requirement of the franchise and you are given an opportunity to make a good faith effort to carry out the requirement. This reason can be used by your supplier only if you fail to make good faith efforts to carry out the requirements of the franchise within the period which began not more than 180 days before you receive the notice of termination.

#### C. Mutual Agreement to Terminate the Franchise

A franchise can be terminated by an agreement in writing between you and your supplier if the agreement is entered into not more than 180 days before the effective date of the termination and you receive a copy of that agreement, together with this summary statement of your rights under the Act. You may cancel the agreement to terminate within 7 days after you receive a copy of the agreement, by mailing (by certified mail) a written statement to this effect to your supplier.

#### D. Withdrawal From the Market Area

Under certain conditions, the Act permits your supplier to terminate your franchise if your supplier is withdrawing from marketing activities in the entire geographic area in which you operate. You should read the Act for a more detailed description of the conditions under which market withdrawal terminations are permitted. See 15 U.S.C. § 2802(b)(E).

#### E. Other Events Permitting a Termination

If your supplier learns within the time period specified in the Act (which in no case is more than 120 days prior to the termination notice) that one of the following events has occurred, your supplier may terminate you franchise agreement:

(1) Fraud or criminal misconduct by you that relates to the operation of your marketing premises.

(2) You declare bankruptcy or a court determines that you are insolvent.

(3) You have a severe physical or mental disability lasting at least 3 months which makes you unable to provide for the continued proper operation of the marketing premises.

(4) Expiration of your supplier's underlying lease to the leased marketing premises, if: (a) your supplier gave you written notice before the beginning of the term of the franchise of the duration of the underlying lease and that the underlying lease might expire and not be renewed during the term of the franchise; (b) your franchisor offered to assign to you, during the 90-day period after notification of termination or nonrenewal was given, any option which the franchisor held to extend the underlying lease or to purchase the marketing premises (such an assignment may be conditioned on the franchisor receiving from both the landowner and the franchisee an unconditional release from liability for specified events occurring after the assignment); and (c) in a situation in which the franchisee acquires possession of the leased marketing premises effective immediately after the loss of the right of the franchisor to grant possession, the franchisor, upon written request of the franchisee, made a bona fide offer to sell or assign to the franchisee the franchiser's interest in any improvements or equipment located on the premises, or offered the franchisee a right of first refusal of any offer from another person to purchase the franchisor's interest in the improvements and equipment.

(5) Condemnation or other taking by the government, in whole or in part, of the marketing premises pursuant to the power of eminent domain. If the termination is based on a condemnation or other taking, your supplier must give you a fair share of any compensation which he receives for any loss of business opportunity or good will.

(6) Loss of your supplier's right to grant the use of the trademark that is the subject of the franchise, unless the loss was because of bad faith actions by your supplier relating to trademark abuse, violation of Federal or State law, or other fault or negligence.

(7) Destruction (other than by your supplier) of all or a substantial part of your marketing premises. If the termination is based on the destruction of the marketing premises and if the premises are rebuilt or replaced by your supplier and operated under a franchise, your supplier must give you a right of first refusal to this new franchise.

(8) Your failure to make payments to your supplier of any sums to which your supplier is legally entitled.

(9) Your failure to operate the marketing premises for 7 consecutive days, or any shorter period of time which, taking into account facts and circumstances, amounts to an unreasonable period of time not to operate.

(10) Your intentional adulteration, mislabeling or misbranding of motor fuels or other trademark violations.

(11) Your failure to comply with Federal, State, or local laws or regulations of which you have knowledge and that relate to the operation of the marketing premises.

(12) Your conviction of any felony involving moral turpitude.

(13) Any event that affects the franchise relationship and as a result of which termination is reasonable.

### II. Reasons for Nonrenewal

If your supplier gives notice that he does not intend to renew any franchise agreement, the Act requires that the reason for nonrenewal must be either one of the reasons for termination listed immediately above, or one of the reasons for nonrenewal listed below.

#### A. Failure to Agree on Changes or Additions To Franchise

If you and your supplier fail to agree to changes in the franchise that your supplier in good faith has determined are required, and your supplier's insistence on the changes is not for the purpose of converting the leased premises to a company operation or otherwise preventing the renewal of the franchise relationship, your supplier may decline to renew the franchise.

#### B. Customer Complaints

If your supplier has received numerous customer complaints relating to the condition of your marketing premises or to the conduct of any of your employees, and you have failed to take prompt corrective action after having been notified of these complaints, your supplier may decline to renew the franchise.



*C. Unsafe or Unhealthful Operations*

If you have failed repeatedly to operate your marketing premises in a clean, safe and healthful manner after repeated notices from your supplier, your supplier may decline to renew the franchise.

*D. Operation of Franchise is Uneconomical*

Under certain conditions specified in the Act, your supplier may decline to renew your franchise if he has determined that renewal of the franchise is likely to be uneconomical. Your supplier may also decline to renew your franchise if he has decided to convert your marketing premises to a use other than for the sale of motor fuel, to sell the premises, or to materially alter, add to, or replace the premises.

## III. Notice Requirements for Termination or Nonrenewal

The following is a description of the requirements for the notice which your supplier must give you before he may terminate your franchise or decline to renew your franchise relationship. These notice requirements apply to all franchise terminations, including franchises entered into before June 19, 1978 and trial and interim franchises, as well as to all nonrenewals of franchise relationships.

*A. How Much Notice Is Required*

In most cases, your supplier must give you notice of termination or nonrenewal at least 90 days before the termination or nonrenewal takes effect.

In circumstances where it would not be reasonable for your supplier to give you 90 days notice, he must give you notice as soon as he can do so. In addition, if the franchise involves leased marketing premises, your supplier may not establish a new franchise relationship involving the same premises until 30 days after notice was given to you or the date the termination or nonrenewal takes effect, whichever is later. If the franchise agreement permits, your supplier my repossess the premises and, in reasonable circumstances, operate them through his employees or agents.

If the termination or nonrenewal is based upon a determination to withdraw from the marketing of motor fuel in the area, your supplier must give you notice at least 180 days before the termination or nonrenewal takes effect.

*B. Manner and Contents of Notice*

To be valid, the notice must be in writing and must be sent by certified mail or personally delivered to you. It must contain: (1) A statement of your supplier's intention to terminate the franchise or not to renew the franchise relationship, together with his reasons for this action; (2) The date the termination or nonrenewal takes effect; and (3) A copy of this summary.

## IV. Trial Franchises and Interim Franchises

The following is a description of the special requirements that apply to trial and interim franchises.

*A. Trial Franchises*

A trial franchise is a franchise, entered into on or after June 19, 1978, in which the franchisee has not previously been a party to a franchise with the franchisor and which has an initial term of 1 year or less. A trial franchise must be in writing and must make certain disclosures, including that it is a trial franchise, and that the franchisor has the right not to renew the franchise relationship at the end of the initial term by giving the franchisee proper notice.

The unexpired portion of a transferred franchise (other than as a trial franchise, as described above) does not qualify as a trial franchise.

In exercising his right not to renew a trial franchise at the end of its initial term, your supplier must comply with the notice requirements described above under the heading "Notice Requirements for Termination or Nonrenewal."

*B. Interim Franchises*

An interim franchise is a franchise, entered into on or after June 19, 1978, the duration of which, when combined with the terms of all prior interim franchises between the franchisor and the franchisee, does not exceed three years, and which begins immediately after the expiration of a prior franchise involving the same marketing premises which was not renewed, based on a lawful determination by the franchisor to withdraw from marketing activities in the geographic area in which the franchisee operates.

An interim franchise must be in writing and must make certain disclosures, including that it is an interim franchise and that the franchisor has the right not to renew the franchise at the end of the term based upon a lawful determination to withdraw from marketing activities in the geographic area in which the franchisee operates.

In exercising his right not to renew a franchise relationship under an interim franchise at the end of its term, your supplier must comply with the notice requirements described above under the heading "Notice Requirements for Termination or Nonrenewal."

## V. Your Legal Rights

Under the enforcement provisions of the Act, you have the right to sue your supplier if he fails to comply with the requirements of the Act. The courts are authorized to grant whatever equitable relief is necessary to remedy the effects of your supplier's failure to comply with the requirements of the Act, including declaratory judgment, mandatory or prohibitive injunctive relief, and interim equitable relief. Actual damages, exemplary (punitive) damages under certain circumstances, and reasonable attorney and expert witness fees are also authorized. For a more detailed description of these legal remedies you should read the text of the Act. 15 U.S.C. §§2801-2806.

## VI. Waiver of Rights and Applicable State Law

Your supplier may not require, as a condition of entering into or renewing the franchise relationship, that you relinquish or waive any right that you have under this or any other Federal law or applicable State law. In addition, no provision in a franchise agreement would be valid or enforceable if the provision specifies that the franchise would be governed by the law of any State other than the one in which the principal place of business for the franchise is located.

## Further Discussion of Title I - Definitions and Legal Remedies

## I. Definitions

Section 101 of the Petroleum Marketing Practices Act sets forth definitions of the key terms used throughout the franchise protection provisions of the Act. The definitions from the Act which are listed below are of those terms which are most essential for purposes of the summary statement. (You should consult section 101 of the Act for additional definitions not included here.)

*A. Franchise*

A "franchise" is any contract between a refiner and a distributor, between a refiner and a retailer, between a distributor and another distributor, or between a distributor and a retailer, under which a refiner or distributor (as the case may be) authorizes or permits a retailer or distributor to use, in connection with the sale, consignment, or distribution of motor fuel, a trademark which is owned or controlled by such refiner or by a refiner which supplies motor fuel to the distributor which authorizes or permits such use.



The term "franchise" includes any contract under which a retailer or distributor (as the case may be) is authorized or permitted to occupy leased marketing premises, which premises are to be employed in connection with the sale, consignment, or distribution of motor fuel under a trademark which is owned or controlled by such refiner or by a refiner which supplies motor fuel to the distributor which authorizes or permits such occupancy. The term also includes any contract pertaining to the supply of motor fuel which is to be sold, consigned or distributed under a trademark owned or controlled by a refiner, or under a contract which has existed continuously since May 15, 1973, and pursuant to which, on May 15, 1973, motor fuel was sold, consigned or distributed under a trademark owned or controlled on such date by a refiner. The unexpired portion of a transferred franchise is also included in the definition of the term.

### B. Franchise Relationship

The term "franchise relationship" refers to the respective motor fuel marketing or distribution obligations and responsibilities of a franchisor and a franchisee which result from the marketing of motor fuel under a franchise.

### C. Franchisee

A "franchisee" is a retailer or distributor who is authorized or permitted, under a franchise, to use a trademark in connection with the sale, consignment, or distribution of motor fuel.

### D. Franchisor

A "franchisor" is a refiner or distributor who authorizes or permits, under a franchise, a retailer or distributor to use a trademark in connection with the sale, consignment, or distribution of motor fuel.

### E. Marketing Premises

"Marketing premises" are the premises which, under a franchise, are to be employed by the franchisee in connection with the sale, consignment, or distribution of motor fuel.

### F. Leased Marketing Premises

"Leased marketing premises" are marketing premises owned, leased or in any way controlled by a franchisor and which the franchisee is authorized or permitted, under the franchise, to employ in connection with the sale, consignment, or distribution of motor fuel.

### G. Fail to Renew and Nonrenewal

The terms "fail to renew" and "nonrenewal" refer to a failure to reinstate, continue, or extend a franchise relationship (1) at the conclusion of the term, or on the expiration date, stated in the relevant franchise, (2) at any time, in the case of the relevant franchise which does not state a term of duration or an expiration date, or (3) following a termination (on or after June 19, 1978) of the relevant franchise which was entered into prior to June 19, 1978 and has not been renewed after such date.

## II. Legal Remedies Available to Franchisee

The following is a more detailed description of the remedies available to the franchisee if a franchise is terminated or not renewed in a way that fails to comply with the Act.

### A. Franchisee's Right to Sue

A franchisee may bring a civil action in United States District Court against a franchisor who does not comply with the requirements of the Act. The action must be brought within one year after the date of termination or nonrenewal or the date the franchisor fails to comply with the requirements of the law, whichever is later.

### B. Equitable Relief

Courts are authorized to grant whatever equitable relief is necessary to remedy the effects of a violation of the law's requirements. Courts are directed to grant a preliminary injunction if the franchisee shows that there are sufficiently serious questions, going to the merits of the case, to make them a fair ground for litigation, and if, on balance, the hardship which the franchisee would suffer if the preliminary injunction is not granted will be greater than the hardship which the franchisor would suffer if such relief is granted.

Courts are not required to order continuation or renewal of the franchise relationship if the action was brought after the expiration of the period during which the franchisee was on notice concerning the franchisor's intention to terminate or not renew the franchise agreement.

### C. Burden of Proof

In an action under the Act, the franchisee has the burden of proving that the franchise was terminated or not renewed. The franchisor has the burden of proving, as an affirmative defense, that the termination or nonrenewal was permitted under the Act and, if applicable, that the franchisor complied with certain other requirements relating to terminations and nonrenewals based on condemnation or destruction of the marketing premises.

### D. Damages

A franchisee who prevails in an action under the Act is entitled to actual damages and reasonable attorney and expert witness fees. If the action was based upon conduct of the franchisor which was in willful disregard of the Act's requirements or the franchisee's rights under the Act, exemplary (punitive) damages may be awarded where appropriate. The court, and not the jury, will decide whether to award exemplary damages and, if so, in what amount.

On the other hand, if the court finds that the franchisee's action is frivolous, it may order the franchisee to pay reasonable attorney and expert witness fees.

### E. Franchisor's Defense to Permanent Injunctive Relief

Courts may not order a continuation or renewal of a franchise relationship if the franchisor shows that the basis of the non-renewal of the franchise relationship was a determination made in good faith and in the normal course of business:

(1) To convert the leased marketing premises to a use other than the sale or distribution of motor fuel;
(2) To materially alter, add to, or replace such premises;
(3) To sell such premises;
(4) To withdraw from marketing activities in the geographic area in which such premises are located; or
(5) That the renewal of the franchise relationship is likely to be uneconomical to the franchisor despite any reasonable changes or additions to the franchise provisions which may be acceptable to the franchisee.

In making this defense, the franchisor also must show that he has complied with the notice provisions of the Act.

This defense to permanent injunctive relief, however, does not affect the franchisee's right to recover actual damages and reasonable attorney and expert witness fees if the nonrenewal is otherwise prohibited under the Act.

Issued in Washington, D.C. on June 12, 1996.

Form BJC-(R)-PMPA (10-2001)



Ingleside #70
26025 W. Grand Ave.
Ingleside, IL 60041

## EXHIBIT B

LEGAL DESCRIPTION

**PARCEL 1: THAT PART OF LOT 1 DESCRIBED AS FOLLOWS: COMMENCING AT A POINT ON THE EAST LINE OF SAID LOT 1, A DISTANCE OF 83.21 FEET NORTH OF THE SOUTHEAST CORNER THEREOF; THENCE WEST PARALLEL WITH THE SOUTH LINE OF SAID LOT 1, A DISTANCE OF 144.57 FEET; THENCE NORTH PARALLEL WITH THE EAST LINE OF SAID LOT 1, A DISTANCE OF 99.0 FEET; THENCE NORTHWESTERLY A DISTANCE OF 30.76 FEET TO A POINT ON THE NORTH LINE OF SAID LOT 1, A DISTANCE OF 52.76 FEET EAST OF THE NORTHWEST CORNER THEREOF; THENCE EAST ALONG THE NORTH LINE OF SAID LOT 1, A DISTANCE OF 159.53 FEET TO THE NORTHEAST CORNER THEREOF; THENCE SOUTH ALONG THE EAST LINE OF SAID LOT 1, A DISTANCE OF 126.30 FEET TO THE POINT OF BEGINNING (EXCEPT THAT PART THEREOF DESCRIBED AS FOLLOWS: COMMENCING AT THE NORTHEAST CORNER OF THE SOUTHEAST 1/4 OF SECTION 11, TOWNSHIP 45 NORTH, RANGE 9 EAST OF THE THIRD PRINCIPAL MERIDIAN; THENCE WESTERLY ON AN ASSUMED BEARING OF NORTH 89 DEGREES 57 MINUTES 37 SECONDS WEST 54.81 FEET ALONG THE NORTH LINE OF SAID QUARTER SECTION; THENCE SOUTH 00 DEGREES 02 MINUTES 23 SECONDS WEST 30.00 FEET TO THE POINT OF BEGINNING; THENCE SOUTH 45 DEGREES 08 MINUTES 27 SECONDS EAST 35.47 FEET TO A POINT ON THE WEST RIGHT-OF-WAY LINE OF WILSON ROAD; THENCE NORTH 00 DEGREES 19 MINUTES 17 SECONDS WEST ALONG SAID WEST RIGHT-OF-WAY LINE OF WILSON ROAD A DISTANCE OF 25.00 FEET TO THE INTERSECTION WITH THE SOUTH RIGHT-OF-WAY LINE OF ILLINOIS ROUTE 59; THENCE NORTH 89 DEGREES 57 MINUTES 37 SECONDS WEST ALONG SAID LINE 25.00 FEET TO THE POINT OF BEGINNING) IN STANTON TERRACE SUBDIVISION IN THE NORTHEAST 1/4 OF THE SOUTHEAST 1/4 OF SECTION 11, TOWNSHIP 45 NORTH, RANGE 9, EAST OF THE THIRD PRINCIPAL MERIDIAN, ACCORDING TO THE PLAT THEREOF RECORDED JUNE 16, 1925 AS DOCUMENT NUMBER 259434 IN BOOK "M" OF PLATS, PAGE 105, IN LAKE COUNTY, ILLINOIS.**

**c/k/a      26025 WEST GRAND AVENUE, INGLESIDE, IL 60041**

**PIN:      05-11-403-018**

Initial _____ _____

Ingleside #70
26025 W. Grand Ave.
Ingleside, IL 60041

## EXHIBIT C

LEGAL DESCRIPTION

**PARCEL 2: LOT 2 AND THAT PART OF LOT 1 DESCRIBED AS FOLLOWS: COMMENCING AT THE SOUTHWEST CORNER OF SAID LOT 1; THENCE EAST ALONG THE SOUTH LINE OF SAID LOT 1 TO THE SOUTHEAST CORNER THEREOF; THENCE NORTH ALONG THE EAST LINE OF SAID LOT 1, A DISTANCE OF 83.21 FEET; THENCE WEST PARALLEL WITH THE SOUTH LINE OF SAID LOT 1, A DISTANCE OF 144.56 FEET; THENCE NORTH PARALLEL WITH THE EAST LINE OF SAID LOT 1, A DISTANCE OF 99.0 FEET; THENCE NORTHWESTERLY A DISTANCE OF 30.76 FEET TO A POINT ON THE NORTH LINE OF SAID LOT 1, A DISTANCE OF 52.76 FEET EAST OF THE NORTHWEST CORNER THEREOF; THENCE WEST ALONG THE NORTH LINE OF SAID LOT 1, A DISTANCE OF 52.76 FEET TO THE NORTHWEST CORNER THEREOF; THENCE SOUTH ALONG THE WEST LINE OF SAID LOT 1, TO THE POINT OF BEGINNING, IN STANTON TERRACE A SUBDIVISION IN THE NORTHEAST 1/4 OF THE SOUTHEAST 1/4 OF SECTION 11, TOWNSHIP 45 NORTH, RANGE 9, EAST OF THE THIRD PRINCIPAL MERIDIAN, ACCORDING TO THE PLAT THEREOF RECORDED JUNE 19, 1925 AS DOCUMENT NUMBER 254934, IN BOOK "M" OF PLATS, PAGE 105, IN LAKE COUNTY, ILLINOIS.**

**c/k/a      26037 WEST GRAND AVENUE, INGLESIDE, IL 60041**

**PIN:      05-11-403-008 and 05-11-403-017**

Initial  _____ _____

# EXHIBIT D



OFFICE OF THE ILLINOIS SECRETARY OF STATE

JESSE WHITE
SECRETARY OF STATE

## LLC MANAGERS

| Entity Name | CATCH 26 LLC | File Number | 04067673 |
| --- | --- | --- | --- |

| Name | Address |
| --- | --- |
| LOUAY ALANI | 1322 N RED OAK CIRCLE, ROUND LAKE BEACH, IL - 60073 |

Close

BACK TO CYBERDRIVEILLINOIS.COM HOME PAGE

# EXHIBIT E

## <u>GUARANTY</u>

In consideration of, and as inducement for the granting, execution and delivery of a certain **Installment Agreement for Deed and Personal Property** dated **April 12, 2013** by and between **BAPA, LLC, PT, LLC and STATE OIL COMPANY,** and **GAS CAP FUELS, LLC, LOUAY ALANI and CATCH 26 LLC,** and in further consideration for the granting, execution and delivery of a certain **Petroleum Products Agreement dated April 12, 2013** between **BAPA, LLC, PT, LLC and STATE OIL COMPANY,** and **GAS CAP FUELS, LLC, LOUAY ALANI and CATCH 26 LLC,** the **Installment Agreement for Deed and Personal Property** and the **Petroleum Products Supply Agreement** (are collectively referred to as the "Agreement") each of which affect the property commonly known as **26025 WEST GRAND AVENUE, INGLESIDE, IL 60041.** **BAPA, LLC, PT, LLC** and **STATE OIL COMPANY,** are collectively referred to as ("Seller") and **GAS CAP FUELS, LLC,** is referred to herein as ("Purchaser"); and in further consideration of the sum of Ten Dollars ($10.00) and other good and valuable consideration paid by the Seller to the undersigned, the receipt of which is hereby acknowledged; the undersigned, **LOUAY ALANI,** whose address is **350 West Prairie Walk, Round Lake, Illinois 60073** (hereinafter referred to as the "Guarantor"), hereby guarantees to the Seller, their successors and assigns, the full and prompt payment of all sums and charges payable by the Purchaser, its successors and assigns under said Agreement, and full performance and observance of all the covenants, terms, conditions and agreements therein provided to be performed and observed by the Purchaser, its successors and assigns; and the Guarantor hereby covenants and agrees to and with the Seller, their successors and assigns, that if default shall at any time be made by the Purchaser, its successors and assigns, in the payment of any such sums or charges, payable by the Purchaser under said Agreement, or in the performance of any of the terms, covenants, provisions or conditions contained in said Agreement, the Guarantor will forthwith pay such sums and charges to Seller, their successors and assigns, and any arrears thereof, and will forthwith faithfully perform and fulfill all of such terms, covenants, conditions and provisions, and will forthwith pay to the Seller all damages that may arise in consequence of any default by the Purchaser, its successors and assigns, under said Agreement, including, without limitation, all reasonable attorneys' fees incurred by the Seller their successors and assigns or caused by any such default and/or by the enforcement of this Guaranty.

This Guaranty is an absolute and unconditional Guaranty of payment and of performance. It shall be enforceable against the Guarantor, his successors and assigns, without the necessity for any suit or proceedings on the Seller's part of any kind or nature whatsoever against the Purchaser, its successors and assigns. The Guaranty hereunder shall in no way be terminated, affected or impaired by reason of the assertion or the failure to assert by the Seller or their successors and assigns against the Purchaser, or the Purchaser's successors and assigns of any of the rights or remedies reserved to the Seller their successors and assigns pursuant to the provisions of said Installment Agreement or the Petroleum Products Supply Agreement.

The Guaranty shall be a continuing Guaranty and the liability of the Guarantor hereunder shall in no way be affected, modified or diminished by reason of any assignment, renewal, modification or extension of the Agreement or by reason of any modification or waiver of, or change in any of the terms, covenants, conditions or provisions of said Agreement, or by reason of any extension of time that may be granted by the Seller to the Purchaser, their successors and assigns, the acceptance of additional parties or the release of anyone primarily or secondarily liable under the Agreement or this Guaranty, or by reason of any dealings or transactions or matter or things occurring between the Seller and Purchaser, their successors and assigns, whether or not notice thereof is given to the Guarantor.

Dated this _12th_ day of _April_ , **2013.**

**GUARANTORS:**

_____

**LOUAY ALANI**

STATE OF ILLINOIS )
                ) SS.
COUNTY OF _Lake_ )

On this _12th_ day of _April_ , 2013, before me personally came **LOUAY ALANI**, known to me to be the same person described in and who executed the foregoing Guaranty and acknowledged to me that they executed the same.

"OFFICIAL SEAL"
KENNETH J. CHALIFOUX
Notary Public, State of Illinois
My Commission Expires 12/08/14

_Kenneth J. Chalifoux_
Notary Public

00050-120671 G:\Atest\Sale of Ingleside Property\CLOSING DOCS rec'd from Chris 040313\Docs Revised 040913\Guaranty - BAPAPT rvsd 110912 -De #5 rvsd 013013 -rvsd 030513.doc

2

## **GUARANTY**

In consideration of, and as inducement for the granting, execution and delivery of a certain **Installment Agreement for Deed and Personal Property** dated **April 12, 2013** by and between **BCP REALTY, LLC, JCC REALTY, LLC and STATE OIL COMPANY** and **GAS CAP FUELS, LLC, LOUAY ALANI and CATCH 26 LLC,** and in further consideration for the granting, execution and delivery of a certain **Petroleum Products Agreement dated April 12, 2013** between **BCP REALTY, LLC, JCC REALTY, LLC and STATE OIL COMPANY** and **GAS CAP FUELS, LLC, LOUAY ALANI and CATCH 26 LLC,** the **Installment Agreement for Deed and Personal Property** and the **Petroleum Products Supply Agreement** (are collectively referred to as the "Agreement") each of which affect the property commonly known as **26037 WEST GRAND AVENUE, INGLESIDE, IL 60041. BCP REALTY, LLC, JCC REALTY, LLC and STATE OIL COMPANY,** are collectively referred to as ("Seller") and **GAS CAP FUELS, LLC,** is referred to herein as ("Purchaser"); and in further consideration of the sum of Ten Dollars ($10.00) and other good and valuable consideration paid by the Seller to the undersigned, the receipt of which is hereby acknowledged; the undersigned, **LOUAY ALANI,** whose address is **350 West Prairie Walk, Round Lake, Illinois 60073** (hereinafter referred to as the "Guarantor"), hereby guarantees to the Seller, their successors and assigns, the full and prompt payment of all sums and charges payable by the Purchaser, its successors and assigns under said Agreement, and full performance and observance of all the covenants, terms, conditions and agreements therein provided to be performed and observed by the Purchaser, its successors and assigns; and the Guarantor hereby covenants and agrees to and with the Seller, their successors and assigns, that if default shall at any time be made by the Purchaser, its successors and assigns, in the payment of any such sums or charges, payable by the Purchaser under said Agreement, or in the performance of any of the terms, covenants, provisions or conditions contained in said Agreement, the Guarantor will forthwith pay such sums and charges to Seller, their successors and assigns, and any arrears thereof, and will forthwith faithfully perform and fulfill all of such terms, covenants, conditions and provisions, and will forthwith pay to the Seller all damages that may arise in consequence of any default by the Purchaser, its successors and assigns, under said Agreement, including, without limitation, all reasonable attorneys' fees incurred by

the Seller their successors and assigns or caused by any such default and/or by the enforcement of this Guaranty.

This Guaranty is an absolute and unconditional Guaranty of payment and of performance. It shall be enforceable against the Guarantor, his successors and assigns, without the necessity for any suit or proceedings on the Seller's part of any kind or nature whatsoever against the Purchaser, its successors and assigns. The Guaranty hereunder shall in no way be terminated, affected or impaired by reason of the assertion or the failure to assert by the Seller or their successors and assigns against the Purchaser, or the Purchaser's successors and assigns of any of the rights or remedies reserved to the Seller their successors and assigns pursuant to the provisions of said Installment Agreement or the Petroleum Products Supply Agreement.

The Guaranty shall be a continuing Guaranty and the liability of the Guarantor hereunder shall in no way be affected, modified or diminished by reason of any assignment, renewal, modification or extension of the Agreement or by reason of any modification or waiver of, or change in any of the terms, covenants, conditions or provisions of said Agreement, or by reason of any extension of time that may be granted by the Seller to the Purchaser, their successors and assigns, the acceptance of additional parties or the release of anyone primarily or secondarily liable under the Agreement or this Guaranty, or by reason of any dealings or transactions or matter or things occurring between the Seller and Purchaser, their successors and assigns, whether or not notice thereof is given to the Guarantor.

Dated this _12th_ day of _April_, **2013.**

**GUARANTOR:**

**LOUAY ALANI**

00050-120671 G:\Anest\Sale of Ingleside Property\Sale 26025 W Grand Ave. Ingleside\Documents\CLOSING DOCS rec'd from Chris 040313\Docs Revised 040913\Guaranty - BCPJCC rvsd 110912 - Doc#6 rvsd 013013 -rvsd 030513.doc

STATE OF ILLINOIS    )
                        )   SS.
COUNTY OF _Lake_   )

On this _12th_ day of _April_, 2013, before me personally came **LOUAY ALANI**, known to me to be the same persons described in and who executed the foregoing Guaranty and acknowledged to me that they executed the same.

_Kenneth J. Chalifoux_
Notary Public

"OFFICIAL SEAL"
KENNETH J. CHALIFOUX
Notary Public, State of Illinois
My Commission Expires 12/06/14

3

# GUARANTY OF SUPPLY AGREEMENT

In consideration of, and as inducement for the granting of its consent to the execution

and delivery of the Supply Agreement dated April 12, 2013 ("Supply Agreement") between

**STATE OIL COMPANY** (hereinafter "Supplier") and **CATCH 26 LLC,** (hereinafter,

"Retailer") to supply petroleum products which affects the property commonly known as 26025

W. Grand Avenue, Ingleside, IL 60041, and in further consideration of the sum of One Dollar

($1.00) and other good and valuable consideration paid in hand and other good and valuable

consideration, the receipt and legal sufficiency of which is hereby acknowledged; the

undersigned **Ali Alani,** whose address is 779 S. Winchester Dr and **Louay Alani,**
Round Lake, IL 60073

whose address is 350 West Prairie Walk Lane, Round Lake, IL 60073 ( herein after

"Guarantors"), hereby guarantees to the Supplier, its successors and assigns, the full prompt

payment of all sums due and owing under the Supply Agreement  and any and all sums and

charges payable by the Retailer, its successors and assigns under said Supply Agreement, and

full performance and observance of all the covenants, terms, conditions and agreements therein

provided be performed by the Retailer, its successors and assigns. Guarantor hereby covenants

and agrees to and with the Supplier, its successors and assigns, that if default shall at any time

be made by the Retailer, its successors and assigns, in the payment of any obligations under this

Supply Agreement, or in the performance of any of the terms, covenants, provisions or

conditions contained in said Supply Agreement, the Guarantor will forthwith pay such sums to

the Supplier and will forthwith faithfully perform and fulfill all of such terms, covenants,

conditions and provisions and will forthwith pay to the Supplier all damages that may arise in

consequence of any default by the Retailer, its successors and assigns, under said Supply

Page **1** of **4**

Initial

Ingleside #70
26025 W. Grand Ave.
Ingleside, IL 60041

Agreement, including, without limitation all reasonable attorneys fees incurred by the Supplier or caused by any such default and/or the enforcement of this Guaranty.

This Guaranty is an absolute and unconditional Guaranty of payment and of performance. It shall be enforceable against the Guarantor, their successors and assigns, without the necessity for any suit or proceedings on the Supplier's part of any kind or nature whatsoever against the Retailer, its successors and assigns. The Guaranty hereunder shall in no way be terminated, affected or impaired by reason of the assertion or the failure to assert by the Supplier against the Retailer, or the Retailer's successors and assigns, of any of the rights or remedies reserved to the Supplier pursuant to the provisions of said Supply Agreement.

The Guaranty shall be a continuing Guaranty, and the liability of the Guarantor hereunder shall in no way be affected, modified or diminished by reason of any assignment, renewal, modification or extension of the Supply Agreement or by reason of any modification or waiver of or change in any of the terms, covenants, conditions or provisions of said Supply Agreement, or by reason of any extension of time that may be granted by the Supplier to the Retailer, their respective successors and assigns, the acceptance of additional parties or the release of anyone primarily or secondarily liable under the Supply Agreement, or by reason of any dealings or transactions or matters of things occurring between the Supplier and Retailer, their successors and assigns, whether or not notice thereof is given to the Guarantor.

*(Remainder of page intentionally left blank.)*

Initial _ΔΔ_ _/βα_

Ingleside #70
26025 W. Grand Ave.
Ingleside, IL 60041

Dated this 12th day of April, 2013.

**GUARANTOR:**

Ali Alani, Individually

SSN:

**GUARANTOR:**

Louay Alani, Individually

SSN:

00050-120671    G:\Anest\Sale of Ingleside Property\Sale 26025 W Grand Ave, Ingleside\Documents\CLOSING DOCS rec'd from Chris 040313\Docs Revised 040913\Guaranty of Supply Agreement - Catch 26 LLC
2013_03_29.doc

Initial

Ingleside #70
26025 W. Grand Ave.
Ingleside, IL 60041

STATE OF ILLINOIS       )
                        )       ss.
County of _Lake_        )

I, the undersigned, a Notary Public in and for said County, in the State aforesaid, DO HEREBY CERTIFY that **Ali Alani** is personally known to me to be the same person whose name is subscribed to the foregoing instrument, and appeared before me this day in person and acknowledged that he signed, sealed and delivered the said instrument as his free and voluntary act, for the uses and purposes therein set forth.

Given under my hand and notarial seal this _12th_ day of _April_ 2013.

_Kenneth J. Chalifoux_
Notary Public

"OFFICIAL SEAL"
KENNETH J. CHALIFOUX
Notary Public, State of Illinois
My Commission Expires 12/06/14

STATE OF ILLINOIS       )
                        )       ss.
County of _Lake_        )

I, the undersigned, a Notary Public in and for said County, in the State aforesaid, DO HEREBY CERTIFY that **Louay Alani** is personally known to me to be the same person whose name is subscribed to the foregoing instrument, and appeared before me this day in person and acknowledged that he signed, sealed and delivered the said instrument as his free and voluntary act, for the uses and purposes therein set forth.

Given under my hand and notarial seal this _12th_ day of _April_ 2013.

_Kenneth J. Chalifoux_
Notary Public

"OFFICIAL SEAL"
KENNETH J. CHALIFOUX
Notary Public, State of Illinois
My Commission Expires 12/06/14

Page **4** of **4**

Initial _AL_  _lw_

# EXHIBIT F

# LEASE
===============

**Date:**        October 22, 2014

**Landlord:**    BAPA, LLC AND PT, LLC

**Tenant:**      GRAYSLAKE STOP & SHOP, LLC

**Property:**    735 BELVIDERE ROAD, GRAYSLAKE, IL 60030

## R E C I T A L S

This Lease ("**Lease**") is entered into by **PT, L.L.C. and BAPA, L.L.C.,** Illinois Limited Liability Companies (the "**Landlord**"), **STATE OIL COMPANY,** an Illinois corporation (the "**Supplier**"), and **GRAYSLAKE STOP & SHOP, LLC,** an Illinois Limited Liability Company (the "**Tenant**").

**WHEREAS,** the Landlord is the record owner of certain real property commonly known as 735 Belvidere Road, Grayslake, IL 60030; and

**WHEREAS,** Supplier operates a petroleum fuel supply business and will contemporaneously with the execution of this Lease and as a precondition of Landlord agreeing to enter into this Lease, enter into a Petroleum Products Supply Agreement ("**Supply Agreement**") with Tenant for the Premises with a term to run contemporaneously with the initial term and any renewal periods to extend the term of this Lease; and

**WHEREAS,** Tenant desires to lease the Premises, on the terms and conditions set forth herein.

**NOW THEREFORE,** in consideration of the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged by Landlord and Tenant, Tenant and Landlord agree as follows:

## ARTICLE 1

### DEMISE OF PREMISES, LEASE TERM AND USE

Section 1.1.    <u>Leased Premises.</u>

Landlord hereby leases to Tenant and Tenant hereby leases from Landlord, that property commonly known as 735 Belvidere Road, Grayslake, IL 60030 ("Premises"), together with all appurtenances, rights and privileges thereto, and the buildings and improvements erected thereon including a gasoline service station, convenience store, and restaurant.   .

Section 1.2.    <u>Term of Lease.</u>

Initial _____

The Initial Term of this Lease shall be a period commencing on October 26, 2014 and terminating on October 31, 2017 (unless sooner terminated as hereinafter provided).

Section 1.2.1   Option to Extend.

Tenant is hereby given one (1) option to extend the Lease.  The option  is for an additional three (3) year term.  Tenant must give Landlord sixty (60) days notice in writing of its election to exercise either option.  Tenant must also have not defaulted on any portion of the Lease or Supply Agreement at any time in order to exercise option.

Section 1.3.   Definition of Lease Year.

As used herein, the term "lease year" shall mean a period of twelve (12) consecutive full calendar months.  If the Commencement Date shall occur on the first day of a calendar month, the first lease year shall begin on the Commencement Date.  If the Commencement Date shall not occur on the first day of a calendar month, then the first lease year shall commence upon the first day of the calendar month next following the Commencement Date.  Each succeeding lease year shall commence upon the anniversary date of the commencement of the first lease year.  The Commencement Date for this Lease shall be October 26, 2014.

Section 1.4.   Use.

Tenant shall use the Premises solely for the retail sales of gasoline and allied petroleum products and for the operation of a convenience grocery store and restaurant.  Tenant shall not permit the Premises to be used for any other purpose without the prior written consent of Landlord.

Section 1.5   Supply Agreement with State Oil Company

Contemporaneously with the execution of this Lease and as a precondition of Landlord agreeing to enter into this Lease, Tenant must enter into a Petroleum Products Supply Agreement with the State Oil Company for supply of petroleum products to the Premises with a term contemporaneous with the term of this Lease.

It is expressly understood by the parties that the Supply Agreement shall be considered a part of this Lease and any default by the Tenant in the Supply Agreement shall be deemed a default under this Lease and a default in this Lease shall be deemed a default under the Supply Agreement.

Initial  w  ﬂﬁ

# ARTICLE 2

## INTENTIONALLY OMITTED

# ARTICLE 3

## RENT

**Section 3.1.** <u>Rent for Lease Years.</u>

Tenant shall pay to Landlord at the address stated in the "Notice" Article of this as in effect from time to time, without deduction or set-off, and without demand, the following sums:

(a) Fixed Rent, payable, in advance, on the fifth day of each and every calendar month during the entire term of this Lease in such amounts as set forth on Exhibit "A" attached hereto.

(b) Additional Rent as set forth in Article 4 hereof which shall be due simultaneously with the payment of the Fixed Rent.

Fixed Rent and Additional Rent shall be prorated on a per diem basis for partial months. However, Tenant will not be liable for neither Fixed Rent nor Additional Rent for any period prior to the Commencement Date.

**Section 3.2.** <u>Security Deposit.</u>

Tenant will deposit with Landlord the sum of Eleven Thousand Dollars ($11,000.00) Said sum shall be held by Landlord as security for the faithful performance by Tenant of all the terms, covenants, and conditions of this Lease to be kept and performed by Tenant during the term hereof. If Tenant defaults with respect to any provision of this Lease, including, but not limited to the provisions relating to the payment of rent, Landlord may (but shall not be required to) use, apply, or return all or any part of the security deposit for the payment of any amount which Landlord may spend or become obligated to spend by reason of Tenant's default, or to compensate Landlord for any other loss or damage which Landlord may suffer by reason of Tenant's default. If any portion of said deposit is so used or applied, Tenant shall, within five (5) days after written demand therefore, deposit cash with Landlord in an amount sufficient to restore the security deposit to its original amount and Tenant's failure to do so shall be a default under this Lease. Landlord shall not be required to keep this security deposit separate from its general funds, and Tenant shall not be entitled to interest on such deposit. If Tenant shall fully and faithfully perform every provision of this Lease to be performed under it, the security deposit or any balance thereof shall be returned to Tenant (or, at Landlord's option, to the last assignee of Tenant's interest hereunder) within ten (10) days following expiration of the Lease Term In the event of termination of Landlord's interest in this Lease, Landlord shall transfer said deposit to Landlord's

Initial

successor in interest.

# ARTICLE 4

## TAXES, INSURANCE AND COMMON AREAS

Section 4.1.    Additional Rent.

In addition to the Fixed Rent provided in Article 3 hereinabove, Tenant shall pay to Landlord as Additional Rent the amounts set forth below:

a.    Tax Deposits.  Tenant shall deposit with Landlord, on the first day of each month, a sum equal to one-twelfth ($1/12^{th}$) of one hundred ten percent (110%) of the most recent ascertainable annual real estate taxes ("Taxes") on the Premises.  Such deposits are to be held without any allowance of interest and are to be used for the payment of Taxes next due and payable when they become due.  So long as Tenant is not in Default hereunder, or under any of the Transaction Documents (an "Event of Default"), Landlord shall pay such Taxes when the same become due and payable If the funds so deposited are insufficient to pay any such Taxes for any year (or installments thereof, as applicable) when the same shall become due and payable, Tenant shall, within ten (10) days after receipt of written demand therefore, deposit additional funds as may be necessary to pay such Taxes in full.  If the funds so deposited exceed the amount required to pay such Taxes for any year, the excess shall be applied toward subsequent deposits.  Such deposits need not be kept separate and apart from any other funds of Landlord.  Once every calendar year, Landlord shall provide Tenant with a reconciliation of all such deposits made by Tenant in the previous year within thirty (30) days after receiving written notice of Tenant's request for such reconciliation.  Landlord, in making any payment hereby authorized related to Taxes, may do so according to any bill, statement, of estimate procured from the appropriate public office without inquiry into the accuracy of such bill, statement or estimate or into the validity of any tax, assessment, sale, forfeiture, tax lien or title or claim thereof.

b.    Insurance Deposits.  In addition to the Tax Deposits hereinabove required, Tenant shall pay to Landlord as Additional Rent an amount equal to $1/12^{th}$ of the fire and hazard policy premium.

c.    Landlord's Interest in and Use of Deposits.  Upon an Event of Default, Landlord may, at its option, apply any monies at the time on deposit pursuant to Section 4 above to cure an Event of Default or pay any of the Indebtedness in such order and manner as Landlord may elect.  If such deposit is used to cure an Event of Default or pay any of the Indebtedness, Tenant shall immediately, upon demand by Landlord, deposit with Landlord an amount equal to the amount expended from the deposits.  When the Indebtedness has been fully paid, any remaining deposits shall be returned to Tenant.  Such deposits are hereby pledged as additional security for the Indebtedness and shall not be subject to the direction or control of Tenant.  Landlord shall not be liable for any failure to apply the payment of Taxes any amount so deposited unless Tenant, prior to an Event of Default, shall have requested Landlord in writing to make application of such funds to the payment of such amounts, accompanied by the bills for such Taxes.  Landlord shall not be liable for any act or omission taken in good faith pursuant to the instruction of any party.


Initial

## ARTICLE 5

## COMPLIANCE WITH LAW

Tenant shall not use the Premises, or permit anything to be done in or about the Premises, which will in any way conflict with any law, statute, ordinance or governmental rule or regulation now in force or which may hereafter be enacted or promulgated. Tenant shall, at its sole cost and expense, promptly comply with all laws, statutes, ordinances and governmental rules, regulations or requirements now in force or which may hereafter be in force and with the requirements of any board of fire underwriters or other similar bodies now or hereafter constituted relating to or affecting the condition, use or occupancy of the Premises, excluding structural changes not related to or affected by Tenant's improvements or acts. The judgment of any court of competent jurisdiction or the admission of Tenant in any action against Tenant, whether Landlord be a party hereto or not, that Tenant has violated any law, statute, ordinance or governmental rule, regulation or requirement, shall be conclusive of that fact as between the Landlord and Tenant.

## ARTICLE 6

## ALTERATIONS AND ADDITIONS

Tenant may from time to time make, at its expense, alterations or additions, structural or otherwise to then existing improvements, fixtures or equipment or any parts thereof as may be, in Tenant's opinion, reasonably necessary or desirable for the conduct, improvement or expansion of Tenant's business; provided, that such alterations do not diminish the value of the then existing structural changes, and Tenant obtain, the Landlord's consent, which consent shall not be unreasonably withheld. Tenant, shall cause to be removed, at Tenant's sole cost and expense, all liens placed against the Premises, as a result of any construction performed hereunder, within thirty (30) days of notice hereof or, in the alternative, to post a bond in an amount callable by Landlord to satisfy said lien in the event Tenant does not cause same to be removed within twelve (12) months from the date of the lien or upon the rendering of a decision by a Court initiated to either foreclose the lien or to quiet title, whichever is later. All alterations and additions to the existing improvements, fixtures or equipment shall become the Property of the Landlord.

## ARTICLE 7

## LIENS

Tenant shall keep the Premises free from any liens arising out of any work performed, materials furnished or obligations incurred by Tenant, except as provided in Article 6.

## ARTICLE 8

## ASSIGNMENT AND SUBLETTING

Initial ___ ___

Tenant shall not either voluntarily, or by operation of law, assign, transfer, mortgage, pledge, hypothecate or encumber this Lease or any interest therein (collectively an assignment), and shall not sublet the said Premises or any part thereof, or any right or privilege appurtenant thereto, or allow any other person (the employees, agents, servants and invitees of Tenant excepted) to occupy or use the said Premises, or any portion thereof, without the written consent of Landlord first had and obtained. Consent to one assignment, subletting, occupation or use by any other person shall not be deemed to be consent to any subsequent assignment, subletting, occupation or use by another person. Consent to any such assignment, occupation or use or subletting shall in no way relieve Tenant of any liability under this Lease. Any such assignment, occupation, use or subletting without such consent shall be void, and shall, at the option of the Landlord, constitute a default under the terms of this Lease. For each assignment, subletting, occupation or use by any other person, Tenant shall pay Landlord a transfer fee of THIRTY THOUSAND AND NO/100 US DOLLARS ($30,000.00).

## ARTICLE 9

## SUBORDINATION

Section 9.1.    Subordination of Lease.

Landlord reserves the right to subordinate this Lease at all times to the lien of any mortgage or trust deed now or hereafter placed upon the Premises, and Tenant agrees to execute and deliver, upon demand of Landlord, such further instruments subordinating this Lease to the lien of any such mortgage or trust deed, provided, however, that no such subordination shall be made unless Tenant shall expressly have the right to remain in possession of the Premises under the terms of this Lease, notwithstanding any default in any such mortgage or trust deed, or after foreclosure thereof, so long as Tenant is not in default under any provisions of this Lease. Tenant agrees not to subordinate this Lease to any mortgage or trust deed other than a first mortgage or trust deed without the prior written consent of the first mortgagee or first trust deed holder.

Section 9.2.    Declaration that Lease is Superior.

If any mortgagee or trustee elects to have this Lease and the interest of Tenant hereunder superior to any such mortgage or trust deed and evidences such election by notice given to Tenant, then this Lease and the interest of Tenant hereunder shall be deemed superior to any such mortgage or trust deed, whether this Lease was executed before or after such mortgage or trust deed, and in that event such mortgagee or trustee shall have the same rights with respect to this Lease as if it had been executed and delivered prior to execution and delivery of the mortgage or trust deed and had been assigned by Landlord to such mortgagee or trustee.

Section 9.3    Additional Assurances.

Tenant shall execute and deliver whatever instruments may be required to effectuate the purposes of this Article, and in the event Tenant fails so to do within ten (10) days after demand in writing, Tenant does

Initial _____

hereby make, constitute and irrevocably appoint Landlord as its attorney in fact and in its name, place and stead so to do.

**ARTICLE 10**

**ADDITIONAL CONSTRUCTION**

Landlord reserves the right as to the Premises, at any time to do, or permit to be done, any or all of the following:  add buildings or structures; change the number and location of buildings and structures; change buildings dimensions; and expand the size of the Premises by acquiring or making available additional land; provided however, that without Tenant's prior consent, no such change shall deny reasonable ingress to and egress from the Premises; materially and adversely affect the visibility and identification of parking spaces on the Premises; except however, that no change caused by a condemnation (as defined in Section 15:1 hereof) shall be deemed to be described in this Article. Provided further, that Landlord shall not operate or lease on the Premises, or any additions thereto, a similar or competing business during the term of the Lease.  Moreover, any real estate taxes applicable to any additional building or land shall be paid by Landlord.  Upon completion of any improvements by the Landlord, Landlord will have the right to adjust the monthly rental for any such improvements.   In addition, Landlord shall have the right to enter into a Cross- Easement Agreement with any Tenant or Purchaser of any property adjacent to the Premises.

**ARTICLE 11**

**CONDITION OF PREMISES**

Section 11.1    <u>Responsibilities of Landlord for Condition of the Premises</u>.

Tenant agrees that no representations respecting the condition of the Premises and that no promises to decorate, alter, repair or improve the Premises, either before or after the execution hereof, have been made by Landlord or its agent to Tenant unless the same are specifically set forth in this Lease or in an exhibit attached to this Lease.

Section 11.2    <u>Responsibilities of Tenant for Condition of the Premises</u>.

Tenant shall at its sole cost and expense and without any cost to Landlord make any and all additions, improvements, alterations and repairs to or on the Premises which may at any time during the term of this Lease be required by any lawful authorities.  All additions, alterations and improvements made by Tenant shall be subject to Landlord's approval, and Landlord may, but shall not be obligate to, deal directly with any authorities respecting their requirements for such additions, alterations and improvements.

Page **7** of 28

Initial _____ _____

## ARTICLE 12

## REPAIR, MAINTENANCE AND TRADE FIXTURES

Section 12.1 <u>Responsibility of Landlord for Equipment Repairs and Maintenance.</u>

The Landlord will repair, except for damages caused by negligence or deliberate acts by Tenant or any other person, only those portions of the underground storage tanks and underground product piping which are located below ground but not any of the mechanisms associated with said portions of the underground storage tanks and product piping.

Section 12.2 <u>Responsibilities of Tenant for Repair and Maintenance.</u>

Except as provided herein, Tenant shall, at all times during the term hereof, and at Tenant's expense, maintain the Premises and equipment and improvements (including, but not limited to, gasoline dispensing and electronic read-out equipment, the roof, driveway, canopy, islands, weight bearing structural damage, all exterior lighting, interior walls, exterior and interior of all windows, exterior sign, plumbing, mechanical, heating, cooling and ventilating equipment, and sewer lines) located on or at the Premises in good repair and in good condition, howsoever the necessity or desirability thereof may occur. As used in this Section, the words "repair" or "repairs" shall include renewals and replacements. Tenant shall also decorate and paint the Premises when necessary to maintain a clean and sightly appearance. All repairs made by Tenant shall be at least equal in quality and class to the original work. Tenant further agrees to pay all lien fees. Tenant shall be entitled to all warranties available to Landlord deriving from the installation of the original equipment (see equipment lists attached as Exhibit "C" and Exhibit "D"). The Tenant shall also be responsible for repair of any damage or injury to any equipment or improvements caused by the negligence or deliberate acts by Tenant or any other person. The failure of Tenant to fulfill its responsibilities under this Section 12.2 shall be deemed a default under this Lease.

Section 12.3 <u>Trade Fixtures.</u>

Tenant agrees to install all trade fixtures at Tenant's expense including, but not limited to cash register, hoses and nozzles, breakaways and intercom system. In instances where the general exterior appearance of the Premises is altered, such trade fixtures shall not be installed without the prior written approval of Landlord. It is further agreed that all trade fixtures belonging to Tenant which are, or may be, put into the Premises during the term hereof, whether or not exempt from sale under execution and attachment under the laws of the State of Illinois, shall at all times be subject to a first lien in favor of Landlord, for all Fixed Rents, Additional Rent or other sums which may become due to Landlord from Tenant under this Lease. Upon termination of the Lease all such equipment, improvements and fixtures shall, at Landlord's option, become the property of Landlord and Landlord shall reimburse Tenant at the depreciated value for the equipment, improvements and fixtures which are to be transferred to Landlord.

Initial _____

## ARTICLE 13

## GENERAL CONDITIONS

Section 13.1. <u>General Conditions</u>.

Tenant shall not:

(a) permit any unlawful or immoral practice to be carried on or committed in the Premises;

(b) make any use of or allow the Premises to be used in any manner or for any purpose that might invalidate or increase the rate of insurance thereof;

(c) keep or use or permit to be kept or used on said Premises any inflammable fluids or explosives other than generally associated with the operation of a gasoline service station; without in each instance obtaining the prior written approval of Landlord; or

(d) deface or injure the building or the Premises or improvements;

Tenant agrees to pay as additional rent any increase in the cost of insurance on the building or Premises to Landlord as a result of any unauthorized use of the Premises by Tenant, but such payment shall not constitute in any manner a waiver by Landlord of its right to enforce all of the covenants and provisions of this Lease.

Section 13.2 <u>Electrical Equipment</u>.

In connection with the installation or use of any electrical equipment, Tenant shall, at Tenant's sole cost and expense, make whatever changes are necessary from time to time to comply with the requirements of the insurance underwriters, governmental authorities, or of insurance inspectors designated by Landlord.

## ARTICLE 14

## UTILITIES AND PUBLIC TELEPHONES

Tenant shall apply to the applicable utility company or municipality for all utility services needed by Tenant in the Premises, and Tenant shall be solely responsible for and shall promptly pay all charges for utility services used or consumed on the Premises. All public telephones on the Premises are provided and controlled by Landlord. The Tenant may install no other public telephones on the Premises.

## ARTICLE 15

Initial _____

## DAMAGE TO PREMISES

In the event the Premises are damaged by fire, explosion, or other casualty or occurrence to the extent of twenty-five percent (25%) or less of the insurable value of the Premises, Landlord shall promptly repair the damage at Landlord's expense. In the event that (a) the Premises shall be damaged by fire, explosion or other casualty or occurrence to the extent of more than twenty-five percent (25%) of the insurable value of the Premises; or (b) substantial damage to the Premises is caused by any occurrence not covered by Landlord's insurance; or (c) the Premises shall be damaged within the last three (3) years of the Lease term to the extent of ten percent (10%) or more of the insurable value, Landlord may elect to repair or rebuild the Premises or to terminate this Lease upon giving notice of such election in writing to Tenant within ninety (90) days of the happening of the event causing the damage. In no event shall Landlord be required to expend for such repair or rebuilding an amount in excess of the insurance proceeds recovered as a result of such damage. If the casualty or the repairing or rebuilding shall render the Premises untenantable in whole or in part, a proportionate abatement of the Fixed Rent shall be allowed from the date when the damage occurred until the date when the Premises can be made tenantable, or until the effective date of termination as herein provided, said abatement to be computed on the basis of the relation which the square foot area of the space rendered untenantable bears to the aggregate square foot area of the Premises. If Landlord is required or elects to rebuild the Premises as herein provided, then and in such event, upon the completion of the rebuilding of the Premises, Tenants shall promptly repair or replace its leasehold improvements (including its fixtures, furnishings, floor coverings and equipment), and replenish its stock in trade. If Tenant has closed its business operations at the Premises, Tenant shall promptly reopen for business.

## ARTICLE 16

## INSURANCE

Section 16.1 <u>Required Insurance Coverage</u>.

Tenant agrees to procure and maintain, for a period commencing the Commencement Date and throughout the term of this Lease, the following insurance with respect to the Premises, from companies satisfactory to the Landlord:

(a) Comprehensive broad form general liability and property damage coverage in the minimum amount of (i) a combined single limit of $2,000,000.00 or (ii) $1,000,000.00 for any one person, $1,000,000.00 for any one occurrence, and $500,000.00 for property damage or such other amount as the parties agree;

(b) Fire and extended coverage, vandalism and malicious mischief coverage on the Tenant's business and personal property, all for their full replacement value;

(c) Rent Loss Insurance or other insurance to cover 12 months of fixed and additional rent payments in the event the Premises become partially or fully untenantable as a result of any damage caused by explosion, fire or other casualty or occurrence;

Initial

(d) Tenant shall maintain Worker's Compensation Insurance not less than the statutory limits set by the State of Illinois. The Insurance Company issuing the policy shall be rated no less than A- by A M Best and be acceptable in all aspects to Landlord;

(e) Tenant shall provide, maintain, and pay for insurance in Landlord's behalf providing coverage for all risks of physical loss commonly provided under I. S. O. Special Property and Contents Forms;

(f) Tenant agrees, that in the event Landlord is able to assign or obtain the assignment of a liquor license, Tenant will reimburse Landlord for any and all expenses, fess, etc., incurred by Landlord to obtain said liquor license. It is further understood and agreed between the parties hereto that in the event a liquor license is issued to Tenant for the operation of a convenience store at the Premises demised herein, said license shall be utilized only in connection with said Premises and that in the event of a termination of this Lease for any reason Tenant agrees that Tenant will assign all interest in said license to Landlord, and will release any right or interest which Tenant may have therein, and will direct the licensing agent to reissue said license in the names of Landlord or their nominees. Tenant further agrees, this paragraph shall constitute such an assignment and direction effective upon the termination of this Lease. Tenant understands that any attempt to transfer said license to a different location will cause irreparable damage to Landlord, which damage is not capable of accurate determination. Tenant hereby authorizes Landlord to obtain, without notice, a restraining order restraining Tenant from transferring or attempting to transfer the liquor license to any other location. Tenant and Landlord further agree that such transfer shall constitute immediate default by Tenant, resulting in immediate forfeiture of the security deposit, without any claim by Tenant for offset. Furthermore Landlord retains the right to pursue compensation for additional loss of business as Landlord may prove in any court of record. Tenant will provide Landlord with evidence of liquor liability insurance paid six (6) months in advance with a limit of no less than $1,000,000.00 combined single limit.

All such insurance to include Landlord, its employees and agents and any mortgagee of the Premises as named insured and as loss payee. Tenant shall provide Landlord with copies of policies or certificates prior to the date Tenant takes possession of the Premises for the purpose of commencing Tenant's Work and from time to time thereafter as required by Landlord evidencing that the aforesaid insurance is in full force and effect.

In lieu of providing the original policy to Landlord, Tenant has the option of providing Evidence of Property Insurance, ACCORD Form 27, along with Certificate of Insurance, ACCORD Form 25-S.

Section 16.2 Notice of Cancellation.

All policies and certificates shall provide that the Landlord shall be given a minimum of thirty (30) days written notice by any such insurance company prior to the cancellation or change of such coverage. All insurance herein required shall be deemed to be additional obligations of the Tenant and not in discharge or of a limitation to Tenant's obligation to indemnify Landlord and its employees and agents under Article 19 hereof.

Section 16.3. Waiver of Subrogation.

Initial

Landlord and Tenant hereby release each other and each other's officers, directors, employees and agents, from liability or responsibility for any loss or damage to property covered by valid and collectible fire insurance with standard extended coverage endorsement. This release shall apply not only to liability and responsibility of the parties to each other, but shall also extend to liability and responsibility for anyone claiming through or under the parties by way of subrogation or otherwise.

Section 16.4. <u>Fire and Extended Coverage</u>

Landlord shall procure and maintain, but shall be reimbursed pursuant to Section 4.1, during the term of this lease, fire, windstorm, and extended coverage insurance on the building, canopy and pumps only.

## ARTICLE 17

## CONDEMNATION

Section 17.1. <u>Complete or Substantial Condemnation.</u>

If thirty percent (30%) or more of the floor area of the Premises should be taken for any public or quasi-public use under any governmental law, ordinance or regulation or by right of eminent domain or by private purchase under threat thereof (a "condemnation"), this Lease shall terminate and the rent shall cease during the unexpired portion of this Lease, effective on the date physical possession is taken by the condemning authority.

Section 17.2. <u>Less Than Substantial Condemnation.</u>

If less than thirty percent (30%) of the floor area of the Premises should be taken by condemnation, this Lease shall not terminate; however, the Fixed Rent payable hereunder during the unexpired portion of this Lease shall be reduced in proportion to the area taken, effective on the date physical possession is taken by the condemning authority.

Section 17.3. <u>Condemnation of Parking Area.</u>

If any of the parking area should be taken for condemnation, this Lease shall not terminate, nor shall the rent payable hereunder be reduced, nor shall Tenant be entitled to any part of the award made for such taking except that either Landlord or Tenant may terminate this Lease if the area of the parking areas remaining following such taking plus any additional parking areas provided by Landlord in reasonable proximity to the Premises shall be less than fifty percent (50%) of the original area of the parking area.

Section 17.4. <u>Election to Terminate.</u>

Any election to terminate this Lease following condemnation shall be evidenced by written notice of termination delivered to the other party within thirty (30) days after the date on which physical

Initial ____

possession is taken by the condemning authority.

Section 17.5. Awards.

All compensation awarded for the condemnation (or the proceeds of private sale under threat thereof) whether for the whole or a part of the Premises or the common areas, shall be the property of Landlord, whether such award is compensation for damages to Landlord's or Tenant's interest in the Premises or the common areas, and Tenant hereby assigns all of its interest in any such award to Landlord; provided, however, Landlord shall have no interest in any award made to Tenant for loss of business or for the taking of Tenant's fixtures and personal property within the Premises if a separate award for such items is made to Tenant.

## ARTICLE 18

## ACCESS TO PREMISES

Tenant agrees that Landlord or its agents may enter the Premises during normal business and at any time when Landlord believes there is an emergency situation which warrants entry, to inspect the conditions of the same, to make such repairs or improvements to the Premises, as Landlord may elect to make and to exhibit the same to prospective purchasers or to prospective tenants, and to place in and upon the Premises "for rent" signs during the last ninety (90) days of the term thereof and Tenant agrees that neither Tenant nor any person within Tenant's control will interfere with such signs. Such entry, inspection and repairs or improvements shall not constitute eviction of Tenant in whole or in part, and the rent reserved shall not abate while such work is being done. If neither Tenant nor Tenant's agents shall be present to permit entry into the Premises when entry therein shall be necessary or permissible under this Lease, Landlord or its agents may enter same by whatever means necessary without liability therefore. Nothing contained in this Article, however, shall be construed to impose upon Landlord any obligation or liability for supervision or repair of the Premises.

## ARTICLE 19

## WAIVER AND INDEMNIFICATION

Section 19.1.  Waiver of Claim by Tenants.

Except for the gross negligence or wanton or deliberate acts of Landlord or Landlord's agents and employees, Tenant waives all claims against Landlord and Landlord's agents and employees for injury to or the death of persons, damage to property or any loss or expense sustained by Tenant or any person claiming through Tenant resulting from any occurrence in or upon the Premises, including, but not limited to, such claims as may result from: (a) any equipment or appurtenance becoming out of repair; (b) the Premises or the building being out of repair; (c) injury or damage done or occasioned by wind, water, flooding, freezing, snow, fire, explosion, earthquake, excessive heat or cold, vandalism, riot or disorder or other casualty; (d) any defect in or failure of plumbing, heating or air conditioning equipment, electric wiring or the installation thereof, gas equipment, water and steam pipes, stairs,

Initial ___

railings or walks; (e) broken glass; (f) the backing up of any sewer pipe or downspout; (g) the bursting, leaking or running of any tank, tub, washstand, water closet, waste pipe, drain, cooling coil or any other pipe or tank in, upon or about the Premises; (h) the escape of steam or hot water; (i) water, snow or ice being upon or coming through the roof, skylight, trap door, stairs, walks or any other place upon or near the Premises or otherwise; (j) the falling of any fixture, plaster or stucco; and (k) any act, omissions or negligence of owners, operators, employees, or their agents of adjoining or contiguous buildings or adjacent property.

Section 19.2.   Indemnification of Landlord.

Except for claims, liabilities, losses, damages and expenses arising out of the gross negligence or wanton or deliberate acts of Landlord or Landlord's agents or employees, Tenant agrees to indemnify, defend and hold harmless Landlord and Landlord's agents and employees, from and against all claims, liabilities, losses, damages and expenses suffered by Landlord as the result of the injury to or the death of any person, or loss of or damage to property (i) caused by Tenant or its employees, agents, invitees, or contractors, or (ii) occurring in the Premises. The foregoing indemnity shall be in addition to Tenant's obligations to supply the insurance required by Article 16 and not in discharge of or substitution for same. It is further understood and agreed that all property kept or stored in the Premises shall be at the risk of Tenant.

Section 19.3.   Right of Landlord to Repair Damage.

If any damage to the Premises or other property of Landlord results from any act or neglect of Tenant, its agents or employees, and Tenant fails and refuses to repair said damage within thirty (30) days of Landlord's written demand thereof, Landlord may, at his option, repair such damage and bill Tenant all reasonable costs of repair. Upon receipt of any such bill, Tenant shall promptly reimburse Landlord for the cost thereof.

# ARTICLE 20

# REGULATIONS; COMPLIANCE

Section 20.1. Regulations. Tenant agrees as follows:

(a) All garbage and refuse shall be kept in the kind of container specified by Landlord, shall be placed in the areas specified by Landlord and prepared for collection in the manner and at the times and places specified by Landlord. If Landlord shall provide or designate a service for picking up refuse and garbage, Tenant shall use same at Tenant's cost, provided such cost shall be competitive to any similar service available to Tenant.

(b) Tenant shall use at Tenant's cost such pest extermination contractor as Landlord may direct and at such intervals as Landlord may require, provided the cost thereof is competitive to any similar service

Initial ___ ___ ___

available to Tenant.

(c) Tenant shall keep the Premises and the sidewalks and service areas immediately adjoining the Premises free and clear of snow, ice and refuse.

Section 20.2. Compliance.

The foregoing covenants and agreements together with any reasonable modification or additions promulgated from time to time by Landlord are hereinafter referred to as "Regulations". Tenant agrees to comply with the Regulations, and in the event of violation by Tenant of any Regulation, Landlord shall have all remedies in this Lease provided for default of Tenant. Landlord shall not be liable to Tenant for violations by other tenants of any Regulation.

## ARTICLE 21

## DEFAULT

Section 21.1. Rights of Landlord Upon Default.

Each of the following events shall constitute a Default: (i) if Tenant vacates or abandons the Premises or permits the same to remain vacant or unoccupied for a period of ten (10) days, (ii) if the rental reserved in Article 3 or Article 4 of this Lease, or any part thereof is not paid when due and remains unpaid for five (5) days after written notice thereof to Tenant, (iii) if default is made in the prompt and full performance by any covenant or condition of this Lease to be kept or performed by Tenant and such default continues for more than a reasonable time (in no event to exceed thirty (30) days) after written notice to Tenant, specifying such default, (iv) if any proceedings are commenced to declare Tenant bankrupt or insolvent or to obtain relief under any bankruptcy or debtor relief law, (v) if any assignment of Tenant's property is made for benefit of creditors, (vi) if a receiver or trustee is appointed for Tenant's property, or (vii) if Tenant fails to properly maintain the Premises in accordance with the terms and conditions of this Lease. If a Default shall occur, Landlord, without further notice or demand of any kind to Tenant or any other person may have, in addition to all other legal or equitable remedies, the following described remedies:

(a) Landlord may elect to terminate this Lease and the term created hereby in which event Landlord forthwith may repossess the Premises and Tenant shall pay at once to Landlord as liquidated damages a sum of money equal to the rental reserved in Article 3 of this Lease to be paid by Tenant to Landlord for the balance of the stated term of this Lease less the fair rental value of the Premises for such period. In addition, all rent unpaid for five (5) days after such rent is due, shall be charged with fifteen percent (15%) per annum interest until all such rent is paid to Landlord.

(b) Landlord may elect to terminate Tenant's right of possession without termination of this Lease in which event Tenant agrees to surrender possession and vacate the Premises immediately and deliver possession thereof to Landlord and Tenant hereby grants to Landlord full and free license to enter into

Initial

and upon the Premises, in whole or in part, with or without process of law to repossess Landlord of the Premises or any part thereof and to expel or remove Tenant and any other person, firm or corporation who may be occupying or within the Premises or any part thereof and remove any and all property therefrom without terminating the Lease or releasing Tenant in whole or in part from Tenant's obligation to pay rent and perform the covenants, conditions and agreements to be performed by Tenant as provided in this Lease; without being deemed in any manner guilty of trespass, eviction or forcible entry or detainer; and without relinquishing Landlord's right to rental or any other right of Landlord under this Lease or by operation of law.

(c) At the election of Landlord, and without limiting the remaining provisions contained in the Lease, in the event that any payment of rent is not paid within five (5) days after the date on which it is due, Tenant shall pay a late charge equal to 15% of the overdue amount, including, but not limited to the sums required to be paid pursuant to Articles 3 and 4 of the Lease, in order to defray the expense incident to handling such delinquent payment or payments.

Section 21.2. <u>Waiver of Other Notices.</u>

Tenant hereby waives the service of any notice under this Article, including any and every form of demand and notice prescribed by law, other than such notice as is in this Lease specified.

Section 21.3. <u>Reletting of Premises.</u>

Upon and after entry into possession without terminating the Lease, Landlord may, but shall not be obligated to relet all or any part of the Premises for the account of Tenant for such rent and upon such terms and to such persons and for such periods as Landlord in Landlord's sole discretion shall determine. Landlord shall not be required to accept any tenant offered by Tenant, to observe any instruction given by Tenant about such reletting or to exercise any care or diligence with respect to such reletting or to the mitigation of damages of Tenant. For the purpose of such reletting, Landlord may decorate or make repairs, alterations or additions to the Premises to the extent deemed desirable by Landlord. All such consideration so received shall be the sole property of the Landlord; provided, however, if the consideration received by Landlord upon any such reletting for Tenant's account is not sufficient to pay the rental reserved in this Lease together with the cost of repairs, alterations, additions, redecorating and Landlord's other expenses (including, without limitation, any broker's commission incurred by Landlord), Tenant agrees to pay to Landlord the deficiency upon demand. Nothing herein shall be construed as limiting the duty of Landlord to mitigate damages in a commercially reasonable manner in the event of a default of Tenant.

Section 21.4. <u>Duty to Pay Rent.</u>

The service of a five-day notice, demand for possession, a notice that the tenancy hereby created will be terminated on the date therein named, institution of an action of forcible detainer or ejectment or the entering of a judgment for possession in such action, or any other act or acts resulting in the termination of Tenant's right to possession of the Premises shall not relieve Tenant from Tenant's obligation to pay the rent hereunder during the balance of the term or any extension thereof, except as herein expressly provided. Landlord may collect and receive any rent due from Tenant; and the payment thereof shall not

Initial

constitute a waiver of or affect any notice or demand given, suit instituted or judgment obtained by Landlord, or be held to waive or alter the rights or remedies which Landlord has in equity or at law or by virtue of the Lease.

Section 21.5. Remedies are Cumulative.

All rights and remedies of Landlord herein created or otherwise existing at law or equity are cumulative and the exercise of one or more rights or remedies shall not be taken to exclude or waive the right to the exercise of any other except as otherwise provided herein. All such rights and remedies may be exercised concurrently and whenever and as often as Landlord shall deem desirable.

Section 21.6. Failure to Insist Upon Strict Performance Not A Waiver.

The failure of Landlord to insist upon strict performance by Tenant of any of the covenants and conditions of this Lease shall not be deemed a waiver of any of Landlord's rights or remedies concerning any subsequent or continuing breach or default by Tenant of any of the covenants and conditions of this Lease. No surrender of the Premises shall be affected by Landlord's acceptance of rental or by any other means whatsoever unless the same be evidenced by Landlord's written acceptance of such a surrender.

Section 21.7. Purchase of Inventory Upon Termination

In the event this Lease is terminated, the Landlord or Supplier may purchase from the Tenant all store merchandise and gasoline inventory at the Tenants actual cost. The purchase price shall be payable five business days after that the Tenant vacates the Premises, subject to any uniform commercial code requirements, Illinois Department of Revenue requirements, and any outstanding indebtedness due to Landlord from Tenant. Any and all equipment installed on the Premises shall become the property of the Landlord at the expiration of the Lease.

Section 21.8. Relationship to Other Agreements

Landlord and Tenant may have agreements related to other locations that are owned or otherwise controlled by Landlord. Any default under any such other agreement shall be considered a default under this Lease.

**ARTICLE 22**

**SURRENDER OF PREMISES; HOLDING OVER**

Section 22.1 Surrender of Premises.

Tenant, upon expiration or termination of the Lease, either by lapse of time or otherwise, agrees to peaceably surrender the Premises (including approved alterations and additions, and non-trade fixtures) to Landlord in broom-clean condition and in good repair, except for damage caused by ordinary use and

Initial

wear and damage by fire or casualty. Tenant further agrees to promptly remove Tenant's trade fixtures upon any such expiration or termination and to promptly repair all damage to the Premises caused by the original installation or removal thereof. Tenant's failure to promptly so remove all of Tenant's trade fixtures shall be deemed an abandonment thereof to Landlord and, if Landlord elects to remove said fixtures, the cost of such removal, including repairing any damage to the Premises caused by their original installation or by the removal thereof, shall be paid by Tenant.

Section 22.2. <u>Holding Over.</u>

If Tenant retains possession of the Premises or any part thereof after expiration or termination of the term by lapse of time or otherwise, then Landlord may, at its option, serve written notice upon Tenant that such holding over constitutes either (i) renewal of this Lease for one year, and from year to year thereafter, at double the sum of all rental reserved in Article 3 of this Lease as in effect immediately prior to the expiration or termination of the term (said double sum being thereinafter referred to as the "Holdover Rent") or (ii) creating of a month-to-month tenancy upon the terms of this Lease except at the Holdover Rent or (iii) creation of a tenancy at sufferance, at a rental in an amount equal to 1/365th of the Holdover Rent for each day the Tenant remains in possession. If no such written notice is served, then a tenancy at sufferance with rental as stated in (iii) shall have been created. Tenant shall also pay to Landlord all damages sustained by Landlord resulting from retention of possession by Tenant. The provisions of this Section shall not constitute a waiver by Landlord of any right of re-entry as hereinabove set forth; nor shall receipt of any rent or any other act in apparent affirmance of tenancy operate as a waiver of the right to terminate this Lease for a breach of any of the covenants or conditions on Tenant's part to be performed.

## ARTICLE 23

### ATTORNEYS FEES

If either party shall be made a party to any litigation commenced against the other party and relating to the other party's use of occupancy of the Premises, and the first party shall not be found to be at fault, then the other party shall pay all costs, expenses and attorneys' fees incurred or paid by the first party in connection with such litigation. A defaulting party shall also be liable to pay the costs, expenses and attorneys' fees incurred or paid by the non-defaulting party in enforcing the covenants and conditions of the defaulting party under this Lease, even in the event that no litigation is commenced.

## ARTICLE 24

### LANDLORD'S SELF HELP

If, during the term of this Lease, Tenant shall fail to comply with and perform any of the covenants or conditions herein contained on Tenant's part to be performed, Landlord shall have the right (but shall not be obligated) to perform any such covenants or conditions. In the event Landlord shall exercise this right, Tenant shall pay to Landlord, on demand, as additional rent hereunder, a sum equal to the amount

Initial _____ _____

expended by Landlord in the performance of such covenants or conditions, together with interest at the rate specified in Section 21.1. hereof. In the event Landlord shall decide to perform any such covenants or conditions, Tenant agrees that Landlord or its agents may enter the Premises for this purpose and that such entry and such performance shall not constitute an eviction of Tenant, in whole or in part, nor relieve Tenant from the continued performance of all covenants and conditions of this Lease. Tenant further agrees that Landlord and its agents shall not be liable for any claims by Tenant relating to the loss of or damage to Tenant's property by virtue of such performance by Landlord of a covenant or condition of Tenant hereunder.

## ARTICLE 25

## ESTOPPEL CERTIFICATE; MORTGAGE PROTECTION

Section 25.1. Estoppel Certificate.

Within ten (10) days after request therefore by Landlord, Tenant agrees to deliver to Landlord an estoppel certificate in recordable form, addressed to whomever Landlord shall designate, wherein Tenant shall certify and agree as follows:

(a) This Lease is in full force and effect, if such is the case, and the Commencement Date and expiration date thereof.

(b) The amount of rent payable by Tenant, and the amount of security deposit, if any.

(c) Tenant has no offsets or defenses to its performance of the covenants and conditions of this Lease, including the payment of rent, if such be the case, or if there are any such defenses or offsets, specifying the same.

(d) Tenant is in possession of the Premises.

(e) Any other reasonable information or requirement of Landlord or mortgagee.

Section 25.2. Mortgagee Protection.

Tenant agrees to give any first mortgagee or first trust deed holder (a "first mortgagee"), by certified or registered mail, a copy of any notice of default served upon Landlord by Tenant, provided that prior to such notice Tenant has notice (by way of service on Tenant of a copy of an assignment of rents and leases, or otherwise) of the address of such first mortgagee. Tenant further agrees that if Landlord shall have failed to cure such default, then the first mortgagee shall have an additional thirty (30) days after receipt of notice thereof within which to cure such default or if such default cannot be cured within that time, then such additional time as may be necessary, if, within such thirty (30) days, any first mortgagee has commenced and is diligently pursuing the remedies necessary to cure such default (including but not limited to commencement of foreclosure proceedings, if necessary to effect such cure). Until the time allowed as aforesaid for the first mortgagee to cure such defaults has expired without cure, Tenant shall have no right to, and shall not terminate this Lease on account of such default.

Initial _____ _____

## ARTICLE 26

## NOTICE

All notices and demands required or permitted to be given hereunder shall be deemed to be properly given if given in writing, delivered personally, by registered or certified United States Mail, with postage prepaid and return receipt request, or by reputable national overnight courier and addressed to the party to be notified at the address set forth below (or to such other address as any party hereto may from time to time designate by notice in writing to the other party hereto):

IF TO LANDLORD:      BAPA, LLC
c/o Bill Anest
31366 N. Highway 45
Libertyville, Illinois 60048

AND

PT, LLC
c/o Peter Anest
31366 N. Highway 45
Libertyville, Illinois 60048

IF TO TENANT:      GRAYSLAKE STOP & SHOP, LLC
c/o Louay Alani
735 Belvidere Rd.
Grayslake, IL 60030

With a copy to:      Roeser Bucheit & Graham, LLC
Two North Riverside Plaza
Suite 1420
Chicago, IL 60606
Attention: William S. Bazianos

Such notice shall be deemed given at the time of such mailing.

## ARTICLE 27

## QUIET ENJOYMENT

Initial

Upon the payment by Tenant of all rents herein provided, and upon the observance and performance of all the covenants, terms, and conditions on Tenant's part to be observed and performed, Tenant shall peaceably and quietly hold and enjoy the Premises for the term hereby demised without hindrance or interruption by Landlord or any other person or persons lawfully or equitably claiming by, through or under Landlord, subject, nevertheless, to the terms and conditions of this Lease.

## ARTICLE 28

## LIMITATION OF LANDLORD'S LIABILITY

Section 28.1. Definition of Landlord.

The term "Landlord" as used in this Lease, insofar as covenants or obligations on the part of Landlord to be performed are concerned, shall be limited to mean and include only the owner at the time in question of the fee of the Premises, and in the event of any transfer of title to the fee, Landlord herein named (and in the case of subsequent transfers or conveyances, the then grantor) shall be automatically freed and relieved from and after the date of such transfer or conveyance, of all liability with respect to the performance of any covenant or obligation on the part of Landlord to be performed thereafter under the terms of this Lease, as long as the new owner or transferee accepts and assumes all of Landlord's duties and obligations under the Lease.

Section 28.2. Limitation of Landlord's Liability.

Landlord shall have absolutely no personal liability with respect to any provision of this Lease or any obligation or liability arising therefrom or in connection therewith. Tenant shall look solely to the equity of Landlord in the Premises for the satisfaction of any remedy of Tenant for breach by Landlord or any of its obligations. Such exculpation of liability shall be absolute and without any exception whatsoever.

## ARTICLE 29

## CORPORATE AUTHORITY

If Tenant is a corporation, each individual executing this Lease on behalf of said corporation represents and warrants that he is duly authorized to execute and deliver this Lease on behalf of said corporation, in accordance with a duly adopted resolution of the board of directors of said corporation, in accordance with the bylaws of said corporation, and that this Lease is approved by said corporation in accordance with its terms. Tenant agrees to provide Landlord with evidence that Tenant is a corporation in good standing in the State of Illinois.

## ARTICLE 30

## FULLY NET LEASE

Initial ___ ___

Landlord and Tenant intend all base rent shall be paid absolutely net to Landlord and that all impositions, charges and expenses relating to the leased Premises, the improvements thereon or the business to be conducted thereon, shall be the sole responsibility of Tenant, so that, during the Lease term, the Leasehold estate shall yield to Landlord all base rent, which is specified herein. Landlord shall not be obligated to pay any charge or expense whatsoever imposed upon or against, or incurred in connection with the Leased Premises, the improvements thereon or the business conducted thereon, and, the collection of base rent shall be subject to no deduction, defense, set off or counterclaim whatsoever for such impositions, charges and expenses.

## ARTICLE 31

## PROHIBITION OF DEBRIS

Tenant shall keep the Premises free from all debris, garbage and other junk in full compliance with the codes and ordinances of the municipality, County of Lake and State of Illinois. It is expressly understood that the Premises shall not be used as a dumping ground for trash, garbage, debris or any other junk.

## ARTICLE 32

## ENVIRONMENTAL REQUIREMENTS

Tenant represents and agrees that it shall comply with all environmental laws that are applicable to the Premises during the term of the Lease including any Lease renewal term. Tenant (i) shall perform any and all required testing at the required intervals and maintain all equipment necessary to comply with environmental requirements; (ii) use such underground tanks during the term of this Lease for the storage and dispensing of motor fuel; and may (iii) dispense motor fuels at the Premises for purchase by retail customers; provided, however, that all such activities, including, without limitation, maintenance, repair and removal of the underground tanks shall be performed in accordance with all applicable environmental laws and other applicable governmental laws and regulations, as well as any amendments to such laws or regulations.

Tenant shall, at its own cost and expense during the term of the Lease, including Lease renewal terms, take all actions as required by applicable environmental laws for the clean-up of the Premises, arising as a result of the actions of Tenant or its employees or third parties during the term of the Lease, including the use or malfunction of any equipment used in conjunction with Tenant's operation of the Premises.

Landlord has enlisted the assistance of third party companies to do monthly, quarterly, and yearly testing on the tanks and monitoring systems. Tenant is responsible for the cost of all testing and spill kits as well as training for any and all employees to be certified as Class A/B and C Operators.

## ARTICLE 33

## TRANSFER OF LANDLORD'S INTEREST

Initial _____

Tenant acknowledges that Landlord has the right to transfer its interest in the property and in the Lease and Tenant agrees that in the event of such transfer, Landlord shall automatically be released from all liability under this Lease as amended and Tenant agrees to look solely to such Transferee for the performance of Landlord's obligations hereunder, provided the Transferee has assumed said obligations.

## ARTICLE 34

## EQUIPMENT AND INVENTORY

Section 34.1.  Equipment to remain property of Landlord.

The Equipment included in the Lease consists of all equipment at the premises, some of which is set forth in Exhibit "B" attached hereto, excluding the equipment that is referred to below in Section 34.2. This Equipment at all times will remain the property of the Landlord.  Tenant acknowledges that at the conclusion of the Term of the Lease or in the event that the Lease is terminated or canceled for any reason whatsoever, all Equipment will be returned to Landlord in at least as good condition as it was transferred.

Section 34.2   Equipment – Vendor Owned, Leased or Consigned.

Attached hereto as Exhibit "C" is a list of all equipment that is vendor-owned, leased or consigned.

Section 34.3  Inventory – Inventory to be Purchased

Attached hereto as Exhibit "D" is a count of inventory and cost calculation done by a third party inventory company.  The cost of the inventory will be due and payable to Landlord upon demand after Tenant takes possession of Premises.

## ARTICLE 35

## MISCELLANEOUS

Section 35.1 Time of Performance.

The time of performance of all of the covenants and conditions of this Lease is of the essence.

Section 35.2 Not a Joint Venture.

Nothing herein shall be construed so as to constitute a joint venture or partnership between Landlord and Tenant.

Initial

Section 35.3 <u>Applicable Law, Venue, Jury Waiver</u>.

The internal laws of the State of Illinois shall govern the validity, performance and enforcement of this Lease. The submission of this Lease for examination does not constitute an offer to lease, or a reservation of or option for the Premises, and this Lease becomes effective only upon execution and delivery thereof by Landlord and Tenant. Tenant knowingly, voluntarily and intentionally waives irrevocably the right it may have to trial by jury with respect to any legal proceeding based hereon, or arising out of, under or in connection with this Lease, or any agreement executed or contemplated to be executed in conjunction herewith or any course of conduct or course of dealing in which Landlord and/or State Oil Company and Tenant are adverse parties. It is further agreed that venue for any legal proceedings shall only be in the Nineteenth Judicial Circuit of the State of Illinois for any State Court proceeding or in the Northern District of Illinois, Eastern Division, for any Federal Court proceeding. This provision is a material inducement for Landlord entering into this Lease.

Section 35.4 <u>Captions for Convenience Only</u>.

The captions of the several articles and sections contained herein are for convenience only and do not define, limit, describe or construe the contents of such articles or sections.

Section 35.5 <u>Amendments To Be In Writing.</u>

No amendment, modification or of supplement to this Lease shall be effective unless in writing, executed and delivered by Landlord and Tenant.

Section 35.6 <u>Severability</u>.

If any provision of this Lease is held to be invalid, such invalid provision shall be deemed to be severable from and shall not affect the validity of the remainder of this Lease.

Section 35.7 <u>Memorandum of Lease</u>.

Tenant agrees not to record this Lease, and Landlord and Tenant each agree, at the request of the other, to execute and deliver to the other a memorandum of this Lease in recordable form which memorandum may be recorded by either party.

Section 35.8 <u>Successors and Assigns</u>.

The terms and provisions of this Lease shall be binding upon, and shall inure to the benefit of the parties hereto and their successors and permitted assigns.

Section 35.9 <u>Plats and Riders</u>.

Clauses, plats, riders and addendums, if any, affixed to this Lease are a part hereof.
Section 35.10 <u>Joint Obligation.</u>

Initial

If there be more than one Tenant, the obligations hereunder imposed shall be joint and several.

Section 35.11 <u>Inability to Perform.</u>

This Lease and the obligations of the Tenant hereunder shall not be affected or impaired because the Landlord is unable to fulfill any of its obligations hereunder or is delayed in doing so, if such inability or delay is caused by reason of strike, labor troubles, acts of God, or any other cause beyond the reasonable control of the Landlord.

Section 35.12 <u>Cumulative Remedies.</u>

No remedy or election hereunder shall be deemed exclusive but shall, wherever possible, be cumulative and all other remedies at law or in equity shall be available to the parties.

Section 35.13 <u>No Franchise Relationship</u>

This Lease is not a Franchise within the meaning of federal or state legislation. Landlord is not selling a way of doing business, and is not selling the right to use a trademark. Nothing contained in this Lease shall be deemed or construed by the parties hereto or by a third party to create the relationship of principal and agent or of partnership or of joint venture or of any association whatsoever between Landlord and Tenant, it being expressly understood and agreed that neither the method of computation of rent nor any other provisions contained in this Lease nor any act or acts of the parties hereto, shall be deemed to create any relationship between Landlord and Tenant other than the relationship of Landlord and Tenant.

*(Remainder of page intentionally left blank.)*

Initial _____

**IN WITNESS WHEREOF,** Landlord and Tenant have executed this Lease, including any riders or schedules attached hereto as of the day and year first above written.

**LANDLORD:**

**BAPA, LLC**

_____
Bill Anest, its Manager

**PT, LLC**

_____
Peter Anest, its Manager

**TENANT:**
**GRAYSLAKE STOP & SHOP, LLC**

_____
Louay Alani, its Manager

**SUPPLIER:**
**STATE OIL COMPANY**

_____
Peter Anest, President

| STATE OF ILLINOIS | ) | |
| | ) | ss. |
| County of Lake | ) | |

I, the undersigned, a Notary Public in and for said County, in the State aforesaid, DO HEREBY CERTIFY that **Bill Anest** is the Manager of **BAPA, LLC** and is personally known to me to be the same person whose name is subscribed to the foregoing instrument as Manger appeared before me this day in person and acknowledged that he signed, sealed and delivered the said instrument as his free and voluntary act, for the uses and purposes therein set forth.

Given under my hand and notarial seal this ___ day of October 2014.

_____
Notary Public

Page 26 of 28

Initial ___ ___ ___

**STATE OF ILLINOIS** )
                       )    **ss.**
**County of Lake** )

        I, the undersigned, a Notary Public in and for said County, in the State aforesaid, DO HEREBY CERTIFY that **Peter Anest** is the Manager of **PT, LLC** and is personally known to me to be the same person whose name is subscribed to the foregoing instrument as Manger appeared before me this day in person and acknowledged that he signed, sealed and delivered the said instrument as his free and voluntary act, for the uses and purposes therein set forth.

        Given under my hand and notarial seal this 22nd day of October 2014.

                                     Notary Public

> "OFFICIAL SEAL"
> KENNETH J. CHALIFOUX
> Notary Public, State of Illinois
> My Commission Expires 12/06/14

**STATE OF ILLINOIS** )
                       )    **ss.**
**County of Lake** )

        I, the undersigned, a Notary Public in and for said County, in the State aforesaid, DO HEREBY CERTIFY that **Louay Alani** is the Manager of **GRAYSLAKE STOP & SHOP, LLC** and is personally known to me to be the same person whose name is subscribed to the foregoing instrument as President appeared before me this day in person and acknowledged that he signed, sealed and delivered the said instrument as his free and voluntary act, for the uses and purposes therein set forth.

        Given under my hand and notarial seal this 22nd day of October 2014.

                                     Notary Public

> "OFFICIAL SEAL"
> KENNETH J. CHALIFOUX
> Notary Public, State of Illinois
> My Commission Expires 12/06/14

**STATE OF ILLINOIS** )
                       )    **ss.**
**County of Lake** )

        I, the undersigned, a Notary Public in and for said County, in the State aforesaid, DO HEREBY CERTIFY that **Peter Anest** is the President of **STATE OIL COMPANY** and is personally known to me to be the same person whose name is subscribed to the foregoing instrument as President appeared before me this day in person and acknowledged that he signed, sealed and delivered the said instrument as his free and voluntary act, for the uses and purposes therein set forth.

        Given under my hand and notarial seal this 22nd day of October 2014.

                                     Notary Public

Page 27 of 28
> "OFFICIAL SEAL"
> KENNETH J. CHALIFOUX
> Notary Public, State of Illinois
> My Commission Expires 12/06/14

# EXHIBIT A

## RENT SCHEDULE

Year 1 ………………………………… $5,500.00

Year 2 ………………………………… $6,000.00

Year 3 ………………………………… $6,500.00

Option Year 1 ………………………………… $6,500.00

Option Year 2 ………………………………… $6,500.00

Option Year 3 ………………………………… $7,000.00

Initial ____ ____

# EXHIBIT G



OFFICE OF THE ILLINOIS SECRETARY OF STATE

JESSE WHITE
SECRETARY OF STATE

## LLC MANAGERS

| Entity Name | GRAYSLAKE STOP & SHOP, LLC | File Number | 00969249 |
|---|---|---|---|
| **Name** | **Address** | | |
| ALANI, LOUAY | 350 W PRAIRIE WALK LN, ROUND LAKE, IL - 60073 | | |

Close

BACK TO CYBERDRIVEILLINOIS.COM HOME PAGE

# EXHIBIT H

**PETROLEUM PRODUCTS
SUPPLY AGREEMENT**

This Agreement is made and entered into this 22nd day of October, 2014, by and between **STATE OIL COMPANY** with an address of 31366 North Highway 45, Libertyville, Illinois 60048 ("Supplier") and **GRAYSLAKE**

**For Recorder's Use Only**

**STOP & SHOP, LLC,** with an address of 735 Belvidere Rd., Grayslake, IL 60030 ("Retailer").

## R E C I T A L S

**WHEREAS, GRAYSLAKE STOP & SHOP, LLC** ("Tenant") has entered into an Lease ("Lease") for the Premises commonly known as 735 Belvidere Rd., Grayslake, IL 60030 ("Premises") with **BAPA, LLC AND PT, LLC** ("Landlord") to rent and use the Premises for the retail sales of gasoline and allied petroleum products;

**WHEREAS,** the Retailer desires to purchase all its needs of gasoline and allied petroleum products to be sold on the Premises from Supplier and Supplier desires to furnish the Retailer with all of its needs of gasoline and allied petroleum products for the Premises;

**NOW, THEREFORE,** in consideration of the covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

1. <u>Supply of Petroleum Products.</u>  The Supplier shall furnish to Retailer a supply of gasoline reasonable for its sales need, to the degree possible and the Retailer shall purchase its gasoline supply exclusively from the Supplier. The Supplier shall make reasonable efforts to provide an adequate supply. If the Supplier is unable to supply the Retailer's reasonable needs of gasoline, and if the Retailer shall be able to acquire a supply of gasoline from any other source, Retailer agrees to enable the Supplier to purchase that gasoline for resale to Retailer at the cost and terms available to Retailer. The Supplier shall charge the Retailer for each transport load of gasoline at Unbranded posted price, plus $.0200 per gallon, plus federal excise tax, Federal Oil Spill Recovery Fee, state motor fuel tax, underground storage tank tax, environmental impact fee, advertising fees from the oil company, freight, prepaid state sales tax, and any county or city imposed taxes that are required to be collected by

Initial _____

Supplier. State sales tax, county imposed motor fuel tax, and any other city or locally imposed tax on sales shall be the sole responsibility of the Retailer. Retailer shall furnish Seller with satisfactory tax exemption certificates where an exemption is claimed. To secure the present and future obligations of Retailer to Supplier, Retailer shall provide Supplier with a Security Agreement on the inventory and equipment of Retailer.

(A) **Delivery.** Deliveries of said gasolines shall be made by Supplier on Retailer's order in single deliveries of not less than 8,500 gallons. However, if Retailer orders a single delivery of less than 8,500 gallons, Retailer remains responsible for all costs of delivery, including freight rate, for a delivery of 8,500 gallons. Supplier shall make deliveries within 48 hours following receipt of Retailer's order but need not make such deliveries outside of normal business hours or on Sunday or holidays. Retailer agrees to purchase a minimum of 50,000 gallons per month from Supplier and the failure to do so shall constitute a default of the terms and conditions of this Supply Agreement.

(B) **Liabilities.** The obligation of the parties to deliver and receive gasoline hereunder shall be suspended and excused (a) if Supplier is prevented from or delayed in producing, manufacturing, transporting or delivering in its normal manner any gasoline hereunder or the materials from which such gasoline is manufactured because of acts of God, earthquake, fire, flood or the elements, malicious mischief, riots, strikes, lockouts, boycotts, picketing, labor disputes or disturbance, compliance with any directive, order or regulation of any governmental authority or representative thereof acting under claim or color of authority; or (b) loss or shortage of any gasoline due to reasons beyond Supplier's reasonable control or (c) loss or shortage of any part of Supplier's own or customary transportation or delivery facilities due to reasons beyond Supplier's reasonable control; or (d) for any reason beyond Supplier's or Retailer's reasonable control. Whenever such causes, in Supplier's judgment, require restriction of deliveries, Supplier reserves the right, in its discretion, to restrict deliveries to Retailer, whether or not delivering to others.

(C) **Payments.** All sums paid to Supplier shall be paid in lawful money of the United States of America without discount at time of delivery or upon such other terms as Supplier may from time to time require. All sums paid shall be applied first to the payments of any outstanding obligation for product purchases, credit card chargebacks, and/or repairs including all bills due to Supplier. Supplier may assess a reasonable administrative fee upon retailer for payments that are returned or rejected for lack of sufficient funds or for any other reason within Retailer's control. All overdue sums owed to Supplier will bear interest at the rate of 18% per annum or the highest rate permitted by law, whichever is lower, from the date due until paid. Supplier expressly reserves the right to initiate an Electronic Funds Transfer (EFT) payment system to satisfy all payment obligations under this Paragraph 1 (Supply of Petroleum Products) and Paragraph 2 (Credit Cards).

(D) **Resale Provisions.** Retailer agrees not to mix, substitute or adulterate said gasolines with any other gasolines or materials. The primary business activity of Supplier is the sale and distribution of petroleum products and it is the understanding of the Supplier and Retailer that the Retailer will continue during the term of this Agreement to purchase all

Initial

petroleum products at this location from the Supplier. In the event the Retailer mixes, substitutes, or adulterates said petroleum products, at Supplier's option, this Agreement may be terminated upon five (5) days written notice to Retailer. The Retailer understands this paragraph in its entirety and upon signing of the Agreement is in complete agreement with all of the above.

(E) **Notice.** All notices and demands required or permitted to be given hereunder shall be deemed to be properly given if given in writing, delivered personally, by registered or certified United States Mail, with postage prepaid and return receipt request, or by reputable national overnight courier and addressed to the party to be notified at the address set forth above or to such other address as any party hereto may from time to time designate by notice in writing to the other party hereto). Any notices hereunder required or permitted to be given to Supplier shall be deemed properly given and served when deposited, postage prepaid, Registered or Certified, in the United States mail, personally delivered, or sent by reputable national overnight courier and addressed to Supplier at 31366 North Highway 45, Libertyville, Illinois 60048.

(F) **Modification.** This agreement may be modified or superseded by any and all governmental laws and regulations enacted subsequent hereto pertaining to Energy Allocation and Conservation, however hardships and forfeitures shall not be enforced between the parties as a result.

(G) **Retailer's Assignment.** This Supply Agreement shall not be assigned by Retailer or by operation of law without Supplier's prior written consent, but otherwise shall be binding upon and shall inure to the benefit of the parties, their heirs, their representatives, successors and assigns, and it is the intention of the parties that the Agreement shall further be deemed to be a covenant running with the land, which shall not be extinguished by a transfer of the Property or by the transfer of the business that is operating on the Property. The parties further agree that a copy or counterpart of this Supply Agreement shall be recorded in the office of the Recorder of Deeds of the County where the property is located.

(H) **Term of Agreement.** Retailer and Supplier expressly agree that the Initial Term of the Supply Agreement shall be for a period which commences on the date in which Retailer takes possession of the Premises, pursuant to the Lease, and terminates in conjunction with the initial term of the lease on October 31, 2017. If Tenant exercises the Lease Option to Extend, the Supply Agreement will terminate on October 17, 2020.

(I) **Right to Assign.** Supplier shall have the right at any time to assign the Supply Agreement to a new Supplier at its sole discretion.

(J) **Shortfalls.** Retailer agrees to reimburse Supplier for the cost of any shortfall that Supplier incurs with respect to any oil company minimum gallonage requirements with respect to the subject property or any shortfalls from rebates due to early delivery.

2. <u>Credit Cards.</u> The Retailer shall have the option of accepting credit cards for retail gasoline sales. If a nationally branded gasoline product is being advertised and sold from the premises, and if the major oil company whose brand is being used requires that its credit cards be accepted, then

Initial

the Retailer shall accept such credit cards and shall comply with all credit card regulations of the oil company. All fees, discounts or charges including charge-backs associated with the use of the credit card will be at the sole expense of the Retailer. Retailer shall have the right to utilize their own credit card processor as long as it continues to accept the credit cards of the oil company whose brand is being used. **If Retailer sells unbranded fuel, credit card proceeds must come directly to Supplier.**

3. <u>Meter Readings and Inventory Control.</u>     Supplier reserves the right, at their option, to have a representative audit the meter readings at the beginning of any given month to verify purchases against sales. Inventory control is required on all underground storage tanks. Retailer agrees to take stick readings and pump readings on every day of each month and mail the inventory control forms and tank data sheets to State Oil Company, 31366 North Highway 45, Libertyville, Illinois 60048, on or before the 5th day of the following month.

4. <u>Sales Tax Affidavit.</u>  Retailer agrees to sign the Sales Tax Affidavit attached hereto and made a part hereof.

5. <u>Use of Premises.</u>     The Retailer shall continuously and uninterruptedly during the term of this Agreement conduct its customary business activity therein during all normal business days and during the Retailer's customary hours, unless prevented from doing so by strike, fire, casualty or other causes beyond the Retailer's control and except during reasonable periods for repairing, cleaning and decorating the Premises.

6. <u>Identification of Business.</u>    The Supplier shall be responsible for supplying and Retailer shall maintain all signs and advertising relating to the gasoline brand being dispensed from the Premises. In the event, the Retailer desires to use another name to identify the convenience grocery store operation upon the Premises, the name will be mutually agreed upon by both the Supplier and Retailer. The Supplier reserves the right to change the brands of gasoline at anytime.

7. <u>Indemnity.</u>    Retailer agrees that it will save, hold harmless and indemnify Supplier and the Oil Company, whose logo or signage is being used in connection with the sale of petroleum products, from and against all liability or loss, including any cost of litigation or attorneys fees, which either the Supplier or the Refiner may sustain as a result of claims, demands, costs or judgments arising from the operation of the Business on the Premises, or from any action or inaction taken by any person at the Business or Premises, or from any condition or claim of condition of the Premises during the term of the Agreement.

8. <u>Term and Termination of Agreement.</u>     The Initial Term of this Agreement shall be for a period which commences on the date in which Retailer takes possession of the Premises pursuant to the Lease and terminates in conjunction with the Lease. The parties specifically acknowledge and agree that the franchise relationship (as defined in the Petroleum Marketing Practices Act, 15 USC §2801 et seq.) created by this Agreement between the Retailer and the Supplier is necessarily contingent upon the Retailer's ability to maintain possession of the Premises. In the event that the Retailer's possession of the Premises is terminated, for any reason the parties agree that the purpose for which this Agreement is being entered into (the supply and purchase of gasoline and allied petroleum products to be sold on the Premises) will be frustrated. The parties further agree that the failure of the Retailer to maintain possession will constitute a default and an event, which is relevant to the franchise relationship as a result of which termination of the franchise by Supplier is reasonable within the meaning of Section

Initial _____  _____  _____

2802 (b)(2)(C) of the Petroleum Marketing Practices Act. Notwithstanding anything to the contrary contained in this Section 8, the mere fact that Retailer has vacated the premises or otherwise has violated the terms of this Agreement does not limit the remedies of Supplier under the Petroleum Marketing Practices Act or pursuant to state law or under this Agreement. Failure on the part of Retailer, its successors and assigns to comply fully with the branding requirements of the Oil Company shall be grounds for termination of this Agreement.

9.    Default.

(A)    **Relationship to Lease.** As stated on Page 1, Landlord, which has the same principal parties as Supplier, entered into a Lease with Tenant, which has the same principal party as Retailer. The Supply Agreement is material to the Lease. A default under the Supply Agreement constitutes a default under the Lease. In turn, a default under the Lease constitutes a default under the Supply Agreement.

(B)    **Other Agreements.** Supplier and Retailer may have agreements related to other locations that are owned or otherwise controlled by Retailer. Any default under any such other agreement shall be considered a default under this Supply Agreement.

10.    Supplier's Remedies. In the event of a breach by Retailer of any of its material covenants or obligations contained herein, not cured within five (5) days after notice, or default by Tenant under the terms of the Lease, the parties agree that the Supplier, in addition to any other remedy available to it at law or equity, shall be entitled to terminate the Agreement and receive damages in a sum to be calculated by taking the average monthly gallons purchased over the most recent 24 months and multiplying it $0.0300 and then multiplying by the number of months remaining on the then current term (Initial Term or Renewal Term) of the Supply Agreement. Supplier will be entitled to recover from Retailer reasonable attorneys' fees and other legal costs Supplier incurs in order to secure or protect the rights inuring to Supplier under this Agreement, or to enforce the terms of this Agreement.

11.    Time of Performance. The time of performance of all of the covenants and conditions of this Agreement is of the essence.

12.    Not a Joint Venture. Nothing herein shall be construed so as to constitute a joint venture or partnership between Supplier and Retailer.

13.    Law of Illinois to Govern. The laws of the State of Illinois shall govern the validity, performance and enforcement of this Agreement.

14.    Captions for Convenience Only. The captions of the several articles and sections contained herein are for convenience only and do not define, limit, describe or construe the contents of such articles or sections.

15.    Amendments to be in Writing. No amendment, modification or supplement to this Agreement shall be effective unless in writing, executed and delivered by Supplier and Retailer.

16.    Severability. If any provision of this Agreement is held to be invalid, such invalid provision shall be deemed to be severable from and shall not affect the validity of the remainder of this Agreement.

Page **5** of **12**

Initial

17.    <u>Successors and Assigns.</u>      The terms and provisions of this Agreement shall be binding upon, and shall inure to the benefit of the parties hereto and their successors and permitted assigns.

18.    <u>Joint Obligation.</u> The obligations hereunder imposed shall be joint and several.

19.    <u>Inability to Perform.</u>    This Agreement and the obligations of the Retailer hereunder shall not be affected or impaired because the Supplier is unable to fulfill any of its obligations hereunder or is delayed in doing so, if such inability or delay is caused by reason of strike, labor troubles, acts of God, or any other cause beyond the reasonable control of the Supplier.

20.    <u>Cumulative Remedies.</u>      No remedy or election hereunder shall be deemed exclusive but shall, wherever possible, be cumulative and all other remedies at law or in equity.

21.    <u>Receipt of Notice.</u>      Retailer acknowledges receipt of a copy of SUMMARY OF THE PETROLEUM MARKETING PRACTICES ACT, #3128-01-Federal Register-Vol. 43, No. 169, attached hereto as **Exhibit "A"**, which is made part of Retailer's Agreement with **STATE OIL COMPANY.**

*(Remainder of page intentionally left blank.)*

Initial

**IN WITNESS WHEREOF,** the parties hereunto have caused this Petroleum Products Supply Agreement to be executed, in Libertyville, Illinois, this 22 day of October, 2014.

**RETAILER: GRAYSLAKE STOP & SHOP, LLC**

_____
Louay Alani, Manager

**GUARANTORS:**

_____          _____
Louay Alani, as an individual                    Ali Alani, as an individual
SSN: ███████                                    SSN: ███████

**TENANT:  GRAYSLAKE STOP & SHOP, LLC**

_____

By: Louay Alani
Its: Manager

**SUPPLIER:   STATE OIL COMPANY**

_____
Peter Anest, President

**STATE OF ILLINOIS**          )
                                              )          **ss.**
**County of Lake**               )

I, the undersigned, a Notary Public in and for said County, in the State aforesaid, DO HEREBY CERTIFY that **Louay Alani** is the Manager of **GRAYSLAKE STOP & SHOP, LLC** who is personally known to me to be the same person whose name is subscribed to the foregoing instrument as President and appeared before me this day in person and acknowledged that he signed, sealed and delivered the said instrument as his free and voluntary act, for the uses and purposes therein set forth.

Given under my hand and notarial seal this 22 day of October 2014.

_____
Notary Public

"OFFICIAL SEAL"
KENNETH J. CHALIFOUX
Notary Public, State of Illinois
My Commission Expires 12/06/14

Initial  X  LA  AA

**STATE OF ILLINOIS** )
                            )    **ss.**
**County of Lake** )

     I, the undersigned, a Notary Public in and for said County, in the State aforesaid, DO HEREBY CERTIFY that **Louay Alani** is personally known to me to be the same person whose name is subscribed to the foregoing instrument as **Guarantor** and appeared before me this day in person and acknowledged that he signed, sealed and delivered the said instrument as his free and voluntary act, for the uses and purposes therein set forth.

     Given under my hand and notarial seal this 22 day of October 2014.

                                               Notary Public

> "OFFICIAL SEAL"
> KENNETH J. CHALIFOUX
> Notary Public, State of Illinois
> My Commission Expires 12/06/14

**STATE OF ILLINOIS** )
                            )    **ss.**
**County of Lake** )

     I, the undersigned, a Notary Public in and for said County, in the State aforesaid, DO HEREBY CERTIFY that **Ali Alani** is personally known to me to be the same person whose name is subscribed to the foregoing instrument as **Guarantor** and appeared before me this day in person and acknowledged that he signed, sealed and delivered the said instrument as his free and voluntary act, for the uses and purposes therein set forth.

     Given under my hand and notarial seal this 22 day of October 2014.

                                               Notary Public

> "OFFICIAL SEAL"
> KENNETH J. CHALIFOUX
> Notary Public, State of Illinois
> My Commission Expires 12/06/14

**STATE OF ILLINOIS** )
                            )    **ss.**
**County of Lake** )

     I, the undersigned, a Notary Public in and for said County, in the State aforesaid, DO HEREBY CERTIFY that **Peter Anest** is the President of **STATE OIL COMPANY**, who is personally known to me to be the same person whose name is subscribed to the foregoing instrument and appeared before me this day in person and acknowledged that he signed, sealed and delivered the said instrument as his free and voluntary act, for the uses and purposes therein set forth.

     Given under my hand and notarial seal this 22 day of October 2014.

                                               Notary Public

Page **8** of **12**

> "OFFICIAL SEAL"
> KENNETH J. CHALIFOUX
> Notary Public, State of Illinois
> My Commission Expires 12/06/14

**EXHIBIT A**

# Revised Summary of Title I of the Petroleum Marketing Practices Act

AGENCY: Department of Energy

ACTION: Notice

SUMMARY: This notice contains a summary of Title I of the Petroleum Marketing Practices Act, as amended (the Act). The Petroleum Marketing Practices Act was originally enacted on June 19, 1978, and was amended by the Petroleum Marketing Practices Act Amendments of 1994, enacted on October 19, 1994. On August 30, 1978, the Department of Energy published in the **Federal Register** a summary of the provisions of Title I of the 1978 law, as required by the Act. The Department is publishing this revised summary to reflect key changes made by the 1994 amendments.

The Act is intended to protect franchised distributors and retailers of gasoline and diesel motor fuel against arbitrary or discriminatory termination or nonrenewal of franchises. This summary describes the reasons for which a franchise may be terminated or not renewed under the law, the responsibilities of franchisors, and the remedies and relief available to franchisees. The Act requires franchisors to give franchisees copies of the summary contained in this notice whenever notification of termination or non renewal of a franchise is given.

SUPPLEMENTARY INFORMATION:

Title I of the Petroleum Marketing Practices Act, as amended, 15 U.S.C. §§2801-2806, provides for the protection of franchised distributors and retailers of motor fuel by establishing minimum Federal standards governing the termination of franchises and the nonrenewal of franchise relationships by the franchisor or distributor of such fuel.

Section 104(d)(1) of the Act required the Secretary of Energy to publish in the **Federal Register** a simple and concise summary of the provisions of Title I, including a statement of the respective responsibilities of, and the remedies and relief available to, franchisors and franchisees under the title. The Department published this summary in the **Federal Register** on August 30, 1978. 43 F.R. 38743 (1978).

In 1994 the Congress enacted the Petroleum Marketing Practices Act Amendments to affirm and clarify certain key provisions of the 1978 statute. Among the key issues addressed in the 1994 amendments are: (1) termination or nonrenewal of franchised dealers by their franchisors for purposes of conversion to "company" operation; (2) application of state law; (3) the rights and obligations of franchisors and franchisees in third-party lease situations; and (4) waiver of rights limitations. See H.R. REP. NO. 737, 103rd Cong., 2nd Sess. 2 (1994), *reprinted in* 1994 U.S.C.C.A.N. 2780. Congress intended to: (1) make explicit that upon renewal a franchisor may not insist on changes to a franchise agreement where the purpose of such changes is to prevent renewal in order to convert a franchise-operated service station into a company-operated service station; (2) make clear that where the franchisor has an option to continue the lease or to purchase the premises but does not wish to do so, the franchisor must offer to assign the option to the franchisee; (3) make clear that no franchisor may require, as a condition of entering or renewing a franchise agreement, that a franchisee waive any rights under the Petroleum Marketing Practices Act, any other Federal law, or any state law; and (4) reconfirm the limited scope of Federal preemption under the Act. *Id.*

The summary which follows reflects key changes to the statute resulting from the 1994 amendments. The Act requires franchisors to give copies of this summary statement to their franchisees when entering into an agreement to terminate the franchise or not to renew the franchise relationship, and when giving notification of termination or nonrenewal. This summary does not purport to interpret the Act, as amended, or to create new legal rights.

In addition to the summary of the provisions of Title I, a more detailed description of the definitions contained in the Act and of the legal remedies available to franchisees is also included in this notice, following the summary statement.

**Summary of Legal Rights of Motor Fuel Franchisees**

This is a summary of the franchise protection provisions of the Federal Petroleum Marketing Practices Act, as amended in 1994 (the Act), 15 U.S.C §§2801-2806. This summary must be given to you, as a person holding a franchise for the sale, consignment or distribution of gasoline or diesel motor fuel, in connection with any termination, or nonrenewal of your franchise by your franchising company (referred to in this summary as your supplier).

You should read this summary carefully, and refer to the Act if necessary, to determine whether a proposed termination or nonrenewal of your franchise is lawful, and what legal remedies are available to you if you think the proposed termination or failure to renew is not lawful. In addition, if you think your supplier has failed to comply with the Act, you may wish to consult an attorney in order to enforce your legal rights.

The franchise protection provisions of the Act apply to a variety of franchise agreements. The term "franchise" is broadly defined as a license to use a motor fuel trademark, which is owned or controlled by a refiner and it includes secondary agreements such as leases of real property and motor fuel supply agreements which have existed continuously since May 15, 1973, regardless of a subsequent withdrawal of a trademark. Thus, if you have lost the use of a trademark previously granted by your supplier but have continued to receive motor fuel supplies through a continuation of a supply agreement with your supplier, you are protected under the Act.

Any issue arising under your franchise which is not governed by this Act will be governed by the law of the State in which the principal place of business of your franchise is located.

Although a State may specify the terms and conditions under which your franchise may be transferred upon the death of the franchisee, it may not require a payment to you (the franchisee) for the goodwill of a franchise upon termination or nonrenewal.

The Act is intended to protect you, whether you are a distributor or a retailer, from arbitrary or discriminatory termination or nonrenewal of your franchise agreement. To accomplish this, the Act first lists the reasons for which termination or nonrenewal is permitted. Any notice of termination or nonrenewal must state the precise reason, as listed in the Act, for which the particular termination or nonrenewal is being made. These reasons are described below under the headings "Reasons for Termination" and "Reasons for Nonrenewal."

The Act also requires your supplier to give you a written notice of termination or intention not to renew the franchise within certain time periods. These requirements are summarized below under the heading "Notice Requirements for Termination or Nonrenewal."

The Act also provides certain special requirements with regard to trial and interim franchise agreements, which are described below under the heading "Trial and Interim Franchises."

The Act gives you certain legal rights if your supplier terminates or does not renew your franchise in a way that is not permitted by the Act. These legal rights are described below under the heading "Your Legal Rights."

The Act contains provisions pertaining to waiver of franchise rights and applicable State law. These provisions are described under the heading "Waiver of Rights and Applicable State Law."

This summary is intended as a simple and concise description of the general nature of your rights under the Act. For a more detailed description of these rights, you should read the text of the Petroleum Marketing Practices Act, as amended in 1994 (15 U.S.C. §§2801-2806). This summary does not purport to interpret the Act, as amended, or to create new legal rights.

Initial

### I. Reasons for Termination

If your franchise was entered into on or after June 19, 1978, the Act bars termination of your franchise for any reasons other than those reasons discussed below. If your franchise was entered into before June 19, 1978, there is no statutory restriction on the reasons for which it may be terminated. If a franchise entered into before June 19, 1978, is terminated, however, the Act requires the supplier to reinstate the franchise relationship unless one of the reasons listed under this heading or one the additional reasons for nonrenewal described below under the heading "Reasons for Nonrenewal" exists.

#### A. Non-Compliance with Franchise Agreement

Your supplier may terminate your franchise if you do not comply with a reasonable and important requirement of the franchise relationship. However, termination may not be based on a failure to comply with a provision of the franchise that is illegal or unenforceable under applicable Federal, State, or local law. In order to terminate for non-compliance with the franchise agreement, your supplier must have learned of this non-compliance recently. The Act limits the time period within which your supplier must have learned of your non-compliance to various periods, the longest of which is 120 days, before you receive notification of the termination.

#### B. Lack of Good Faith Efforts

Your supplier may terminate your franchise if you have not made good faith efforts to carry out the requirements of the franchise, provided you are first notified in writing that you are not meeting a requirement of the franchise and you are given an opportunity to make a good faith effort to carry out the requirement. This reason can be used by your supplier only if you fail to make good faith efforts to carry out the requirements of the franchise within the period which began not more than 180 days before you receive the notice of termination.

#### C. Mutual Agreement to Terminate the Franchise

A franchise can be terminated by an agreement in writing between you and your supplier if the agreement is entered into not more than 180 days before the effective date of the termination and you receive a copy of that agreement, together with this summary statement of your rights under the Act. You may cancel the agreement to terminate within 7 days after you receive a copy of the agreement, by mailing (by certified mail) a written statement to this effect to your supplier.

#### D. Withdrawal From the Market Area

Under certain conditions, the Act permits your supplier to terminate your franchise if your supplier is withdrawing from marketing activities in the entire geographic area in which you operate. You should read the Act for a more detailed description of the conditions under which market withdrawal terminations are permitted. See 15 U.S.C. § 2802(b)(E).

#### E. Other Events Permitting a Termination

If your supplier learns within the time period specified in the Act (which in no case is more than 120 days prior to the termination notice) that one of the following events has occurred, your supplier may terminate you franchise agreement:

(1) Fraud or criminal misconduct by you that relates to the operation of your marketing premises.

(2) You declare bankruptcy or a court determines that you are insolvent.

(3) You have a severe physical or mental disability lasting at least 3 months which makes you unable to provide for the continued proper operation of the marketing premises.

(4) Expiration of your supplier's underlying lease to the leased marketing premises, if: (a) your supplier gave you written notice before the beginning of the term of the franchise of the duration of the underlying lease and that the underlying lease might expire and not be renewed during the term of the franchise; (b) your franchisor offered to assign to you, during the 90-day period after notification of termination or nonrenewal was given, any option which the franchisor held to extend the underlying lease or to purchase the marketing premises (such an assignment may be conditioned on the franchisor receiving from both the landowner and the franchisee an unconditional release from liability for specified events occurring after the assignment); and (c) in a situation in which the franchisee acquires possession of the leased marketing premises effective immediately after the loss of the right of the franchisor to grant possession, the franchisor, upon written request of the franchisee, made a bona fide offer to sell or assign to the franchisee the franchiser's interest in any improvements or equipment located on the premises, or offered by the franchisee a right of first refusal of any offer from another person to purchase the franchisor's interest in the improvements and equipment.

(5) Condemnation or other taking by the government, in whole or in part, of the marketing premises pursuant to the power of eminent domain. If the termination is based on a condemnation or other taking, your supplier must give you a fair share of any compensation which he receives for any loss of business opportunity or good will.

(6) Loss of your supplier's right to grant the use of the trademark that is the subject of the franchise, unless the loss was because of bad faith actions by your supplier relating to trademark abuse, violation of Federal or State law, or other fault or negligence.

(7) Destruction (other than by your supplier) of all or a substantial part of your marketing premises. If the termination is based on the destruction of the marketing premises and if the premises are rebuilt or replaced by your supplier and operated under a franchise, your supplier must give you a right of first refusal to this new franchise.

(8) Your failure to make payments to your supplier of any sums to which your supplier is legally entitled.

(9) Your failure to operate the marketing premises for 7 consecutive days, or any shorter period of time which, taking into account facts and circumstances, amounts to an unreasonable period of time not to operate.

(10) Your intentional adulteration, mislabeling or misbranding of motor fuels or other trademark violations.

(11) Your failure to comply with Federal, State, or local laws or regulations of which you have knowledge and that relate to the operation of the marketing premises.

(12) Your conviction of any felony involving moral turpitude.

(13) Any event that affects the franchise relationship and as a result of which termination is reasonable.

### II. Reasons for Nonrenewal

If your supplier gives notice that he does not intend to renew any franchise agreement, the Act requires that the reason for nonrenewal must be either one of the reasons for termination listed immediately above, or one of the reasons for nonrenewal listed below.

#### A. Failure to Agree on Changes or Additions To Franchise

If you and your supplier fail to agree to changes in the franchise that your supplier in good faith has determined are required, and your supplier's insistence on the changes is not for the purpose of converting the leased premises to a company operation or otherwise preventing the renewal of the franchise relationship, your supplier may decline to renew the franchise.

#### B. Customer Complaints

If your supplier has received numerous customer complaints relating to the condition of your marketing premises or to the conduct of any of your employees, and you have failed to take prompt corrective action after having been notified of these complaints, your supplier may decline to renew the franchise.

Initial

### C. Unsafe or Unhealthful Operations

If you have failed repeatedly to operate your marketing premises in a clean, safe and healthful manner after repeated notices from your supplier, your supplier may decline to renew the franchise.

### D. Operation of Franchise is Uneconomical

Under certain conditions specified in the Act, your supplier may decline to renew your franchise if he has determined that renewal of the franchise is likely to be uneconomical. Your supplier may also decline to renew your franchise if he has decided to convert your marketing premises to a use other than for the sale of motor fuel, to sell the premises, or to materially alter, add to, or replace the premises.

## III. Notice Requirements for Termination or Nonrenewal

The following is a description of the requirements for the notice which your supplier must give you before he may terminate your franchise or decline to renew your franchise relationship. These notice requirements apply to all franchise terminations, including franchises entered into before June 19, 1978 and trial and interim franchises, as well as to all nonrenewals of franchise relationships.

### A. How Much Notice is Required

In most cases, your supplier must give you notice of termination or nonrenewal at least 90 days before the termination or nonrenewal takes effect.

In circumstances where it would not be reasonable for your supplier to give you 90 days notice, he must give you notice as soon as he can do so. In addition, if the franchise involves leased marketing premises, your supplier may not establish a new franchise relationship involving the same premises until 30 days after notice was given to you or the date the termination or nonrenewal takes effect, whichever is later. If the franchise agreement permits, your supplier my repossess the premises and, in reasonable circumstances, operate them through his employees or agents.

If the termination or nonrenewal is based upon a determination to withdraw from the marketing of motor fuel in the area, your supplier must give you notice at least 180 days before the termination or nonrenewal takes effect.

### B. Manner and Contents of Notice

To be valid, the notice must be in writing and must be sent by certified mail or personally delivered to you. It must contain: (1) A statement of your supplier's intention to terminate the franchise or not to renew the franchise relationship, together with his reasons for this action; (2) The date the termination or nonrenewal takes effect; and (3) A copy of this summary.

## IV. Trial Franchises and Interim Franchises

The following is a description of the special requirements that apply to trial and interim franchises.

### A. Trial Franchises

A trial franchise is a franchise, entered into on or after June 19, 1978, in which the franchisee has not previously been a party to a franchise with the franchisor and which has an initial term of 1 year or less. A trial franchise must be in writing and must make certain disclosures, including that it is a trial franchise, and that the franchisor has the right not to renew the franchise relationship at the end of the initial term by giving the franchisee proper notice.

The unexpired portion of a transferred franchise (other than as a trial franchise, as described above) does not qualify as a trial franchise.

In exercising his right not to renew a trial franchise at the end of its initial term, your supplier must comply with the notice requirements described above under the heading "Notice Requirements for Termination or Nonrenewal."

### B. Interim Franchises

An interim franchise is a franchise, entered into on or after June 19, 1978, the duration of which, when combined with the terms of all prior interim franchises between the franchisor and the franchisee, does not exceed three years, and which begins immediately after the expiration of a prior franchise involving the same marketing premises which was not renewed, based on a lawful determination by the franchisor to withdraw from marketing activities in the geographic area in which the franchisee operates.

An interim franchise must be in writing and must make certain disclosures, including that it is an interim franchise and that the franchisor has the right not to renew the franchise at the end of the term based upon a lawful determination to withdraw from marketing activities in the geographic area in which the franchisee operates.

In exercising his right not to renew a franchise relationship under an interim franchise at the end of its term, your supplier must comply with the notice requirements described above under the heading "Notice Requirements for Termination or Nonrenewal."

## V. Your Legal Rights

Under the enforcement provisions of the Act, you have the right to sue your supplier if he fails to comply with the requirements of the Act. The courts are authorized to grant whatever equitable relief is necessary to remedy the effects of your supplier's failure to comply with the requirements of the Act, including declaratory judgment, mandatory or prohibitive injunctive relief, and interim equitable relief. Actual damages, exemplary (punitive) damages under certain circumstances, and reasonable attorney and expert witness fees are also authorized. For a more detailed description of these legal remedies you should read the text of the Act. 15 U.S.C. §§2801-2806.

## VI. Waiver of Rights and Applicable State Law

Your supplier may not require, as a condition of entering into or renewing the franchise relationship, that you relinquish or waive any right that you have under this or any other Federal law or applicable State law. In addition, no provision in a franchise agreement would be valid or enforceable if the provision specifies that the franchise would be governed by the law of any State other than the one in which the principal place of business for the franchise is located.

## Further Discussion of Title I - Definitions and Legal Remedies

### I. Definitions

Section 101 of the Petroleum Marketing Practices Act sets forth definitions of the key terms used throughout the franchise protection provisions of the Act. The definitions from the Act which are listed below are of those terms which are most essential for purposes of the summary statement. (You should consult section 101 of the Act for additional definitions not included here.)

### A. Franchise

A "franchise" is any contract between a refiner and a distributor, between a refiner and a retailer, between a distributor and another distributor, or between a distributor and a retailer, under which a refiner or distributor (as the case may be) authorizes or permits a retailer or distributor to use, in connection with the sale, consignment, or distribution of motor fuel, a trademark which is owned or controlled by such refiner or by a refiner which supplies motor fuel to the distributor which authorizes or permits such use.

Initial

The term "franchise" includes any contract under which a retailer or distributor (as the case may be) is authorized or permitted to occupy leased marketing premises, which premises are to be employed in connection with the sale, consignment, or distribution of motor fuel under a trademark which is owned or controlled by such refiner or by a refiner which supplies motor fuel to the distributor which authorizes or permits such occupancy. The term also includes any contract pertaining to the supply of motor fuel which is to be sold, consigned or distributed under a trademark owned or controlled by a refiner, or under a contract which has existed continuously since May 15, 1973, and pursuant to which, on May 15, 1973, motor fuel was sold, consigned or distributed under a trademark owned or controlled on such date by a refiner. The unexpired portion of a transferred franchise is also included in the definition of the term.

### B. Franchise Relationship

The term "franchise relationship" refers to the respective motor fuel marketing or distribution obligations and responsibilities of a franchisor and a franchisee which result from the marketing of motor fuel under a franchise.

### C. Franchise

A "franchisee" is a retailer or distributor who is authorized or permitted, under a franchise, to use a trademark in connection with the sale, consignment, or distribution of motor fuel.

### D. Franchisor

A "franchisor" is a refiner or distributor who authorizes or permits, under a franchise, a retailer or distributor to use a trademark in connection with the sale, consignment, or distribution of motor fuel.

### E. Marketing Premises

"Marketing premises" are the premises which, under a franchise, are to be employed by the franchisee in connection with the sale, consignment, or distribution of motor fuel.

### F. Leased Marketing Premises

"Leased marketing premises" are marketing premises owned, leased or in any way controlled by a franchisor and which the franchisee is authorized or permitted, under the franchise, to employ in connection with the sale, consignment, or distribution of motor fuel.

### G. Fail to Renew and Nonrenewal

The terms "fail to renew" and "nonrenewal" refer to a failure to reinstate, continue, or extend a franchise relationship (1) at the conclusion of the term, or on the expiration date, stated in the relevant franchise, (2) at any time, in the case of the relevant franchise which does not state a term of duration or an expiration date, or (3) following a termination (on or after June 19, 1978) of the relevant franchise which was entered into prior to June 19, 1978 and has not been renewed after such date.

## II. Legal Remedies Available to Franchisee

The following is a more detailed description of the remedies available to the franchisee if a franchise is terminated or not renewed in a way that fails to comply with the Act.

### A. Franchisee's Right to Sue

A franchisee may bring a civil action in United States District Court against a franchisor who does not comply with the requirements of the Act. The action must be brought within one year after the date of termination or nonrenewal or the date the franchisor fails to comply with the requirements of the law, whichever is later.

### B. Equitable Relief

Courts are authorized to grant whatever equitable relief is necessary to remedy the effects of a violation of the law's requirements. Courts are directed to grant a preliminary injunction if the franchisee shows that there are sufficiently serious questions, going to the merits of the case, to make them a fair ground for litigation, and if, on balance, the hardship which the franchisee would suffer if the preliminary injunction is not granted will be greater than the hardship which the franchisor would suffer if such relief is granted.

Courts are not required to order continuation or renewal of the franchise relationship if the action was brought after the expiration of the period during which the franchisee was on notice concerning the franchisor's intention to terminate or not renew the franchise agreement.

### C. Burden of Proof

In an action under the Act, the franchisee has the burden of proving that the franchise was terminated or not renewed. The franchisor has the burden of proving, as an affirmative defense, that the termination or nonrenewal was permitted under the Act and, if applicable, that the franchisor complied with certain other requirements relating to terminations and nonrenewals based on condemnation or destruction of the marketing premises.

### D. Damages

A franchisee who prevails in an action under the Act is entitled to actual damages and reasonable attorney and expert witness fees. If the action was based upon conduct of the franchisor which was in willful disregard of the Act's requirements or the franchisee's rights under the Act, exemplary (punitive) damages may be awarded where appropriate. The court, and not the jury, will decide whether to award exemplary damages and, if so, in what amount.

On the other hand, if the court finds that the franchisee's action is frivolous, it may order the franchisee to pay reasonable attorney and expert witness fees.

### E. Franchisor's Defense to Permanent Injunctive Relief

Courts may not order a continuation or renewal of a franchise relationship if the franchisor shows that the basis of the non-renewal of the franchise relationship was a determination made in good faith and in the normal course of business:

(1) To convert the leased marketing premises to a use other than the sale or distribution of motor fuel;
(2) To materially alter, add to, or replace such premises;
(3) To sell such premises;
(4) To withdraw from marketing activities in the geographic area in which such premises are located; or
(5) That the renewal of the franchise relationship is likely to be uneconomical to the franchisor despite any reasonable changes or additions to the franchise provisions which may be acceptable to the franchisee.

In making this defense, the franchisor also must show that he has complied with the notice provisions of the Act.

This defense to permanent injunctive relief, however, does not affect the franchisee's right to recover actual damages and reasonable attorney and expert witness fees if the nonrenewal is otherwise prohibited under the Act.

Issued in Washington, D.C. on June 12, 1996.

Form BJC-(R)-PMPA (10-2001)

Initial

# EXHIBIT I

# SECURITY AGREEMENT

This Security Agreement (the "Agreement") is given this *2nd* day of October, 2014, by **GRAYSLAKE STOP & SHOP, LLC** ("Debtor") to **STATE OIL COMPANY** ("Secured Party").

1.  Debtor grants to Secured Party to secure the payment and performance of all liabilities of the Debtor to Secured Party, a security interest in Debtors' account receivables, equipment, inventory (including gasoline fuel and diesel fuel and any other petroleum products), fixtures, documents chattel paper, instruments, intangibles, and in the proceeds and products thereof (hereinafter collectively referred to as "Collateral").

2.  This Agreement is given for the following purposes:

    a)  As further security for the performance of certain obligations under the Petroleum Products Supply Agreement of even date herewith ("the Supply Agreement").

    b)  To secure the payment of any and all additional sums that may be advanced, paid or expended by Secured Party under this Agreement, or the Supply Agreement, and the payment of any and all sums or amounts that Secured Party may, at its option hereafter advance or expend under this Agreement or for the maintenance and/or preservation of the Collateral.

    c)  To secure the payment in the full complete and faithful performance of each and every obligation, covenant, promise and agreement herein contained and contained in said Supply Agreement.

    d)  To secure the payment of any and all loss or damage which Secured Party may sustain by reason of any of the defaults on the part of Debtor under the Supply Agreement or this Agreement.

3.  As security for the payment and performance of all liabilities, the Secured Party shall have continuing security interest in the following Collateral:

    a)  All Equipment that is owned by Debtor.

    b)  Inventory (including gasoline fuel, and diesel fuel, all other petroleum products and all convenience store inventories).

    c)  Proceeds and products of each of the foregoing.

Page **1** of **6**

Initial

4. Debtor does hereby agree as follows:

a) To prepare and deliver to Secured Party, upon notice given by Secured Party from time to time, a full inventory listing as of the date such notice is given, of all items then constituting Collateral and such other information as Secured Party may request with respect to purchases or sales or other acquisitions or dispositions of Collateral. Each such inventory shall be certified as being true and complete by a duly Authorized officer of Debtor, or by one of the Debtors if Debtor is not a corporate entity.

b) To provide and maintain in force, at all times, fire and other types of insurance as may be required by Secured Party, each in an amount satisfactory to and with loss payable to Secured Party.

c) To appear in and defend any action or proceeding, affecting or purporting to affect the security of this Agreement and pay all costs and expenses thereof and all costs and expenses in any such action or proceeding in which Secured Party may appear.

d) To promptly pay on demand all costs and expenses of filing financing statements, continuation statements, partial releases and termination statements deemed necessary or appropriate by Secured Party, or any modification thereof.

e) Debtor promptly shall execute and file such financing statements or other instruments as Secured Party requests to evidence, perfect and continue the security interest granted hereunder.

f) To pay, before delinquent, all taxes and assessments affecting the Collateral and all costs and penalties thereon.

g) Not to remove the Collateral, or any part thereof, from its present location without first obtaining the express written consent of Secured Party.

h) Not to transfer voluntarily or permit any involuntary transfer of the Collateral, or any interest thereon, by way of sale, creation of a security interest, levy or other judicial process, without first obtaining the written consent of Secured Party.

i) Debtor hereby authorizes Secured Party to file such financing statements that Secured Party deems necessary to perfect its security interest in the Collateral, including a copy of this Agreement, authorizes Secured Party to adopt on Debtor's behalf any symbol required for authenticating any electronic filings. Debtor waives any right to file correction or termination statements without Secured Party's advance written consent.

5. Debtor represents and warrants to Secured Party the following:

Initial

a) Debtor has full right, power and authority to enter into and perform its obligations under this Security Agreement and the execution hereof and the grant of the security interest hereunder does not and will not constitute a default under any other agreement or commitment to which Debtor is a party or by which Debtor is bound.

b) Secured Party may, but need not, perform any act required of Debtor and may, but need not pay, purchase, contest or compromise any claim, debt, lien, charge or encumbrance which in the judgment of Secured Party may affect or appear to affect the security of this Agreement and may, but need not, discharge taxes, liens, security interest or other encumbrances at any time levied or placed on the Collateral and make any payment for insurance on the Collateral and for maintenance or preservation of the Collateral; all sums so expended shall be immediately paid by Debtor upon demand by Secured Party.

c) A default in the performance of any obligation, covenant or liability of the Debtor herein provided shall constitute a default under the Supply Agreement, and any default under the Supply Agreement shall constitute a default under this Agreement.

6. Should Debtor fail or refuse to make any payment or do any act which it is obligated to make or do at any time and in any manner herein provided, or should Debtor default in the true and faithful performance of any covenant or condition hereof, and which default is not cured within fifteen (15) days after Secured Party has given notice of such default to Debtor, or in the event any warranty, representation or statement made or furnished to Secured Party by or on behalf of Debtor shall be false in any material respect when made or furnished, then Secured Party, at its sole discretion, may declare all sums secured hereby immediately due without demand upon or notice to Debtor, and may:

a) Take immediate possession of the Collateral, and Debtor agrees upon demand to surrender possession thereof to Secured Party peaceably and that Secured Party may employ any and all means reasonably necessary within its sole discretion to gain possession of the Collateral.

b) Sell and dispose of all or any portion of the Collateral as a unit or in parcels, at public or private sale, conducted in Lake County, Illinois, with or without having the Collateral at the place of sale, or, without removal of the Collateral, upon the premises of Debtor, and upon the terms and in such manner as Secured Party may determine. Upon the sale of the Collateral, Secured Party may apply, the proceeds of such sale to the unpaid principal balance, accrued but unpaid interest and other charges due under the Supply Agreement, as well as all other obligations of every class and character owed by Debtor to Secured Party and

Page 3 of 6

Initial _____

secured by virtue of the provisions hereof, together with all costs incurred by Secured Party and all charges of making such sale, including, among others, all expenses of repossession, storage, preparation for sale, advertising, sale of the Collateral and reasonable attorneys' fees and expenses; Secured Party or its agents, successors or assigns may purchase all or any part of the Collateral at any such sale; and any and all unexpired insurance shall inure to the benefit of and pass to the purchaser of the Collateral at any sale held hereunder.

7.     In addition to any rights or remedies provided herein, Secured Party may have and exercise all other rights and remedies as provided for in law or in equity, and shall have the right to enforce one or more remedies hereunder successively or concurrently and any such action shall not stop or prevent Secured Party from pursuing any further remedy which it may have hereunder or by law.

8.     No default shall be waived by Secured Party except in writing and no waiver of any default shall operate as a waiver of any other default or the same default on a future occasion.

9.     With reference to any of the parties to this Agreement, the use of the singular number shall include the plural, the use of the plural shall include the singular number, the use of the masculine gender shall include the feminine gender, and the use of the feminine gender shall include the masculine gender and shall be so construed as applicable to and including a corporation, partnership or other entity that may be a party or parties hereto.

10.    Debtor agrees that Secured Party shall not be liable to Debtor or to any other person or Persons for injury or damage that may result to any person or property by reason of the use or condition of the Collateral or any part thereof, and Debtor further agrees to defend and hold Secured Party harmless from any and all costs, damages, losses, expenses, claims or liability arising out of or connected with, directly or indirectly, the use, management or condition of the Collateral.

11.    This Agreement and the terms, conditions, covenants and agreements hereof are intended to and shall inure to the benefit of and extend to and include the successors and assigns of Secured Party and shall be binding upon the successors, heirs, and assigns of Debtor.

12.    The person or persons who shall execute this Security Agreement on behalf of Debtor do hereby represent and warrant to Secured Party that he or they were and are authorized, directed and empowered to execute this agreement for and on behalf of and in the name of Debtor.

13.    The security interest granted under this Agreement shall terminate only upon payment in full of all amounts due to Secured Party in connection with Supply Agreement and this Agreement.

Page **4** of **6**

Initial _____

14.    Wherever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement shall be prohibited by or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.

15.    The terms and provisions contained herein shall, unless the context otherwise requires, have the meanings and be construed as provided in the Uniform Commercial Code of the State of Illinois.

16.    All notices required to be given under this Agreement shall be construed to mean notice in writing signed by or on behalf of the party giving the same, and the same may be served upon the other party or his agent personally, by reputable national overnight courier, or by certified or registered mail, return receipt requested to the parties as follows:

|  |  |
|---|---|
| TO SECURED PARTY: | STATE OIL COMPANY<br>c/o Bill Anest or Peter Anest<br>31366 N. Highway 45<br>Libertyville, IL 60048 |
| TO DEBTOR: | GRAYSLAKE STOP & SHOP<br>c/o Louay Alani<br>735 Belvidere Road<br>Grayslake, IL 60030 |
| With a copy to: | Roeser Bucheit & Graham, LLC<br>Two North Riverside Plaza<br>Suite 1420<br>Chicago, IL 60606<br>Attention: William S. Bazianos |

This notice will be deemed to be effective two business days after mailing.

**IN WITNESS WHEREOF,** Debtor has executed this Agreement the day and year first above mentioned.

**DEBTOR:**
**GRAYSLAKE STOP & SHOP, LLC**

**By: Louay Alani**
**Its:  Manager**

**SECURED PARTY:**
**STATE OIL COMPANY**

**By: Peter Anest**
**Its: President**

Page **5** of **6**

Initial _____

STATE OF ILLINOIS     )
                            ) ss.
COUNTY OF LAKE     )

     I, the undersigned, a Notary Public in and for said County, in the State aforesaid, DO HEREBY CERTIFY that **Peter Anest** is the President of **STATE OIL COMPANY** and is personally known to me to be the same person whose name is subscribed to the foregoing instrument, appeared before me this day in person and acknowledged that he signed, sealed and delivered the said instrument as his free and voluntary act, for the uses and purposes therein set forth.

     Given under my hand and notarial seal this _22nd_ day of October 2014.

_Kenneth J. Chalifoux_
Notary Public

"OFFICIAL SEAL"
KENNETH J. CHALIFOUX
Notary Public, State of Illinois
My Commission Expires 12/06/14

STATE OF ILLINOIS     )
                            ) ss.
COUNTY OF LAKE     )

     I, the undersigned, a Notary Public in and for said County, in the State aforesaid, DO HEREBY CERTIFY that **Louay Alani** is the Manager of **GRAYSLAKE STOP & SHOP, LLC**, and is personally known to me to be the same person whose name is subscribed to the foregoing instrument, appeared before me this day in person and acknowledged that he signed, sealed and delivered the said instrument as his free and voluntary act, for the uses and purposes therein set forth.

     Given under my hand and notarial seal this _22_ day of October 2014.

_Kenneth J. Chalifoux_
Notary Public

"OFFICIAL SEAL"
KENNETH J. CHALIFOUX
Notary Public, State of Illinois
My Commission Expires 12/06/14

Initial _____

# EXHIBIT J

## GUARANTY

In consideration of, and as inducement for the granting, execution, and delivery of the foregoing **Lease** dated October 22, 2014 (hereinafter "Lease") which affects the property commonly known as **735 Belvidere Rd., Grayslake, IL 60030** between **BAPA, LLC and PT, LLC** (hereinafter the "Landlord") to **GRAYSLAKE STOP & SHOP, LLC** (hereinafter called the "Tenant"), and in further consideration for the granting, execution, and deliver of a **Petroleum Products Supply Agreement** dated October 22, 2014 between **STATE OIL COMPANY** (hereinafter the "Supplier"), and **GRAYSLAKE STOP & SHOP, LLC** (hereinafter called the "Retailer"), which also affects the property commonly known as **735 Belvidere Rd., Grayslake, IL 60030,** and in further consideration of the sum of Ten Dollars ($10.00) and other good and valuable consideration paid by the Landlord and Supplier to the undersigned, **Louay Alani,** whose address is 350 West Prairie Walk Lane, Round Lake, IL 60073 and **Ali Alani,** whose address is 779 S. Winchester Drive, Round Lake, IL 60073 (hereinafter collectively referred to as "Guarantor"), hereby guarantees to the Landlord, its successors and assigns, the full and prompt payment of rent, including, but not limited to, the fixed minimum rent, common area charge, percentage rent, additional rent and any and all other sums and charges payable by the Tenant, its successors and assigns under said Lease, and full performance and observance of all the covenants, terms, conditions and agreements therein provided to be performed and observed by the Tenant, its successors and assigns; and the Guarantor hereby covenants and agrees to and with the Landlord, its successors and assigns, that if default shall at any time be made by the Tenant, its successors and assigns, in the payment of any such rent, payable by the Tenant under said Lease, or in the performance of any of the terms, covenants, provisions or conditions contained in said Lease, the Guarantor will

Page **1** of **4**

Initial

forthwith pay such rent to Landlord, its successors and assigns, and any arrears thereof, and will forthwith faithfully perform and fulfill all of such terms, covenants, conditions and provisions, and will forthwith pay to the Landlord all damages that may arise in consequence of any default by the Tenant, its successors and assigns, under said Lease, including, without limitation, all reasonable attorneys' fees incurred by the Landlord or caused by any such default and/or by the enforcement of this Guaranty.

In addition, the Guarantor hereby guarantees to the Supplier, its successors and assigns, the full prompt payment of all sums due and owing under the Petroleum Products Supply Agreement ("Supply Agreement") and any and all sums and charges payable by the Retailer, its successors and assigns under said Supply Agreement, and full performance and observance of all the covenants, terms, conditions and agreements therein provided be performed by the Retailer, its successors and assigns. Guarantor hereby covenants and agrees to and with the Supplier, its successors and assigns, that if default shall at any time be made by the Retailer, its successors and assigns, in the payment of any obligations under this Supply Agreement, or in the performance of any of the terms, covenants, provisions or conditions contained in said Supply Agreement, the Guarantor will forthwith pay such sums to the Supplier and will forthwith faithfully perform and fulfill all of such terms, covenants, conditions and provisions and will forthwith pay to the Supplier all damages that may arise in consequence of any default by the Retailer, its successors and assigns, under said Supply Agreement, including, without limitation all reasonable attorneys fees incurred by the Supplier or caused by any such default and/or the enforcement of this Guaranty.

This Guaranty is an absolute and unconditional Guaranty of payment and of performance. It shall be enforceable against the Guarantor, their successors and assigns, without

Initial

the necessity for any suit or proceedings on the Landlord's part of any kind or nature whatsoever against the Tenant, its successors and assigns or on the Supplier's part of any kind or nature whatsoever against the Retailer, its successors and assigns. The Guaranty hereunder shall in no way be terminated, affected or impaired by reason of the assertion or the failure to assert by the Landlord against the Tenant, or the Tenant's successors and assigns, of any of the rights or remedies reserved to the Landlord pursuant to the provisions of said Lease, or by the Supplier against the Retailer, or the Retailer's successors and assigns, of any of the rights or remedies reserved to the Supplier pursuant to the provisions of said Supply Agreement.

The Guaranty shall be a continuing Guaranty, and the liability of the Guarantor hereunder shall in no way be affected, modified or diminished by reason of any assignment, renewal, modification or extension of the Lease or by reason of any modification or waiver of or change in any of the terms, covenants, conditions or provisions of said Lease, or by reason of any extension of time that may be granted by the Landlord to the Tenant, or which may be granted by the Supplier to Retailer, their respective successors and assigns, or by reasons of any dealings or transactions or matters of things occurring between the Landlord and Tenant, its successors and assigns, or the Supplier and Retailer, its successors and assigns, or by reason of any dealings or transactions or matter or things occurring between the Landlord and Tenant, its successors and assigns, or the Supplier and Retailer, its successors and assigns, whether or not notice thereof is given to the Guarantor.

*(Remainder of page intentionally left blank.)*

Page **3** of **4**

Initial _____

Dated: October 22, 2014

**GUARANTOR:**

Louay Alani, Individually

SSN: ███████

Ali Alani, Individually

SSN: ███████

STATE OF ILLINOIS)

           ) ss.

COUNTY OF LAKE )

      On this 22 day of October, 2014 before me personally came **Louay Alani** known to me to be the person described in and who executed the foregoing Guaranty and acknowledged to me that he executed the same.

Notary Public

"OFFICIAL SEAL"
KENNETH J. CHALFOUX
Notary Public, State of Illinois
My Commission Expires 12/06/14

STATE OF ILLINOIS)

           ) ss.

COUNTY OF LAKE )

      On this 22 day of October, 2014 before me personally came **Ali Alani** known to me to be the person described in and who executed the foregoing Guaranty and acknowledged to me that he executed the same.

Notary Public

"OFFICIAL SEAL"
KENNETH J. CHALFOUX
Notary Public, State of Illinois
My Commission Expires 12/06/14
Initial

Page 4 of 4

# EXHIBIT K

# LEASE
===============

Date:          October 22, 2014

Landlord:      BAPA, LLC AND PT, LLC

Tenant:        CATCH 26, LLC

Property:      401 S EASTWOOD, WOODSTOCK, IL 60098

## R E C I T A L S

This Lease ("**Lease**") is entered into by **PT, L.L.C. and BAPA, L.L.C.**, Illinois Limited Liability Companies (the "**Landlord**"), **STATE OIL COMPANY**, an Illinois corporation (the "**Supplier**"), and **CATCH 26, LLC**, an Illinois Limited Liability Company (the "**Tenant**").

**WHEREAS**, the Landlord is the record owner of certain real property commonly known as 401 S. Eastwood, Woodstock, IL 60098; and

**WHEREAS**, Supplier operates a petroleum fuel supply business and will contemporaneously with the execution of this Lease and as a precondition of Landlord agreeing to enter into this Lease, enter into a Petroleum Products Supply Agreement ("**Supply Agreement**") with Tenant for the Premises with a term to run contemporaneously with the initial term and any renewal periods to extend the term of this Lease; and

**WHEREAS**, Tenant desires to lease the Premises, on the terms and conditions set forth herein.

**NOW THEREFORE**, in consideration of the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged by Landlord and Tenant, Tenant and Landlord agree as follows:

## ARTICLE 1

## DEMISE OF PREMISES, LEASE TERM AND USE

Section 1.1.    Leased Premises.

Landlord hereby leases to Tenant and Tenant hereby leases from Landlord, that property commonly known as 401 S. Eastwood, Woodstock, IL 60098 ("Premises"), together with all appurtenances, rights and privileges thereto, and the buildings and improvements erected thereon including a gasoline service station, convenience store, and restaurant.   .

Section 1.2.    Term of Lease.

Initial _____ _____ _____

The Initial Term of this Lease shall be a period commencing on October 24, 2014 and terminating on October 31, 2017 (unless sooner terminated as hereinafter provided).

Section 1.2.1   Option to Extend.

Tenant is hereby given one (1) option to extend the Lease.  The option  is for an additional three (3) year term.  Tenant must give Landlord sixty (60) days notice in writing of its election to exercise either option.  Tenant must also have not defaulted on any portion of the Lease or Supply Agreement at any time in order to exercise option.

Section 1.3.   Definition of Lease Year.

As used herein, the term "lease year" shall mean a period of twelve (12) consecutive full calendar months.  If the Commencement Date shall occur on the first day of a calendar month, the first lease year shall begin on the Commencement Date.  If the Commencement Date shall not occur on the first day of a calendar month, then the first lease year shall commence upon the first day of the calendar month next following the Commencement Date.  Each succeeding lease year shall commence upon the anniversary date of the commencement of the first lease year.  The Commencement Date for this Lease shall be October 24, 2014.

Section 1.4.   Use.

Tenant shall use the Premises solely for the retail sales of gasoline and allied petroleum products and for the operation of a convenience grocery store and restaurant.  Tenant shall not permit the Premises to be used for any other purpose without the prior written consent of Landlord.

Section 1.5   Supply Agreement with State Oil Company

Contemporaneously with the execution of this Lease and as a precondition of Landlord agreeing to enter into this Lease, Tenant must enter into a Petroleum Products Supply Agreement with the State Oil Company for supply of petroleum products to the Premises with a term contemporaneous with the term of this Lease.

It is expressly understood by the parties that the Supply Agreement shall be considered a part of this Lease and any default by the Tenant in the Supply Agreement shall be deemed a default under this Lease and a default in this Lease shall be deemed a default under the Supply Agreement.

**ARTICLE 2**

Page 2 of 28

Initial

**INTENTIONALLY OMITTED**

**ARTICLE 3**

**RENT**

Section 3.1.   Rent for Lease Years.

Tenant shall pay to Landlord at the address stated in the "Notice" Article of this as in effect from time to time, without deduction or set-off, and without demand, the following sums:

(a) Fixed Rent, payable, in advance, on the fifth day of each and every calendar month during the entire term of this Lease in such amounts as set forth on Exhibit "A" attached hereto.

(b) Additional Rent as set forth in Article 4 hereof which shall be due simultaneously with the payment of the Fixed Rent.

Fixed Rent and Additional Rent shall be prorated on a per diem basis for partial months. However, Tenant will not be liable for neither Fixed Rent nor Additional Rent for any period prior to the Commencement Date.

Section 3.2.   Security Deposit.

Tenant will deposit with Landlord the sum of Two Thousand Dollars ($2,000.00) Said sum shall be held by Landlord as security for the faithful performance by Tenant of all the terms, covenants, and conditions of this Lease to be kept and performed by Tenant during the term hereof. If Tenant defaults with respect to any provision of this Lease, including, but not limited to the provisions relating to the payment of rent, Landlord may (but shall not be required to) use, apply, or return all or any part of the security deposit for the payment of any amount which Landlord may spend or become obligated to spend by reason of Tenant's default, or to compensate Landlord for any other loss or damage which Landlord may suffer by reason of Tenant's default. If any portion of said deposit is so used or applied, Tenant shall, within five (5) days after written demand therefore, deposit cash with Landlord in an amount sufficient to restore the security deposit to its original amount and Tenant's failure to do so shall be a default under this Lease. Landlord shall not be required to keep this security deposit separate from its general funds, and Tenant shall not be entitled to interest on such deposit. If Tenant shall fully and faithfully perform every provision of this Lease to be performed under it, the security deposit or any balance thereof shall be returned to Tenant (or, at Landlord's option, to the last assignee of Tenant's interest hereunder) within ten (10) days following expiration of the Lease Term In the event of termination of Landlord's interest in this Lease, Landlord shall transfer said deposit to Landlord's successor in interest.

Initial _____

# ARTICLE 4

## TAXES, INSURANCE AND COMMON AREAS

Section 4.1.    <u>Additional Rent</u>.

In addition to the Fixed Rent provided in Article 3 hereinabove, Tenant shall pay to Landlord as Additional Rent the amounts set forth below:

      a.     <u>Tax Deposits</u>.  Tenant shall deposit with Landlord, on the first day of each month, a sum equal to one-twelfth ($1/12^{th}$) of one hundred ten percent (110%) of the most recent ascertainable annual real estate taxes ("Taxes") on the Premises.  Such deposits are to be held without any allowance of interest and are to be used for the payment of Taxes next due and payable when they become due.  So long as Tenant is not in Default hereunder, or under any of the Transaction Documents (an "Event of Default"), Landlord shall pay such Taxes when the same become due and payable If the funds so deposited are insufficient to pay any such Taxes for any year (or installments thereof, as applicable) when the same shall become due and payable, Tenant shall, within ten (10) days after receipt of written demand therefore, deposit additional funds as may be necessary to pay such Taxes in full.  If the funds so deposited exceed the amount required to pay such Taxes for any year, the excess shall be applied toward subsequent deposits.  Such deposits need not be kept separate and apart from any other funds of Landlord.  Once every calendar year, Landlord shall provide Tenant with a reconciliation of all such deposits made by Tenant in the previous year within thirty (30) days after receiving written notice of Tenant's request for such reconciliation.  Landlord, in making any payment hereby authorized related to Taxes, may do so according to any bill, statement, of estimate procured from the appropriate public office without inquiry into the accuracy of such bill, statement or estimate or into the validity of any tax, assessment, sale, forfeiture, tax lien or title or claim thereof.

      b.     <u>Insurance Deposits</u>.  In addition to the Tax Deposits hereinabove required, Tenant shall pay to Landlord as Additional Rent an amount equal to $1/12^{th}$ of the fire and hazard policy premium.

      c.     <u>Landlord's Interest in and Use of Deposits</u>.  Upon an Event of Default, Landlord may, at its option, apply any monies at the time on deposit pursuant to Section 4 above to cure an Event of Default or pay any of the Indebtedness in such order and manner as Landlord may elect.  If such deposit is used to cure an Event of Default or pay any of the Indebtedness, Tenant shall immediately, upon demand by Landlord, deposit with Landlord an amount equal to the amount expended from the deposits.  When the Indebtedness has been fully paid, any remaining deposits shall be returned to Tenant.  Such deposits are hereby pledged as additional security for the Indebtedness and shall not be subject to the direction or control of Tenant.  Landlord shall not be liable for any failure to apply the payment of Taxes any amount so deposited unless Tenant, prior to an Event of Default, shall have requested Landlord in writing to make application of such funds to the payment of such amounts, accompanied by the bills for such Taxes.  Landlord shall not be liable for any act or omission taken in good faith pursuant to the instruction of any party.

Initial _____

## ARTICLE 5

## COMPLIANCE WITH LAW

Tenant shall not use the Premises, or permit anything to be done in or about the Premises, which will in any way conflict with any law, statute, ordinance or governmental rule or regulation now in force or which may hereafter be enacted or promulgated. Tenant shall, at its sole cost and expense, promptly comply with all laws, statutes, ordinances and governmental rules, regulations or requirements now in force or which may hereafter be in force and with the requirements of any board of fire underwriters or other similar bodies now or hereafter constituted relating to or affecting the condition, use or occupancy of the Premises, excluding structural changes not related to or affected by Tenant's improvements or acts. The judgment of any court of competent jurisdiction or the admission of Tenant in any action against Tenant, whether Landlord be a party hereto or not, that Tenant has violated any law, statute, ordinance or governmental rule, regulation or requirement, shall be conclusive of that fact as between the Landlord and Tenant.

## ARTICLE 6

## ALTERATIONS AND ADDITIONS

Tenant may from time to time make, at its expense, alterations or additions, structural or otherwise to then existing improvements, fixtures or equipment or any parts thereof as may be, in Tenant's opinion, reasonably necessary or desirable for the conduct, improvement or expansion of Tenant's business; provided, that such alterations do not diminish the value of the then existing structural changes, and Tenant obtain, the Landlord's consent, which consent shall not be unreasonably withheld. Tenant, shall cause to be removed, at Tenant's sole cost and expense, all liens placed against the Premises, as a result of any construction performed hereunder, within thirty (30) days of notice hereof or, in the alternative, to post a bond in an amount callable by Landlord to satisfy said lien in the event Tenant does not cause same to be removed within twelve (12) months from the date of the lien or upon the rendering of a decision by a Court initiated to either foreclose the lien or to quiet title, whichever is later. All alterations and additions to the existing improvements, fixtures or equipment shall become the Property of the Landlord.

## ARTICLE 7

## LIENS

Tenant shall keep the Premises free from any liens arising out of any work performed, materials furnished or obligations incurred by Tenant, except as provided in Article 6.

## ARTICLE 8

## ASSIGNMENT AND SUBLETTING

Tenant shall not either voluntarily, or by operation of law, assign, transfer, mortgage, pledge,

Initial _____

hypothecate or encumber this Lease or any interest therein (collectively an assignment), and shall not sublet the said Premises or any part thereof, or any right or privilege appurtenant thereto, or allow any other person (the employees, agents, servants and invitees of Tenant excepted) to occupy or use the said Premises, or any portion thereof, without the written consent of Landlord first had and obtained. Consent to one assignment, subletting, occupation or use by any other person shall not be deemed to be consent to any subsequent assignment, subletting, occupation or use by another person. Consent to any such assignment, occupation or use or subletting shall in no way relieve Tenant of any liability under this Lease. Any such assignment, occupation, use or subletting without such consent shall be void, and shall, at the option of the Landlord, constitute a default under the terms of this Lease. For each assignment, subletting, occupation or use by any other person, Tenant shall pay Landlord a transfer fee of TWENTY THOUSAND AND NO/100 US DOLLARS ($20,000.00); provided, however, Tenant shall not be obligated to pay a transfer fee in the event Tenant is subletting a bay.

## ARTICLE 9

### SUBORDINATION

Section 9.1.    Subordination of Lease.

Landlord reserves the right to subordinate this Lease at all times to the lien of any mortgage or trust deed now or hereafter placed upon the Premises, and Tenant agrees to execute and deliver, upon demand of Landlord, such further instruments subordinating this Lease to the lien of any such mortgage or trust deed, provided, however, that no such subordination shall be made unless Tenant shall expressly have the right to remain in possession of the Premises under the terms of this Lease, notwithstanding any default in any such mortgage or trust deed, or after foreclosure thereof, so long as Tenant is not in default under any provisions of this Lease. Tenant agrees not to subordinate this Lease to any mortgage or trust deed other than a first mortgage or trust deed without the prior written consent of the first mortgagee or first trust deed holder.

Section 9.2.    Declaration that Lease is Superior.

If any mortgagee or trustee elects to have this Lease and the interest of Tenant hereunder superior to any such mortgage or trust deed and evidences such election by notice given to Tenant, then this Lease and the interest of Tenant hereunder shall be deemed superior to any such mortgage or trust deed, whether this Lease was executed before or after such mortgage or trust deed, and in that event such mortgagee or trustee shall have the same rights with respect to this Lease as if it had been executed and delivered prior to execution and delivery of the mortgage or trust deed and had been assigned by Landlord to such mortgagee or trustee.

Section 9.3    Additional Assurances.

Tenant shall execute and deliver whatever instruments may be required to effectuate the purposes of this Article, and in the event Tenant fails so to do within ten (10) days after demand in writing, Tenant does hereby make, constitute and irrevocably appoint Landlord as its attorney in fact and in its name, place

Initial

and stead so to do.

## ARTICLE 10

### ADDITIONAL CONSTRUCTION

Landlord reserves the right as to the Premises, at any time to do, or permit to be done, any or all of the following: add buildings or structures; change the number and location of buildings and structures; change buildings dimensions; and expand the size of the Premises by acquiring or making available additional land; provided however, that without Tenant's prior consent, no such change shall deny reasonable ingress to and egress from the Premises; materially and adversely affect the visibility and identification of parking spaces on the Premises; except however, that no change caused by a condemnation (as defined in Section 15:1 hereof) shall be deemed to be described in this Article. Provided further, that Landlord shall not operate or lease on the Premises, or any additions thereto, a similar or competing business during the term of the Lease. Moreover, any real estate taxes applicable to any additional building or land shall be paid by Landlord. Upon completion of any improvements by the Landlord, Landlord will have the right to adjust the monthly rental for any such improvements. In addition, Landlord shall have the right to enter into a Cross- Easement Agreement with any Tenant or Purchaser of any property adjacent to the Premises.

## ARTICLE 11

### CONDITION OF PREMISES

Section 11.1    Responsibilities of Landlord for Condition of the Premises.

Tenant agrees that no representations respecting the condition of the Premises and that no promises to decorate, alter, repair or improve the Premises, either before or after the execution hereof, have been made by Landlord or its agent to Tenant unless the same are specifically set forth in this Lease or in an exhibit attached to this Lease.

Section 11.2    Responsibilities of Tenant for Condition of the Premises.

Tenant shall at its sole cost and expense and without any cost to Landlord make any and all additions, improvements, alterations and repairs to or on the Premises which may at any time during the term of this Lease be required by any lawful authorities. All additions, alterations and improvements made by Tenant shall be subject to Landlord's approval, and Landlord may, but shall not be obligate to, deal directly with any authorities respecting their requirements for such additions, alterations and improvements.

Initial _____

# ARTICLE 12

## REPAIR, MAINTENANCE AND TRADE FIXTURES

Section 12.1 Responsibility of Landlord for Equipment Repairs and Maintenance.

The Landlord will repair, except for damages caused by negligence or deliberate acts by Tenant or any other person, only those portions of the underground storage tanks and underground product piping which are located below ground but not any of the mechanisms associated with said portions of the underground storage tanks and product piping.

Section 12.2 Responsibilities of Tenant for Repair and Maintenance.

Except as provided herein, Tenant shall, at all times during the term hereof, and at Tenant's expense, maintain the Premises and equipment and improvements (including, but not limited to, gasoline dispensing and electronic read-out equipment, the roof, driveway, canopy, islands, weight bearing structural damage, all exterior lighting, interior walls, exterior and interior of all windows, exterior sign, plumbing, mechanical, heating, cooling and ventilating equipment, and sewer lines) located on or at the Premises in good repair and in good condition, howsoever the necessity or desirability thereof may occur. As used in this Section, the words "repair" or "repairs" shall include renewals and replacements. Tenant shall also decorate and paint the Premises when necessary to maintain a clean and sightly appearance. All repairs made by Tenant shall be at least equal in quality and class to the original work. Tenant further agrees to pay all lien fees. Tenant shall be entitled to all warranties available to Landlord deriving from the installation of the original equipment (see equipment lists attached as Exhibit "C" and Exhibit "D"). The Tenant shall also be responsible for repair of any damage or injury to any equipment or improvements caused by the negligence or deliberate acts by Tenant or any other person. The failure of Tenant to fulfill its responsibilities under this Section 12.2 shall be deemed a default under this Lease.

Section 12.3 Trade Fixtures.

Tenant agrees to install all trade fixtures at Tenant's expense including, but not limited to cash register, hoses and nozzles, breakaways and intercom system. In instances where the general exterior appearance of the Premises is altered, such trade fixtures shall not be installed without the prior written approval of Landlord. It is further agreed that all trade fixtures belonging to Tenant which are, or may be, put into the Premises during the term hereof, whether or not exempt from sale under execution and attachment under the laws of the State of Illinois, shall at all times be subject to a first lien in favor of Landlord, for all Fixed Rents, Additional Rent or other sums which may become due to Landlord from Tenant under this Lease. Upon termination of the Lease all such equipment, improvements and fixtures shall, at Landlord's option, become the property of Landlord and Landlord shall reimburse Tenant at the depreciated value for the equipment, improvements and fixtures which are to be transferred to Landlord.

Initial _____

## ARTICLE 13

## GENERAL CONDITIONS

Section 13.1. General Conditions.

Tenant shall not:

(a) permit any unlawful or immoral practice to be carried on or committed in the Premises;

(b) make any use of or allow the Premises to be used in any manner or for any purpose that might invalidate or increase the rate of insurance thereof;

(c) keep or use or permit to be kept or used on said Premises any inflammable fluids or explosives other than generally associated with the operation of a gasoline service station; without in each instance obtaining the prior written approval of Landlord; or

(d) deface or injure the building or the Premises or improvements;

Tenant agrees to pay as additional rent any increase in the cost of insurance on the building or Premises to Landlord as a result of any unauthorized use of the Premises by Tenant, but such payment shall not constitute in any manner a waiver by Landlord of its right to enforce all of the covenants and provisions of this Lease.

Section 13.2 Electrical Equipment.

In connection with the installation or use of any electrical equipment, Tenant shall, at Tenant's sole cost and expense, make whatever changes are necessary from time to time to comply with the requirements of the insurance underwriters, governmental authorities, or of insurance inspectors designated by Landlord.

## ARTICLE 14

## UTILITIES AND PUBLIC TELEPHONES

Tenant shall apply to the applicable utility company or municipality for all utility services needed by Tenant in the Premises, and Tenant shall be solely responsible for and shall promptly pay all charges for utility services used or consumed on the Premises. All public telephones on the Premises are provided and controlled by Landlord. The Tenant may install no other public telephones on the Premises.

## ARTICLE 15

## DAMAGE TO PREMISES

Initial

In the event the Premises are damaged by fire, explosion, or other casualty or occurrence to the extent of twenty-five percent (25%) or less of the insurable value of the Premises, Landlord shall promptly repair the damage at Landlord's expense. In the event that (a) the Premises shall be damaged by fire, explosion or other casualty or occurrence to the extent of more than twenty-five percent (25%) of the insurable value of the Premises; or (b) substantial damage to the Premises is caused by any occurrence not covered by Landlord's insurance; or (c) the Premises shall be damaged within the last three (3) years of the Lease term to the extent of ten percent (10%) or more of the insurable value, Landlord may elect to repair or rebuild the Premises or to terminate this Lease upon giving notice of such election in writing to Tenant within ninety (90) days of the happening of the event causing the damage. In no event shall Landlord be required to expend for such repair or rebuilding an amount in excess of the insurance proceeds recovered as a result of such damage. If the casualty or the repairing or rebuilding shall render the Premises untenantable in whole or in part, a proportionate abatement of the Fixed Rent shall be allowed from the date when the damage occurred until the date when the Premises can be made tenantable, or until the effective date of termination as herein provided, said abatement to be computed on the basis of the relation which the square foot area of the space rendered untenantable bears to the aggregate square foot area of the Premises. If Landlord is required or elects to rebuild the Premises as herein provided, then and in such event, upon the completion of the rebuilding of the Premises, Tenants shall promptly repair or replace its leasehold improvements (including its fixtures, furnishings, floor coverings and equipment), and replenish its stock in trade. If Tenant has closed its business operations at the Premises, Tenant shall promptly reopen for business.

## ARTICLE 16

## INSURANCE

Section 16.1 <u>Required Insurance Coverage</u>.

Tenant agrees to procure and maintain, for a period commencing the Commencement Date and throughout the term of this Lease, the following insurance with respect to the Premises, from companies satisfactory to the Landlord:

(a) Comprehensive broad form general liability and property damage coverage in the minimum amount of (i) a combined single limit of $2,000,000.00 or (ii) $1,000,000.00 for any one person, $1,000,000.00 for any one occurrence, and $500,000.00 for property damage or such other amount as the parties agree;

(b) Fire and extended coverage, vandalism and malicious mischief coverage on the Tenant's business and personal property, all for their full replacement value;

(c) Rent Loss Insurance or other insurance to cover 12 months of fixed and additional rent payments in the event the Premises become partially or fully untenantable as a result of any damage caused by explosion, fire or other casualty or occurrence;

(d) Tenant shall maintain Worker's Compensation Insurance not less than the statutory limits set by the

Initial ___

State of Illinois. The Insurance Company issuing the policy shall be rated no less than A- by A M Best and be acceptable in all aspects to Landlord;

(e) Tenant shall provide, maintain, and pay for insurance in Landlord's behalf providing coverage for all risks of physical loss commonly provided under I. S. O. Special Property and Contents Forms;

(f) Tenant agrees, that in the event Landlord is able to assign or obtain the assignment of a liquor license, Tenant will reimburse Landlord for any and all expenses, fess, etc., incurred by Landlord to obtain said liquor license. It is further understood and agreed between the parties hereto that in the event a liquor license is issued to Tenant for the operation of a convenience store at the Premises demised herein, said license shall be utilized only in connection with said Premises and that in the event of a termination of this Lease for any reason Tenant agrees that Tenant will assign all interest in said license to Landlord, and will release any right or interest which Tenant may have therein, and will direct the licensing agent to reissue said license in the names of Landlord or their nominees. Tenant further agrees, this paragraph shall constitute such an assignment and direction effective upon the termination of this Lease. Tenant understands that any attempt to transfer said license to a different location will cause irreparable damage to Landlord, which damage is not capable of accurate determination. Tenant hereby authorizes Landlord to obtain, without notice, a restraining order restraining Tenant from transferring or attempting to transfer the liquor license to any other location. Tenant and Landlord further agree that such transfer shall constitute immediate default by Tenant, resulting in immediate forfeiture of the security deposit, without any claim by Tenant for offset. Furthermore Landlord retains the right to pursue compensation for additional loss of business as Landlord may prove in any court of record. Tenant will provide Landlord with evidence of liquor liability insurance paid six (6) months in advance with a limit of no less than $1,000,000.00 combined single limit.

All such insurance to include Landlord, its employees and agents and any mortgagee of the Premises as named insured and as loss payee. Tenant shall provide Landlord with copies of policies or certificates prior to the date Tenant takes possession of the Premises for the purpose of commencing Tenant's Work and from time to time thereafter as required by Landlord evidencing that the aforesaid insurance is in full force and effect.

In lieu of providing the original policy to Landlord, Tenant has the option of providing Evidence of Property Insurance, ACCORD Form 27, along with Certificate of Insurance, ACCORD Form 25-S.

Section 16.2 <u>Notice of Cancellation.</u>

All policies and certificates shall provide that the Landlord shall be given a minimum of thirty (30) days written notice by any such insurance company prior to the cancellation or change of such coverage. All insurance herein required shall be deemed to be additional obligations of the Tenant and not in discharge or of a limitation to Tenant's obligation to indemnify Landlord and its employees and agents under Article 19 hereof.

Section 16.3. <u>Waiver of Subrogation.</u>

Initial

Landlord and Tenant hereby release each other and each other's officers, directors, employees and agents, from liability or responsibility for any loss or damage to property covered by valid and collectible fire insurance with standard extended coverage endorsement. This release shall apply not only to liability and responsibility of the parties to each other, but shall also extend to liability and responsibility for anyone claiming through or under the parties by way of subrogation or otherwise.

Section 16.4. Fire and Extended Coverage

Landlord shall procure and maintain, but shall be reimbursed pursuant to Section 4.1, during the term of this lease, fire, windstorm, and extended coverage insurance on the building, canopy and pumps only.

## ARTICLE 17

## CONDEMNATION

Section 17.1. Complete or Substantial Condemnation.

If thirty percent (30%) or more of the floor area of the Premises should be taken for any public or quasi-public use under any governmental law, ordinance or regulation or by right of eminent domain or by private purchase under threat thereof (a "condemnation"), this Lease shall terminate and the rent shall cease during the unexpired portion of this Lease, effective on the date physical possession is taken by the condemning authority.

Section 17.2.  Less Than Substantial Condemnation.

If less than thirty percent (30%) of the floor area of the Premises should be taken by condemnation, this Lease shall not terminate; however, the Fixed Rent payable hereunder during the unexpired portion of this Lease shall be reduced in proportion to the area taken, effective on the date physical possession is taken by the condemning authority.

Section 17.3. Condemnation of Parking Area.

If any of the parking area should be taken for condemnation, this Lease shall not terminate, nor shall the rent payable hereunder be reduced, nor shall Tenant be entitled to any part of the award made for such taking except that either Landlord or Tenant may terminate this Lease if the area of the parking areas remaining following such taking plus any additional parking areas provided by Landlord in reasonable proximity to the Premises shall be less than fifty percent (50%) of the original area of the parking area.

Section 17.4. Election to Terminate.

Any election to terminate this Lease following condemnation shall be evidenced by written notice of termination delivered to the other party within thirty (30) days after the date on which physical possession is taken by the condemning authority.

Initial

Section 17.5. Awards.

All compensation awarded for the condemnation (or the proceeds of private sale under threat thereof) whether for the whole or a part of the Premises or the common areas, shall be the property of Landlord, whether such award is compensation for damages to Landlord's or Tenant's interest in the Premises or the common areas, and Tenant hereby assigns all of its interest in any such award to Landlord; provided, however, Landlord shall have no interest in any award made to Tenant for loss of business or for the taking of Tenant's fixtures and personal property within the Premises if a separate award for such items is made to Tenant.

## ARTICLE 18

## ACCESS TO PREMISES

Tenant agrees that Landlord or its agents may enter the Premises during normal business and at any time when Landlord believes there is an emergency situation which warrants entry, to inspect the conditions of the same, to make such repairs or improvements to the Premises, as Landlord may elect to make and to exhibit the same to prospective purchasers or to prospective tenants, and to place in and upon the Premises "for rent" signs during the last ninety (90) days of the term thereof and Tenant agrees that neither Tenant nor any person within Tenant's control will interfere with such signs. Such entry, inspection and repairs or improvements shall not constitute eviction of Tenant in whole or in part, and the rent reserved shall not abate while such work is being done. If neither Tenant nor Tenant's agents shall be present to permit entry into the Premises when entry therein shall be necessary or permissible under this Lease, Landlord or its agents may enter same by whatever means necessary without liability therefore. Nothing contained in this Article, however, shall be construed to impose upon Landlord any obligation or liability for supervision or repair of the Premises.

## ARTICLE 19

## WAIVER AND INDEMNIFICATION

Section 19.1.  Waiver of Claim by Tenants.

Except for the gross negligence or wanton or deliberate acts of Landlord or Landlord's agents and employees, Tenant waives all claims against Landlord and Landlord's agents and employees for injury to or the death of persons, damage to property or any loss or expense sustained by Tenant or any person claiming through Tenant resulting from any occurrence in or upon the Premises, including, but not limited to, such claims as may result from: (a) any equipment or appurtenance becoming out of repair; (b) the Premises or the building being out of repair; (c) injury or damage done or occasioned by wind, water, flooding, freezing, snow, fire, explosion, earthquake, excessive heat or cold, vandalism, riot or disorder or other casualty; (d) any defect in or failure of plumbing, heating or air conditioning equipment, electric wiring or the installation thereof, gas equipment, water and steam pipes, stairs, railings or walks; (e) broken glass; (f) the backing up of any sewer pipe or downspout; (g) the bursting,

Initial

leaking or running of any tank, tub, washstand, water closet, waste pipe, drain, cooling coil or any other pipe or tank in, upon or about the Premises; (h) the escape of steam or hot water; (i) water, snow or ice being upon or coming through the roof, skylight, trap door, stairs, walks or any other place upon or near the Premises or otherwise; (j) the falling of any fixture, plaster or stucco; and (k) any act, omissions or negligence of owners, operators, employees, or their agents of adjoining or contiguous buildings or adjacent property.

Section 19.2. <u>Indemnification of Landlord.</u>

Except for claims, liabilities, losses, damages and expenses arising out of the gross negligence or wanton or deliberate acts of Landlord or Landlord's agents or employees, Tenant agrees to indemnify, defend and hold harmless Landlord and Landlord's agents and employees, from and against all claims, liabilities, losses, damages and expenses suffered by Landlord as the result of the injury to or the death of any person, or loss of or damage to property (i) caused by Tenant or its employees, agents, invitees, or contractors, or (ii) occurring in the Premises. The foregoing indemnity shall be in addition to Tenant's obligations to supply the insurance required by Article 16 and not in discharge of or substitution for same. It is further understood and agreed that all property kept or stored in the Premises shall be at the risk of Tenant.

Section 19.3. <u>Right of Landlord to Repair Damage.</u>

If any damage to the Premises or other property of Landlord results from any act or neglect of Tenant, its agents or employees, and Tenant fails and refuses to repair said damage within thirty (30) days of Landlord's written demand thereof, Landlord may, at his option, repair such damage and bill Tenant all reasonable costs of repair. Upon receipt of any such bill, Tenant shall promptly reimburse Landlord for the cost thereof.

## ARTICLE 20

## REGULATIONS; COMPLIANCE

Section 20.1. <u>Regulations.</u> Tenant agrees as follows:

(a) All garbage and refuse shall be kept in the kind of container specified by Landlord, shall be placed in the areas specified by Landlord and prepared for collection in the manner and at the times and places specified by Landlord. If Landlord shall provide or designate a service for picking up refuse and garbage, Tenant shall use same at Tenant's cost, provided such cost shall be competitive to any similar service available to Tenant.

(b) Tenant shall use at Tenant's cost such pest extermination contractor as Landlord may direct and at such intervals as Landlord may require, provided the cost thereof is competitive to any similar service available to Tenant.

Initial _____

(c) Tenant shall keep the Premises and the sidewalks and service areas immediately adjoining the Premises free and clear of snow, ice and refuse.

Section 20.2. <u>Compliance.</u>

The foregoing covenants and agreements together with any reasonable modification or additions promulgated from time to time by Landlord are hereinafter referred to as "Regulations". Tenant agrees to comply with the Regulations, and in the event of violation by Tenant of any Regulation, Landlord shall have all remedies in this Lease provided for default of Tenant. Landlord shall not be liable to Tenant for violations by other tenants of any Regulation.

## ARTICLE 21

## DEFAULT

Section 21.1. <u>Rights of Landlord Upon Default.</u>

Each of the following events shall constitute a Default: (i) if Tenant vacates or abandons the Premises or permits the same to remain vacant or unoccupied for a period of ten (10) days, (ii) if the rental reserved in Article 3 or Article 4 of this Lease, or any part thereof is not paid when due and remains unpaid for five (5) days after written notice thereof to Tenant, (iii) if default is made in the prompt and full performance by any covenant or condition of this Lease to be kept or performed by Tenant and such default continues for more than a reasonable time (in no event to exceed thirty (30) days) after written notice to Tenant, specifying such default, (iv) if any proceedings are commenced to declare Tenant bankrupt or insolvent or to obtain relief under any bankruptcy or debtor relief law, (v) if any assignment of Tenant's property is made for benefit of creditors, (vi) if a receiver or trustee is appointed for Tenant's property, or (vii) if Tenant fails to properly maintain the Premises in accordance with the terms and conditions of this Lease. If a Default shall occur, Landlord, without further notice or demand of any kind to Tenant or any other person may have, in addition to all other legal or equitable remedies, the following described remedies:

(a) Landlord may elect to terminate this Lease and the term created hereby in which event Landlord forthwith may repossess the Premises and Tenant shall pay at once to Landlord as liquidated damages a sum of money equal to the rental reserved in Article 3 of this Lease to be paid by Tenant to Landlord for the balance of the stated term of this Lease less the fair rental value of the Premises for such period. In addition, all rent unpaid for five (5) days after such rent is due, shall be charged with fifteen percent (15%) per annum interest until all such rent is paid to Landlord.

(b) Landlord may elect to terminate Tenant's right of possession without termination of this Lease in which event Tenant agrees to surrender possession and vacate the Premises immediately and deliver possession thereof to Landlord and Tenant hereby grants to Landlord full and free license to enter into and upon the Premises, in whole or in part, with or without process of law to repossess Landlord of the

Initial ___ ___ ___

Premises or any part thereof and to expel or remove Tenant and any other person, firm or corporation who may be occupying or within the Premises or any part thereof and remove any and all property therefrom without terminating the Lease or releasing Tenant in whole or in part from Tenant's obligation to pay rent and perform the covenants, conditions and agreements to be performed by Tenant as provided in this Lease; without being deemed in any manner guilty of trespass, eviction or forcible entry or detainer; and without relinquishing Landlord's right to rental or any other right of Landlord under this Lease or by operation of law.

(c) At the election of Landlord, and without limiting the remaining provisions contained in the Lease, in the event that any payment of rent is not paid within five (5) days after the date on which it is due, Tenant shall pay a late charge equal to 15% of the overdue amount, including, but not limited to the sums required to be paid pursuant to Articles 3 and 4 of the Lease, in order to defray the expense incident to handling such delinquent payment or payments.

Section 21.2. <u>Waiver of Other Notices.</u>

Tenant hereby waives the service of any notice under this Article, including any and every form of demand and notice prescribed by law, other than such notice as is in this Lease specified.

Section 21.3. <u>Reletting of Premises.</u>

Upon and after entry into possession without terminating the Lease, Landlord may, but shall not be obligated to relet all or any part of the Premises for the account of Tenant for such rent and upon such terms and to such persons and for such periods as Landlord in Landlord's sole discretion shall determine. Landlord shall not be required to accept any tenant offered by Tenant, to observe any instruction given by Tenant about such reletting or to exercise any care or diligence with respect to such reletting or to the mitigation of damages of Tenant. For the purpose of such reletting, Landlord may decorate or make repairs, alterations or additions to the Premises to the extent deemed desirable by Landlord. All such consideration so received shall be the sole property of the Landlord; provided, however, if the consideration received by Landlord upon any such reletting for Tenant's account is not sufficient to pay the rental reserved in this Lease together with the cost of repairs, alterations, additions, redecorating and Landlord's other expenses (including, without limitation, any broker's commission incurred by Landlord), Tenant agrees to pay to Landlord the deficiency upon demand. Nothing herein shall be construed as limiting the duty of Landlord to mitigate damages in a commercially reasonable manner in the event of a default of Tenant.

Section 21.4. <u>Duty to Pay Rent.</u>

The service of a five-day notice, demand for possession, a notice that the tenancy hereby created will be terminated on the date therein named, institution of an action of forcible detainer or ejectment or the entering of a judgment for possession in such action, or any other act or acts resulting in the termination of Tenant's right to possession of the Premises shall not relieve Tenant from Tenant's obligation to pay the rent hereunder during the balance of the term or any extension thereof, except as herein expressly provided. Landlord may collect and receive any rent due from Tenant; and the payment thereof shall not constitute a waiver of or affect any notice or demand given, suit instituted or judgment obtained by

Initial

Landlord, or be held to waive or alter the rights or remedies which Landlord has in equity or at law or by virtue of the Lease.

Section 21.5. Remedies are Cumulative.

All rights and remedies of Landlord herein created or otherwise existing at law or equity are cumulative and the exercise of one or more rights or remedies shall not be taken to exclude or waive the right to the exercise of any other except as otherwise provided herein. All such rights and remedies may be exercised concurrently and whenever and as often as Landlord shall deem desirable.

Section 21.6. Failure to Insist Upon Strict Performance Not A Waiver.

The failure of Landlord to insist upon strict performance by Tenant of any of the covenants and conditions of this Lease shall not be deemed a waiver of any of Landlord's rights or remedies concerning any subsequent or continuing breach or default by Tenant of any of the covenants and conditions of this Lease. No surrender of the Premises shall be affected by Landlord's acceptance of rental or by any other means whatsoever unless the same be evidenced by Landlord's written acceptance of such a surrender.

Section 21.7. Purchase of Inventory Upon Termination

In the event this Lease is terminated, the Landlord or Supplier may purchase from the Tenant all store merchandise and gasoline inventory at the Tenants actual cost. The purchase price shall be payable five business days after that the Tenant vacates the Premises, subject to any uniform commercial code requirements, Illinois Department of Revenue requirements, and any outstanding indebtedness due to Landlord from Tenant. Any and all equipment installed on the Premises shall become the property of the Landlord at the expiration of the Lease.

Section 21.8. Relationship to Other Agreements

Landlord and Tenant may have agreements related to other locations that are owned or otherwise controlled by Landlord. Any default under any such other agreement shall be considered a default under this Lease.

## ARTICLE 22

## SURRENDER OF PREMISES; HOLDING OVER

Section 22.1 Surrender of Premises.

Tenant, upon expiration or termination of the Lease, either by lapse of time or otherwise, agrees to peaceably surrender the Premises (including approved alterations and additions, and non-trade fixtures) to Landlord in broom-clean condition and in good repair, except for damage caused by ordinary use and wear and damage by fire or casualty. Tenant further agrees to promptly remove Tenant's trade fixtures

Initial

upon any such expiration or termination and to promptly repair all damage to the Premises caused by the original installation or removal thereof. Tenant's failure to promptly so remove all of Tenant's trade fixtures shall be deemed an abandonment thereof to Landlord and, if Landlord elects to remove said fixtures, the cost of such removal, including repairing any damage to the Premises caused by their original installation or by the removal thereof, shall be paid by Tenant.

Section 22.2. <u>Holding Over.</u>

If Tenant retains possession of the Premises or any part thereof after expiration or termination of the term by lapse of time or otherwise, then Landlord may, at its option, serve written notice upon Tenant that such holding over constitutes either (i) renewal of this Lease for one year, and from year to year thereafter, at double the sum of all rental reserved in Article 3 of this Lease as in effect immediately prior to the expiration or termination of the term (said double sum being thereinafter referred to as the "Holdover Rent") or (ii) creating of a month-to-month tenancy upon the terms of this Lease except at the Holdover Rent or (iii) creation of a tenancy at sufferance, at a rental in an amount equal to 1/365th of the Holdover Rent for each day the Tenant remains in possession. If no such written notice is served, then a tenancy at sufferance with rental as stated in (iii) shall have been created. Tenant shall also pay to Landlord all damages sustained by Landlord resulting from retention of possession by Tenant. The provisions of this Section shall not constitute a waiver by Landlord of any right of re-entry as hereinabove set forth; nor shall receipt of any rent or any other act in apparent affirmance of tenancy operate as a waiver of the right to terminate this Lease for a breach of any of the covenants or conditions on Tenant's part to be performed.

## ARTICLE 23

### ATTORNEYS FEES

If either party shall be made a party to any litigation commenced against the other party and relating to the other party's use of occupancy of the Premises, and the first party shall not be found to be at fault, then the other party shall pay all costs, expenses and attorneys' fees incurred or paid by the first party in connection with such litigation. A defaulting party shall also be liable to pay the costs, expenses and attorneys' fees incurred or paid by the non-defaulting party in enforcing the covenants and conditions of the defaulting party under this Lease, even in the event that no litigation is commenced.

## ARTICLE 24

### LANDLORD'S SELF HELP

If, during the term of this Lease, Tenant shall fail to comply with and perform any of the covenants or conditions herein contained on Tenant's part to be performed, Landlord shall have the right (but shall not be obligated) to perform any such covenants or conditions. In the event Landlord shall exercise this right, Tenant shall pay to Landlord, on demand, as additional rent hereunder, a sum equal to the amount expended by Landlord in the performance of such covenants or conditions, together with interest at the

Initial

rate specified in Section 21.1. hereof. In the event Landlord shall decide to perform any such covenants or conditions, Tenant agrees that Landlord or its agents may enter the Premises for this purpose and that such entry and such performance shall not constitute an eviction of Tenant, in whole or in part, nor relieve Tenant from the continued performance of all covenants and conditions of this Lease. Tenant further agrees that Landlord and its agents shall not be liable for any claims by Tenant relating to the loss of or damage to Tenant's property by virtue of such performance by Landlord of a covenant or condition of Tenant hereunder.

## ARTICLE 25

### ESTOPPEL CERTIFICATE; MORTGAGE PROTECTION

Section 25.1. Estoppel Certificate.

Within ten (10) days after request therefore by Landlord, Tenant agrees to deliver to Landlord an estoppel certificate in recordable form, addressed to whomever Landlord shall designate, wherein Tenant shall certify and agree as follows:

(a) This Lease is in full force and effect, if such is the case, and the Commencement Date and expiration date thereof.

(b) The amount of rent payable by Tenant, and the amount of security deposit, if any.

(c) Tenant has no offsets or defenses to its performance of the covenants and conditions of this Lease, including the payment of rent, if such be the case, or if there are any such defenses or offsets, specifying the same.

(d) Tenant is in possession of the Premises.

(e) Any other reasonable information or requirement of Landlord or mortgagee.

Section 25.2. Mortgagee Protection.

Tenant agrees to give any first mortgagee or first trust deed holder (a "first mortgagee"), by certified or registered mail, a copy of any notice of default served upon Landlord by Tenant, provided that prior to such notice Tenant has notice (by way of service on Tenant of a copy of an assignment of rents and leases, or otherwise) of the address of such first mortgagee. Tenant further agrees that if Landlord shall have failed to cure such default, then the first mortgagee shall have an additional thirty (30) days after receipt of notice thereof within which to cure such default or if such default cannot be cured within that time, then such additional time as may be necessary, if, within such thirty (30) days, any first mortgagee has commenced and is diligently pursuing the remedies necessary to cure such default (including but not limited to commencement of foreclosure proceedings, if necessary to effect such cure). Until the time allowed as aforesaid for the first mortgagee to cure such defaults has expired without cure, Tenant shall have no right to, and shall not terminate this Lease on account of such default.

Initial

## ARTICLE 26

## NOTICE

All notices and demands required or permitted to be given hereunder shall be deemed to be properly given if given in writing, delivered personally, by registered or certified United States Mail, with postage prepaid and return receipt request, or by reputable national overnight courier and addressed to the party to be notified at the address set forth below (or to such other address as any party hereto may from time to time designate by notice in writing to the other party hereto):

IF TO LANDLORD:     BAPA, LLC
c/o Bill Anest
31366 N. Highway 45
Libertyville, Illinois 60048

AND

PT, LLC
c/o Peter Anest
31366 N. Highway 45
Libertyville, Illinois 60048

IF TO TENANT:     CATCH 26, LLC
c/o Ali Alani
401 S. Eastwood
Woodstock, IL 60098

With a copy to:     Roeser Bucheit & Graham, LLC
Two North Riverside Plaza
Suite 1420
Chicago, IL 60606
Attention: William S. Bazianos

Such notice shall be deemed given at the time of such mailing.

## ARTICLE 27

## QUIET ENJOYMENT

Upon the payment by Tenant of all rents herein provided, and upon the observance and performance of

Page 20 of 28

Initial

all the covenants, terms, and conditions on Tenant's part to be observed and performed, Tenant shall peaceably and quietly hold and enjoy the Premises for the term hereby demised without hindrance or interruption by Landlord or any other person or persons lawfully or equitably claiming by, through or under Landlord, subject, nevertheless, to the terms and conditions of this Lease.


# ARTICLE 28

## LIMITATION OF LANDLORD'S LIABILITY

Section 28.1. <u>Definition of Landlord.</u>

The term "Landlord" as used in this Lease, insofar as covenants or obligations on the part of Landlord to be performed are concerned, shall be limited to mean and include only the owner at the time in question of the fee of the Premises, and in the event of any transfer of title to the fee, Landlord herein named (and in the case of subsequent transfers or conveyances, the then grantor) shall be automatically freed and relieved from and after the date of such transfer or conveyance, of all liability with respect to the performance of any covenant or obligation on the part of Landlord to be performed thereafter under the terms of this Lease, as long as the new owner or transferee accepts and assumes all of Landlord's duties and obligations under the Lease.


Section 28.2. <u>Limitation of Landlord's Liability.</u>

Landlord shall have absolutely no personal liability with respect to any provision of this Lease or any obligation or liability arising therefrom or in connection therewith. Tenant shall look solely to the equity of Landlord in the Premises for the satisfaction of any remedy of Tenant for breach by Landlord or any of its obligations. Such exculpation of liability shall be absolute and without any exception whatsoever.


# ARTICLE 29

## CORPORATE AUTHORITY

If Tenant is a corporation, each individual executing this Lease on behalf of said corporation represents and warrants that he is duly authorized to execute and deliver this Lease on behalf of said corporation, in accordance with a duly adopted resolution of the board of directors of said corporation, in accordance with the bylaws of said corporation, and that this Lease is approved by said corporation in accordance with its terms. Tenant agrees to provide Landlord with evidence that Tenant is a corporation in good standing in the State of Illinois.

# ARTICLE 30

## FULLY NET LEASE

Initial _____ _____ _____

Landlord and Tenant intend all base rent shall be paid absolutely net to Landlord and that all impositions, charges and expenses relating to the leased Premises, the improvements thereon or the business to be conducted thereon, shall be the sole responsibility of Tenant, so that, during the Lease term, the Leasehold estate shall yield to Landlord all base rent, which is specified herein. Landlord shall not be obligated to pay any charge or expense whatsoever imposed upon or against, or incurred in connection with the Leased Premises, the improvements thereon or the business conducted thereon, and, the collection of base rent shall be subject to no deduction, defense, set off or counterclaim whatsoever for such impositions, charges and expenses.

## ARTICLE 31

## PROHIBITION OF DEBRIS

Tenant shall keep the Premises free from all debris, garbage and other junk in full compliance with the codes and ordinances of the municipality, County of Lake and State of Illinois. It is expressly understood that the Premises shall not be used as a dumping ground for trash, garbage, debris or any other junk.

## ARTICLE 32

## ENVIRONMENTAL REQUIREMENTS

Tenant represents and agrees that it shall comply with all environmental laws that are applicable to the Premises during the term of the Lease including any Lease renewal term. Tenant (i) shall perform any and all required testing at the required intervals and maintain all equipment necessary to comply with environmental requirements; (ii) use such underground tanks during the term of this Lease for the storage and dispensing of motor fuel; and may (iii) dispense motor fuels at the Premises for purchase by retail customers; provided, however, that all such activities, including, without limitation, maintenance, repair and removal of the underground tanks shall be performed in accordance with all applicable environmental laws and other applicable governmental laws and regulations, as well as any amendments to such laws or regulations.

Tenant shall, at its own cost and expense during the term of the Lease, including Lease renewal terms, take all actions as required by applicable environmental laws for the clean-up of the Premises, arising as a result of the actions of Tenant or its employees or third parties during the term of the Lease, including the use or malfunction of any equipment used in conjunction with Tenant's operation of the Premises.

Landlord has enlisted the assistance of third party companies to do monthly, quarterly, and yearly testing on the tanks and monitoring systems. Tenant is responsible for the cost of all testing and spill kits as well as training for any and all employees to be certified as Class A/B and C Operators.

## ARTICLE 33

Page **22** of **28**

Initial _____

**TRANSFER OF LANDLORD'S INTEREST**

Tenant acknowledges that Landlord has the right to transfer its interest in the property and in the Lease and Tenant agrees that in the event of such transfer, Landlord shall automatically be released from all liability under this Lease as amended and Tenant agrees to look solely to such Transferee for the performance of Landlord's obligations hereunder, provided the Transferee has assumed said obligations.

## ARTICLE 34

## EQUIPMENT AND INVENTORY

Section 34.1.  Equipment to remain property of Landlord.

The Equipment included in the Lease consists of all equipment at the premises, some of which is set forth in Exhibit "B" attached hereto, excluding the equipment that is referred to below in Section 34.2. This Equipment at all times will remain the property of the Landlord.  Tenant acknowledges that at the conclusion of the Term of the Lease or in the event that the Lease is terminated or canceled for any reason whatsoever, all Equipment will be returned to Landlord in at least as good condition as it was transferred.

Section 34.2   Equipment – Vendor Owned, Leased or Consigned.

Attached hereto as Exhibit "C" is a list of all equipment that is vendor-owned, leased or consigned.

Section 34.3  Inventory – Inventory to be Purchased

Attached hereto as Exhibit "D" is a count of inventory and cost calculation done by a third party inventory company.  The cost of the inventory will be due and payable to Landlord upon demand after Tenant takes possession of Premises.

## ARTICLE 35

## MISCELLANEOUS

Section 35.1 Time of Performance.

The time of performance of all of the covenants and conditions of this Lease is of the essence.

Section 35.2 Not a Joint Venture.

Nothing herein shall be construed so as to constitute a joint venture or partnership between Landlord and

Initial

Tenant.

Section 35.3 <u>Applicable Law, Venue, Jury Waiver</u>.

The internal laws of the State of Illinois shall govern the validity, performance and enforcement of this Lease. The submission of this Lease for examination does not constitute an offer to lease, or a reservation of or option for the Premises, and this Lease becomes effective only upon execution and delivery thereof by Landlord and Tenant. Tenant knowingly, voluntarily and intentionally waives irrevocably the right it may have to trial by jury with respect to any legal proceeding based hereon, or arising out of, under or in connection with this Lease, or any agreement executed or contemplated to be executed in conjunction herewith or any course of conduct or course of dealing in which Landlord and/or State Oil Company and Tenant are adverse parties. It is further agreed that venue for any legal proceedings shall only be in the Nineteenth Judicial Circuit of the State of Illinois for any State Court proceeding or in the Northern District of Illinois, Eastern Division, for any Federal Court proceeding. This provision is a material inducement for Landlord entering into this Lease.

Section 35.4 <u>Captions for Convenience Only</u>.

The captions of the several articles and sections contained herein are for convenience only and do not define, limit, describe or construe the contents of such articles or sections.

Section 35.5 <u>Amendments To Be In Writing</u>.

No amendment, modification or of supplement to this Lease shall be effective unless in writing, executed and delivered by Landlord and Tenant.

Section 35.6 <u>Severability</u>.

If any provision of this Lease is held to be invalid, such invalid provision shall be deemed to be severable from and shall not affect the validity of the remainder of this Lease.

Section 35.7 <u>Memorandum of Lease</u>.

Tenant agrees not to record this Lease, and Landlord and Tenant each agree, at the request of the other, to execute and deliver to the other a memorandum of this Lease in recordable form which memorandum may be recorded by either party.

Section 35.8 <u>Successors and Assigns</u>.

The terms and provisions of this Lease shall be binding upon, and shall inure to the benefit of the parties hereto and their successors and permitted assigns.

Section 35.9 <u>Plats and Riders</u>.

Clauses, plats, riders and addendums, if any, affixed to this Lease are a part hereof.

Initial

Section 35.10 <u>Joint Obligation.</u>

If there be more than one Tenant, the obligations hereunder imposed shall be joint and several.

Section 35.11 <u>Inability to Perform.</u>

This Lease and the obligations of the Tenant hereunder shall not be affected or impaired because the Landlord is unable to fulfill any of its obligations hereunder or is delayed in doing so, if such inability or delay is caused by reason of strike, labor troubles, acts of God, or any other cause beyond the reasonable control of the Landlord.

Section 35.12 <u>Cumulative Remedies.</u>

No remedy or election hereunder shall be deemed exclusive but shall, wherever possible, be cumulative and all other remedies at law or in equity shall be available to the parties.

Section 35.13 <u>No Franchise Relationship</u>

This Lease is not a Franchise within the meaning of federal or state legislation. Landlord is not selling a way of doing business, and is not selling the right to use a trademark. Nothing contained in this Lease shall be deemed or construed by the parties hereto or by a third party to create the relationship of principal and agent or of partnership or of joint venture or of any association whatsoever between Landlord and Tenant, it being expressly understood and agreed that neither the method of computation of rent nor any other provisions contained in this Lease nor any act or acts of the parties hereto, shall be deemed to create any relationship between Landlord and Tenant other than the relationship of Landlord and Tenant.

*(Remainder of page intentionally left blank.)*

Initial ___

**IN WITNESS WHEREOF,** Landlord and Tenant have executed this Lease, including any riders or schedules attached hereto as of the day and year first above written.

**LANDLORD:**

**BAPA, LLC**

_____
Bill Anest, its Manager

**PT, LLC**

_____
Peter Anest, its Manager

**TENANT:**
**CATCH 26, LLC**

_____
Ali Alani, its Manager

**SUPPLIER:**
**STATE OIL COMPANY**

_____
Peter Anest, President

| | | |
|---|---|---|
| **STATE OF ILLINOIS** | ) | |
| | ) | **ss.** |
| **County of Lake** | ) | |

I, the undersigned, a Notary Public in and for said County, in the State aforesaid, DO HEREBY CERTIFY that **Bill Anest** is the Manager of **BAPA, LLC** and is personally known to me to be the same person whose name is subscribed to the foregoing instrument as Manger appeared before me this day in person and acknowledged that he signed, sealed and delivered the said instrument as his free and voluntary act, for the uses and purposes therein set forth.

Given under my hand and notarial seal this 22 day of October 2014.

_____
Notary Public

"OFFICIAL SEAL"
KENNETH J. CHALIFOUX
Notary Public, State of Illinois
My Commission Expires 12/06/14

Page 26 of 28                                                 Initial _____ _____

**STATE OF ILLINOIS**  )
                        )   **ss.**
**County of Lake**      )

I, the undersigned, a Notary Public in and for said County, in the State aforesaid, DO HEREBY CERTIFY that **Peter Anest** is the Manager of **PT, LLC** and is personally known to me to be the same person whose name is subscribed to the foregoing instrument as Manger appeared before me this day in person and acknowledged that he signed, sealed and delivered the said instrument as his free and voluntary act, for the uses and purposes therein set forth.

Given under my hand and notarial seal this 22 day of October 2014.

_Kenneth J. Chal..._
Notary Public

> "OFFICIAL SEAL"
> KENNETH J. CHALIFOUX
> Notary Public, State of Illinois
> My Commission Expires 12/06/14

**STATE OF ILLINOIS**  )
                        )   **ss.**
**County of Lake**      )

I, the undersigned, a Notary Public in and for said County, in the State aforesaid, DO HEREBY CERTIFY that **Ali Alani** is the Manager of **CATCH 26, LLC** and is personally known to me to be the same person whose name is subscribed to the foregoing instrument as President appeared before me this day in person and acknowledged that he signed, sealed and delivered the said instrument as his free and voluntary act, for the uses and purposes therein set forth.

Given under my hand and notarial seal this 22 day of October 2014.

_Kenneth J. Chal..._
Notary Public

> "OFFICIAL SEAL"
> KENNETH J. CHALIFOUX
> Notary Public, State of Illinois
> My Commission Expires 12/06/14

**STATE OF ILLINOIS**  )
                        )   **ss.**
**County of Lake**      )

I, the undersigned, a Notary Public in and for said County, in the State aforesaid, DO HEREBY CERTIFY that **Peter Anest** is the President of **STATE OIL COMPANY** and is personally known to me to be the same person whose name is subscribed to the foregoing instrument as President appeared before me this day in person and acknowledged that he signed, sealed and delivered the said instrument as his free and voluntary act, for the uses and purposes therein set forth.

Given under my hand and notarial seal this 22 day of October 2014.

_Kenneth J. Chal..._
Notary Public

Page 27 of 28

> "OFFICIAL SEAL"
> KENNETH J. CHALIFOUX
> Notary Public, State of Illinois
> My Commission Expires 12/06/14

# EXHIBIT A

## RENT SCHEDULE

Year 1 ……………………………… $1,000.00

Year 2 ……………………………… $1,500.00

Year 3 ……………………………… $2,000.00

Option Year 1 ……………………….. $2,000.00

Option Year 2 ……………………….$2,000.00

Option Year 3…………………..…..$2,500.00

Initial _____ ____ ____

# EXHIBIT L

## PETROLEUM PRODUCTS SUPPLY AGREEMENT

This Agreement is made and entered into this *22* day of October 2014, by and between **STATE OIL COMPANY** with an address of 31366 North Highway 45, Libertyville, Illinois 60048 ("Supplier") and **CATCH 26, LLC,** with an address of 401 S. Eastwood, Woodstock, IL 60098 ("Retailer").

**For Recorder's Use Only**

## R E C I T A L S

**WHEREAS, CATCH 26, LLC** ("Tenant") has entered into an Lease ("Lease") for the Premises commonly known as 401 S. Eastwood, Woodstock, IL 60098 ("Premises") with **BAPA, LLC AND PT, LLC** ("Landlord") to rent and use the Premises for the retail sales of gasoline and allied petroleum products;

**WHEREAS,** the Retailer desires to purchase all its needs of gasoline and allied petroleum products to be sold on the Premises from Supplier and Supplier desires to furnish the Retailer with all of its needs of gasoline and allied petroleum products for the Premises;

**NOW, THEREFORE,** in consideration of the covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

1. <u>Supply of Petroleum Products.</u> The Supplier shall furnish to Retailer a supply of gasoline reasonable for its sales need, to the degree possible and the Retailer shall purchase its gasoline supply exclusively from the Supplier. The Supplier shall make reasonable efforts to provide an adequate supply. If the Supplier is unable to supply the Retailer's reasonable needs of gasoline, and if the Retailer shall be able to acquire a supply of gasoline from any other source, Retailer agrees to enable the Supplier to purchase that gasoline for resale to Retailer at the cost and terms available to Retailer. The Supplier shall charge the Retailer for each transport load of gasoline at Unbranded Posted Price, plus $.0200 per gallon, plus federal excise tax, Federal Oil Spill Recovery Fee, state motor fuel tax, underground storage tank tax, environmental impact fee, advertising fees from the oil company, freight, prepaid state sales tax, and any county or city imposed taxes that are required to be collected by

Initial

Supplier. State sales tax, county imposed motor fuel tax, and any other city or locally imposed tax on sales shall be the sole responsibility of the Retailer. Retailer shall furnish Seller with satisfactory tax exemption certificates where an exemption is claimed. To secure the present and future obligations of Retailer to Supplier, Retailer shall provide Supplier with a Security Agreement on the inventory and equipment of Retailer.

(A) **Delivery.** Deliveries of said gasolines shall be made by Supplier on Retailer's order in single deliveries of not less than 8,500 gallons. However, if Retailer orders a single delivery of less than 8,500 gallons, Retailer remains responsible for all costs of delivery, including freight rate, for a delivery of 8,500 gallons. Supplier shall make deliveries within 48 hours following receipt of Retailer's order but need not make such deliveries outside normal business hours or on Sunday or holidays. Retailer agrees to purchase a minimum of 50,000 gallons per month from Supplier and the failure to do so shall constitute a default of the terms and conditions of this Supply Agreement.

(B) **Liabilities.** The obligation of the parties to deliver and receive gasoline hereunder shall be suspended and excused (a) if Supplier is prevented from or delayed in producing, manufacturing, transporting or delivering in its normal manner any gasoline hereunder or the materials from which such gasoline is manufactured because of acts of God, earthquake, fire, flood or the elements, malicious mischief, riots, strikes, lockouts, boycotts, picketing, labor disputes or disturbance, compliance with any directive, order or regulation of any governmental authority or representative thereof acting under claim or color of authority; or (b) loss or shortage of any gasoline due to reasons beyond Supplier's reasonable control or (c) loss or shortage of any part of Supplier's own or customary transportation or delivery facilities due to reasons beyond Supplier's reasonable control; or (d) for any reason beyond Supplier's or Retailer's reasonable control. Whenever such causes, in Supplier's judgment, require restriction of deliveries, Supplier reserves the right, in its discretion, to restrict deliveries to Retailer, whether or not delivering to others.

(C) **Payments.** All sums paid to Supplier shall be paid in lawful money of the United States of America without discount at time of delivery or upon such other terms as Supplier may from time to time require. All sums paid shall be applied first to the payments of any outstanding obligation for product purchases, credit card chargebacks, and/or repairs including all bills due to Supplier. Supplier may assess a reasonable administrative fee upon retailer for payments that are returned or rejected for lack of sufficient funds or for any other reason within Retailer's control. All overdue sums owed to Supplier will bear interest at the rate of 18% per annum or the highest rate permitted by law, whichever is lower, from the date due until paid. Supplier expressly reserves the right to initiate an Electronic Funds Transfer (EFT) payment system to satisfy all payment obligations under this Paragraph 1 (Supply of Petroleum Products) and Paragraph 2 (Credit Cards).

(D) **Resale Provisions.** Retailer agrees not to mix, substitute or adulterate said gasolines with any other gasolines or materials. The primary business activity of Supplier is the sale and distribution of petroleum products and it is the understanding of the Supplier and Retailer that the Retailer will continue during the term of this Agreement to purchase all

Initial _____ _____ _____

petroleum products at this location from the Supplier. In the event the Retailer mixes, substitutes, or adulterates said petroleum products, at Supplier's option, this Agreement may be terminated upon five (5) days written notice to Retailer. The Retailer understands this paragraph in its entirety and upon signing of the Agreement is in complete agreement with all of the above.

(E) **Notice.** All notices and demands required or permitted to be given hereunder shall be deemed to be properly given if given in writing, delivered personally, by registered or certified United States Mail, with postage prepaid and return receipt request, or by reputable national overnight courier and addressed to the party to be notified at the address set forth above or to such other address as any party hereto may from time to time designate by notice in writing to the other party hereto). Any notices hereunder required or permitted to be given to Supplier shall be deemed properly given and served when deposited, postage prepaid, Registered or Certified, in the United States mail, personally delivered, or sent by reputable national overnight courier and addressed to Supplier at 31366 North Highway 45, Libertyville, Illinois 60048.

(F) **Modification.** This agreement may be modified or superseded by any and all governmental laws and regulations enacted subsequent hereto pertaining to Energy Allocation and Conservation, however hardships and forfeitures shall not be enforced between the parties as a result.

(G) **Retailer's Assignment.** This Supply Agreement shall not be assigned by Retailer or by operation of law without Supplier's prior written consent, but otherwise shall be binding upon and shall inure to the benefit of the parties, their heirs, their representatives, successors and assigns, and it is the intention of the parties that the Agreement shall further be deemed to be a covenant running with the land, which shall not be extinguished by a transfer of the Property or by the transfer of the business that is operating on the Property. The parties further agree that a copy or counterpart of this Supply Agreement shall be recorded in the office of the Recorder of Deeds of the County where the property is located.

(H) **Term of Agreement.** Retailer and Supplier expressly agree that the Initial Term of the Supply Agreement shall be for a period which commences on the date in which Retailer takes possession of the Premises, pursuant to the Lease, and terminates in conjunction with the initial term of the lease on October 31, 2017. Should the Lease be extended, the Supply Agreement will then terminate on October 17, 2020.

(I) **Right to Assign.** Supplier shall have the right at any time to assign the Supply Agreement to a new Supplier at its sole discretion.

(J) **Shortfalls.** Retailer agrees to reimburse Supplier for the cost of any shortfall that Supplier incurs with respect to any oil company minimum gallonage requirements with respect to the subject property or any shortfalls from rebates due to early delivery.

2.    <u>Credit Cards.</u> The Retailer shall have the option of accepting credit cards for retail gasoline sales. If a nationally branded gasoline product is being advertised and sold from the premises, and if the major oil company whose brand is being used requires that its credit cards be accepted, then

Initial

the Retailer shall accept such credit cards and shall comply with all credit card regulations of the oil company. All fees, discounts or charges including charge-backs associated with the use of the credit card will be at the sole expense of the Retailer. Retailer shall have the right to utilize their own credit card processor as long as it continues to accept the credit cards of the oil company whose brand is being used. **If Retailer sells unbranded fuel, all credit card proceeds must go directly to Supplier.**

3. <u>Meter Readings and Inventory Control.</u>     Supplier reserves the right, at their option, to have a representative audit the meter readings at the beginning of any given month to verify purchases against sales. Inventory control is required on all underground storage tanks. Retailer agrees to take stick readings and pump readings on every day of each month and mail the inventory control forms and tank data sheets to State Oil Company, 31366 North Highway 45, Libertyville, Illinois 60048, on or before the 5th day of the following month.

4. <u>Sales Tax Affidavit.</u>  Retailer agrees to sign the Sales Tax Affidavit attached hereto and made a part hereof.

5. <u>Use of Premises.</u>     The Retailer shall continuously and uninterruptedly during the term of this Agreement conduct its customary business activity therein during all normal business days and during the Retailer's customary hours, unless prevented from doing so by strike, fire, casualty or other causes beyond the Retailer's control and except during reasonable periods for repairing, cleaning and decorating the Premises.

6. <u>Identification of Business.</u>   The Supplier shall be responsible for supplying and Retailer shall maintain all signs and advertising relating to the gasoline brand being dispensed from the Premises. In the event, the Retailer desires to use another name to identify the convenience grocery store operation upon the Premises, the name will be mutually agreed upon by both the Supplier and Retailer. The Supplier reserves the right to change the brands of gasoline at anytime.

7. <u>Indemnity.</u>    Retailer agrees that it will save, hold harmless and indemnify Supplier and the Oil Company, whose logo or signage is being used in connection with the sale of petroleum products, from and against all liability or loss, including any cost of litigation or attorneys fees, which either the Supplier or the Refiner may sustain as a result of claims, demands, costs or judgments arising from the operation of the Business on the Premises, or from any action or inaction taken by any person at the Business or Premises, or from any condition or claim of condition of the Premises during the term of the Agreement.

8. <u>Term and Termination of Agreement.</u>     The Initial Term of this Agreement shall be for a period which commences on the date in which Retailer takes possession of the Premises pursuant to the Lease and terminates in conjunction with the Lease. The parties specifically acknowledge and agree that the franchise relationship (as defined in the Petroleum Marketing Practices Act, 15 USC §2801 et seq.) created by this Agreement between the Retailer and the Supplier is necessarily contingent upon the Retailer's ability to maintain possession of the Premises. In the event that the Retailer's possession of the Premises is terminated, for any reason the parties agree that the purpose for which this Agreement is being entered into (the supply and purchase of gasoline and allied petroleum products to be sold on the Premises) will be frustrated. The parties further agree that the failure of the Retailer to maintain possession will constitute a default and an event, which is relevant to the franchise relationship as a result of which termination of the franchise by Supplier is reasonable within the meaning of Section

Initial

2802 (b)(2)(C) of the Petroleum Marketing Practices Act. Notwithstanding anything to the contrary contained in this Section 8, the mere fact that Retailer has vacated the premises or otherwise has violated the terms of this Agreement does not limit the remedies of Supplier under the Petroleum Marketing Practices Act or pursuant to state law or under this Agreement. Failure on the part of Retailer, its successors and assigns to comply fully with the branding requirements of the Oil Company shall be grounds for termination of this Agreement.

9. <u>Default.</u>

(A) **Relationship to Lease.** As stated on Page 1, Landlord, which has the same principal parties as Supplier, entered into a Lease with Tenant, which has the same principal party as Retailer. The Supply Agreement is material to the Lease. A default under the Supply Agreement constitutes a default under the Lease. In turn, a default under the Lease constitutes a default under the Supply Agreement.

(B) **Other Agreements.** Supplier and Retailer may have agreements related to other locations that are owned or otherwise controlled by Retailer. Any default under any such other agreement shall be considered a default under this Supply Agreement.

10. <u>Supplier's Remedies.</u> In the event of a breach by Retailer of any of its material covenants or obligations contained herein, not cured within five (5) days after written notice, or default by Tenant under the terms of the Lease, the parties agree that the Supplier, in addition to any other remedy available to it at law or equity, shall be entitled to terminate the Agreement and receive damages in a sum to be calculated by taking the average monthly gallons purchased over the most recent 24 months and multiplying it $0.0300 and then multiplying by the number of months remaining on the then current term (Initial Term or Renewal Term) of the Supply Agreement. Supplier will be entitled to recover from Retailer reasonable attorneys' fees and other legal costs Supplier incurs in order to secure or protect the rights inuring to Supplier under this Agreement, or to enforce the terms of this Agreement.

11. <u>Time of Performance.</u> The time of performance of all of the covenants and conditions of this Agreement is of the essence.

12. <u>Not a Joint Venture.</u> Nothing herein shall be construed so as to constitute a joint venture or partnership between Supplier and Retailer.

13. <u>Law of Illinois to Govern.</u> The laws of the State of Illinois shall govern the validity, performance and enforcement of this Agreement.

14. <u>Captions for Convenience Only.</u> The captions of the several articles and sections contained herein are for convenience only and do not define, limit, describe or construe the contents of such articles or sections.

15. <u>Amendments to be in Writing.</u> No amendment, modification or supplement to this Agreement shall be effective unless in writing, executed and delivered by Supplier and Retailer.

16. <u>Severability.</u> If any provision of this Agreement is held to be invalid, such invalid provision shall be deemed to be severable from and shall not affect the validity of the remainder of this Agreement.

Initial

17.     <u>Successors and Assigns.</u>     The terms and provisions of this Agreement shall be binding upon, and shall inure to the benefit of the parties hereto and their successors and permitted assigns.

18.     <u>Joint Obligation.</u> The obligations hereunder imposed shall be joint and several.

19.     <u>Inability to Perform.</u>     This Agreement and the obligations of the Retailer hereunder shall not be affected or impaired because the Supplier is unable to fulfill any of its obligations hereunder or is delayed in doing so, if such inability or delay is caused by reason of strike, labor troubles, acts of God, or any other cause beyond the reasonable control of the Supplier.

20.     <u>Cumulative Remedies.</u>     No remedy or election hereunder shall be deemed exclusive but shall, wherever possible, be cumulative and all other remedies at law or in equity.

21.     <u>Receipt of Notice.</u>     Retailer acknowledges receipt of a copy of SUMMARY OF THE PETROLEUM MARKETING PRACTICES ACT, #3128-01-Federal Register-Vol. 43, No. 169, attached hereto as **<u>Exhibit "A"</u>**, which is made part of Retailer's Agreement with **STATE OIL COMPANY.**

*(Remainder of page intentionally left blank.)*

Initial

**IN WITNESS WHEREOF,** the parties hereunto have caused this Petroleum Products Supply Agreement to be executed, in Libertyville, Illinois, this 23rd day of ~~September~~ 2014.
22    October

**RETAILER: CATCH 26, LLC**

_____
Ali Alani, Manager

**GUARANTORS:**

_____
Louay Alani, as an individual
SSN: ▮▮▮▮▮▮

_____
Ali Alani, as an individual
SSN: ▮▮▮▮▮▮

**TENANT: CATCH 26, LLC**

_____
By: Ali
Its: Manager

**SUPPLIER:  STATE OIL COMPANY**

_____
Peter Anest, President

**STATE OF ILLINOIS** )
                      )    ss.
**County of Lake** )

I, the undersigned, a Notary Public in and for said County, in the State aforesaid, DO HEREBY CERTIFY that **Ali Alani** is the Manager of **Catch 26, LLC** who is personally known to me to be the same person whose name is subscribed to the foregoing instrument as President and appeared before me this day in person and acknowledged that he signed, sealed and delivered the said instrument as his free and voluntary act, for the uses and purposes therein set forth.

Given under my hand and notarial seal this 22 day of October 2014.

_____
Notary Public

"OFFICIAL SEAL"
Kenneth J. CHALIFOUX
Notary Public, State of Illinois
My Commission Expires 12/06/14

Initial

**STATE OF ILLINOIS**     )
                       )    ss.
**County of Lake**        )

I, the undersigned, a Notary Public in and for said County, in the State aforesaid, DO HEREBY CERTIFY that **Louay Alani** is personally known to me to be the same person whose name is subscribed to the foregoing instrument as **Guarantor** and appeared before me this day in person and acknowledged that he signed, sealed and delivered the said instrument as his free and voluntary act, for the uses and purposes therein set forth.

Given under my hand and notarial seal this 22 day of October 2014.

_____
Notary Public

> "OFFICIAL SEAL"
> KENNETH J. CHALIFOUX
> Notary Public, State of Illinois
> My Commission Expires 12/08/14

**STATE OF ILLINOIS**     )
                       )    ss.
**County of Lake**        )

I, the undersigned, a Notary Public in and for said County, in the State aforesaid, DO HEREBY CERTIFY that **Ali Alani** is personally known to me to be the same person whose name is subscribed to the foregoing instrument as **Guarantor** and appeared before me this day in person and acknowledged that he signed, sealed and delivered the said instrument as his free and voluntary act, for the uses and purposes therein set forth.

Given under my hand and notarial seal this 22 day of October 2014.

_____
Notary Public

> "OFFICIAL SEAL"
> KENNETH J. CHALIFOUX
> Notary Public, State of Illinois
> My Commission Expires 12/08/14

**STATE OF ILLINOIS**     )
                       )    ss.
**County of Lake**        )

I, the undersigned, a Notary Public in and for said County, in the State aforesaid, DO HEREBY CERTIFY that **Peter Anest** is the President of **STATE OIL COMPANY**, who is personally known to me to be the same person whose name is subscribed to the foregoing instrument and appeared before me this day in person and acknowledged that he signed, sealed and delivered the said instrument as his free and voluntary act, for the uses and purposes therein set forth.

Given under my hand and notarial seal this 22 day of October 2014.

_____
Notary Public

> "OFFICIAL SEAL"
> KENNETH J. CHALIFOUX
> Notary Public, State of Illinois
> My Commission Expires 12/08/14

Page 8 of 12

# EXHIBIT A

## Revised Summary of Title I of the Petroleum Marketing Practices Act

AGENCY: Department of Energy

ACTION: Notice

SUMMARY: This notice contains a summary of Title I of the Petroleum Marketing Practices Act, as amended (the Act). The Petroleum Marketing Practices Act was originally enacted on June 19, 1978, and was amended by the Petroleum Marketing Practices Act Amendments of 1994, enacted on October 19, 1994. On August 30, 1978, the Department of Energy published in the **Federal Register** a summary of the provisions of Title I of the 1978 law, as required by the Act. The Department is publishing this revised summary to reflect key changes made by the 1994 amendments.

The Act is intended to protect franchised distributors and retailers of gasoline and diesel motor fuel against arbitrary or discriminatory termination or nonrenewal of franchises. This summary describes the reasons for which a franchise may be terminated or not renewed under the law, the responsibilities of franchisors, and the remedies and relief available to franchisees. The Act requires franchisors to give franchisees copies of the summary contained in this notice whenever notification of termination or non renewal of a franchise is given.

SUPPLEMENTARY INFORMATION:
Title I of the Petroleum Marketing Practices Act, as amended, 15 U.S.C. §§2801-2806, provides for the protection of franchised distributors and retailers of motor fuel by establishing minimum Federal standards governing the termination of franchises and the nonrenewal of franchise relationships by the franchisor or distributor of such fuel.

Section 104(d)(1) of the Act required the Secretary of Energy to publish in the **Federal Register** a simple and concise summary of the provisions of Title I, including a statement of the respective responsibilities of, and the remedies and relief available to, franchisors and franchisees under the title. The Department published this summary in the **Federal Register** on August 30, 1978, 43 F.R. 38743 (1978).

In 1994 the Congress enacted the Petroleum Marketing Practices Act Amendments to affirm and clarify certain key provisions of the 1978 statute. Among the key issues addressed in the 1994 amendments are: (1) termination or nonrenewal of franchised dealers by their franchisors for purposes of conversion to "company" operation; (2) application of state law; (3) the rights and obligations of franchisors and franchisees in third-party lease situations; and (4) waiver of rights limitations. See H.R. REP. NO. 737, 103rd Cong., 2nd Sess. 2 (1994), *reprinted in* 1994 U.S.C.C.A.N. 2780. Congress intended to: (1) make explicit that upon renewal a franchisor may not insist on changes to a franchise agreement where the purpose of such changes is to prevent renewal in order to convert a franchisee-operated service station into a company-operated service station; (2) make clear that where the franchisor has an option to continue the lease or to purchase the premises but does not wish to do so, the franchisor must offer to assign the option to the franchisee; (3) make clear that no franchisor may require, as a condition of entering or renewing a franchise agreement, that a franchisee waive any rights under the Petroleum Marketing Practices Act, any other Federal law, or any state law; and (4) reconfirm the limited scope of Federal preemption under the Act. *Id.*

The summary which follows reflects key changes to the statute resulting from the 1994 amendments. The Act requires franchisors to give copies of this summary statement to their franchisees when entering into an agreement to terminate the franchise or not to renew the franchise relationship, and when giving notification of termination or nonrenewal. This summary does not purport to interpret the Act, as amended, or to create new legal rights.

In addition to the summary of the provisions of Title I, a more detailed description of the definitions contained in the Act and of the legal remedies available to franchisees is also included in this notice, following the summary statement.

### Summary of Legal Rights of Motor Fuel Franchisees

This is a summary of the franchise protection provisions of the Federal Petroleum Marketing Practices Act, as amended in 1994 (the Act), 15 U.S.C §§2801-2806. This summary must be given to you, as a person holding a franchise for the sale, consignment or distribution of gasoline or diesel motor fuel, in connection with any termination, or nonrenewal of your franchise by your franchising company (referred to in this summary as your supplier).

You should read this summary carefully, and refer to the Act if necessary, to determine whether a proposed termination or nonrenewal of your franchise is lawful, and what legal remedies are available to you if you think the proposed termination or failure to renew is not lawful. In addition, if you think your supplier has failed to comply with the Act, you may wish to consult an attorney in order to enforce your legal rights.

The franchise protection provisions of the Act apply to a variety of franchise agreements. The term "franchise" is broadly defined as a license to use a motor fuel trademark, which is owned or controlled by a refiner and it includes secondary agreements such as leases of real property and motor fuel supply agreements which have existed continuously since May 15, 1973, regardless of a subsequent withdrawal of a trademark. Thus, if you have lost the use of a trademark previously granted by your supplier but have continued to receive motor fuel supplies through a continuation of a supply agreement with your supplier, you are protected under the Act.

Any issue arising under your franchise which is not governed by this Act will be governed by the law of the State in which the principal place of business of your franchise is located.

Although a State may specify the terms and conditions under which your franchise may be transferred upon the death of the franchisee, it may not require a payment to you (the franchisee) for the goodwill of a franchise upon termination or nonrenewal.

The Act is intended to protect you, whether you are a distributor or a retailer, from arbitrary or discriminatory termination or nonrenewal of your franchise agreement. To accomplish this, the Act first lists the reasons for which termination or nonrenewal is permitted. Any notice of termination or nonrenewal must state the precise reason, as listed in the Act, for which the particular termination or nonrenewal is being made. These reasons are described below under the headings "Reasons for Termination" and "Reasons for Nonrenewal."

The Act also requires your supplier to give you a written notice of termination or intention not to renew the franchise within certain time periods. These requirements are summarized below under the heading "Notice Requirements for Termination or Nonrenewal."

The Act also provides certain special requirements with regard to trial and interim franchise agreements, which are described below under the heading "Trial and Interim Franchises."

The Act gives you certain legal rights if your supplier terminates or does not renew your franchise in a way that is not permitted by the Act. These legal rights are described below under the heading "Your Legal Rights."

The Act contains provisions pertaining to waiver of franchisee rights and applicable State law. These provisions are described under the heading "Waiver of Rights and Applicable State Law."

This summary is intended as a simple and concise description of the general nature of your rights under the Act. For a more detailed description of these rights, you should read the text of the Petroleum Marketing Practices Act, as amended in 1994 (15 U.S.C. §§2801-2806). This summary does not purport to interpret the Act, as amended, or to create new legal rights.

Initial

**I. Reasons for Termination**

If your franchise was entered into on or after June 19, 1978, the Act bars termination of your franchise for any reasons other than those reasons discussed below. If your franchise was entered into before June 19, 1978, there is no statutory restriction on the reasons for which it may be terminated. If a franchise entered into before June 19, 1978, is terminated, however, the Act requires the supplier to reinstate the franchise relationship unless one of the reasons listed under this heading or one the additional reasons for nonrenewal described below under the heading "Reasons for Nonrenewal" exists.

*A. Non-Compliance with Franchise Agreement*

Your supplier may terminate your franchise if you do not comply with a reasonable and important requirement of the franchise relationship. However, termination may not be based on a failure to comply with a provision of the franchise that is illegal or unenforceable under applicable Federal, State, or local law. In order to terminate for non-compliance with the franchise agreement, your supplier must have learned of this non-compliance recently. The Act limits the time period within which your supplier must have learned of your non-compliance to various periods, the longest of which is 120 days, before you receive notification of the termination.

*B. Lack of Good Faith Efforts*

Your supplier may terminate your franchise if you have not made good faith efforts to carry out the requirements of the franchise, provided you are first notified in writing that you are not meeting a requirement of the franchise and you are given an opportunity to make a good faith effort to carry out the requirement. This reason can be used by your supplier only if you fail to make good faith efforts to carry out the requirements of the franchise within the period which began not more than 180 days before you receive the notice of termination.

*C. Mutual Agreement to Terminate the Franchise*

A franchise can be terminated by an agreement in writing between you and your supplier if the agreement is entered into not more than 180 days before the effective date of the termination and you receive a copy of that agreement, together with this summary statement of your rights under the Act. You may cancel the agreement to terminate within 7 days after you receive a copy of the agreement, by mailing (by certified mail) a written statement to this effect to your supplier.

*D. Withdrawal From the Market Area*

Under certain conditions, the Act permits your supplier to terminate your franchise if your supplier is withdrawing from marketing activities in the entire geographic area in which you operate. You should read the Act for a more detailed description of the conditions under which market withdrawal terminations are permitted. See 15 U.S.C. § 2802(b)(E).

*E. Other Events Permitting a Termination*

If your supplier learns within the time period specified in the Act (which in no case is more than 120 days prior to the termination notice) that one of the following events has occurred, your supplier may terminate you franchise agreement:

(1) Fraud or criminal misconduct by you that relates to the operation of your marketing premises.

(2) You declare bankruptcy or a court determines that you are insolvent.

(3) You have a severe physical or mental disability lasting at least 3 months which makes you unable to provide for the continued proper operation of the marketing premises.

(4) Expiration of your supplier's underlying lease to the leased marketing premises, if: (a) your supplier gave you written notice before the beginning of the term of the franchise of the duration of the underlying lease and that the underlying lease might expire and not be renewed during the term of the franchise; (b) your franchisor offered to assign to you, during the 90-day period after notification of termination or nonrenewal was given, any option which the franchisor held to extend the underlying lease or to purchase the marketing premises (such an assignment may be conditioned on the franchisor receiving from both the landowner and the franchisee an unconditional release from liability for specified events occurring after the assignment); and (c) in a situation in which the franchisor acquires possession of the leased marketing premises effective immediately after the loss of the right of the franchisor to grant possession, the franchisor, upon written request of the franchisee, made a bona fide offer to sell or assign to the franchisee the franchiser's interest in any improvements or equipment located on the premises, or offered by the franchisee a right of first refusal of any offer from another person to purchase the franchisor's interest in the improvements and equipment.

(5) Condemnation or other taking by the government, in whole or in part, of the marketing premises pursuant to the power of eminent domain. If the termination is based on a condemnation or other taking, your supplier must give you a fair share of any compensation which he receives for any loss of business opportunity or good will.

(6) Loss of your supplier's right to grant the use of the trademark that is the subject of the franchise, unless the loss was because of bad faith actions by your supplier relating to trademark abuse, violation of Federal or State law, or other fault or negligence.

(7) Destruction (other than by your supplier) of all or a substantial part of your marketing premises. If the termination is based on the destruction of the marketing premises and if the premises are rebuilt or replaced by your supplier and operated under a franchise, your supplier must give you a right of first refusal to this new franchise.

(8) Your failure to make payments to your supplier of any sums to which your supplier is legally entitled.

(9) Your failure to operate the marketing premises for 7 consecutive days, or any shorter period of time which, taking into account facts and circumstances, amounts to an unreasonable period of time not to operate.

(10) Your intentional adulteration, mislabeling or misbranding of motor fuels or other trademark violations.

(11) Your failure to comply with Federal, State, or local laws or regulations of which you have knowledge and that relate to the operation of the marketing premises.

(12) Your conviction of any felony involving moral turpitude.

(13) Any event that affects the franchise relationship and as a result of which termination is reasonable.

**II. Reasons for Nonrenewal**

If your supplier gives notice that he does not intend to renew any franchise agreement, the Act requires that the reason for nonrenewal must be either one of the reasons for termination listed immediately above, or one of the reasons for nonrenewal listed below.

*A. Failure to Agree on Changes or Additions To Franchise*

If you and your supplier fail to agree to changes in the franchise that your supplier in good faith has determined are required, and your supplier's insistence on the changes is not for the purpose of converting the leased premises to a company operation or otherwise preventing the renewal of the franchise relationship, your supplier may decline to renew the franchise.

*B. Customer Complaints*

If you supplier has received numerous customer complaints relating to the condition of your marketing premises or to the conduct of any of your employees, and you have failed to take prompt corrective action after having been notified of these complaints, your supplier may decline to renew the franchise.

Initial

*C. Unsafe or Unhealthful Operations*

If you have failed repeatedly to operate your marketing premises in a clean, safe and healthful manner after repeated notices from your supplier, your supplier may decline to renew the franchise.

*D. Operation of Franchise is Uneconomical*

Under certain conditions specified in the Act, your supplier may decline to renew your franchise if he has determined that renewal of the franchise is likely to be uneconomical. Your supplier may also decline to renew your franchise if he has decided to convert your marketing premises to a use other than for the sale of motor fuel, to sell the premises, or to materially alter, add to, or replace the premises.

## III. Notice Requirements for Termination or Nonrenewal

The following is a description of the requirements for the notice which your supplier must give you before he may terminate your franchise or decline to renew your franchise relationship. These notice requirements apply to all franchise terminations, including franchises entered into before June 19, 1978 and trial and interim franchises, as well as to all nonrenewals of franchise relationships.

*A. How Much Notice Is Required*

In most cases, your supplier must give you notice of termination or nonrenewal at least 90 days before the termination or nonrenewal takes effect.

In circumstances where it would not be reasonable for your supplier to give you 90 days notice, he must give you notice as soon as he can do so. In addition, if the franchise involves leased marketing premises, your supplier may not establish a new franchise relationship involving the same premises until 30 days after notice was given to you or the date the termination or nonrenewal takes effect, whichever is later. If the franchise agreement permits, your supplier my repossess the premises and, in reasonable circumstances, operate them through his employees or agents.

If the termination or nonrenewal is based upon a determination to withdraw from the marketing of motor fuel in the area, your supplier must give you notice at least 180 days before the termination or nonrenewal takes effect.

*B. Manner and Contents of Notice*

To be valid, the notice must be in writing and must be sent by certified mail or personally delivered to you. It must contain: (1) A statement of your supplier's intention to terminate the franchise or not to renew the franchise relationship, together with his reasons for this action; (2) The date the termination or nonrenewal takes effect; and (3) A copy of this summary.

## IV. Trial Franchises and Interim Franchises

The following is a description of the special requirements that apply to trial and interim franchises.

*A. Trial Franchises*

A trial franchise is a franchise, entered into on or after June 19, 1978, in which the franchisee has not previously been a party to a franchise with the franchisor and which has an initial term of 1 year or less. A trial franchise must be in writing and must make certain disclosures, including that it is a trial franchise, and that the franchisor has the right not to renew the franchise relationship at the end of the initial term by giving the franchisee proper notice.

The unexpired portion of a transferred franchise (other than as a trial franchise, as described above) does not qualify as a trial franchise.

In exercising his right not to renew a trial franchise at the end of its initial term, your supplier must comply with the notice requirements described above under the heading "Notice Requirements for Termination or Nonrenewal."

*B. Interim Franchises*

An interim franchise is a franchise, entered into on or after June 19, 1978, the duration of which, when combined with the terms of all prior interim franchises between the franchisor and the franchisee, does not exceed three years, and which begins immediately after the expiration of a prior franchise involving the same marketing premises which was not renewed, based on a lawful determination by the franchisor to withdraw from marketing activities in the geographic area in which the franchisee operates.

An interim franchise must be in writing and must make certain disclosures, including that it is an interim franchise and that the franchisor has the right not to renew the franchise at the end of the term based upon a lawful determination to withdraw from marketing activities in the geographic area in which the franchise operates.

In exercising his right not to renew a franchise relationship under an interim franchise at the end of its term, your supplier must comply with the notice requirements described above under the heading "Notice Requirements for Termination or Nonrenewal."

## V. Your Legal Rights

Under the enforcement provisions of the Act, you have the right to sue your supplier if he fails to comply with the requirements of the Act. The courts are authorized to grant whatever equitable relief is necessary to remedy the effects of your supplier's failure to comply with the requirements of the Act, including declaratory judgment, mandatory or prohibitive injunctive relief, and interim equitable relief. Actual damages, and reasonable (punitive) damages under certain circumstances, and reasonable attorney and expert witness fees are also authorized. For a more detailed description of these legal remedies you should read the text of the Act. 15 U.S.C. §§2801-2806.

## VI. Waiver of Rights and Applicable State Law

Your supplier may not require, as a condition of entering into or renewing the franchise relationship, that you relinquish or waive any right that you have under this or any other Federal law or applicable State law. In addition, no provision in a franchise agreement would be valid or enforceable if the provision specifies that the franchise would be governed by the law of any State other than the one in which the principal place of business for the franchise is located.

## Further Discussion of Title I - Definitions and Legal Remedies

### I. Definitions

Section 101 of the Petroleum Marketing Practices Act sets forth definitions of the key terms used throughout the franchise protection provisions of the Act. The definitions from the Act which are listed below are of those terms which are most essential for purposes of the summary statement. (You should consult section 101 of the Act for additional definitions not included here.)

*A. Franchise*

A "franchise" is any contract between a refiner and a distributor, between a refiner and a retailer, between a distributor and another distributor, or between a distributor and a retailer, under which a refiner or distributor (as the case may be) authorizes or permits a retailer or distributor to use, in connection with the sale, consignment, or distribution of motor fuel, a trademark which is owned or controlled by such refiner or by a refiner which supplies motor fuel to the distributor which authorizes or permits such use.

Initial

The term "franchise" includes any contract under which a retailer or distributor (as the case may be) is authorized or permitted to occupy leased marketing premises, which premises are to be employed in connection with the sale, consignment, or distribution of motor fuel under a trademark which is owned or controlled by such refiner or by a refiner which supplies motor fuel to the distributor which authorizes or permits such occupancy. The term also includes any contract pertaining to the supply of motor fuel which is to be sold, consigned or distributed under a trademark owned or controlled by a refiner, or under a contract which has existed continuously since May 15, 1973, and pursuant to which, on May 15, 1973, motor fuel was sold, consigned or distributed under a trademark owned or controlled on such date by a refiner. The unexpired portion of a transferred franchise is also included in the definition of the term.

*B. Franchise Relationship*
The term "franchise relationship" refers to the respective motor fuel marketing or distribution obligations and responsibilities of a franchisor and a franchisee which result from the marketing of motor fuel under a franchise.

*C. Franchisee*
A "franchisee" is a retailer or distributor who is authorized or permitted, under a franchise, to use a trademark in connection with the sale, consignment, or distribution of motor fuel.

*D. Franchisor*
A "franchisor" is a refiner or distributor who authorizes or permits, under a franchise, a retailer or distributor to use a trademark in connection with the sale, consignment, or distribution of motor fuel.

*E. Marketing Premises*
"Marketing premises" are the premises which, under a franchise, are to be employed by the franchisee in connection with the sale, consignment, or distribution of motor fuel.

*F. Leased Marketing Premises*
"Leased marketing premises" are marketing premises owned, leased or in any way controlled by a franchisor and which the franchisee is authorized or permitted, under the franchise, to employ in connection with the sale, consignment, or distribution of motor fuel.

*G. Fail to Renew and Nonrenewal*
The terms "fail to renew" and "nonrenewal" refer to a failure to reinstate, continue, or extend a franchise relationship (1) at the conclusion of the term, or on the expiration date, stated in the relevant franchise, (2) at any time, in the case of the relevant franchise which does not state a term of duration or an expiration date, or (3) following a termination (on or after June 19, 1978) of the relevant franchise which was entered into prior to June 19, 1978 and has not been renewed after such date.

## II. Legal Remedies Available to Franchisee

The following is a more detailed description of the remedies available to the franchisee if a franchise is terminated or not renewed in a way that fails to comply with the Act.

*A. Franchisee's Right to Sue*
A franchisee may bring a civil action in United States District Court against a franchisor who does not comply with the requirements of the Act. The action must be brought within one year after the date of termination or nonrenewal or the date the franchisor fails to comply with the requirements of the law, whichever is later.

*B. Equitable Relief*
Courts are authorized to grant whatever equitable relief is necessary to remedy the effects of a violation of the law's requirements. Courts are directed to grant a preliminary injunction if the franchisee shows that there are sufficiently serious questions, going to the merits of the case, to make them a fair ground for litigation, and if, on balance, the hardship which the franchisee would suffer if the preliminary injunction is not granted will be greater than the hardship which the franchisor would suffer if such relief is granted.

Courts are not required to order continuation or renewal of the franchise relationship if the action was brought after the expiration of the period during which the franchisee was on notice concerning the franchisor's intention to terminate or not renew the franchise agreement.

*C. Burden of Proof*
In an action under the Act, the franchisee has the burden of proving that the franchise was terminated or not renewed. The franchisor has the burden of proving, as an affirmative defense, that the termination or nonrenewal was permitted under the Act and, if applicable, that the franchisor complied with certain other requirements relating to terminations and nonrenewals based on condemnation or destruction of the marketing premises.

*D. Damages*
A franchisee who prevails in an action under the Act is entitled to actual damages and reasonable attorney and expert witness fees. If the action was based upon conduct of the franchisor which was in willful disregard of the Act's requirements or the franchisee's rights under the Act, exemplary (punitive) damages may be awarded where appropriate. The court, and not the jury, will decide whether to award exemplary damages and, if so, in what amount.

On the other hand, if the court finds that the franchisee's action is frivolous, it may order the franchisee to pay reasonable attorney and expert witness fees.

*E. Franchisor's Defense to Permanent Injunctive Relief*
Courts may not order a continuation or renewal of a franchise relationship if the franchisor shows that the basis of the non-renewal of the franchise relationship was a determination made in good faith and in the normal course of business:

(1) To convert the leased marketing premises to a use other than the sale or distribution of motor fuel;
(2) To materially alter, add to, or replace such premises;
(3) To sell such premises;
(4) To withdraw from marketing activities in the geographic area in which such premises are located; or
(5) That the renewal of the franchise relationship is likely to be uneconomical to the franchisor despite any reasonable changes or additions to the franchise provisions which may be acceptable to the franchisee.

In making this defense, the franchisor also must show that he has complied with the notice provisions of the Act.

This defense to permanent injunctive relief, however, does not affect the franchisee's right to recover actual damages and reasonable attorney and expert witness fees if the nonrenewal is otherwise prohibited under the Act.

Issued in Washington, D.C. on June 12, 1996.

Form BJC-(R)-PMPA (10-2001)

Initial 

# EXHIBIT M

## SECURITY AGREEMENT

This Security Agreement (the "Agreement") is given this *22* day of October 2014, by **CATCH 26, LLC** ("Debtor") to **STATE OIL COMPANY** ("Secured Party").

1.　Debtor grants to Secured Party to secure the payment and performance of all liabilities of the Debtor to Secured Party, a security interest in Debtors' account receivables, equipment, inventory (including gasoline fuel and diesel fuel and any other petroleum products), fixtures, documents chattel paper, instruments, intangibles, and in the proceeds and products thereof (hereinafter collectively referred to as "Collateral").

2.　This Agreement is given for the following purposes:

　　a)　As further security for the performance of certain obligations under the Petroleum Products Supply Agreement of even date herewith ("the Supply Agreement").

　　b)　To secure the payment of any and all additional sums that may be advanced, paid or expended by Secured Party under this Agreement, or the Supply Agreement, and the payment of any and all sums or amounts that Secured Party may, at its option hereafter advance or expend under this Agreement or for the maintenance and/or preservation of the Collateral.

　　c)　To secure the payment in the full complete and faithful performance of each and every obligation, covenant, promise and agreement herein contained and contained in said Supply Agreement.

　　d)　To secure the payment of any and all loss or damage which Secured Party may sustain by reason of any of the defaults on the part of Debtor under the Supply Agreement or this Agreement.

3.　As security for the payment and performance of all liabilities, the Secured Party shall have continuing security interest in the following Collateral:

　　a)　All Equipment that is owned by Debtor.

　　b)　Inventory (including gasoline fuel, and diesel fuel, all other petroleum products and all convenience store inventories).

　　c)　Proceeds and products of each of the foregoing.

Page **1** of **6**

Initial _____

4.    Debtor does hereby agree as follows:

a) To prepare and deliver to Secured Party, upon notice given by Secured Party from time to time, a full inventory listing as of the date such notice is given, of all items then constituting Collateral and such other information as Secured Party may request with respect to purchases or sales or other acquisitions or dispositions of Collateral. Each such inventory shall be certified as being true and complete by a duly Authorized officer of Debtor, or by one of the Debtors if Debtor is not a corporate entity.

b) To provide and maintain in force, at all times, fire and other types of insurance as may be required by Secured Party, each in an amount satisfactory to and with loss payable to Secured Party.

c) To appear in and defend any action or proceeding, affecting or purporting to affect the security of this Agreement and pay all costs and expenses thereof and all costs and expenses in any such action or proceeding in which Secured Party may appear.

d) To promptly pay on demand all costs and expenses of filing financing statements, continuation statements, partial releases and termination statements deemed necessary or appropriate by Secured Party, or any modification thereof.

e) Debtor promptly shall execute and file such financing statements or other instruments as Secured Party requests to evidence, perfect and continue the security interest granted hereunder.

f) To pay, before delinquent, all taxes and assessments affecting the Collateral and all costs and penalties thereon.

g) Not to remove the Collateral, or any part thereof, from its present location without first obtaining the express written consent of Secured Party.

h) Not to transfer voluntarily or permit any involuntary transfer of the Collateral, or any interest thereon, by way of sale, creation of a security interest, levy or other judicial process, without first obtaining the written consent of Secured Party.

i) Debtor hereby authorizes Secured Party to file such financing statements that Secured Party deems necessary to perfect its security interest in the Collateral, including a copy of this Agreement, authorizes Secured Party to adopt on Debtor's behalf any symbol required for authenticating any electronic filings. Debtor waives any right to file correction or termination statements without Secured Party's advance written consent.

5.    Debtor represents and warrants to Secured Party the following:

Page **2** of **6**

Initial _____

a)  Debtor has full right, power and authority to enter into and perform its obligations under this Security Agreement and the execution hereof and the grant of the security interest hereunder does not and will not constitute a default under any other agreement or commitment to which Debtor is a party or by which Debtor is bound.

b)  Secured Party may, but need not, perform any act required of Debtor and may, but need not pay, purchase, contest or compromise any claim, debt, lien, charge or encumbrance which in the judgment of Secured Party may affect or appear to affect the security of this Agreement and may, but need not, discharge taxes, liens, security interest or other encumbrances at any time levied or placed on the Collateral and make any payment for insurance on the Collateral and for maintenance or preservation of the Collateral; all sums so expended shall be immediately paid by Debtor upon demand by Secured Party.

c)  A default in the performance of any obligation, covenant or liability of the Debtor herein provided shall constitute a default under the Supply Agreement, and any default under the Supply Agreement shall constitute a default under this Agreement.

6.  Should Debtor fail or refuse to make any payment or do any act which it is obligated to make or do at any time and in any manner herein provided, or should Debtor default in the true and faithful performance of any covenant or condition hereof, and which default is not cured within fifteen (15) days after Secured Party has given notice of such default to Debtor, or in the event any warranty, representation or statement made or furnished to Secured Party by or on behalf of Debtor shall be false in any material respect when made or furnished, then Secured Party, at its sole discretion, may declare all sums secured hereby immediately due without demand upon or notice to Debtor, and may:

a)  Take immediate possession of the Collateral, and Debtor agrees upon demand to surrender possession thereof to Secured Party peaceably and that Secured Party may employ any and all means reasonably necessary within its sole discretion to gain possession of the Collateral.

b)  Sell and dispose of all or any portion of the Collateral as a unit or in parcels, at public or private sale, conducted in Lake County, Illinois, with or without having the Collateral at the place of sale, or, without removal of the Collateral, upon the premises of Debtor, and upon the terms and in such manner as Secured Party may determine. Upon the sale of the Collateral, Secured Party may apply, the proceeds of such sale to the unpaid principal balance, accrued but unpaid interest and other charges due under the Supply Agreement, as well as all other obligations of every class and character owed by Debtor to Secured Party and secured by virtue of the provisions hereof, together with all costs incurred by

Page **3** of **6**

Initial

Secured Party and all charges of making such sale, including, among others, all expenses of repossession, storage, preparation for sale, advertising, sale of the Collateral and reasonable attorneys' fees and expenses; Secured Party or its agents, successors or assigns may purchase all or any part of the Collateral at any such sale; and any and all unexpired insurance shall inure to the benefit of and pass to the purchaser of the Collateral at any sale held hereunder.

7.     In addition to any rights or remedies provided herein, Secured Party may have and exercise all other rights and remedies as provided for in law or in equity, and shall have the right to enforce one or more remedies hereunder successively or concurrently and any such action shall not stop or prevent Secured Party from pursuing any further remedy which it may have hereunder or by law.

8.     No default shall be waived by Secured Party except in writing and no waiver of any default shall operate as a waiver of any other default or the same default on a future occasion.

9.     With reference to any of the parties to this Agreement, the use of the singular number shall include the plural, the use of the plural shall include the singular number, the use of the masculine gender shall include the feminine gender, and the use of the feminine gender shall include the masculine gender and shall be so construed as applicable to and including a corporation, partnership or other entity that may be a party or parties hereto.

10.    Debtor agrees that Secured Party shall not be liable to Debtor or to any other person or Persons for injury or damage that may result to any person or property by reason of the use or condition of the Collateral or any part thereof, and Debtor further agrees to defend and hold Secured Party harmless from any and all costs, damages, losses, expenses, claims or liability arising out of or connected with, directly or indirectly, the use, management or condition of the Collateral.

11.    This Agreement and the terms, conditions, covenants and agreements hereof are intended to and shall inure to the benefit of and extend to and include the successors and assigns of Secured Party and shall be binding upon the successors, heirs, and assigns of Debtor.

12.    The person or persons who shall execute this Security Agreement on behalf of Debtor do hereby represent and warrant to Secured Party that he or they were and are authorized, directed and empowered to execute this agreement for and on behalf of and in the name of Debtor.

13.    The security interest granted under this Agreement shall terminate only upon payment in full of all amounts due to Secured Party in connection with Supply Agreement and this Agreement.

Page **4** of **6**

Initial _____

14. Wherever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement shall be prohibited by or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.

15. The terms and provisions contained herein shall, unless the context otherwise requires, have the meanings and be construed as provided in the Uniform Commercial Code of the State of Illinois.

16. All notices required to be given under this Agreement shall be construed to mean notice in writing signed by or on behalf of the party giving the same, and the same may be served upon the other party or his agent personally, by reputable national overnight courier, or by certified or registered mail, return receipt requested to the parties as follows:

<u>TO SECURED PARTY</u>:    STATE OIL COMPANY
c/o Bill Anest or Peter Anest
31366 N. Highway 45
Libertyville, IL 60048

<u>TO DEBTOR</u>:    CATCH 26, LLC
c/o Ali Alani
401 S. Eastwood
Woodstock, IL 60098

With a copy to:    Roeser Bucheit & Graham, LLC
Two North Riverside Plaza
Suite 1420
Chicago, IL 60606
Attention: William S. Bazianos

This notice will be deemed to be effective two business days after mailing.

**IN WITNESS WHEREOF,** Debtor has executed this Agreement the day and year first above mentioned.

**DEBTOR:**
**CATCH 26, LLC**

By: Ali Alani
Its: Manager

**SECURED PARTY:**
**STATE OIL COMPANY**

By: Peter Anest
Its: President

Page 5 of **6**

Initial _____

STATE OF ILLINOIS     )
                             ) ss.
COUNTY OF LAKE     )

    I, the undersigned, a Notary Public in and for said County, in the State aforesaid, DO HEREBY CERTIFY that **Peter Anest** is the President of **STATE OIL COMPANY** and is personally known to me to be the same person whose name is subscribed to the foregoing instrument, appeared before me this day in person and acknowledged that he signed, sealed and delivered the said instrument as his free and voluntary act, for the uses and purposes therein set forth.

    Given under my hand and notarial seal this 22 day of October 2014.

Kenneth J. Chalifoux<br>
Notary Public

"OFFICIAL SEAL"
KENNETH J. CHALIFOUX
Notary Public, State of Illinois
My Commission Expires 12/06/14

STATE OF ILLINOIS     )
                             ) ss.
COUNTY OF LAKE     )

    I, the undersigned, a Notary Public in and for said County, in the State aforesaid, DO HEREBY CERTIFY that **Ali Alani** is the Manager of **Catch 26, LLC**, and is personally known to me to be the same person whose name is subscribed to the foregoing instrument, appeared before me this day in person and acknowledged that he signed, sealed and delivered the said instrument as his free and voluntary act, for the uses and purposes therein set forth.

    Given under my hand and notarial seal this 22 day of October 2014.

Kenneth J. Chalifoux<br>
Notary Public

"OFFICIAL SEAL"
KENNETH J. CHALIFOUX
Notary Public, State of Illinois
My Commission Expires 12/06/14

Page **6** of **6**

Initial ___

# EXHIBIT N

## GUARANTY

In consideration of, and as inducement for the granting, execution, and delivery of the foregoing **Lease** dated October 22, 2014 (hereinafter "Lease") which affects the property commonly known as **401 S. Eastwood, Woodstock, IL 60098** between **BAPA, LLC and PT, LLC** (hereinafter the "Landlord") to **CATCH 26, LLC** (hereinafter called the "Tenant"), and in further consideration for the granting, execution, and deliver of a **Petroleum Products Supply Agreement** dated October 22, 2014 between **STATE OIL COMPANY** (hereinafter the "Supplier"), and **CATCH 26, LLC** (hereinafter called the "Retailer"), which also affects the property commonly known as **401 S. Eastwood, Woodstock, IL 60098,** and in further consideration of the sum of Ten Dollars ($10.00) and other good and valuable consideration paid by the Landlord and Supplier to the undersigned, **Louay Alani,** whose address is 350 West Prairie Walk Lane, Round Lake, IL 60073 and **Ali Alani,** whose address is 779 S. Winchester Drive, Round Lake, IL 60073 (hereinafter collectively referred to as "Guarantor"), hereby guarantees to the Landlord, its successors and assigns, the full and prompt payment of rent, including, but not limited to, the fixed minimum rent, common area charge, percentage rent, additional rent and any and all other sums and charges payable by the Tenant, its successors and assigns under said Lease, and full performance and observance of all the covenants, terms, conditions and agreements therein provided to be performed and observed by the Tenant, its successors and assigns; and the Guarantor hereby covenants and agrees to and with the Landlord, its successors and assigns, that if default shall at any time be made by the Tenant, its successors and assigns, in the payment of any such rent, payable by the Tenant under said Lease, or in the performance of any of the terms, covenants, provisions or conditions contained in said Lease, the Guarantor will forthwith pay such rent to Landlord, its successors and assigns,

Page **1** of **4**

Initial

and any arrears thereof, and will forthwith faithfully perform and fulfill all of such terms, covenants, conditions and provisions, and will forthwith pay to the Landlord all damages that may arise in consequence of any default by the Tenant, its successors and assigns, under said Lease, including, without limitation, all reasonable attorneys' fees incurred by the Landlord or caused by any such default and/or by the enforcement of this Guaranty.

In addition, the Guarantor hereby guarantees to the Supplier, its successors and assigns, the full prompt payment of all sums due and owing under the Petroleum Products Supply Agreement ("Supply Agreement") and any and all sums and charges payable by the Retailer, its successors and assigns under said Supply Agreement, and full performance and observance of all the covenants, terms, conditions and agreements therein provided be performed by the Retailer, its successors and assigns. Guarantor hereby covenants and agrees to and with the Supplier, its successors and assigns, that if default shall at any time be made by the Retailer, its successors and assigns, in the payment of any obligations under this Supply Agreement, or in the performance of any of the terms, covenants, provisions or conditions contained in said Supply Agreement, the Guarantor will forthwith pay such sums to the Supplier and will forthwith faithfully perform and fulfill all of such terms, covenants, conditions and provisions and will forthwith pay to the Supplier all damages that may arise in consequence of any default by the Retailer, its successors and assigns, under said Supply Agreement, including, without limitation all reasonable attorneys fees incurred by the Supplier or caused by any such default and/or the enforcement of this Guaranty.

This Guaranty is an absolute and unconditional Guaranty of payment and of performance. It shall be enforceable against the Guarantor, their successors and assigns, without the necessity for any suit or proceedings on the Landlord's part of any kind or nature whatsoever

Initial _ _ _

against the Tenant, its successors and assigns or on the Supplier's part of any kind or nature whatsoever against the Retailer, its successors and assigns. The Guaranty hereunder shall in no way be terminated, affected or impaired by reason of the assertion or the failure to assert by the Landlord against the Tenant, or the Tenant's successors and assigns, of any of the rights or remedies reserved to the Landlord pursuant to the provisions of said Lease, or by the Supplier against the Retailer, or the Retailer's successors and assigns, of any of the rights or remedies reserved to the Supplier pursuant to the provisions of said Supply Agreement.

The Guaranty shall be a continuing Guaranty, and the liability of the Guarantor hereunder shall in no way be affected, modified or diminished by reason of any assignment, renewal, modification or extension of the Lease or by reason of any modification or waiver of or change in any of the terms, covenants, conditions or provisions of said Lease, or by reason of any extension of time that may be granted by the Landlord to the Tenant, or which may be granted by the Supplier to Retailer, their respective successors and assigns, or by reasons of any dealings or transactions or matters of things occurring between the Landlord and Tenant, its successors and assigns, or the Supplier and Retailer, its successors and assigns, or by reason of any dealings or transactions or matter or things occurring between the Landlord and Tenant, its successors and assigns, or the Supplier and Retailer, its successors and assigns, whether or not notice thereof is given to the Guarantor.

*(Remainder of page intentionally left blank.)*

Page 3 of 4

Initial

Dated: October 22, 2014

**GUARANTOR:**

Louay Alani, Individually

SSN: █████████

Ali Alani, Individually

SSN: █████████

STATE OF ILLINOIS)
               ) ss.
COUNTY OF LAKE  )

       On this 22 day of October, 2014 before me personally came **Louay Alani** known to me to be the person described in and who executed the foregoing Guaranty and acknowledged to me that he executed the same.

Notary Public

"OFFICIAL SEAL"
KENNETH J. CHALIFOUX
Notary Public, State of Illinois
My Commission Expires 12/08/14

STATE OF ILLINOIS)
               ) ss.
COUNTY OF LAKE  )

       On this 22 day of October, 2014 before me personally came **Ali Alani** known to me to be the person described in and who executed the foregoing Guaranty and acknowledged to me that he executed the same.

Notary Public

"OFFICIAL SEAL"
KENNETH J. CHALIFOUX
Notary Public, State of Illinois
My Commission Expires 12/08/14

Page 4 of 4

# EXHIBIT O

## <u>NOTICE OF ASSIGNMENT</u>

Date:                     August 17, 2016

Dealer:                   Grayslake (Stop & Shop)
                          735 Belvidere Rd.
                          Grayslake, IL 60030

Marketing Premises:       IL0090/ 156

Agreements:               Security Agreement
                          Petroleum Products Supply Agreement
                          Lease

Supplier:                 State Oil Company

Effective Date:           On or about September 27, 2016

Please note that on the Effective Date, the above-referenced Agreements, and all other agreements and documents executed in connection therewith, shall be assigned from State Oil Company to Lehigh Gas Wholesale LLC ("LGW"), LGP Realty Holdings LP (or subsidiaries of LGP Realty Holdings LP) ("LGP Holdings") and Lehigh Gas Wholesale Services, Inc. ("LGW Services"), each of which are subsidiaries of Cross America Partners LP.  Accordingly, from and after the Effective Date:

  (37)     LGW shall supply and invoice motor fuel to the Marketing Premises,

  (38)     LGP Holdings or subsidiaries of LGP Holdings shall lease and collect rent for the Marketing Premises to you, and

  (3)      LGW Services shall provide and bill fees associated with all other franchise rights, associated intangible property and services.

 In addition, please note that any guaranties executed by you, or security given by you, in connection with the Agreements shall continue to apply for the benefit of each of the assignees.  Moreover, a default by you under any one of the Agreements will constitute a default under all of the Agreements.

In conjunction with this organizational change, we would like to meet with you to review the process and introduce our team at CAP (parent of LGP).  **Please join us for Lunch at the Drake Hotel, 2301 York Road, Oak Brook, IL 60523 on August 31, 2016 at 11:00 am.**

Enclosed with this package, we have included the paperwork for your location that must be completed in order to facilitate a smooth transition come the end of September.
- Electronic Funds Transfer (EFT) authorization is required for LGW and LGW Services. Accordingly, please complete the attached AUTHORIZATION AGREEMENTS FOR AUTOMATIC DEPOSITS (DEBITS).
- A voided check is required to verify the account for the electronic transfers or a bank notice indicating routing and account numbers.
- A W9 must be completed for your organization.
- A Dealer Application for our reference.

Notice #1

- A sample Certificate of Insurance to provide to your carrier to update the Additional Insured for this assignment.

Please bring the completed paperwork with you on August 31. Team members will be available to help you process paperwork if needed. If you would prefer to send the paperwork, our fax number is (484)544-8974 -Attn: Mari Prudente.

**It is important to note that as of the Assignment date, we will not be able to provide fuel until all required paperwork is completed.**

Thank you in advance for your cooperation with this matter. If you have any questions, please feel free to contact the Chicago Territory Managers, John and Brian (contact info included).

We look forward to seeing you on August 31st!

Christopher P. Anest                               David Hrinak
Vice President                                      EVP and COO
State Oil Company                            Cross America Partners GP LLC

# EXHIBIT P

# <u>NOTICE OF ASSIGNMENT</u>

Date:                                August 17, 2016

Dealer:                              Woodstock
                                     401 S. Eastwood Dr.
                                     Woodstock, IL  60098

Marketing Premises:     IL0083/ 139

Agreements:                  Security Agreement
                                      Petroleum Products Supply Agreement
                                      Lease

Supplier:                         State Oil Company

Effective Date:               On or about September 27, 2016

Please note that on the Effective Date, the above-referenced Agreements, and all other agreements and documents executed in connection therewith, shall be assigned from State Oil Company to Lehigh Gas Wholesale LLC ("LGW"), LGP Realty Holdings LP (or subsidiaries of LGP Realty Holdings LP) ("LGP Holdings") and Lehigh Gas Wholesale Services, Inc. ("LGW Services"), each of which are subsidiaries of Cross America Partners LP.  Accordingly, from and after the Effective Date:

> (27)     LGW shall supply and invoice motor fuel to the Marketing Premises,

> (28)     LGP Holdings or subsidiaries of LGP Holdings shall lease and collect rent for the Marketing Premises to you, and

> (3)      LGW Services shall provide and bill fees associated with all other franchise rights, associated intangible property and services.

 In addition, please note that any guaranties executed by you, or security given by you, in connection with the Agreements shall continue to apply for the benefit of each of the assignees.  Moreover, a default by you under any one of the Agreements will constitute a default under all of the Agreements.

In conjunction with this organizational change, we would like to meet with you to review the process and introduce our team at CAP (parent of LGP).  **Please join us for Lunch at the Drake Hotel, 2301 York Road, Oak Brook, IL  60523 on August 31, 2016 at 11:00 am.**

Enclosed with this package, we have included the paperwork for your location that must be completed in order to facilitate a smooth transition come the end of September.
- Electronic Funds Transfer (EFT) authorization is required for LGW and LGW Services. Accordingly, please complete the attached AUTHORIZATION AGREEMENTS FOR AUTOMATIC DEPOSITS (DEBITS).
- A voided check is required to verify the account for the electronic transfers or a bank notice indicating routing and account numbers.
- A W9 must be completed for your organization.
- A Dealer Application for our reference.

- A sample Certificate of Insurance to provide to your carrier to update the Additional Insured for this assignment.

Please bring the completed paperwork with you on August 31. Team members will be available to help you process paperwork if needed. If you would prefer to send the paperwork, our fax number is (484)544-8974 -Attn: Mari Prudente.

**It is important to note that as of the Assignment date, we will not be able to provide fuel until all required paperwork is completed.**

Thank you in advance for your cooperation with this matter. If you have any questions, please feel free to contact the Chicago Territory Managers, John and Brian (contact info included).

We look forward to seeing you on August 31st!

Christopher P. Anest                                    David Hrinak
Vice President                                         EVP and COO
State Oil Company                                      Cross America Partners GP LLC

# EXHIBIT Q

## <u>NOTICE OF ASSIGNMENT</u>

Date:                    August 17, 2016

Dealer:                 Ingleside
                        26025 W. Grand Ave.
                        Ingleside, IL  60041

Marketing Premises:     IL0132/ 70

Agreements:             Security Agreement
                        Petroleum Products Supply Agreement
                        Promissory Note

Supplier:               State Oil Company

Effective Date:         On or about September 27, 2016

Please note that on the Effective Date, the above-referenced Agreements, and all other agreements and documents executed in connection therewith, shall be assigned from State Oil Company to Lehigh Gas Wholesale LLC ("LGW"), LGP Realty Holdings LP (or subsidiaries of LGP Realty Holdings LP) ("LGP Holdings") and Lehigh Gas Wholesale Services, Inc. ("LGW Services"), each of which are subsidiaries of Cross America Partners LP.  Accordingly, from and after the Effective Date:

    (49)    LGW shall supply and invoice motor fuel to the Marketing Premises,

    (50)    LGP Holdings or subsidiaries of LGP Holdings shall lease and collect rent for the Marketing Premises to you, and

    (3)    LGW Services shall provide and bill fees associated with all other franchise rights, associated intangible property and services.

 In addition, please note that any guaranties executed by you, or security given by you, in connection with the Agreements shall continue to apply for the benefit of each of the assignees.  Moreover, a default by you under any one of the Agreements will constitute a default under all of the Agreements.

In conjunction with this organizational change, we would like to meet with you to review the process and introduce our team at CAP (parent of LGP).  **Please join us for Lunch at the Drake Hotel, 2301 York Road, Oak Brook, IL  60523 on August 31, 2016 at 11:00 am.**

Enclosed with this package, we have included the paperwork for your location that must be completed in order to facilitate a smooth transition come the end of September.
- Electronic Funds Transfer (EFT) authorization is required for LGW and LGW Services. Accordingly, please complete the attached AUTHORIZATION AGREEMENTS FOR AUTOMATIC DEPOSITS (DEBITS).
- A voided check is required to verify the account for the electronic transfers or a bank notice indicating routing and account numbers.
- A W9 must be completed for your organization.
- A Dealer Application for our reference.

- A sample Certificate of Insurance to provide to your carrier to update the Additional Insured for this assignment.

Please bring the completed paperwork with you on August 31. Team members will be available to help you process paperwork if needed. If you would prefer to send the paperwork, our fax number is (484)544-8974 -Attn: Mari Prudente.

**It is important to note that as of the Assignment date, we will not be able to provide fuel until all required paperwork is completed.**

Thank you in advance for your cooperation with this matter. If you have any questions, please feel free to contact the Chicago Territory Managers, John and Brian (contact info included).

We look forward to seeing you on August 31st!

Christopher P. Anest                                David Hrinak
Vice President                                       EVP and COO
State Oil Company                           Cross America Partners GP LLC

# EXHIBIT R

**SPECIAL WARRANTY DEED**
**(Illinois)**

**This instrument was prepared by:**
Jeremy R. Segal, Esq.
Barack Ferrazzano Kirschbaum
 & Nagelberg LLP
200 W. Madison Street, Suite 3900
Chicago, IL 60606

**After recording, please return to:**
Marc A. Albanese, Esq.
Davison & McCarthy, P.C.
702 Hamilton Street, Suite 300
Allentown, PA 18101

*Grantees Address*
**Send Subsequent Tax Bills to:**
LGP Realty Holdings LP
515 Hamilton Street, Suite 200
Allentown, PA 18101
Attention: Real Estate Dept.

Image# 055555420006 Type: DW
Recorded: 09/30/2016 at 01:31:31 PM
Receipt#: 2016-00060371
Page 1 of 6
Fees: $800.75
IL Rental Housing Fund: $9.00
Lake County IL Recorder
Mary Ellen Vanderventer Recorder
File **7333520**

$506,112.00

**REAL ESTATE TRANSFER TAX** — 03-Oct-2016

|  |  |  |
|---|---|---|
|  | COUNTY: | 253.25 |
|  | ILLINOIS: | 506.50 |
|  | TOTAL: | 759.75 |
| 05-11-403-008-0000 | 20160904960360 | 1-780-619-072 |

**Above Space for Recorder's Use Only**

**BAPA, LLC**, an Illinois limited liability company, as to an undivided ½ (one-half) interest and **PT, L.L.C.**, an Illinois limited liability company, as to an undivided ½ (one half) interest (collectively as tenants-in-common and not as joint tenants or tenants by the entirety, "**Grantor**"), for and in consideration of TEN AND NO/100 DOLLARS ($10.00), and other good and valuable consideration in hand paid, the receipt whereof is hereby acknowledged, **HEREBY CONVEYS AND WARRANTS to LGP REALTY HOLDINGS LP**, a Delaware limited partnership ("**Grantee**"), the following described real property situated in the County of Lake in the State of Illinois, to wit:

See Exhibit A attached hereto and made a part hereof for legal description (the "Real Estate"),

Subject to each of the following (collectively, the "Encumbrances"):

1.     All covenants, conditions, restrictions, reservations, rights, rights of way, easements, encumbrances, liens and other matters of record as of the date hereof;

2.     All matters which would be revealed or disclosed in an accurate survey or inspection of the property hereby conveyed; and

3.     All laws, ordinances and governmental rules, regulations and restrictions affecting such property.

1233387.v2

4. Real estate taxes and assessments, if any, not yet due and payable.

5. Acts or omissions of Grantee and the rights of all persons claiming by, through or under Grantee.

ADDRESS: 26025 & 26037 W. Grand Ave., Ingleside, IL 60041
PIN: 05-11-403-018; 05-11-403-017; 05-11-403-008

Together with Grantor's right, title and interest, if any, in the following (subject to the Encumbrances):

(i) all buildings and improvements located thereon;

(ii) all rights, privileges, remainders, reversions, tenements, hereditaments, benefits and easement appurtenant or belonging to the Real Estate, including all rents, issues and profits, air rights, water, water rights, riparian rights and water stock relating to the Real Estate and any rights-of-way or other appurtenances used in connection with ownership, use and enjoying of the Real Estate; and

(iii) any road, street, highway or alley, or in any abandoned or vacated road, street, highway or alley abutting the Real Estate.

TO HAVE AND TO HOLD the said Real Estate as above described, with the appurtenances, unto Grantee, its successors and assigns forever.

And Grantor, for itself, and its successors, does covenant, promise and agree, to and with Grantee, its successors and assigns, that it has not done or suffered to be done, anything whereby the said premises hereby granted are, or may be, in any manner encumbered or charged, except as herein recited; and that the said premises, against all persons lawfully claiming, or to claim the same, by, through or under it, it WILL WARRANT AND DEFEND, subject to the Encumbrances.

[signature page follows]

IN WITNESS WHEREOF, Grantor has executed the foregoing instrument on this _27_ day of _SEPTEMBER_, 2016.

BAPA, LLC, an Illinois limited liability company

By: _____

Name: Bill Anest

Its: Manager

State of _ILLINOIS_ )
                          )SS:
County of _COOK_ )

I, the undersigned, a Notary Public in and for said County, DO HEREBY CERTIFY, THAT Bill Anest, personally known to me to be the Manager of BAPA, LLC, an Illinois limited liability company, and personally known to me to be the same person whose name is subscribed to the foregoing instrument, appeared before me this day in person and acknowledged that as such duly appointed Manager, he signed and delivered the said instrument pursuant to his authority as his free and voluntary act on behalf of said entity.

Given under my hand and official seal this _20th_ day of _SEPTEMBER_, 2016.

OFFICIAL SEAL
DANIEL SHERANIAN
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES 6-19-2017

Signature _____

Signature of Notary Public

Place Notary Seal Above

[Signatures Continue on Next Page]

1233387.v2

**PT, L.L.C.**, an Illinois limited liability company

By: _____

Name: Peter Anest

Its: Manager

State of ILLINOIS )
)SS:
County of COOK )

I, the undersigned, a Notary Public in and for said County, DO HEREBY CERTIFY, THAT Peter Anest, personally known to me to be the Manager of PT, L.L.C., an Illinois limited liability company, and personally known to me to be the same person whose name is subscribed to the foregoing instrument, appeared before me this day in person and acknowledged that as such duly appointed Manager, he signed and delivered the said instrument pursuant to his authority as his free and voluntary act on behalf of said entity.

Given under my hand and official seal this 20th day of SEPTEMBER , 2016.

OFFICIAL SEAL
DANIEL SHERANIAN
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES 6-19-2017

Signature _____

Signature of Notary Public

Place Notary Seal Above

1233387.v2

**EXHIBIT A TO DEED**
**LEGAL DESCRIPTION**

PARCEL 1:

THAT SAID PART OF LOT 1 DESCRIBED AS FOLLOWS: COMMENCING AT A POINT ON THE EAST LINE OF SAID LOT 1, A DISTANCE OF 83.21 FEET NORTH OF THE SOUTHEAST CORNER THEREOF; THENCE WEST PARALLEL WITH THE SOUTH LINE OF SAID LOT 1, A DISTANCE OF 114.57 FEET; THENCE NORTH PARALLEL WITH THE EAST LINE OF SAID LOT 1, A DISTANCE OF 99.0 FEET; THENCE NORTHWESTERLY A DISTANCE OF 30.76 FEET TO A POINT ON THE NORTH LINE OF SAID LOT 1, A DISTANCE OF 52.76 FEET EAST OF THE NORTHWEST CORNER THEREOF; THENCE EAST ALONG THE NORTH LINE OF SAID LOT 1, A DISTANCE OF 159.53 FEET TO THE NORTHEAST CORNER THEREOF; THENCE SOUTH ALONG THE EAST LINE OF SAID LOT 1, A DISTANCE OF 126.30 FEET TO THE POINT OF BEGINNING (EXCEPT THAT PART THEREOF DESCRIBED AS FOLLOWS: COMMENCING AT THE NORTHEAST CORNER OF THE SOUTHEAST 1/4 OF SECTION 11, TOWNSHIP 45 NORTH, RANGE 9 EAST OF THE THIRD PRINCIPAL MERIDIAN; THENCE WESTERLY ON AN ASSUMED BEARING OF NORTH 89 DEGREES 57 MINUTES 37 SECONDS WEST 54.81 FEET ALONG THE NORTH LINE OF SAID QUARTER SECTION; THENCE SOUTH 00 DEGREES 02 MINIUTES 23 SECONDS WEST 30.00 FEET TO THE POINT OF BEGINNING; THENCE SOUTH 45 DEGREES 08 MINUTES 27 SECONDS EAST 35.47 FEET TO A POINT ON THE WEST RIGHT-OF-WAY LINE OF WILSON ROAD; THENCE NORTH 00 DEGREES 19 MINUTES 17 SECONDS WEST ALONG SAID WEST RIGHT-OF-WAY LINE OF WILSON ROAD A DISTANCE OF 25.00 FEET TO THE INTERSECTION WITH THE SOUTH RIGHT-OF-WAY LINE OF ILLINOIS ROUTE 59; THENCE NORTH 89 DEGREES 57 MINUTES 37 SECONDS WEST ALONG SAID LINE 25.00 FEET TO THE POINT OF BEGINNING) IN STANTON TERRACE SUBDIVISION IN THE NORTHEAST 1/4 OF THE SOUTHEAST 1/4 OF SECTION 11, TOWNSHIP 45 NORTH, RANGE 9 EAST OF THE THIRD PRINCIPAL MERIDIAN, ACCORDING TO THE PLAT THEREOF RECORDED JUNE 16, 1925 AS DOCUMENT 259434 IN BOOK "M" OF PLATS, PAGE 105, IN LAKE COUNTY, ILLINOIS.

PARCEL 2:

LOT 2 AND THAT PART OF LOT 1 DESCRIBED AS FOLLOWS: COMMENCING AT THE SOUTHWEST CORNER OF SAID LOT 1; THENCE EAST ALONG THE SOUTH LINE OF SAID LOT 1 TO THE SOUTHEAST CORNER THEREOF; THENCE NORTH ALONG THE EAST LINE OF SAID LOT 1, A DISTANCE 83.21 FEET; THENCE WEST PARALLEL WITH THE SOUTH LINE OF SAID LOT 1, A DISTANCE OF 114.57 FEET; THENCE NORTH PARALLEL WITH THE EAST LINE OF SAID LOT 1, A DISTANCE OF 99.0 FEET; THENCE NORTHWESTERLY A DISTANCE OF 30.76 FEET TO A POINT ON THE NORTH LINE OF SAID LOT 1, A DISTANCE OF 52.76 FEET EAST OF THE NORTHWEST CORNER THEREOF; THENCE WEST ALONG THE NORTH LINE OF SAID LOT 1, A DISTANCE OF 52.76 FEET TO THE NORTHWEST CORNER THEREOF; THENCE SOUTH

ALONG THE WEST LINE OF SAID LOT 1, TO THE POINT OF BEGINNING, IN STANTON TERRACE, A SUBDIVISION IN THE NORTHEAST QUARTER OF THE SOUTHEAST QUARTER OF SECTION 11, TOWNSHIP 45 NORTH, RANGE 9, EAST OF THE THIRD PRINCIPAL MERIDIAN, ACCORDING TO THE PLAT THEREOF RECORDED JUNE 19, 1925, AS DOCUMENT 259434 IN BOOK "M" OF PLATS, PAGE 105, IN LAKE COUNTY, ILLINOIS.

APN(s):                  05-11-403-018; 05-11-403-017; 05-11-403-008

Common Address:          26025 & 26037 W. Grand Ave., Ingleside, IL 60041

# EXHIBIT S

**Sarah J. Cafran**

| | |
|---|---|
| **From:** | Windisch, Holly |
| **Sent:** | Thursday, August 10, 2017 9:27 AM |
| **To:** | Catch-26@comcast.net |
| **Cc:** | Frye, Kenneth; Trendy, Tyler; Bedics, William; Disert, Randy; Rider, Leslie; Sinclair, Sabrina |
| **Subject:** | IL0132 - Gas Cap Fuels LLC - Please place on Hold |

Dear Gas Cap Fuels LLC,

Your draft for $ 17,208.90 on 8/5/2017 was returned to us for insufficient funds. Please wire us the full payment, plus a $250 service fee to avoid additional charges on your account. Until the wire is received, your account will be put on hold for future deliveries. If you have any questions, please feel free to contact us.

Thank you,
Holly


Holly Windisch
CrossAmerica Partners LP
515 Hamilton Street, Suite 200
Allentown, PA 18101

# EXHIBIT T

U.S. Postal Service
CERTIFIED MAIL RECEIPT
(Domestic Mail Only; No Insurance Coverage Provided)
For delivery information visit our website at www.usps.com®

OFFICIAL USE

| Postage | $ | |
| Certified Fee | | |
| Return Receipt Fee (Endorsement Required) | | Postmark Here |
| Restricted Delivery Fee (Endorsement Required) | | |
| Total Postage & Fees | $ | |

Sent To Louay Alani  Gas Cap Fuels, Catch 26, Grayslk.
Street, Apt. No.; or PO Box No. 735 Belvidere Road
City, State, ZIP+4 Grayslake, IL 60030

PS Form 3800, August 2006          See Reverse for Instructions

RITON & FURRER, LLP
YS AND COUNSELORS AT LAW
BUSINESS PARK DRIVE
SUITE 302
ONK, NEW YORK 10504

(914) 730-3400
FAX (914) 730-3405
www.hflawllp.com

LEGAL ASSISTANTS
SEAN HARRITON
KAREN B. HASTEROK
CAROL A. BOCCARDI

August 15, 2017

**VIA HAND DELIVERY AND CERTIFIED**
**MAIL, RETURN RECIPT REQUESTED**

Louay Alani
Gas Cap Fuels, LLC
Catch 26, LLC
Grayslake Stop & Shop, LLC
735 Belvidere Rd.
Grayslake, IL 60030

RE: **NOTICE OF TERMINATION**
26025/26037 W. Grand Avenue, Ingleside, IL 60041
401 S. Eastwood, Woodstock, IL 60098
735 E. Belvidere, Grayslake, IL 60030

Dear Mr. Alani:

Please be advised that, pursuant to the Petroleum Marketing Practices Act ("PMPA"), 15 U.S.C.S. 2801, et seq., LGP Realty Holdings LP ("LGPRH") and Lehigh Gas Wholesale LLC ("LGW") hereby terminate their franchise, franchise relationship and all franchise agreements with Gas Cap Fuels, LLC, Catch 26, LLC and Grayslake Stop & Shop, LLC **effective August 25, 2017.** LGPRH and LGW are collectively referred to herein as "Lehigh." The franchises are comprised of the following agreements together with any other agreement(s) that may have been expressly made a part of the franchises:

1. Lease dated October 22, 2014, made by and between Grayslake Stop & Shop, LLC ("Grayslake LLC") and LGPRH, as successor by assignment to PT, L.L.C., BAPA, L.L.C and State Oil Company, concerning 735 E. Belvidere, Grayslake, IL 60030 ("Grayslake Property") (**"Grayslake Lease"**);

2. Petroleum Products Supply Agreement dated October 22, 2014, made by and between Grayslake LLC and LGW, as successor by assignment to State Oil Company, concerning the Grayslake Property (**"Grayslake Supply Agreement"**);

HARRITON & FURRER, LLP

ATTORNEYS AND COUNSELORS AT LAW

Louay Alani
August 14, 2017
Page - 2 –

3. Lease dated October 22, 2014, made by and between Catch 26, LLC ("Catch LLC") and LGPRH, as successor by assignment to PT, L.L.C., BAPA, L.L.C and State Oil Company, concerning 401 S. Eastwood, Woodstock, IL 60098 ("Woodstock Property") ("**Woodstock Lease**");

4. Petroleum Products Supply Agreement dated October 22, 2014, made by and between Catch LLC and LGW, as successor by assignment to State Oil Company, concerning the Woodstock Property ("**Woodstock Supply Agreement**");

5. Installment Agreements for Warranty Deed and Personal Property dated April 12, 2013, made by and between Louay Alani, Gas Cap Fuels, LLC ("Gas Cap LLC", and together with Louay Alani, Grayslake LLC and Catch LLC, "Alani"), Catch LLC and LGPRH, as successor by assignment to PT, L.L.C., BAPA, L.L.C and State Oil Company, concerning 26025/26037 W. Grand Avenue, Ingleside, IL 60041 ("Ingleside Property") ("**Ingleside Installment Agreements**"); and

6. Petroleum Products Supply Agreement dated April 12, 2013, made by and between Catch LLC and LGW, as successor by assignment to State Oil Company, concerning the Ingleside Property (the "**Ingleside Supply Agreement**", and together with the Grayslake Lease, the Grayslake Supply Agreement, the Woodstock Lease, the Woodstock Supply Agreement and the Ingleside Installment Agreements, the "Ingleside Agreements").

The grounds for termination are: (1) your failure to pay sums due in a timely manner at the Grayslake Property and Ingleside Property, which failure is grounds for termination: (a) in that you failed to comply with franchise provisions which are reasonable and material, 15 U.S.C.S. §2802(b)(2)(A); (b) in that you failed to exert good faith efforts to carry out the provisions of the franchise, (c) §2802(b)(2)(B); and (c) due to the occurrence of an enumerated event relevant to the franchise relationships, §2802(b)(2)(C) and §2802(c)(8); (2) your willful adulteration, mislabeling and misbranding of motor fuels and other trademark violations at the Grayslake Property and Woodstock Property, which actions are grounds for termination: (a) in that you failed to comply with franchise provisions which are reasonable and material, 15 U.S.C.S. §2802(b)(2)(A); (b) in that you failed to exert good faith efforts to carry out the provisions of the franchise, §2802(b)(2)(B); and (c) due to the occurrence of an enumerated event relevant to the franchise relationships, §2802(b)(2)(C) and §2802(c)(10); and (3) your unilateral changing of your banking information so as to prevent Lehigh, as Supplier, from initiating Electronic Funds Transfer ("EFT") payments and receiving credit card deposits at the Grayslake Property and Woodstock Property, which action is grounds for termination in that you failed to: (a) comply with franchise provisions which are reasonable and material, 15 U.S.C.S. §2802(b)(2)(A); and (b) exert good faith efforts to carry out the provisions of the franchise.

**Please note that you are required to surrender the Woodstock Property and Grayslake Property and surrender all of Lehigh's personal property from each of the three properties in accordance with the PMPA Franchise Agreement provisions and pursuant to the PMPA on August 25, 2017.**

HARRITON & FURRER, LLP
ATTORNEYS AND COUNSELORS AT LAW

Louay Alani
August 14, 2017
Page - 3 –


In addition, your account has become substantially delinquent. Lehigh demands that you immediately wire transfer **$51,500.81** for the past monies owed to Lehigh.

Please note that pursuant to Section 9(a) of the aforementioned Supply Agreements and Section 1.5 of the Lease Agreements, a default of one shall be considered a default of the other and a default at one location shall be considered a default at the other locations. In turn, pursuant to paragraph 31 of the aforementioned Installment Agreements, a default under one or more of the Supply Agreements constitutes a default under the Installment Agreements. Accordingly, because of the defaults listed above, all of the Supply Agreements and Installment Agreements for the above-referenced three locations are similarly hereby terminated effective **August 25, 2017**.

Nothing in this letter should be read to limit Lehigh's rights with respect to any other basis for termination or other violations of the Agreements.  Lehigh further reserves the right to seek all remedies available to it under the Agreements or applicable law, including but not limited to: the Supplier's Remedies set for in Section 10 of the Supply Agreements, rights of eviction, rights to collect the balance of the rent owed for the remainder of the terms of the Agreements, all sums incurred by Lehigh to prepare the stations for re-rental, attorney's fees and costs incurred to enforce its rights under the Agreements, as well damages for the loss of business resulting from the aforementioned defaults.

Pursuant to 15 U.S.C. § 2804 (c)(3)(C), a summary statement of Title 1 of the PMPA is provided herewith.

Very truly yours,

s/ *Urs Broderick Furrer*

URS BRODERICK FURRER

UBF/kbh
Enclosure
cc: Marc A. Albanese, Esq. (via email only)
    Kenneth Frye (via email only)
    William S. Bazianos, Esq. (via email only)

# PMPA SUMMARY STATEMENT

DEPARTMENT OF ENERGY
**Revised Summary of Title I of the Petroleum Marketing Practices Act**
(Extracted from the Federal Register, Vol. 61, No. 123, Tuesday, June 25, 1996, 32786-32790)
AGENCY: Department of Energy.
ACTION: Notice.
------------------------------------------------------------------

SUMMARY: This notice contains a summary of Title I of the Petroleum Marketing Practices Act, as amended (the Act). The Petroleum Marketing Practices Act was originally enacted on June 19, 1978, and was amended by the Petroleum Marketing Practices Act Amendments of 1994, enacted on October 19, 1994. On August 30, 1978, the Department of Energy published in the Federal Register a summary of the provisions of Title I of the 1978 law, as required by the Act. The Department is publishing this revised summary to reflect key changes made by the 1994 amendments.

The Act is intended to protect franchised distributors and retailers of gasoline and diesel motor fuel against arbitrary or discriminatory termination or nonrenewal of franchises. This summary describes the reasons for which a franchise may be terminated or not renewed under the law, the responsibilities of franchisors, and the remedies and relief available to franchisees. The Act requires franchisors to give franchisees copies of the summary contained in this notice whenever notification of termination or nonrenewal of a franchise is given.

FOR FURTHER INFORMATION CONTACT: Office of Energy Efficiency, Alternative Fuels, and Oil Analysis (PO-62), U.S. Department of Energy, Washington, D.C. 20585, Telephone (202) 586-4444; Office of General Counsel (GC-73), U.S. Department of Energy, Washington, D.C. 20585, Telephone (202) 586-6978.

SUPPLEMENTARY INFORMATION: Title I of the Petroleum Marketing Practices Act, as amended, 15 U.S.C. Secs. 2801-2806, provides for the protection of franchised distributors and retailers of motor fuel by establishing minimum Federal standards governing the termination of franchises and the nonrenewal of franchise relationships by the franchisor or distributor of such fuel.

Section 104(d)(1) of the Act required the Secretary of Energy to publish in the Federal Register a simple and concise summary of the provisions of Title I, including a statement of the respective responsibilities of, and the remedies and relief available to, franchisors and franchisees under that title. The Department published this summary in the Federal Register on August 30, 1978. 43 F.R. 38743 (1978).

In 1994 the Congress enacted the Petroleum Marketing Practices Act Amendments to affirm and clarify certain key provisions of the 1978 statute. Among the key issues addressed in the 1994 amendments are: (1) termination or nonrenewal of franchised dealers by their franchisors for purposes of conversion to ``company'' operation; (2) application of state law; (3) the rights and obligations of franchisors and franchisees in third-party lease situations; and (4) waiver of rights limitations. See H.R. REP. NO. 737, 103rd Cong., 2nd Sess. 2 (1994), reprinted in 1994 U.S.C.C.A.N. 2780.

Congress intended to: (1) make explicit that upon renewal a franchisor may not insist on changes to a franchise agreement where the purpose of such changes is to prevent renewal in order to convert a franchisee-operated service station into a company-operated service station; (2) make clear that where the franchisor has an option to continue the lease or to purchase the premises but does not wish to do so, the franchisor must offer to assign the option to the franchisee; (3) make clear that no franchisor may require, as a condition of entering or renewing a franchise agreement, that a franchisee waive any rights under the Petroleum Marketing Practices Act, any other Federal law, or any state law; and (4) reconfirm the limited scope of Federal preemption under the Act. Id.

The summary which follows reflects key changes to the statute resulting from the 1994 amendments. The Act requires franchisors to give copies of this summary statement to their franchisees when entering into an agreement to terminate the franchise or not to renew the franchise relationship, and when giving notification of termination or nonrenewal. This summary does not purport to interpret the Act, as amended, or to create new legal rights.

In addition to the summary of the provisions of Title I, a more detailed description of the definitions contained in the Act and of the legal remedies available to franchisees is also included in this notice, following the summary statement.

Summary of Legal Rights of Motor Fuel Franchisees

This is a summary of the franchise protection provisions of the Federal Petroleum Marketing Practices Act, as amended in 1994 (the Act), 15 U.S.C. Sections. 2801-2806. This summary must be given to you, as a person holding a franchise for the sale, consignment or distribution of gasoline or diesel motor fuel, in connection with any termination or nonrenewal of your franchise by your franchising company (referred to in this summary as your supplier).

You should read this summary carefully, and refer to the Act if necessary, to determine whether a proposed termination or nonrenewal of your franchise is lawful, and what legal remedies are available to you if you think the proposed termination or failure to renew is not lawful. In addition, if you think your supplier has failed to comply with the Act, you may wish to consult an attorney in order to enforce your legal rights.

The franchise protection provisions of the Act apply to a variety of franchise agreements. The term ``franchise'' is broadly defined as a license to use a motor fuel trademark which is owned or controlled by a refiner, and it includes secondary arrangements such as leases of real property and motor fuel supply agreements which have existed continuously since May 15, 1973, regardless of a subsequent withdrawal of a trademark. Thus, if you have lost the use of a trademark previously granted by your supplier but have continued to receive motor fuel supplies through a continuation of a supply agreement with your supplier, you are protected under the Act. Any issue arising under your franchise which is not governed by this Act will be governed by the law of the State in which the principal place of business of your franchise is located. Although a State may specify the terms and conditions under which your franchise may be transferred upon the death of the franchisee, it may not require a payment to you (the franchisee) for the goodwill of a franchise upon termination or nonrenewal.

The Act is intended to protect you, whether you are a distributor or a retailer, from arbitrary or discriminatory termination or nonrenewal of your franchise agreement. To accomplish this, the Act first lists the reasons for which termination or nonrenewal is permitted. Any notice of termination or nonrenewal must state the precise reason, as listed in the Act, for which the particular termination or nonrenewal is being made. These reasons are described below under the headings "Reasons for Termination" and "Reasons for Nonrenewal."

The Act also requires your supplier to give you a written notice of termination or intention not to renew the franchise within certain time periods. These requirements are summarized below under the heading "Notice Requirements for Termination or Nonrenewal."

The Act also provides certain special requirements with regard to trial and interim franchise agreements, which are described below under the heading "Trial and Interim Franchises."

The Act gives you certain legal rights if your supplier terminates or does not renew your franchise in a way that is not permitted by the Act. These legal rights are described below under the heading "Your Legal Rights."

The Act contains provisions pertaining to waiver of franchisee rights and applicable State law. These provisions are described under the heading "Waiver of Rights and Applicable State Law."

This summary is intended as a simple and concise description of the general nature of your rights under the Act. For a more detailed description of these rights, you should read the text of the Petroleum Marketing Practices Act, as amended in 1994 (15 U.S.C. Secs. 2801-2806). This summary does not purport to interpret the Act, as amended, or to create new legal rights.

I. Reasons for Termination

If your franchise was entered into on or after June 19, 1978, the Act bars termination of your franchise for any reasons other than those reasons discussed below. If your franchise was entered into before June 19, 1978, there is no statutory restriction on the reasons for which it may be terminated. If a franchise entered into before June 19, 1978, is terminated, however, the Act requires the supplier to reinstate the franchise relationship unless one of the reasons listed under this heading or one of the additional reasons for nonrenewal described below under the heading "Reasons for Nonrenewal" exists.

A. Non-Compliance with Franchise Agreement

Your supplier may terminate your franchise if you do not comply with a reasonable and important requirement of the franchise relationship. However, termination may not be based on a failure to comply with a provision of the franchise that is illegal or unenforceable under applicable Federal, State or local law. In order to terminate for non-compliance with the franchise agreement, your supplier must have learned of this non-compliance recently. The Act limits the time period within which your supplier must have learned of your non-compliance to various periods, the longest of which is 120 days, before you receive notification of the termination.

B. Lack of Good Faith Efforts

Your supplier may terminate your franchise if you have not made good faith efforts to carry out the requirements of the franchise, provided you are first notified in writing that you are not meeting a requirement of the franchise and you are given an opportunity to make a good faith effort to carry out the requirement. This reason can be used by your supplier only if you fail to make good faith efforts to carry out the requirements of the franchise within the period which began not more than 180 days before you receive the notice of termination.

C. Mutual Agreement To Terminate the Franchise

A franchise can be terminated by an agreement in writing between you and your supplier if the agreement is entered into not more than 180 days before the effective date of the termination and you receive a copy of that agreement, together with this summary statement of your rights under the Act. You may cancel the agreement to terminate within 7 days after you receive a copy of the agreement, by mailing (by certified mail) a written statement to this effect to your supplier.

D. Withdrawal From the Market Area

Under certain conditions, the Act permits your supplier to terminate your franchise if your supplier is withdrawing from marketing activities in the entire geographic area in which you operate. You should read the Act for a more detailed description of the conditions under which market withdrawal terminations are permitted. See 15 U.S.C. Sec. 2802(b)(E).

E. Other Events Permitting a Termination

If your supplier learns within the time period specified in the Act (which in no case is more than 120 days prior to the termination notice) that one of the following events has occurred, your supplier may terminate your franchise agreement:

(1) Fraud or criminal misconduct by you that relates to the operation of your marketing premises.

(2) You declare bankruptcy or a court determines that you are insolvent.

(3) You have a severe physical or mental disability lasting at least 3 months which makes you unable to provide for the continued proper operation of the marketing premises.

(4) Expiration of your supplier's underlying lease to the leased marketing premises, if: (a) your supplier gave you written notice before the beginning of the term of the franchise of the duration of the underlying lease and that the underlying lease might expire and not be renewed during the term of the franchise; (b) your franchisor offered to assign to you, during the 90-day period after notification of termination or nonrenewal was given, any option which the franchisor held to extend the underlying lease or to purchase the marketing premises (such an assignment may be conditioned on the franchisor receiving from both the landowner and the franchisee an unconditional release from liability for specified events occurring after the assignment); and (c) in a situation in which the franchisee acquires possession of the leased marketing premises effective immediately after the loss of the right of the franchisor to grant possession, the franchisor, upon the written request of the franchisee, made a bona fide offer to sell or assign to the franchisee the franchisor's interest in any improvements or equipment located on the premises, or offered the franchisee a right of first refusal of any offer from another person to purchase the franchisor's interest in the improvements and equipment.

(5) Condemnation or other taking by the government, in whole or in part, of the marketing premises pursuant to the power of eminent domain. If the termination is based on a condemnation or other taking, your supplier must give you a fair share of any compensation which he receives for any loss of business opportunity or good will.

(6) Loss of your supplier's right to grant the use of the trademark that is the subject of the franchise, unless the loss was because of bad faith actions by your supplier relating to trademark abuse, violation of Federal or State law, or other fault or negligence.

(7) Destruction (other than by your supplier) of all or a substantial part of your marketing premises. If the termination is based on the destruction of the marketing premises and if the premises are rebuilt or replaced by your supplier and operated under a franchise, your supplier must give you a right of first refusal to this new franchise.

(8) Your failure to make payments to your supplier of any sums to which your supplier is legally entitled.

(9) Your failure to operate the marketing premises for 7 consecutive days, or any shorter period of time which, taking into account facts and circumstances, amounts to an unreasonable period of time not to operate.

(10) Your intentional adulteration, mislabeling or misbranding of motor fuels or other trademark violations.

(11) Your failure to comply with Federal, State, or local laws or regulations of which you have knowledge and that relate to the operation of the marketing premises.

(12) Your conviction of any felony involving moral turpitude.

(13) Any event that affects the franchise relationship and as a result of which termination is reasonable.

II. Reasons for Nonrenewal

If your supplier gives notice that he does not intend to renew any franchise agreement, the Act requires that the reason for nonrenewal must be either one of the reasons for termination listed immediately above, or one of the reasons for nonrenewal listed below.

A. Failure To Agree on Changes or Additions To Franchise

If you and your supplier fail to agree to changes in the franchise that your supplier in good faith has determined are required, and your supplier's insistence on the changes is not for the purpose of converting the leased premises to a company operation or otherwise preventing the renewal of the franchise relationship, your supplier may decline to renew the franchise.

B. Customer Complaints

If your supplier has received numerous customer complaints relating to the condition of your marketing premises or to the conduct of any of your employees, and you have failed to take prompt corrective action after having been notified of these complaints, your supplier may decline to renew the franchise.

C. Unsafe or Unhealthful Operations

If you have failed repeatedly to operate your marketing premises in a clean, safe and healthful manner after repeated notices from your supplier, your supplier may decline to renew the franchise.

D. Operation of Franchise is Uneconomical

Under certain conditions specified in the Act, your supplier may decline to renew your franchise if he has determined that renewal of the franchise is likely to be uneconomical. Your supplier may also decline to renew your franchise if he has decided to convert your marketing premises to a use other than for the sale of motor fuel, to sell the premises, or to materially alter, add to, or replace the premises.

III. Notice Requirements for Termination or Nonrenewal

The following is a description of the requirements for the notice which your supplier must give you before he may terminate your franchise or decline to renew your franchise relationship. These notice requirements apply to all franchise terminations, including franchises entered into before June 19, 1978 and trial and interim franchises, as well as to all nonrenewals of franchise relationships.

A. How Much Notice Is Required

In most cases, your supplier must give you notice of termination or non-renewal at least 90 days before the termination or nonrenewal takes effect.

In circumstances where it would not be reasonable for your supplier to give you 90 days notice, he must give you notice as soon as he can do so. In addition, if the franchise involves leased marketing premises, your supplier may not establish a new franchise relationship involving the same premises until 30 days after notice was given to you or the date the termination or nonrenewal takes effect, whichever is later. If the franchise agreement permits, your supplier may repossess the premises and, in reasonable circumstances, operate them through his employees or agents.

If the termination or nonrenewal is based upon a determination to withdraw from the marketing of motor fuel in the area, your supplier must give you notice at least 180 days before the termination or nonrenewal takes effect.

B. Manner and Contents of Notice

To be valid, the notice must be in writing and must be sent by certified mail or personally delivered to you. It must contain:
   (1) A statement of your supplier's intention to terminate the franchise or not to renew the franchise relationship, together with his reasons for this action;
   (2) The date the termination or non-renewal takes effect; and
   (3) A copy of this summary.

IV. Trial Franchises and Interim Franchises

The following is a description of the special requirements that apply to trial and interim franchises.

A. Trial Franchises

A trial franchise is a franchise, entered into on or after June 19, 1978, in which the franchisee has not previously been a party to a franchise with the franchisor and which has an initial term of 1 year or less. A trial franchise must be in writing and must make certain disclosures, including that it is a trial franchise, and that the franchisor has the right not to renew the franchise relationship at the end of the initial term by giving the franchisee proper notice.

The unexpired portion of a transferred franchise (other than as a trial franchise, as described above) does not qualify as a trial franchise.

In exercising his right not to renew a trial franchise at the end of its initial term, your supplier must comply with the notice requirements described above under the heading "Notice Requirements for Termination or Nonrenewal."

B. Interim Franchises

An interim franchise is a franchise, entered into on or after June 19, 1978, the duration of which, when combined with the terms of all prior interim franchises between the franchisor and the franchisee, does not exceed three years, and which begins immediately after the expiration of a prior franchise involving the same marketing premises which was not renewed, based on a lawful determination by the franchisor to withdraw from marketing activities in the geographic area in which the franchisee operates.

An interim franchise must be in writing and must make certain disclosures, including that it is an interim franchise and that the franchisor has the right not to renew the franchise at the end of the term based upon a lawful determination to withdraw from marketing activities in the geographic area in which the franchisee operates.

In exercising his right not to renew a franchise relationship under an interim franchise at the end of its term, your supplier must comply with the notice requirements described above under the heading ``Notice Requirements for Termination or Nonrenewal."

V. Your Legal Rights

Under the enforcement provisions of the Act, you have the right to sue your supplier if he fails to comply with the requirements of the Act. The courts are authorized to grant whatever equitable relief is necessary to remedy the effects of your supplier's failure to comply with the requirements of the Act, including declaratory judgment, mandatory or prohibitive injunctive relief, and interim equitable relief. Actual damages, exemplary (punitive) damages under certain circumstances, and reasonable attorney and expert witness fees are also authorized. For a more detailed description of these legal remedies you should read the text of the Act. 15 U.S.C. Sections 2801-2806.

VI. Waiver of Rights and Applicable State Law

Your supplier may not require, as a condition of entering into or renewing the franchise relationship, that you relinquish or waive any right that you have under this or any other Federal law or applicable State law. In addition, no provision in a franchise agreement would be valid or enforceable if the provision specifies that the franchise would be governed by the law of any State other than the one in which the principal place of business for the franchise is located.

Further Discussion of Title I--Definitions and Legal Remedies

I. Definitions

Section 101 of the Petroleum Marketing Practices Act sets forth definitions of the key terms used throughout the franchise protection provisions of the Act. The definitions from the Act which are listed below are of those terms which are most essential for purposes of the summary statement. (You should consult section 101 of the Act for additional definitions not included here.)

A. Franchise

A ``franchise'' is any contract between a refiner and a distributor, between a refiner and a retailer, between a distributor and another distributor, or between a distributor and a retailer, under which a refiner or distributor (as the case may be) authorizes or permits a retailer or distributor to use, in connection with the sale, consignment, or distribution of motor fuel, a trademark which is owned or controlled by such refiner or by a refiner which supplies motor fuel to the distributor which authorizes or permits such use. The term ``franchise'' includes any contract under which a retailer or distributor (as the case may be) is authorized or permitted to occupy leased marketing premises, which premises are to be employed in connection with the sale, consignment, or distribution of motor fuel under a trademark which is owned or controlled by such refiner or by a refiner which supplies motor fuel to the distributor which authorizes or permits such occupancy. The term also includes any contract pertaining to the supply of motor fuel which is to be sold, consigned or distributed under a trademark owned or controlled by a refiner, or under a contract which has existed continuously since May 15, 1973, and pursuant to which, on May 15, 1973, motor fuel was sold, consigned or distributed under a trademark owned or controlled on such date by a refiner. The unexpired portion of a transferred franchise is also included in the definition of the term.

B. Franchise Relationship

The term "franchise relationship" refers to the respective motor fuel marketing or distribution obligations and responsibilities of a franchisor and a franchisee which result from the marketing of motor fuel under a franchise.

C. Franchisee

A "franchisee" is a retailer or distributor who is authorized or permitted, under a franchise, to use a trademark in connection with the sale, consignment, or distribution of motor fuel.

D. Franchisor

A "franchisor" is a refiner or distributor who authorizes or permits, under a franchise, a retailer or distributor to use a trademark in connection with the sale, consignment, or distribution of motor fuel.

E. Marketing Premises

"Marketing premises" are the premises which, under a franchise, are to be employed by the franchisee in connection with the sale, consignment, or distribution of motor fuel.

F. Leased Marketing Premises

"Leased marketing premises" are marketing premises owned, leased or in any way controlled by a franchisor and which the franchisee is authorized or permitted, under the franchise, to employ in connection with the sale, consignment, or distribution of motor fuel.

G. Fail to Renew and Nonrenewal

The terms "fail to renew" and "nonrenewal" refer to a failure to reinstate, continue, or extend a franchise relationship (1) at the conclusion of the term, or on the expiration date, stated in the relevant franchise, (2) at any time, in the case of the relevant franchise which does not state a term of duration or an expiration date, or (3) following a termination (on or after June 19, 1978) of the relevant franchise which was entered into prior to June 19, 1978 and has not been renewed after such date.

II. Legal Remedies Available to Franchisee

The following is a more detailed description of the remedies available to the franchisee if a franchise is terminated or not renewed in a way that fails to comply with the Act.

A. Franchisee's Right to Sue

A franchisee may bring a civil action in United States District Court against a franchisor who does not comply with the requirements of the Act. The action must be brought within one year after the date of termination or nonrenewal or the date the franchisor fails to comply with the requirements of the law, whichever is later.

B. Equitable Relief

Courts are authorized to grant whatever equitable relief is necessary to remedy the effects of a violation of the law's requirements. Courts are directed to grant a preliminary injunction if the franchisee shows that there are sufficiently serious questions, going to the merits of the case, to make them a fair ground for litigation, and if, on balance, the hardship which the franchisee would suffer if the preliminary injunction is not granted will be greater than the hardship which the franchisor would suffer if such relief is granted.

Courts are not required to order continuation or renewal of the franchise relationship if the action was brought after the expiration of the period during which the franchisee was on notice concerning the franchisor's intention to terminate or not renew the franchise agreement.

C. Burden of Proof

In an action under the Act, the franchisee has the burden of proving that the franchise was terminated or not renewed. The franchisor has the burden of proving, as an affirmative defense, that the termination or nonrenewal was permitted under the Act and, if applicable, that the franchisor complied with certain other requirements relating to terminations and nonrenewals based on condemnation or destruction of the marketing premises.

D. Damages

A franchisee who prevails in an action under the Act is entitled to actual damages and reasonable attorney and expert witness fees. If the action was based upon conduct of the franchisor which was in willful disregard of the Act's requirements or the franchisee's rights under the Act, exemplary (punitive) damages may be awarded where appropriate. The court, and not the jury, will decide whether to award exemplary damages and, if so, in what amount.

On the other hand, if the court finds that the franchisee's action is frivolous, it may order the franchisee to pay reasonable attorney and expert witness fees.

E. Franchisor's Defense to Permanent Injunctive Relief

Courts may not order a continuation or renewal of a franchise relationship if the franchisor shows that the basis of the non-renewal of the franchise relationship was a determination made in good faith and in the normal course of business:
  (1) To convert the leased marketing premises to a use other than the sale or distribution of motor fuel;
  (2) To materially alter, add to, or replace such premises;
  (3) To sell such premises;
  (4) To withdraw from marketing activities in the geographic area in which such premises are located; or
  (5) That the renewal of the franchise relationship is likely to be uneconomical to the franchisor despite any reasonable changes or additions to the franchise provisions which may be acceptable to the franchisee.

In making this defense, the franchisor also must show that he has complied with the notice provisions of the Act.

This defense to permanent injunctive relief, however, does not affect the franchisee's right to recover actual damages and reasonable attorney and expert witness fees if the nonrenewal is otherwise prohibited under the Act.

Issued in Washington, D.C. on June 12, 1996.
Marc W. Chupka,
Acting Assistant Secretary for Policy.
[FR Doc. 96-16124 Filed 6-24-96; 8:45 am]

**SENDER: COMPLETE THIS SECTION**

- ■ Complete items 1, 2, and 3.
- ■ Print your name and address on the reverse so that we can return the card to you.
- ■ Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

LOUAY ALANI
GAS CAP FUELS, INC
CATCH 26, LLC
GRAYSLAKE STOP & SHOP, LLC
735 BELVEDERE RD.
GRAYSLAKE, IL 60030

9590 9403 0256 5155 3145 56

2. Article Number (Transfer from service label)

7011 3500 0001 8359 1136

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X

☐ Agent
☐ Addressee

B. Received by (Printed Name)    C. Date of Delivery

W S                              8/18/17

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:        ☐ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☒ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
☐ Insured Mail Restricted Delivery (over $500)

☐ Priority Mail Express®
☒ Registered Mail™
☒ Registered Mail Restricted Delivery
☐ Return Receipt for Merchandise
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

PS Form 3811, April 2015 PSN 7530-02-000-9053         Domestic Return Receipt

First-Class Mail
Postage & Fees Paid
USPS
Permit No. G-10

UNITED STATES POSTAL SERVICE

• Sender: Please print your name, address, and ZIP+4® in this box●

**HARRITON & FURRER, LLP**
84 BUSINESS PARK DR STE 302
ARMONK, NY 10504

USPS TRACKING#

9590 9403 0254 9155 3145 54

# EXHIBIT U

HARRITON & FURRER, LLP

ATTORNEYS AND COUNSELORS AT LAW

84 BUSINESS PARK DRIVE

SUITE 302

ARMONK, NEW YORK 10504

(914) 730-3400
FAX (914) 730-3405
www.hflawllp.com

KEITH S. HARRITON, P.C. (NY & CT)                                                    LEGAL ASSISTANTS
URS BRODERICK FURRER, P.C. (NY, NJ, CT, MA & PA)                        KAREN B. HASTEROK
KIMBERLY A. SANFORD, P.C. (NY & CT)                                           CAROL A. BOCCARDI
____

SARAH J. CAFRAN (NY, NJ & MA)
SEAN HARRITON (NY & CT)

October 5, 2017

**VIA HAND DELIVERY AND CERTIFIED
MAIL, RETURN RECIPT REQUESTED**

Louay Alani
Gas Cap Fuels, LLC
Catch 26, LLC
26025 West Grand Avenue
Ingleside, IL 60041

Re:    **NOTICE OF TERMINATION**
          26025/26037 West Grand Avenue, Ingleside, IL 60041

Dear Mr. Alani:

Please be advised that, pursuant to the Petroleum Marketing Practices Act ("PMPA"), 15 U.S.C.S. 2801, et seq., LGP Realty Holdings LP ("LGPRH") and Lehigh Gas Wholesale LLC ("LGW") (collectively "Lehigh") hereby terminate their franchise, franchise relationship and all franchise agreements with Catch 26, LLC **effective October 27, 2017**.  This Notice of Termination is in addition to but not in lieu of the Notice of Termination dated August 14, 2017. The franchise is comprised of the Petroleum Products Supply Agreement dated April 12, 2013, made by and between Catch 26, LLC and Lehigh, as successor by assignment to State Oil Company ("Ingleside Supply Agreement") concerning the station located at 26025/26037 West Grand Avenue, Ingleside, IL 60041 ("Ingleside Property") together with any other related agreement(s) that may have been expressly made a part of the franchise.

The grounds for termination are your willful adulteration, mislabeling, misbranding and substitution of motor fuels and other trademark violations at the Ingleside Property, which actions were visually confirmed on September 1, 2017, and which actions are grounds for termination: (a) in that you failed to comply with franchise provisions which are reasonable and material, 15 U.S.C.S. §2802(b)(2)(A); and (b) due to the occurrence of an enumerated event which is relevant to the franchise relationship and as a result of which termination of the franchise and franchise relationship is reasonable, 15 U.S.C.S. §2802(b)(2)(C) and §2802(c)(10).

**Please note that you are required to surrender the Ingleside Property and surrender all of Lehigh's personal property in accordance with the PMPA Franchise Agreement provisions and pursuant to the PMPA on October 27, 2017.**

HARRITON & FURRER, LLP
ATTORNEYS AND COUNSELORS AT LAW

Louay Alani
October 5, 2017
Page - 2 –

Please note that pursuant to Section 9(a) of the Ingleside Supply Agreement, "a default under the Supply Agreement constitutes a default under both Installment Contract[s]." Accordingly, Lehigh hereby terminates the two Installment Agreements for Warranty Deed and Personal Property dated April 12, 2013, made by and between Gas Cap Fuels, LLC and Lehigh, as successor by assignment to PT, L.L.C., BAPA, L.L.C and State Oil Company, relating to the Property **effective October 27, 2017**.

Nothing in this letter should be read to limit Lehigh's rights with respect to any other basis for termination or other violations of the aforementioned Agreements.  Lehigh further reserves the right to seek all remedies available to it under the Agreements or applicable law, including but not limited to: Supplier's Remedies set for in Section 10 of the Ingleside Supply Agreement, rights of eviction, rights to collect the balance of the rent owed for the remainder of the terms of the Agreements, all sums incurred by Lehigh to prepare the station for re-rental, attorney's fees and costs incurred to enforce its rights under the Agreements, as well damages for the loss of business resulting from the aforementioned default.

Pursuant to 15 U.S.C. § 2804 (c)(3)(C), a summary statement of Title 1 of the PMPA is provided herewith.

Very truly yours,

s/ *Urs Broderick Furrer*

URS BRODERICK FURRER

UBF/kbh
Enclosure
cc:  Kenneth Frye (via email only)
     David A. Rolf, Esq. (via email only)
     John Conway, Esq. (via email only)

## PMPA SUMMARY STATEMENT

DEPARTMENT OF ENERGY
**Revised Summary of Title I of the Petroleum Marketing Practices Act**
(Extracted from the Federal Register, Vol. 61, No. 123, Tuesday, June 25, 1996, 32786-32790)
AGENCY: Department of Energy.
ACTION: Notice.
--------------------------------------------------------------------

SUMMARY: This notice contains a summary of Title I of the Petroleum Marketing Practices Act, as amended (the Act). The Petroleum Marketing Practices Act was originally enacted on June 19, 1978, and was amended by the Petroleum Marketing Practices Act Amendments of 1994, enacted on October 19, 1994. On August 30, 1978, the Department of Energy published in the Federal Register a summary of the provisions of Title I of the 1978 law, as required by the Act. The Department is publishing this revised summary to reflect key changes made by the 1994 amendments.

The Act is intended to protect franchised distributors and retailers of gasoline and diesel motor fuel against arbitrary or discriminatory termination or nonrenewal of franchises. This summary describes the reasons for which a franchise may be terminated or not renewed under the law, the responsibilities of franchisors, and the remedies and relief available to franchisees. The Act requires franchisors to give franchisees copies of the summary contained in this notice whenever notification of termination or nonrenewal of a franchise is given.

FOR FURTHER INFORMATION CONTACT: Office of Energy Efficiency, Alternative Fuels, and Oil Analysis (PO-62), U.S. Department of Energy, Washington, D.C. 20585, Telephone (202) 586-4444; Office of General Counsel (GC-73), U.S. Department of Energy, Washington, D.C. 20585, Telephone (202) 586-6978.

SUPPLEMENTARY INFORMATION: Title I of the Petroleum Marketing Practices Act, as amended, 15 U.S.C. Secs. 2801-2806, provides for the protection of franchised distributors and retailers of motor fuel by establishing minimum Federal standards governing the termination of franchises and the nonrenewal of franchise relationships by the franchisor or distributor of such fuel.

Section 104(d)(1) of the Act required the Secretary of Energy to publish in the Federal Register a simple and concise summary of the provisions of Title I, including a statement of the respective responsibilities of, and the remedies and relief available to, franchisors and franchisees under that title. The Department published this summary in the Federal Register on August 30, 1978. 43 F.R. 38743 (1978).

In 1994 the Congress enacted the Petroleum Marketing Practices Act Amendments to affirm and clarify certain key provisions of the 1978 statute. Among the key issues addressed in the 1994 amendments are: (1) termination or nonrenewal of franchised dealers by their franchisors for purposes of conversion to ``company'' operation; (2) application of state law; (3) the rights and obligations of franchisors and franchisees in third-party lease situations; and (4) waiver of rights limitations. See H.R. REP. NO. 737, 103rd Cong., 2nd Sess. 2 (1994), reprinted in 1994 U.S.C.C.A.N. 2780.

Congress intended to: (1) make explicit that upon renewal a franchisor may not insist on changes to a franchise agreement where the purpose of such changes is to prevent renewal in order to convert a franchisee-operated service station into a company-operated service station; (2) make clear that where the franchisor has an option to continue the lease or to purchase the premises but does not wish to do so, the franchisor must offer to assign the option to the franchisee; (3) make clear that no franchisor may require, as a condition of entering or renewing a franchise agreement, that a franchisee waive any rights under the Petroleum Marketing Practices Act, any other Federal law, or any state law; and (4) reconfirm the limited scope of Federal preemption under the Act. Id.

The summary which follows reflects key changes to the statute resulting from the 1994 amendments. The Act requires franchisors to give copies of this summary statement to their franchisees when entering into an agreement to terminate the franchise or not to renew the franchise relationship, and when giving notification of termination or nonrenewal. This summary does not purport to interpret the Act, as amended, or to create new legal rights.

In addition to the summary of the provisions of Title I, a more detailed description of the definitions contained in the Act and of the legal remedies available to franchisees is also included in this notice, following the summary statement.

Summary of Legal Rights of Motor Fuel Franchisees

This is a summary of the franchise protection provisions of the Federal Petroleum Marketing Practices Act, as amended in 1994 (the Act), 15 U.S.C. Sections. 2801-2806. This summary must be given to you, as a person holding a franchise for the sale, consignment or distribution of gasoline or diesel motor fuel, in connection with any termination or nonrenewal of your franchise by your franchising company (referred to in this summary as your supplier).

You should read this summary carefully, and refer to the Act if necessary, to determine whether a proposed termination or nonrenewal of your franchise is lawful, and what legal remedies are available to you if you think the proposed termination or failure to renew is not lawful. In addition, if you think your supplier has failed to comply with the Act, you may wish to consult an attorney in order to enforce your legal rights.

The franchise protection provisions of the Act apply to a variety of franchise agreements. The term ``franchise'' is broadly defined as a license to use a motor fuel trademark which is owned or controlled by a refiner, and it includes secondary arrangements such as leases of real property and motor fuel supply agreements which have existed continuously since May 15, 1973, regardless of a subsequent withdrawal of a trademark. Thus, if you have lost the use of a trademark previously granted by your supplier but have continued to receive motor fuel supplies through a continuation of a supply agreement with your supplier, you are protected under the Act. Any issue arising under your franchise which is not governed by this Act will be governed by the law of the State in which the principal place of business of your franchise is located. Although a State may specify the terms and conditions under which your franchise may be transferred upon the death of the franchisee, it may not require a payment to you (the franchisee) for the goodwill of a franchise upon termination or nonrenewal.

The Act is intended to protect you, whether you are a distributor or a retailer, from arbitrary or discriminatory termination or nonrenewal of your franchise agreement. To accomplish this, the Act first lists the reasons for which termination or nonrenewal is permitted. Any notice of termination or nonrenewal must state the precise reason, as listed in the Act, for which the particular termination or nonrenewal is being made. These reasons are described below under the headings "Reasons for Termination" and "Reasons for Nonrenewal."

The Act also requires your supplier to give you a written notice of termination or intention not to renew the franchise within certain time periods. These requirements are summarized below under the heading "Notice Requirements for Termination or Nonrenewal."

The Act also provides certain special requirements with regard to trial and interim franchise agreements, which are described below under the heading "Trial and Interim Franchises."

The Act gives you certain legal rights if your supplier terminates or does not renew your franchise in a way that is not permitted by the Act. These legal rights are described below under the heading "Your Legal Rights."

The Act contains provisions pertaining to waiver of franchisee rights and applicable State law. These provisions are described under the heading "Waiver of Rights and Applicable State Law."

This summary is intended as a simple and concise description of the general nature of your rights under the Act. For a more detailed description of these rights, you should read the text of the Petroleum Marketing Practices Act, as amended in 1994 (15 U.S.C. Secs. 2801-2806). This summary does not purport to interpret the Act, as amended, or to create new legal rights.

I. Reasons for Termination

If your franchise was entered into on or after June 19, 1978, the Act bars termination of your franchise for any reasons other than those reasons discussed below. If your franchise was entered into before June 19, 1978, there is no statutory restriction on the reasons for which it may be terminated. If a franchise entered into before June 19, 1978, is terminated, however, the Act requires the supplier to reinstate the franchise relationship unless one of the reasons listed under this heading or one of the additional reasons for nonrenewal described below under the heading "Reasons for Nonrenewal" exists.

A. Non-Compliance with Franchise Agreement

Your supplier may terminate your franchise if you do not comply with a reasonable and important requirement of the franchise relationship. However, termination may not be based on a failure to comply with a provision of the franchise that is illegal or unenforceable under applicable Federal, State or local law. In order to terminate for non-compliance with the franchise agreement, your supplier must have learned of this non-compliance recently. The Act limits the time period within which your supplier must have learned of your non-compliance to various periods, the longest of which is 120 days, before you receive notification of the termination.

B. Lack of Good Faith Efforts

Your supplier may terminate your franchise if you have not made good faith efforts to carry out the requirements of the franchise, provided you are first notified in writing that you are not meeting a requirement of the franchise and you are given an opportunity to make a good faith effort to carry out the requirement. This reason can be used by your supplier only if you fail to make good faith efforts to carry out the requirements of the franchise within the period which began not more than 180 days before you receive the notice of termination.

C. Mutual Agreement To Terminate the Franchise

A franchise can be terminated by an agreement in writing between you and your supplier if the agreement is entered into not more than 180 days before the effective date of the termination and you receive a copy of that agreement, together with this summary statement of your rights under the Act. You may cancel the agreement to terminate within 7 days after you receive a copy of the agreement, by mailing (by certified mail) a written statement to this effect to your supplier.

D. Withdrawal From the Market Area

Under certain conditions, the Act permits your supplier to terminate your franchise if your supplier is withdrawing from marketing activities in the entire geographic area in which you operate. You should read the Act for a more detailed description of the conditions under which market withdrawal terminations are permitted. See 15 U.S.C. Sec. 2802(b)(E).

E. Other Events Permitting a Termination

If your supplier learns within the time period specified in the Act (which in no case is more than 120 days prior to the termination notice) that one of the following events has occurred, your supplier may terminate your franchise agreement:

(1) Fraud or criminal misconduct by you that relates to the operation of your marketing premises.

(2) You declare bankruptcy or a court determines that you are insolvent.

(3) You have a severe physical or mental disability lasting at least 3 months which makes you unable to provide for the continued proper operation of the marketing premises.

(4) Expiration of your supplier's underlying lease to the leased marketing premises, if: (a) your supplier gave you written notice before the beginning of the term of the franchise of the duration of the underlying lease and that the underlying lease might expire and not be renewed during the term of the franchise; (b) your franchisor offered to assign to you, during the 90-day period after notification of termination or nonrenewal was given, any option which the franchisor held to extend the underlying lease or to purchase the marketing premises (such an assignment may be conditioned on the franchisor receiving from both the landowner and the franchisee an unconditional release from liability for specified events occurring after the assignment); and (c) in a situation in which the franchisee acquires possession of the leased marketing premises effective immediately after the loss of the right of the franchisor to grant possession, the franchisor, upon the written request of the franchisee, made a bona fide offer to sell or assign to the franchisee the franchisor's interest in any improvements or equipment located on the premises, or offered the franchisee a right of first refusal of any offer from another person to purchase the franchisor's interest in the improvements and equipment.

(5) Condemnation or other taking by the government, in whole or in part, of the marketing premises pursuant to the power of eminent domain. If the termination is based on a condemnation or other taking, your supplier must give you a fair share of any compensation which he receives for any loss of business opportunity or good will.

(6) Loss of your supplier's right to grant the use of the trademark that is the subject of the franchise, unless the loss was because of bad faith actions by your supplier relating to trademark abuse, violation of Federal or State law, or other fault or negligence.

(7) Destruction (other than by your supplier) of all or a substantial part of your marketing premises. If the termination is based on the destruction of the marketing premises and if the premises are rebuilt or replaced by your supplier and operated under a franchise, your supplier must give you a right of first refusal to this new franchise.

(8) Your failure to make payments to your supplier of any sums to which your supplier is legally entitled.

(9) Your failure to operate the marketing premises for 7 consecutive days, or any shorter period of time which, taking into account facts and circumstances, amounts to an unreasonable period of time not to operate.

(10) Your intentional adulteration, mislabeling or misbranding of motor fuels or other trademark violations.

(11) Your failure to comply with Federal, State, or local laws or regulations of which you have knowledge and that relate to the operation of the marketing premises.

(12) Your conviction of any felony involving moral turpitude.

(13) Any event that affects the franchise relationship and as a result of which termination is reasonable.

II. Reasons for Nonrenewal

If your supplier gives notice that he does not intend to renew any franchise agreement, the Act requires that the reason for nonrenewal must be either one of the reasons for termination listed immediately above, or one of the reasons for nonrenewal listed below.

A. Failure To Agree on Changes or Additions To Franchise

If you and your supplier fail to agree to changes in the franchise that your supplier in good faith has determined are required, and your supplier's insistence on the changes is not for the purpose of converting the leased premises to a company operation or otherwise preventing the renewal of the franchise relationship, your supplier may decline to renew the franchise.

B. Customer Complaints

If your supplier has received numerous customer complaints relating to the condition of your marketing premises or to the conduct of any of your employees, and you have failed to take prompt corrective action after having been notified of these complaints, your supplier may decline to renew the franchise.

C. Unsafe or Unhealthful Operations

If you have failed repeatedly to operate your marketing premises in a clean, safe and healthful manner after repeated notices from your supplier, your supplier may decline to renew the franchise.

D. Operation of Franchise is Uneconomical

Under certain conditions specified in the Act, your supplier may decline to renew your franchise if he has determined that renewal of the franchise is likely to be uneconomical. Your supplier may also decline to renew your franchise if he has decided to convert your marketing premises to a use other than for the sale of motor fuel, to sell the premises, or to materially alter, add to, or replace the premises.

III. Notice Requirements for Termination or Nonrenewal

The following is a description of the requirements for the notice which your supplier must give you before he may terminate your franchise or decline to renew your franchise relationship. These notice requirements apply to all franchise terminations, including franchises entered into before June 19, 1978 and trial and interim franchises, as well as to all nonrenewals of franchise relationships.

A. How Much Notice Is Required

In most cases, your supplier must give you notice of termination or non-renewal at least 90 days before the termination or nonrenewal takes effect.

In circumstances where it would not be reasonable for your supplier to give you 90 days notice, he must give you notice as soon as he can do so. In addition, if the franchise involves leased marketing premises, your supplier may not establish a new franchise relationship involving the same premises until 30 days after notice was given to you or the date the termination or nonrenewal takes effect, whichever is later. If the franchise agreement permits, your supplier may repossess the premises and, in reasonable circumstances, operate them through his employees or agents.

If the termination or nonrenewal is based upon a determination to withdraw from the marketing of motor fuel in the area, your supplier must give you notice at least 180 days before the termination or nonrenewal takes effect.

B. Manner and Contents of Notice

To be valid, the notice must be in writing and must be sent by certified mail or personally delivered to you. It must contain:
    (1) A statement of your supplier's intention to terminate the franchise or not to renew the franchise relationship, together with his reasons for this action;
    (2) The date the termination or non-renewal takes effect; and
    (3) A copy of this summary.

IV. Trial Franchises and Interim Franchises

The following is a description of the special requirements that apply to trial and interim franchises.

A. Trial Franchises

A trial franchise is a franchise, entered into on or after June 19, 1978, in which the franchisee has not previously been a party to a franchise with the franchisor and which has an initial term of 1 year or less. A trial franchise must be in writing and must make certain disclosures, including that it is a trial franchise, and that the franchisor has the right not to renew the franchise relationship at the end of the initial term by giving the franchisee proper notice.

The unexpired portion of a transferred franchise (other than as a trial franchise, as described above) does not qualify as a trial franchise.

In exercising his right not to renew a trial franchise at the end of its initial term, your supplier must comply with the notice requirements described above under the heading "Notice Requirements for Termination or Nonrenewal."

B. Interim Franchises

An interim franchise is a franchise, entered into on or after June 19, 1978, the duration of which, when combined with the terms of all prior interim franchises between the franchisor and the franchisee, does not exceed three years, and which begins immediately after the expiration of a prior franchise involving the same marketing premises which was not renewed, based on a lawful determination by the franchisor to withdraw from marketing activities in the geographic area in which the franchisee operates.

An interim franchise must be in writing and must make certain disclosures, including that it is an interim franchise and that the franchisor has the right not to renew the franchise at the end of the term based upon a lawful determination to withdraw from marketing activities in the geographic area in which the franchisee operates.

In exercising his right not to renew a franchise relationship under an interim franchise at the end of its term, your supplier must comply with the notice requirements described above under the heading ``Notice Requirements for Termination or Nonrenewal."

V. Your Legal Rights

Under the enforcement provisions of the Act, you have the right to sue your supplier if he fails to comply with the requirements of the Act. The courts are authorized to grant whatever equitable relief is necessary to remedy the effects of your supplier's failure to comply with the requirements of the Act, including declaratory judgment, mandatory or prohibitive injunctive relief, and interim equitable relief. Actual damages, exemplary (punitive) damages under certain circumstances, and reasonable attorney and expert witness fees are also authorized. For a more detailed description of these legal remedies you should read the text of the Act. 15 U.S.C. Sections 2801-2806.

VI. Waiver of Rights and Applicable State Law

Your supplier may not require, as a condition of entering into or renewing the franchise relationship, that you relinquish or waive any right that you have under this or any other Federal law or applicable State law. In addition, no provision in a franchise agreement would be valid or enforceable if the provision specifies that the franchise would be governed by the law of any State other than the one in which the principal place of business for the franchise is located.

Further Discussion of Title I--Definitions and Legal Remedies

I. Definitions

Section 101 of the Petroleum Marketing Practices Act sets forth definitions of the key terms used throughout the franchise protection provisions of the Act. The definitions from the Act which are listed below are of those terms which are most essential for purposes of the summary statement. (You should consult section 101 of the Act for additional definitions not included here.)

A. Franchise

A ``franchise'' is any contract between a refiner and a distributor, between a refiner and a retailer, between a distributor and another distributor, or between a distributor and a retailer, under which a refiner or distributor (as the case may be) authorizes or permits a retailer or distributor to use, in connection with the sale, consignment, or distribution of motor fuel, a trademark which is owned or controlled by such refiner or by a refiner which supplies motor fuel to the distributor which authorizes or permits such use. The term ``franchise'' includes any contract under which a retailer or distributor (as the case may be) is authorized or permitted to occupy leased marketing premises, which premises are to be employed in connection with the sale, consignment, or distribution of motor fuel under a trademark which is owned or controlled by such refiner or by a refiner which supplies motor fuel to the distributor which authorizes or permits such occupancy. The term also includes any contract pertaining to the supply of motor fuel which is to be sold, consigned or distributed under a trademark owned or controlled by a refiner, or under a contract which has existed continuously since May 15, 1973, and pursuant to which, on May 15, 1973, motor fuel was sold, consigned or distributed under a trademark owned or controlled on such date by a refiner. The unexpired portion of a transferred franchise is also included in the definition of the term.

B. Franchise Relationship

The term "franchise relationship" refers to the respective motor fuel marketing or distribution obligations and responsibilities of a franchisor and a franchisee which result from the marketing of motor fuel under a franchise.

C. Franchisee

A "franchisee" is a retailer or distributor who is authorized or permitted, under a franchise, to use a trademark in connection with the sale, consignment, or distribution of motor fuel.

D. Franchisor

A "franchisor" is a refiner or distributor who authorizes or permits, under a franchise, a retailer or distributor to use a trademark in connection with the sale, consignment, or distribution of motor fuel.

E. Marketing Premises

"Marketing premises" are the premises which, under a franchise, are to be employed by the franchisee in connection with the sale, consignment, or distribution of motor fuel.

F. Leased Marketing Premises

"Leased marketing premises" are marketing premises owned, leased or in any way controlled by a franchisor and which the franchisee is authorized or permitted, under the franchise, to employ in connection with the sale, consignment, or distribution of motor fuel.

G. Fail to Renew and Nonrenewal

The terms "fail to renew" and "nonrenewal" refer to a failure to reinstate, continue, or extend a franchise relationship (1) at the conclusion of the term, or on the expiration date, stated in the relevant franchise, (2) at any time, in the case of the relevant franchise which does not state a term of duration or an expiration date, or (3) following a termination (on or after June 19, 1978) of the relevant franchise which was entered into prior to June 19, 1978 and has not been renewed after such date.

II. Legal Remedies Available to Franchisee

The following is a more detailed description of the remedies available to the franchisee if a franchise is terminated or not renewed in a way that fails to comply with the Act.

A. Franchisee's Right to Sue

A franchisee may bring a civil action in United States District Court against a franchisor who does not comply with the requirements of the Act. The action must be brought within one year after the date of termination or nonrenewal or the date the franchisor fails to comply with the requirements of the law, whichever is later.

B. Equitable Relief

Courts are authorized to grant whatever equitable relief is necessary to remedy the effects of a violation of the law's requirements. Courts are directed to grant a preliminary injunction if the franchisee shows that there are sufficiently serious questions, going to the merits of the case, to make them a fair ground for litigation, and if, on balance, the hardship which the franchisee would suffer if the preliminary injunction is not granted will be greater than the hardship which the franchisor would suffer if such relief is granted.

Courts are not required to order continuation or renewal of the franchise relationship if the action was brought after the expiration of the period during which the franchisee was on notice concerning the franchisor's intention to terminate or not renew the franchise agreement.

C. Burden of Proof

In an action under the Act, the franchisee has the burden of proving that the franchise was terminated or not renewed. The franchisor has the burden of proving, as an affirmative defense, that the termination or nonrenewal was permitted under the Act and, if applicable, that the franchisor complied with certain other requirements relating to terminations and nonrenewals based on condemnation or destruction of the marketing premises.

D. Damages

A franchisee who prevails in an action under the Act is entitled to actual damages and reasonable attorney and expert witness fees. If the action was based upon conduct of the franchisor which was in willful disregard of the Act's requirements or the franchisee's rights under the Act, exemplary (punitive) damages may be awarded where appropriate. The court, and not the jury, will decide whether to award exemplary damages and, if so, in what amount.

On the other hand, if the court finds that the franchisee's action is frivolous, it may order the franchisee to pay reasonable attorney and expert witness fees.

E. Franchisor's Defense to Permanent Injunctive Relief

Courts may not order a continuation or renewal of a franchise relationship if the franchisor shows that the basis of the non-renewal of the franchise relationship was a determination made in good faith and in the normal course of business:
  (1) To convert the leased marketing premises to a use other than the sale or distribution of motor fuel;
  (2) To materially alter, add to, or replace such premises;
  (3) To sell such premises;
  (4) To withdraw from marketing activities in the geographic area in which such premises are located; or
  (5) That the renewal of the franchise relationship is likely to be uneconomical to the franchisor despite any reasonable changes or additions to the franchise provisions which may be acceptable to the franchisee.

In making this defense, the franchisor also must show that he has complied with the notice provisions of the Act.

This defense to permanent injunctive relief, however, does not affect the franchisee's right to recover actual damages and reasonable attorney and expert witness fees if the nonrenewal is otherwise prohibited under the Act.

Issued in Washington, D.C. on June 12, 1996.
Marc W. Chupka,
Acting Assistant Secretary for Policy.
[FR Doc. 96-16124 Filed 6-24-96; 8:45 am]

# EXHIBIT V

HARRITON & FURRER, LLP
ATTORNEYS AND COUNSELORS AT LAW
84 BUSINESS PARK DRIVE
SUITE 302
ARMONK, NEW YORK 10504

(914) 730-3400
FAX (914) 730-3405
www.hflawllp.com

KEITH S. HARRITON, P.C. (NY & CT)                                                    LEGAL ASSISTANTS
URS BRODERICK FURRER, P.C. (NY, NJ, CT, MA & PA)                         KAREN B. HASTEROK
KIMBERLY A. SANFORD, P.C. (NY & CT)                                           CAROL A. BOCCARDI

SARAH J. CAFRAN (NY, NJ & MA)
SEAN HARRITON (NY & CT)

October 30, 2017

**VIA HAND DELIVERY AND CERTIFIED
MAIL, RETURN RECIPT REQUESTED**

Louay Alani
Gas Cap Fuels, LLC
Catch 26, LLC
26025 West Grand Avenue
Ingleside, IL 60041

Re:     **NOTICE OF TERMINATION**
        26025/26037 West Grand Avenue, Ingleside, IL 60041

Dear Mr. Alani:

Please be advised that, pursuant to the Petroleum Marketing Practices Act ("PMPA"), 15 U.S.C.S. 2801, et seq., LGP Realty Holdings LP ("LGPRH") and Lehigh Gas Wholesale LLC ("LGW") (collectively "Lehigh") hereby terminate their franchise, franchise relationship and all franchise agreements with Catch 26, LLC **effective November 10, 2017**. This Notice of Termination is in addition to but not in lieu of the Notice of Termination dated October 5, 2017. The franchise is comprised of the Petroleum Products Supply Agreement dated April 12, 2013, made by and between Catch 26, LLC and Lehigh, as successor by assignment to State Oil Company ("Ingleside Supply Agreement") concerning the station located at 26025/26037 West Grand Avenue, Ingleside, IL 60041 ("Ingleside Property") together with any other related agreement(s) that may have been expressly made a part of the franchise.

The grounds for termination are your willful adulteration, mislabeling, misbranding and substitution of motor fuels and other trademark violations at the Ingleside Property and which actions are grounds for termination: (a) in that you failed to comply with franchise provisions which are reasonable and material, 15 U.S.C.S. §2802(b)(2)(A); and (b) due to the occurrence of an enumerated event which is relevant to the franchise relationship and as a result of which termination of the franchise and franchise relationship is reasonable, 15 U.S.C.S. §2802(b)(2)(C) and §2802(c)(10).

**Please note that you are required to surrender the Ingleside Property and surrender all of Lehigh's personal property in accordance with the PMPA Franchise Agreement provisions and pursuant to the PMPA on November 10, 2017.**

Please note that pursuant to Section 9(a) of the Ingleside Supply Agreement, "a default under the

HARRITON & FURRER, LLP
ATTORNEYS AND COUNSELORS AT LAW

Louay Alani
October 30, 2017
Page - 2 —

Supply Agreement constitutes a default under both Installment Contract[s]." Accordingly, Lehigh hereby terminates the two Installment Agreements for Warranty Deed and Personal Property dated April 12, 2013, made by and between Gas Cap Fuels, LLC and Lehigh, as successor by assignment to PT, L.L.C., BAPA, L.L.C and State Oil Company, relating to the Property **effective November 10, 2017**.

Nothing in this letter should be read to limit Lehigh's rights with respect to any other basis for termination or other violations of the aforementioned Agreements. Lehigh further reserves the right to seek all remedies available to it under the Agreements or applicable law, including but not limited to: Supplier's Remedies set for in Section 10 of the Ingleside Supply Agreement, rights of eviction, rights to collect the balance of the rent owed for the remainder of the terms of the Agreements, all sums incurred by Lehigh to prepare the station for re-rental, attorney's fees and costs incurred to enforce its rights under the Agreements, as well damages for the loss of business resulting from the aforementioned default.

Pursuant to 15 U.S.C. § 2804 (c)(3)(C), a summary statement of Title 1 of the PMPA is provided herewith.

Very truly yours,

s/ *Urs Broderick Furrer*

URS BRODERICK FURRER

UBF/kbh
Enclosure
cc: Kenneth Frye (via email only)
    David A. Rolf, Esq. (via email only)
    John Conway, Esq. (via email only)

# PMPA SUMMARY STATEMENT

DEPARTMENT OF ENERGY
**Revised Summary of Title I of the Petroleum Marketing Practices Act**
(Extracted from the Federal Register, Vol. 61, No. 123, Tuesday, June 25, 1996, 32786-32790)
AGENCY: Department of Energy.
ACTION: Notice.

------------------------------------------------------------------------

SUMMARY: This notice contains a summary of Title I of the Petroleum Marketing Practices Act, as amended (the Act). The Petroleum Marketing Practices Act was originally enacted on June 19, 1978, and was amended by the Petroleum Marketing Practices Act Amendments of 1994, enacted on October 19, 1994. On August 30, 1978, the Department of Energy published in the Federal Register a summary of the provisions of Title I of the 1978 law, as required by the Act. The Department is publishing this revised summary to reflect key changes made by the 1994 amendments.

The Act is intended to protect franchised distributors and retailers of gasoline and diesel motor fuel against arbitrary or discriminatory termination or nonrenewal of franchises. This summary describes the reasons for which a franchise may be terminated or not renewed under the law, the responsibilities of franchisors, and the remedies and relief available to franchisees. The Act requires franchisors to give franchisees copies of the summary contained in this notice whenever notification of termination or nonrenewal of a franchise is given.

FOR FURTHER INFORMATION CONTACT: Office of Energy Efficiency, Alternative Fuels, and Oil Analysis (PO-62), U.S. Department of Energy, Washington, D.C. 20585, Telephone (202) 586-4444; Office of General Counsel (GC-73), U.S. Department of Energy, Washington, D.C. 20585, Telephone (202) 586-6978.

SUPPLEMENTARY INFORMATION: Title I of the Petroleum Marketing Practices Act, as amended, 15 U.S.C. Secs. 2801-2806, provides for the protection of franchised distributors and retailers of motor fuel by establishing minimum Federal standards governing the termination of franchises and the nonrenewal of franchise relationships by the franchisor or distributor of such fuel.

Section 104(d)(1) of the Act required the Secretary of Energy to publish in the Federal Register a simple and concise summary of the provisions of Title I, including a statement of the respective responsibilities of, and the remedies and relief available to, franchisors and franchisees under that title. The Department published this summary in the Federal Register on August 30, 1978. 43 F.R. 38743 (1978).

In 1994 the Congress enacted the Petroleum Marketing Practices Act Amendments to affirm and clarify certain key provisions of the 1978 statute. Among the key issues addressed in the 1994 amendments are: (1) termination or nonrenewal of franchised dealers by their franchisors for purposes of conversion to ``company'' operation; (2) application of state law; (3) the rights and obligations of franchisors and franchisees in third-party lease situations; and (4) waiver of rights limitations. See H.R. REP. NO. 737, 103rd Cong., 2nd Sess. 2 (1994), reprinted in 1994 U.S.C.C.A.N. 2780.

Congress intended to: (1) make explicit that upon renewal a franchisor may not insist on changes to a franchise agreement where the purpose of such changes is to prevent renewal in order to convert a franchisee-operated service station into a company-operated service station; (2) make clear that where the franchisor has an option to continue the lease or to purchase the premises but does not wish to do so, the franchisor must offer to assign the option to the franchisee; (3) make clear that no franchisor may require, as a condition of entering or renewing a franchise agreement, that a franchisee waive any rights under the Petroleum Marketing Practices Act, any other Federal law, or any state law; and (4) reconfirm the limited scope of Federal preemption under the Act. Id.

The summary which follows reflects key changes to the statute resulting from the 1994 amendments. The Act requires franchisors to give copies of this summary statement to their franchisees when entering into an agreement to terminate the franchise or not to renew the franchise relationship, and when giving notification of termination or nonrenewal. This summary does not purport to interpret the Act, as amended, or to create new legal rights.

In addition to the summary of the provisions of Title I, a more detailed description of the definitions contained in the Act and of the legal remedies available to franchisees is also included in this notice, following the summary statement.

Summary of Legal Rights of Motor Fuel Franchisees

This is a summary of the franchise protection provisions of the Federal Petroleum Marketing Practices Act, as amended in 1994 (the Act), 15 U.S.C. Sections. 2801-2806. This summary must be given to you, as a person holding a franchise for the sale, consignment or distribution of gasoline or diesel motor fuel, in connection with any termination or nonrenewal of your franchise by your franchising company (referred to in this summary as your supplier).

You should read this summary carefully, and refer to the Act if necessary, to determine whether a proposed termination or nonrenewal of your franchise is lawful, and what legal remedies are available to you if you think the proposed termination or failure to renew is not lawful. In addition, if you think your supplier has failed to comply with the Act, you may wish to consult an attorney in order to enforce your legal rights.

The franchise protection provisions of the Act apply to a variety of franchise agreements. The term ``franchise'' is broadly defined as a license to use a motor fuel trademark which is owned or controlled by a refiner, and it includes secondary arrangements such as leases of real property and motor fuel supply agreements which have existed continuously since May 15, 1973, regardless of a subsequent withdrawal of a trademark. Thus, if you have lost the use of a trademark previously granted by your supplier but have continued to receive motor fuel supplies through a continuation of a supply agreement with your supplier, you are protected under the Act. Any issue arising under your franchise which is not governed by this Act will be governed by the law of the State in which the principal place of business of your franchise is located. Although a State may specify the terms and conditions under which your franchise may be transferred upon the death of the franchisee, it may not require a payment to you (the franchisee) for the goodwill of a franchise upon termination or nonrenewal.

The Act is intended to protect you, whether you are a distributor or a retailer, from arbitrary or discriminatory termination or nonrenewal of your franchise agreement. To accomplish this, the Act first lists the reasons for which termination or nonrenewal is permitted. Any notice of termination or nonrenewal must state the precise reason, as listed in the Act, for which the particular termination or nonrenewal is being made. These reasons are described below under the headings "Reasons for Termination" and "Reasons for Nonrenewal."

The Act also requires your supplier to give you a written notice of termination or intention not to renew the franchise within certain time periods. These requirements are summarized below under the heading "Notice Requirements for Termination or Nonrenewal."

The Act also provides certain special requirements with regard to trial and interim franchise agreements, which are described below under the heading "Trial and Interim Franchises."

The Act gives you certain legal rights if your supplier terminates or does not renew your franchise in a way that is not permitted by the Act. These legal rights are described below under the heading "Your Legal Rights."

The Act contains provisions pertaining to waiver of franchisee rights and applicable State law. These provisions are described under the heading "Waiver of Rights and Applicable State Law."

This summary is intended as a simple and concise description of the general nature of your rights under the Act. For a more detailed description of these rights, you should read the text of the Petroleum Marketing Practices Act, as amended in 1994 (15 U.S.C. Secs. 2801-2806). This summary does not purport to interpret the Act, as amended, or to create new legal rights.

I. Reasons for Termination

If your franchise was entered into on or after June 19, 1978, the Act bars termination of your franchise for any reasons other than those reasons discussed below. If your franchise was entered into before June 19, 1978, there is no statutory restriction on the reasons for which it may be terminated. If a franchise entered into before June 19, 1978, is terminated, however, the Act requires the supplier to reinstate the franchise relationship unless one of the reasons listed under this heading or one of the additional reasons for nonrenewal described below under the heading "Reasons for Nonrenewal" exists.

A. Non-Compliance with Franchise Agreement

Your supplier may terminate your franchise if you do not comply with a reasonable and important requirement of the franchise relationship. However, termination may not be based on a failure to comply with a provision of the franchise that is illegal or unenforceable under applicable Federal, State or local law. In order to terminate for non-compliance with the franchise agreement, your supplier must have learned of this non-compliance recently. The Act limits the time period within which your supplier must have learned of your non-compliance to various periods, the longest of which is 120 days, before you receive notification of the termination.

B. Lack of Good Faith Efforts

Your supplier may terminate your franchise if you have not made good faith efforts to carry out the requirements of the franchise, provided you are first notified in writing that you are not meeting a requirement of the franchise and you are given an opportunity to make a good faith effort to carry out the requirement. This reason can be used by your supplier only if you fail to make good faith efforts to carry out the requirements of the franchise within the period which began not more than 180 days before you receive the notice of termination.

C. Mutual Agreement To Terminate the Franchise

A franchise can be terminated by an agreement in writing between you and your supplier if the agreement is entered into not more than 180 days before the effective date of the termination and you receive a copy of that agreement, together with this summary statement of your rights under the Act. You may cancel the agreement to terminate within 7 days after you receive a copy of the agreement, by mailing (by certified mail) a written statement to this effect to your supplier.

D. Withdrawal From the Market Area

Under certain conditions, the Act permits your supplier to terminate your franchise if your supplier is withdrawing from marketing activities in the entire geographic area in which you operate. You should read the Act for a more detailed description of the conditions under which market withdrawal terminations are permitted. See 15 U.S.C. Sec. 2802(b)(E).

E. Other Events Permitting a Termination

If your supplier learns within the time period specified in the Act (which in no case is more than 120 days prior to the termination notice) that one of the following events has occurred, your supplier may terminate your franchise agreement:

(1) Fraud or criminal misconduct by you that relates to the operation of your marketing premises.
(2) You declare bankruptcy or a court determines that you are insolvent.
(3) You have a severe physical or mental disability lasting at least 3 months which makes you unable to provide for the continued proper operation of the marketing premises.
(4) Expiration of your supplier's underlying lease to the leased marketing premises, if: (a) your supplier gave you written notice before the beginning of the term of the franchise of the duration of the underlying lease and that the underlying lease might expire and not be renewed during the term of the franchise; (b) your franchisor offered to assign to you, during the 90-day period after notification of termination or nonrenewal was given, any option which the franchisor held to extend the underlying lease or to purchase the marketing premises (such an assignment may be conditioned on the franchisor receiving from both the landowner and the franchisee an unconditional release from liability for specified events occurring after the assignment); and (c) in a situation in which the franchisee acquires possession of the leased marketing premises effective immediately after the loss of the right of the franchisor to grant possession, the franchisor, upon the written request of the franchisee, made a bona fide offer to sell or assign to the franchisee the franchisor's interest in any improvements or equipment located on the premises, or offered the franchisee a right of first refusal of any offer from another person to purchase the franchisor's interest in the improvements and equipment.
(5) Condemnation or other taking by the government, in whole or in part, of the marketing premises pursuant to the power of eminent domain. If the termination is based on a condemnation or other taking, your supplier must give you a fair share of any compensation which he receives for any loss of business opportunity or good will.
(6) Loss of your supplier's right to grant the use of the trademark that is the subject of the franchise, unless the loss was because of bad faith actions by your supplier relating to trademark abuse, violation of Federal or State law, or other fault or negligence.
(7) Destruction (other than by your supplier) of all or a substantial part of your marketing premises. If the termination is based on the destruction of the marketing premises and if the premises are rebuilt or replaced by your supplier and operated under a franchise, your supplier must give you a right of first refusal to this new franchise.
(8) Your failure to make payments to your supplier of any sums to which your supplier is legally entitled.
(9) Your failure to operate the marketing premises for 7 consecutive days, or any shorter period of time which, taking into account facts and circumstances, amounts to an unreasonable period of time not to operate.
(10) Your intentional adulteration, mislabeling or misbranding of motor fuels or other trademark violations.
(11) Your failure to comply with Federal, State, or local laws or regulations of which you have knowledge and that relate to the operation of the marketing premises.
(12) Your conviction of any felony involving moral turpitude.
(13) Any event that affects the franchise relationship and as a result of which termination is reasonable.

II. Reasons for Nonrenewal

If your supplier gives notice that he does not intend to renew any franchise agreement, the Act requires that the reason for nonrenewal must be either one of the reasons for termination listed immediately above, or one of the reasons for nonrenewal listed below.

A. Failure To Agree on Changes or Additions To Franchise

If you and your supplier fail to agree to changes in the franchise that your supplier in good faith has determined are required, and your supplier's insistence on the changes is not for the purpose of converting the leased premises to a company operation or otherwise preventing the renewal of the franchise relationship, your supplier may decline to renew the franchise.

B. Customer Complaints

If your supplier has received numerous customer complaints relating to the condition of your marketing premises or to the conduct of any of your employees, and you have failed to take prompt corrective action after having been notified of these complaints, your supplier may decline to renew the franchise.

C. Unsafe or Unhealthful Operations

If you have failed repeatedly to operate your marketing premises in a clean, safe and healthful manner after repeated notices from your supplier, your supplier may decline to renew the franchise.

D. Operation of Franchise is Uneconomical

Under certain conditions specified in the Act, your supplier may decline to renew your franchise if he has determined that renewal of the franchise is likely to be uneconomical. Your supplier may also decline to renew your franchise if he has decided to convert your marketing premises to a use other than for the sale of motor fuel, to sell the premises, or to materially alter, add to, or replace the premises.

III. Notice Requirements for Termination or Nonrenewal

The following is a description of the requirements for the notice which your supplier must give you before he may terminate your franchise or decline to renew your franchise relationship. These notice requirements apply to all franchise terminations, including franchises entered into before June 19, 1978 and trial and interim franchises, as well as to all nonrenewals of franchise relationships.

A. How Much Notice Is Required

In most cases, your supplier must give you notice of termination or non-renewal at least 90 days before the termination or nonrenewal takes effect.

In circumstances where it would not be reasonable for your supplier to give you 90 days notice, he must give you notice as soon as he can do so. In addition, if the franchise involves leased marketing premises, your supplier may not establish a new franchise relationship involving the same premises until 30 days after notice was given to you or the date the termination or nonrenewal takes effect, whichever is later. If the franchise agreement permits, your supplier may repossess the premises and, in reasonable circumstances, operate them through his employees or agents.

If the termination or nonrenewal is based upon a determination to withdraw from the marketing of motor fuel in the area, your supplier must give you notice at least 180 days before the termination or nonrenewal takes effect.

B. Manner and Contents of Notice

To be valid, the notice must be in writing and must be sent by certified mail or personally delivered to you. It must contain:
  (1) A statement of your supplier's intention to terminate the franchise or not to renew the franchise relationship, together with his reasons for this action;
  (2) The date the termination or non-renewal takes effect; and
  (3) A copy of this summary.

IV. Trial Franchises and Interim Franchises

The following is a description of the special requirements that apply to trial and interim franchises.

A. Trial Franchises

A trial franchise is a franchise, entered into on or after June 19, 1978, in which the franchisee has not previously been a party to a franchise with the franchisor and which has an initial term of 1 year or less. A trial franchise must be in writing and must make certain disclosures, including that it is a trial franchise, and that the franchisor has the right not to renew the franchise relationship at the end of the initial term by giving the franchisee proper notice.

The unexpired portion of a transferred franchise (other than as a trial franchise, as described above) does not qualify as a trial franchise.

In exercising his right not to renew a trial franchise at the end of its initial term, your supplier must comply with the notice requirements described above under the heading "Notice Requirements for Termination or Nonrenewal."

B. Interim Franchises

An interim franchise is a franchise, entered into on or after June 19, 1978, the duration of which, when combined with the terms of all prior interim franchises between the franchisor and the franchisee, does not exceed three years, and which begins immediately after the expiration of a prior franchise involving the same marketing premises which was not renewed, based on a lawful determination by the franchisor to withdraw from marketing activities in the geographic area in which the franchisee operates.

An interim franchise must be in writing and must make certain disclosures, including that it is an interim franchise and that the franchisor has the right not to renew the franchise at the end of the term based upon a lawful determination to withdraw from marketing activities in the geographic area in which the franchisee operates.

In exercising his right not to renew a franchise relationship under an interim franchise at the end of its term, your supplier must comply with the notice requirements described above under the heading "Notice Requirements for Termination or Nonrenewal."

V. Your Legal Rights

Under the enforcement provisions of the Act, you have the right to sue your supplier if he fails to comply with the requirements of the Act. The courts are authorized to grant whatever equitable relief is necessary to remedy the effects of your supplier's failure to comply with the requirements of the Act, including declaratory judgment, mandatory or prohibitive injunctive relief, and interim equitable relief. Actual damages, exemplary (punitive) damages under certain circumstances, and reasonable attorney and expert witness fees are also authorized. For a more detailed description of these legal remedies you should read the text of the Act. 15 U.S.C. Sections 2801-2806.

VI. Waiver of Rights and Applicable State Law

Your supplier may not require, as a condition of entering into or renewing the franchise relationship, that you relinquish or waive any right that you have under this or any other Federal law or applicable State law. In addition, no provision in a franchise agreement would be valid or enforceable if the provision specifies that the franchise would be governed by the law of any State other than the one in which the principal place of business for the franchise is located.

Further Discussion of Title I--Definitions and Legal Remedies

I. Definitions

Section 101 of the Petroleum Marketing Practices Act sets forth definitions of the key terms used throughout the franchise protection provisions of the Act. The definitions from the Act which are listed below are of those terms which are most essential for purposes of the summary statement. (You should consult section 101 of the Act for additional definitions not included here.)

A. Franchise

A ``franchise'' is any contract between a refiner and a distributor, between a refiner and a retailer, between a distributor and another distributor, or between a distributor and a retailer, under which a refiner or distributor (as the case may be) authorizes or permits a retailer or distributor to use, in connection with the sale, consignment, or distribution of motor fuel, a trademark which is owned or controlled by such refiner or by a refiner which supplies motor fuel to the distributor which authorizes or permits such use. The term ``franchise'' includes any contract under which a retailer or distributor (as the case may be) is authorized or permitted to occupy leased marketing premises, which premises are to be employed in connection with the sale, consignment, or distribution of motor fuel under a trademark which is owned or controlled by such refiner or by a refiner which supplies motor fuel to the distributor which authorizes or permits such occupancy. The term also includes any contract pertaining to the supply of motor fuel which is to be sold, consigned or distributed under a trademark owned or controlled by a refiner, or under a contract which has existed continuously since May 15, 1973, and pursuant to which, on May 15, 1973, motor fuel was sold, consigned or distributed under a trademark owned or controlled on such date by a refiner. The unexpired portion of a transferred franchise is also included in the definition of the term.

B. Franchise Relationship

The term "franchise relationship" refers to the respective motor fuel marketing or distribution obligations and responsibilities of a franchisor and a franchisee which result from the marketing of motor fuel under a franchise.

C. Franchisee

A "franchisee" is a retailer or distributor who is authorized or permitted, under a franchise, to use a trademark in connection with the sale, consignment, or distribution of motor fuel.

D. Franchisor

A "franchisor" is a refiner or distributor who authorizes or permits, under a franchise, a retailer or distributor to use a trademark in connection with the sale, consignment, or distribution of motor fuel.

E. Marketing Premises

"Marketing premises" are the premises which, under a franchise, are to be employed by the franchisee in connection with the sale, consignment, or distribution of motor fuel.

F. Leased Marketing Premises

"Leased marketing premises" are marketing premises owned, leased or in any way controlled by a franchisor and which the franchisee is authorized or permitted, under the franchise, to employ in connection with the sale, consignment, or distribution of motor fuel.

G. Fail to Renew and Nonrenewal

The terms "fail to renew" and "nonrenewal" refer to a failure to reinstate, continue, or extend a franchise relationship (1) at the conclusion of the term, or on the expiration date, stated in the relevant franchise, (2) at any time, in the case of the relevant franchise which does not state a term of duration or an expiration date, or (3) following a termination (on or after June 19, 1978) of the relevant franchise which was entered into prior to June 19, 1978 and has not been renewed after such date.

II. Legal Remedies Available to Franchisee

The following is a more detailed description of the remedies available to the franchisee if a franchise is terminated or not renewed in a way that fails to comply with the Act.

A. Franchisee's Right to Sue

A franchisee may bring a civil action in United States District Court against a franchisor who does not comply with the requirements of the Act. The action must be brought within one year after the date of termination or nonrenewal or the date the franchisor fails to comply with the requirements of the law, whichever is later.

B. Equitable Relief

Courts are authorized to grant whatever equitable relief is necessary to remedy the effects of a violation of the law's requirements. Courts are directed to grant a preliminary injunction if the franchisee shows that there are sufficiently serious questions, going to the merits of the case, to make them a fair ground for litigation, and if, on balance, the hardship which the franchisee would suffer if the preliminary injunction is not granted will be greater than the hardship which the franchisor would suffer if such relief is granted.

Courts are not required to order continuation or renewal of the franchise relationship if the action was brought after the expiration of the period during which the franchisee was on notice concerning the franchisor's intention to terminate or not renew the franchise agreement.

C. Burden of Proof

In an action under the Act, the franchisee has the burden of proving that the franchise was terminated or not renewed. The franchisor has the burden of proving, as an affirmative defense, that the termination or nonrenewal was permitted under the Act and, if applicable, that the franchisor complied with certain other requirements relating to terminations and nonrenewals based on condemnation or destruction of the marketing premises.

D. Damages

A franchisee who prevails in an action under the Act is entitled to actual damages and reasonable attorney and expert witness fees. If the action was based upon conduct of the franchisor which was in willful disregard of the Act's requirements or the franchisee's rights under the Act, exemplary (punitive) damages may be awarded where appropriate. The court, and not the jury, will decide whether to award exemplary damages and, if so, in what amount.

On the other hand, if the court finds that the franchisee's action is frivolous, it may order the franchisee to pay reasonable attorney and expert witness fees.

E. Franchisor's Defense to Permanent Injunctive Relief

Courts may not order a continuation or renewal of a franchise relationship if the franchisor shows that the basis of the non-renewal of the franchise relationship was a determination made in good faith and in the normal course of business:
    (1) To convert the leased marketing premises to a use other than the sale or distribution of motor fuel;
    (2) To materially alter, add to, or replace such premises;
    (3) To sell such premises;
    (4) To withdraw from marketing activities in the geographic area in which such premises are located; or
    (5) That the renewal of the franchise relationship is likely to be uneconomical to the franchisor despite any reasonable changes or additions to the franchise provisions which may be acceptable to the franchisee.

In making this defense, the franchisor also must show that he has complied with the notice provisions of the Act.

This defense to permanent injunctive relief, however, does not affect the franchisee's right to recover actual damages and reasonable attorney and expert witness fees if the nonrenewal is otherwise prohibited under the Act.

Issued in Washington, D.C. on June 12, 1996.
Marc W. Chupka,
Acting Assistant Secretary for Policy.
[FR Doc. 96-16124 Filed 6-24-96; 8:45 am]



**CERTIFIED MAIL**

7016 1370 0001 0707 2767

Louay Alani
Gas CafFuels, LLC
Catch 26, LLC
2602S West Grand Avenue
Ingleside, IL 60041

HARRITON & FURRER, LLP
ATTORNEYS AND COUNSELORS AT LAW
84 Business Park Drive
Suite 302
Armonk, New York 10504

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Louay Aron,
Gaslcap Fuels, LLC
Catch26, LLC
2602 S West Grand Ave.
Ingleside, IL 60041

9590 9402 2233 6193 9023 58

2. Article Number *(Transfer from service label)*

7016 1370 0001 0707 2767

PS Form 3811, July 2015 PSN 7530-02-000-9053

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X _____ ☐ Agent ☐ Addressee

B. Received by *(Printed Name)*

C. Date of Delivery  7/1/0

D. Is delivery address different from item 1? ☐ Yes
   If YES, enter delivery address below: ☐ No

3. Service Type
☐ Priority Mail Express®
☐ Adult Signature          ☐ Registered Mail™
☐ Adult Signature Restricted Delivery ☐ Registered Mail Restricted Delivery
☐ Certified Mail®          ☐ Return Receipt for Merchandise
☐ Certified Mail Restricted Delivery ☐ Signature Confirmation™
☐ Collect on Delivery      ☐ Signature Confirmation Restricted Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
☐ Insured Mail Restricted Delivery (over $500)

Domestic Return Receipt

---

**U.S. Postal Service™**
**CERTIFIED MAIL® RECEIPT**
*Domestic Mail Only*

For delivery information, visit our website at *www.usps.com®*.

OFFICIAL USE

Certified Mail Fee
$

Extra Services & Fees *(check box, add fee as appropriate)*
☐ Return Receipt (hardcopy)          $
☐ Return Receipt (electronic)        $
☐ Certified Mail Restricted Delivery $
☐ Adult Signature Required           $
☐ Adult Signature Restricted Delivery $

Postmark
Here

Postage
$

Total Postage and Fees
$

Sent To  Louay Aron Gaslcaptic Is LLC Catch
Street and Apt. No., or PO Box No.  26025 West Grand Av.
City, State, ZIP+4®  Ingleside, IL 60041

7016 1370 0001 0707 2762

PS Form 3800, April 2015 PSN 7530-02-000-9047    See Reverse for Instructions



First-Class Mail
Postage & Fees Paid
USPS
Permit No. G-10

USPS TRACKING #

9590 9402 2233 6193 9023 58

United States
Postal Service

• Sender: Please print your name, address, and ZIP+4® in this box•

Harritony Furer, LLP
84 Business Park Drive
Suite 302
Armonk, NY 10504

capl-Algni